UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____  x

JOHN A. GENOVESE, Individually and On
Behalf of All Others Similarly Situated,

                      Plaintiff,

     vs.

STEPHEN B. ASHLEY, DANIEL H. MUDD,
STEPHEN M. SWAD and ROBERT J.
LEVIN,

                 Defendants.

_____  x

: Civil Action No. 08-cv-7831
:
: CLASS ACTION
:
: COMPLAINT FOR VIOLATION OF THE
: FEDERAL SECURITIES LAWS
:
:
:
:
:
:
:
:
: DEMAND FOR JURY TRIAL

**INTRODUCTION**

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Federal National Mortgage Association ("Fannie Mae" or the "Company") between November 16, 2007 and September 5, 2008 (the "Class Period"), against certain of Fannie Mae's officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2. Fannie Mae is a government-sponsored enterprise of the United States federal government. It is a shareholder-owned corporation authorized to make loans and loan guarantees. It is the leading market-maker in the U.S. secondary mortgage market, which helps to replenish the supply of money for mortgages and enables money to be available for housing purchases. Fannie Mae provides funds to mortgage lenders through the purchase of mortgage assets, and issues and guarantees mortgage-related securities that facilitate the flow of funds into the mortgage market in the United States.

3. On September 20, 2004, the Office of Federal Housing Enterprise Oversight ("OFHEO") announced that Fannie Mae was under investigation for its accounting practices. OFHEO released a report on September 22, 2004, alleging widespread accounting errors, including shifting of losses so senior executives could earn bonuses. Subsequently, on December 6, 2006, the Company announced $6.3 billion in restated earnings.

4. On May 23, 2006, the SEC and OFHEO announced a $400 million settlement with Fannie Mae for accounting violations. A civil class action on behalf of shareholders is pending, as is an OFHEO action against Chief Executive Officer Franklin D. Raines, Chief Financial Officer J. Timothy Howard, and the former Controller Leanne G. Spencer to recoup more than $115 million in bonus payments and about $100 million in penalties for their involvement in the accounting scandal.

5.	In the wake of this scandal, new management overhauled and improved Fannie Mae's internal controls with the oversight of OFHEO. Then, just as those changes were nearly complete, the U.S. housing and credit markets took a well-publicized turn for the worse in the spring and summer of 2007. This downturn decreased the value of the mortgage-backed securities held by Fannie Mae as the chance of homeowner defaults increased. It also increased the likelihood that Fannie Mae would have to make good on its guarantees of mortgage-backed securities held by others. This simultaneous decline in assets and increase in liabilities rendered the Company massively undercapitalized.

6.	Accordingly, Fannie Mae needed to raise capital. Given the state of the credit markets and the large amount needed, such a capital raise would involve the issuance of new shares, either common or preferred. Common shares confer an ownership interest in a company, the right to vote on certain matters, and discretionary dividends. Preferred shares confer an ownership interest, normally have no voting rights, but, most importantly, generally have a fixed dividend. In that respect, they are similar to corporate bonds, which normally pay a fixed return.

7.	Raising capital through the issuance of common shares has the unfortunate effect of diluting the ownership interest of current shareholders. The anticipated dilution from a stock issuance can thus depress the price of a stock even before it occurs. If the stock price slumps due to anticipated dilution, the issuer then has to issue even more shares to raise the same amount of capital.

8.	Raising capital through the issuance of preferred shares is generally less dilutive than issuing common shares, but if investors know that a company is highly undercapitalized, they will demand a higher dividend or other compensation in the structure of the securities.

9.	Thus, when defendants realized that Fannie Mae would need to raise capital in the fall of 2007, they were in a bind. If they honestly disclosed Fannie Mae's massive capital needs, the

Company's stock price would plummet and they would have to either issue even more common stock to raise the necessary capital, which would likely drive the stock price down further, or pay burdensome dividends in order to sell preferred shares. Accordingly, defendants falsely misrepresented the Company's capital needs, allowing Fannie Mae to raise $7 billion in the fourth quarter of 2007 by issuing preferred shares. Afterward, defendants assured investors that there would be no further dilutive capital raises.

10.     Despite assuring investors that the Company did not need to raise further capital after December of 2007, defendants announced another $6.5 billion capital raise in May of 2008. The December 2007 capital raise had improved Fannie Mae's position so that this second capital raise could be accomplished on much more favorable terms than if all of the capital had been raised at the same time. After the May 2008 capital raise, defendants represented that the Company had sufficient capital to withstand a worst-case scenario.

11.     On July 7, 2008, a financial analyst at Lehman Brothers published a report suggesting that Fannie Mae might need to raise as much as $46 billion in capital, causing the Company's stock price to plummet 16% in a single trading day.

12.     Following that disclosure, former St. Louis Federal Reserve Board President, William Poole, suggested that Fannie Mae was nearly insolvent and *The New York Times* disclosed that the federal government was making plans to place the Company into a conservatorship. Then, on July 13, 2008, the Treasury Department announced that it was making a temporary line of credit available to Fannie Mae and would purchase an equity stake if necessary to provide more capital. From July 7 through July 14, 2008, Fannie Mae's stock price declined over 48%.

13.     Finally, on Sunday, September 7, 2008, in the biggest government bail out in U.S. history, federal regulators seized control of Fannie Mae.

14. On September 8, 2008, Fannie Mae stock opened at $1.91 per share, down from a close of $7.04 per share on September 5, 2008, a 72% decline.

15. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) The decline in the U.S. housing market rendered Fannie Mae undercapitalized;

(b) Fannie Mae's December 2007 capital raise did not meet its capital needs;

(c) Fannie Mae's May 2008 capital raise did not meet its capital needs;

(d) Although Fannie Mae had more capital than its regulator required, it did not have "surplus capital" as defendants claimed; and

(e) Fannie Mae's publicly disclosed financial results misrepresented the financial condition of the Company.

## JURISDICTION AND VENUE

16. Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

17. Venue is proper here pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District. Fannie Mae has a substantial presence in New York. Many of the acts and transactions giving rise to the violations of law complained of occurred here.

18. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

19.     Plaintiff John A. Genovese purchased Fannie Mae securities as described in the attached certification and was damaged thereby.

20.     Defendant Stephen B. Ashley ("Ashley") is, and at relevant times was, Chairman of the Board of Fannie Mae.  Ashley received over $500,000 in compensation from Fannie Mae in 2007.

21.     Defendant Daniel H. Mudd ("Mudd") is, and at all relevant times was, President, Chief Executive Officer ("CEO") and a director of Fannie Mae.  Mudd received over $14 million in compensation from Fannie Mae in 2006 and over $12 million in 2007.

22.     Defendant Stephen M. Swad ("Swad") was, at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Fannie Mae until his resignation on August 28, 2008.  Swad received over $4.8 million in compensation from Fannie Mae in 2007.

23.     Defendant Robert J. Levin ("Levin") was at relevant times Executive Vice President and Chief Business Officer of Fannie Mae.  Levin received over $9.5 million in compensation from Fannie Mae in 2006 and over $8.4 million in 2007.

24.     Defendants Ashley, Mudd, Swad and Levin (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Fannie Mae's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e*., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that

the positive representations being made were then materially false and misleading. In addition, the Individual Defendants were motivated to misrepresent Fannie Mae's financial condition by their generous compensation packages as set forth above. During the Class Period, defendants knew that if Fannie Mae's true financial condition was disclosed, the U.S. government would be forced to intervene and that any such intervention would entail increased regulatory scrutiny of the Company, including executive compensation, and that is exactly what happened. As part of the federal bail-out of Fannie Mae, Congress created a new regulator with the power to approve, disapprove, or modify executive compensation.

### FRAUDULENT SCHEME AND COURSE OF BUSINESS

25.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Fannie Mae. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Fannie Mae publicly traded securities was a success, as it: (i) deceived the investing public regarding Fannie Mae's prospects and business; (ii) artificially inflated the prices of Fannie Mae publicly traded securities; and (iii) caused plaintiff and other members of the Class to purchase Fannie Mae publicly traded securities at inflated prices.

### BACKGROUND

26.     Fannie Mae is the nation's largest source of financing for home mortgages. The U.S. Congress chartered Fannie Mae in 1968 for the purpose of providing liquidity in the secondary mortgage market in order to increase the availability and affordability of homeownership for low, moderate and middle-income Americans. Although created by Congress, the U.S. government did not guarantee, directly or indirectly, Fannie Mae's securities or other obligations. Fannie Mae is a private, shareholder-owned company and its common stock is publicly traded on the New York Stock Exchange ("NYSE") under the symbol "FNM."

27.     Congress's central idea behind creating Fannie Mae and Freddie Mac was that they would encourage home ownership by buying mortgages from banks – freeing up banks' limited capital and therefore allowing the banks to make more loans.  The purchase also relieved the banks of both the credit risk (the risk the holder of the loan might default) and the interest rate risk (the risk that the interest rates might rise during the life of the loan).  Fannie Mae and Freddie Mac have several advantages over other banks, including that they are exempt from state and local taxes, they have less stringent capital requirements than banks, and the U.S. Treasury was permitted to buy $2.25 billion of each company's debt in case of possible default.  Also, their cost of capital is kept low by the market's belief that the U.S. government would never let them default, even though the U.S. government does not formally guarantee their debt.

28.     Fannie Mae operates exclusively in the secondary mortgage market and does not loan money directly to consumers.  Fannie Mae makes its money in two major ways.  The first and more conservative way is its credit guaranty business.  In this part of its business, Fannie Mae gets a fee for guaranteeing the payments on the mortgages it buys, which it then re-sells to investors, usually in the form of mortgage-backed securities ("MBS"), *i.e.*, beneficial interests in pools of mortgage loans or in other mortgage-related securities issued by Fannie Mae.  Fannie Mae receives fees for its guaranty of timely payment of principal and interest payments due to certificate holders on the MBS it issues.  Fannie Mae typically shares the credit risk on the underlying mortgages with third parties such as the lenders that originated the mortgages and private mortgage insurance companies.

29.     The second and more aggressive way that Fannie Mae makes money is its portfolio investment business.  In this part of its business, Fannie Mae holds the mortgage loan and mortgage-related securities and other investments that it purchases from commercial banks, savings and loan associations, mortgage companies, securities dealers and other investors and it also purchases short-

term, non-mortgage assets for liquidity and investment purposes. Fannie Mae funds these portfolio purchases by issuing short- and long-term debt and by selling debt securities to domestic and international capital market investors. Fannie Mae profits to the extent that the yield on the mortgage assets and other investments in its portfolio exceed its low cost of capital (the cost of the debt securities it issued to fund those portfolio investments). Since 1995, Fannie Mae's portfolio has grown an average of 20% a year.

## DEFENDANTS' PRE-CLASS PERIOD STATEMENTS

30. On November 9, 2007, Fannie Mae issued a press release entitled "Fannie Mae Files 2007 Quarterly Reports with the SEC – Company Returns to Current Financial Reporting," which stated in part:

> Today, Fannie Mae is reporting results for the first, second and third quarters of 2007 in its quarterly reports with the U.S. Securities and Exchange Commission (SEC), marking its return to current financial reporting.
>
> Summary of Results – January through September 2007
>
> - In the first three quarters of 2007, net income was $1.5 billion, compared with $3.5 billion in the first three quarters of 2006
>
> - Diluted earnings per share (EPS) was $1.17 for the first three quarters of 2007, compared with $3.16 per share in the first three quarters of 2006
>
> \* \* \*
>
> "During the last year, we vastly reduced our material weaknesses in internal controls, expanded our risk-management functions, reduced our headcount, and cut our operating expenses," Mudd said. "The company is in solid shape to support the market, and is in better shape to benefit when the market correction ends."
>
> \* \* \*
>
> Fannie Mae's core capital in the third quarter was $41.7 billion, $2.3 billion above the level mandated by the OFHEO-directed 30 percent capital surplus requirement.
>
> \* \* \*

**Subprime and Alt-A Securities**

Fannie Mae holds private-label mortgage securities (PLS) backed by subprime or Alt-A loans. Of the total $76.2 billion of such PLS on its books, $42.4 billion are backed by subprime loans and $33.8 billion are backed by Alt-A loans.

About $14 billion of the company's subprime PLS are classified as trading assets, and as such are marked to market through the "Unrealized Gains (Losses) on Trading Securities, Net" on the income statement. The company recorded a loss of approximately $300 million in the first nine months of the year on these trading-classified subprime PLS, reflecting a decline in the estimated fair value of the securities. The remaining subprime-backed private-label securities on the company's books, which total $28 billion and are classified as available for sale, have an unrealized loss on September 30 of about $600 million.

About $5 billion of the company's Alt-A PLS are classified as trading assets. The mark-to-market loss on these trading securities was approximately $100 million in the first nine months of the year, also reflecting a decline in the estimated fair value of the securities. The remaining $29 billion of Alt-A PLS on the company's books, which are classified as available for sale, have an unrealized loss on September 30 of approximately $300 million.

The unrealized losses on these subprime and Alt-A securities, totaling about $900 million, reflects current market values of these securities and is included on an after-tax basis in Accumulated Other Comprehensive Loss for the first nine months of the year. We have not recorded any impairment on these securities, as they continue to be investment-grade and we have the intent to hold these securities until the unrealized loss is recovered or the securities mature.

\*     \*     \*

**Fair Value of Net Assets**

The fair value of net assets declined $8.7 billion, or 20 percent from $42.9 billion on December 31, 2006 to $34.2 billion on September 30, 2007. This decrease was primarily driven by the payment of $1.7 billion in dividends to shareholders, a net $100 million reduction in preferred stock outstanding, and a $4.5 billion decline in the fair value of the net guaranty assets, including related deferred tax assets. In addition, there was an approximately $4.5 to $5.0 billion decline, including related tax effects, in the fair value of the company's net portfolio assets due to wider mortgage-to-debt option adjusted spreads (OAS). Excluding the effect of capital transactions, Fannie Mae experienced a $7.0 billion decrease in the estimated fair value of net assets for the first nine months of 2007.

31.    On November 9, 2007, the Company filed its Form 10-Q for the first quarter of 2007,

which included the same financial results as previously reported.  The Form 10-Q also included a

certification by Mudd, which stated:

I, Daniel H. Mudd, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 of Fannie Mae (formally, the Federal National Mortgage Association);

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation over internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

32. Defendant Swad signed a nearly identical certification included in the Form 10-Q.

33. Additionally on November 9, 2007, the Company filed its Form 10-Qs for the second and third quarters of 2007, which included the same financial results as previously reported. The Form 10-Qs also contained virtually identical certifications by Mudd and Swad as contained in Fannie Mae's Form 10-Q for the first quarter of 2007, as cited above.

34. On November 9, 2007, on the Company's conference call, defendants made the following statements:

**Daniel H. Mudd, President & Chief Executive Officer**

\* \* \*

The third point, we're working to free up capital. As you know, in May 2006, our consent order with OFHEO imposed a 30% capital surcharge, as well as a limit on our mortgage portfolio as we work through our issues. Caps and capital, as you know, are basically the numerator and the denominator of the consent order limit on the business, and we need to address both. We now carry $11.4 billion in capital above the congressionally mandated minimum capital and $2.3 billion above the OFHEO-mandated 30% surcharge over that.

*     *     *

[Nandu Narayanan, Trident Investment Management – Analyst]

Okay. But in terms of subprime and Alt-A, you seem to have roughly about $400 billion, roughly, give or take, in exposure to those areas. In terms of what we've seen on the overall markets, the losses in those areas have been colossal, at least so far as market prices are concerned. Given your equity capital of $40 billion and given that most people are saying that this might be one of the worst housing markets since the Great Depression, because we've never had a national home price decline since the Great Depression, and given that with $40 billion of capital, you've got something in the order of $3 trillion of risk. You know, what do you see as the prognosis? Because obviously the assumptions you make about recessionary impact next year or so on are going to really substantially change your loss factors and everything else. I'd like to get your perspective on what your assumptions are, because obviously things could get a lot worse here.

[Mudd]

Okay, thank you for the question. Some of the numbers in your assumptions that are a little bit cross-wires with each other. But what I'll do is try to start with the notion, the question which is, we're in a tough market, we have some exposures. What if things get worse?

I start with the basic notion there is a fundamentally sound business model here and what we're talking about is, on the guarantee side of the book, earning fees that are, on average across the book, north of 20 basis points. I think 22 basis points is the last figure. We are projecting increasing losses in the 8% to 10% basis point, but there's still a lot of margin in that sound business model to cover.

Do we plan for all kinds of scenarios? Yes. Do we plan for scenarios that might be significantly worse than what we are projecting? Yes. Is that what we hold capital against? Yes. Is our total capital more than our risk-based capital? Yes. Is this a time to be conservative from a capital standpoint? Yes, it is. Is this a time to take these issues and these scenarios extremely seriously? Yes. Is this a time to make sure that we are beefing up all of our back-end resources to manage loss mitigation and foreclosures? Yes. Are we doing that? Yes.

Do we know what's going to happen? No. That's when I finally have to give you a no answer. But are we prepared for scenarios that are somewhat ahistorical? Yes.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD**

35.     On November 16, 2007, on the Company's conference call, defendants made the following statements:

[Brad Ball, Citigroup Investment Research]

Got it, okay. My final question has to do with your capital position and your internal view of capital adequacy. I understand that you're issuing another preferred, perhaps a trust preferred this morning. I don't have any details on that, but I wonder if you could clarify that? And then also talk about the decision to issue preferreds in this market at these rates when Dan just talked on Friday about how you have surplus excess capital.

[Mary Lou Christy, Senior Vice President – Investor Relations]

Brad, I appreciate that question and we'd like to follow up, but we really are not equipped right now on this call to go through that.

[Brad Ball]

Okay, so you can't talk about the preferreds, but can you talk about your assessment of capital adequacy?

[Stephen M. Swad, Executive Vice President & Chief Financial Officer]

We disclosed over $41 billion of capital as of September [30, 2007] and over $2 billion of excess. And I also want to highlight that we are currently in an environment where there are very profitable incremental investments in both of our major businesses, on the single-family side and on the capital market side, where we believe we can make investments and earn returns well above our cost of capital.

\*      \*      \*

[Howard Shapiro, Fox-Pitt, Kelton – Analyst]

Hi.  Thank you very much and thank you for holding on the call. Just a couple of questions. First of all, the SOP 03-03 charge, even though it's not how you manage your business, I just want to clarify, it would be reflected or it would affect your regulatory capital levels. Am I correct?

[Swad]

You are correct. Regulatory capital is based on GAAP and 03-3 is a GAAP requirement.

[Shapiro]

Okay, so if you were to have a very large charge of some magnitude, you could conceivably be undercapitalized, or your capital ratios would go below the 30% OFHEO surcharge; that is conceivable?

[Swad]

I think the way to think about it is, our capital is affected by GAAP earnings. SOP 03-3 is a component of GAAP earnings, as is our 22 basis point G fee revenue and growing. And to look at any one line item I don't think is the appropriate way to look at it. Just to remind you, we do have over $2 billion of excess above the minimum.

36. On December 4, 2007, the Company issued a press release entitled "Fannie Mae Announces Steps to Increase Capital; Plans Issuance of $7 Billion in Preferred Stock and Reduction in Common Stock Dividend." The release stated in part:

Fannie Mae announced today it plans to issue $7 billion of non-convertible preferred stock in one or more offerings in December. This financing will provide the company with additional capital to conservatively manage increased risk in the housing and credit markets, help meet its mission of providing affordability, liquidity and stability, and free up capital to pursue emerging growth opportunities.

In light of the planned preferred stock issuance, Fannie Mae's Board of Directors, at its regularly scheduled meeting in January, intends to reduce the company's quarterly common stock dividend beginning with the first quarter of 2008 by 30 percent from $0.50 per share to $0.35 per share.

"Fannie Mae has a responsibility to serve the mortgage market in good times and in times like these," said Daniel H. Mudd, President and Chief Executive Officer. "The steps we are taking today are designed to enable us to meet that responsibility with a comprehensive, conservative plan to serve the market and manage our capital. The market needs us to be there -- and we believe this plan will help us do that."

37. On December 6, 2007, the Company issued a press release entitled "Fannie Mae Prices $7 billion of Preferred Stock," which stated in part:

Fannie Mae today priced $7 billion of non-cumulative perpetual fixed-to-floating rate preferred stock, Series S (CUSIP 313586752). The preferred stock has a stated value of $25 per share, and the 280 million shares are expected to be issued on December 11, 2007.

\*       \*       \*

"We saw exceptional investor demand for this preferred offering," said David C. Benson, Senior Vice President and Treasurer. "This preferred stock issuance completes our previously announced capital raising program."

38.     On February 27, 2008, Fannie Mae reported its fourth quarter and full year 2007

financial results, in a release that stated in part:

> Fannie Mae today reported fourth quarter and full-year 2007 results and filed its
> annual report on Form 10-K with the Securities and Exchange Commission (SEC).

**2007 Overview**

- Net loss of $2.1 billion, or ($2.63) per diluted share, *vs. net* income of
  $4.1 billion, or $3.65 per diluted share in 2006.

- Credit-related expenses, including incremental additions to the
  allowance for loan losses and the reserve for guaranty losses of $5.0
  billion, vs. $783 million in 2006.

- Guaranty fee income of $5.1 billion in 2007, a 19.3 percent increase,
  from $4.3 billion in 2006. Fannie Mae's single-family guaranty book
  grew 15 percent to $2.6 trillion.

- Net interest income of $4.6 billion in 2007, a $2.2 billion decrease
  driven by higher relative borrowing costs.

- Derivatives fair value losses of $4.1 billion, vs. $1.5 billion in 2006,
  due to the impact of declining yields on the interest rate swaps used
  to hedge net assets.

- Combined loss allowance of $3.4 billion at Dec. 31, compared with
  $859 million on Dec. 31, 2006.

- Core capital of $45.4 billion at year end, compared with $42.0 billion
  at the end of 2006.

- Completion of the remediation of material weaknesses in accounting
  systems and controls, and all 81 requirements of the Consent Order.

                    *       *       *

"While our business has always been cyclical, Fannie Mae's credit loss
experience in this cycle reflects the significant decline in home prices in a number of
large regional markets and the growing number of borrowers struggling with their
mortgages," Mudd said. "Our strategy for moving through another tough year is to
protect and conserve our capital base, and control credit losses. We have also
increased our credit loss reserves. Finally, we will also provide liquidity to the
market by growing our guaranty business as we build a very strong credit book.
These steps will help us do our part to maintain a liquid, stable and affordable
mortgage market – and also position us well when the market recovers."

*    *    *

"In addition, we have completed the 81 requirements of the Consent Order, and we are in ongoing discussions with the Office of Federal Housing Enterprise Oversight, our regulator, regarding the 30 percent capital surplus requirement," he said. Swad added that all of the company's internal control material weaknesses dating from its 2004 restatement have now been fully remediated.

*    *    *

## Stockholders Equity and Core Capital

Stockholders' equity was $44.0 billion as of December 31, 2007, reflecting an increase of $2.5 billion, or 6 percent, from the December 31, 2006 level of $41.5 billion.

Core capital was $45.4 billion as of December 31, 2007, compared to $42.0 billion as of December 31, 2006. To maintain sufficient capital levels, Fannie Mae undertook several capital management actions in the fourth quarter of 2007. These capital management actions included the issuance of $7.8 billion in preferred stock, net of fees, managing the size of the balance sheet, and reducing the company's common stock dividend beginning with the first quarter of 2008. In addition, the company made other changes to business practices to reduce losses and expenses. Issuances of preferred stock in 2007 resulted in a material change in the mix and relative cost of Fannie Mae's core capital.

## Fair Value of Net Assets

Fannie Mae also reported a $7.9 billion decline in the fair value of net assets, from $43.7 billion at year-end 2006, to $35.8 billion at year-end 2007. Excluding $5.5 billion in net capital transactions, fair value declined by $13.4 billion. This decline was primarily attributable to a decrease in the fair value of net guaranty assets and the widening of option-adjusted spreads on net portfolio assets, as extraordinary illiquidity and concern about home price declines and credit disruptions in the market drove down the value of mortgage assets generally in 2007, especially in the fourth quarter. Fannie Mae expects periodic fluctuations in the fair value of net assets due to its business activities as well as changes in market conditions, interest rates, relative spreads between mortgage assets and debt, and implied volatility. As a long-term investor in mortgages, Fannie Mae expects a significant portion of the value relating to changes in option-adjusted spreads to return as the securities it holds mature at par.

*    *    *

## Subprime and Alt-A Securities

Fannie Mae holds private-label mortgage securities (PLS) and Fannie Mae-guaranteed securities backed by subprime or Alt-A mortgage assets. Of the total

- 16 -

$73.9 billion of such securities on its books, $41.4 billion are backed by subprime mortgage assets and $32.5 billion are backed by Alt-A loans.

About $14.4 billion, or 35 percent, of the company's subprime mortgage securities are classified as trading assets, and as such are marked to market through the "Investment Losses, Net" line item on the income statement.

The company recorded a loss of approximately $1.0 billion in 2007 on these trading-classified subprime securities, reflecting a decline in the estimated fair value of the securities. The remaining subprime securities on the company' books, which total $27.0 billion and are classified as available-for-sale, have an unrealized loss as of December 31, 2007, of about $2.3 billion.

About $4.6 billion, or 16 percent, of the company's Alt-A PLS are classified as trading assets. The company recorded a loss of approximately $350 million in 2007 on these trading-classified Alt-A PLS, reflecting a decline in the estimated fair value of the securities., The remaining Alt-A-backed PLS on the company's books, which total $27.9 billion and are classified as available-for-sale (AFS), have an unrealized loss as of December 31, 2007, of about $931 million.

The unrealized losses on the subprime and Alt-A securities classified as AFS, totaling about $3.3 billion, reflect the estimate of the current market values of these securities, based on prices obtained from third-party pricing services, and are included on an after-tax basis in Accumulated Other Comprehensive Loss. These securities continue to perform and Fannie Mae is receiving principal and interest payments on all of them.

39.     On February 27, 2008, the Company filed its Form 10-K for the full year 2007, which included the results for the fourth quarter of 2007, as previously reported. The Form 10-K also contained virtually identical certifications by Mudd and Swad as contained in Fannie Mae's Form 10-Q for the first quarter 2007, as cited above.

40.     On February 27, 2008, on the Company's earnings conference call, defendants made the following statements:

[Mudd]

Thank you. Thank you all for joining us today. Our 2007 results released this morning accurately portray the most challenging market facing Fannie Mae since the housing dislocation after World War II. At the same time, they also portray the major opportunities for Fannie Mae when we emerge on the other side of this period. The issue it seems to me is fundamentally how well we bridge our away across the

turbulence to what remains a promising future and a healthier market. We start this year long capital, long experience and talent and also long mortgages.

*       *       *

Let me take you through our priorities. The number one priority is capital. We want to stay long capital. 2007 was a tough year. 2008 will be tough as well. And 2009 we do not anticipate will be particularly rosy, so through this period, capital remains king and we want to remain long capital.

*       *       *

These new projections are based on our most recent market observations, observations that also, by the way, led to us boost our loan loss reserve by $2 billion in the fourth quarter of '07. That on top provision put our combined loss reserve at the end of the year at $3.4 billion which was a four-fold increase over the prior year.

Summary, based on everything we have seen since November, we have moved the dials somewhat to the more negative side, and are accordingly taking on a more conservative capital and business stance.

*       *       *

Start with capital. On the protect side, the plan is to maintain a cushion over our regulatory requirements at all times. As you know, we put ourselves in a better capital position last quarter by issuing $7.8 billion of preferred stock and by reducing our common stock dividend by 30% this quarter. One result is that we closed the year with more capital than we began the year. And while the dividend cut in particular was a tough choice, we felt that it was prudent in order to conserve the capital and protect the business. We also wanted the capital to pursue growth opportunities, especially emphasizing the capital efficient guaranty business, versus growth in the balance sheet. The guaranty book growth so far has outpaced portfolio growth in '07. We expect that will continue in '08. That's capital.

*       *       *

[Swad]

Let me finish up with a discussion on capital. Looking at slide 13, you can see a walk through of changes in our capital position. Our one source of capital in the fourth quarter was the issuance of preferred stock. Our uses of capital in the fourth quarter break down into three categories, first, our net loss used $3.6 billion of capital; second, we distributed $600 million to shareholders as dividends; and third, we used $2 billion of capital to support growth in both on and off balance sheet assets, including $700 million of capital used to support $116 billion increase in our MBS outstanding.

So turning to slide 14, you can see we ended 2007 with $45.4 billion in core capital, that's $13.4 billion above the statutory minimum and $3.9 million above the OFHEO-mandated 30% level. In addition, we have got approximately $50 billion of very short-term maturing assets, mainly bank deposits within our liquid investment portfolio against which we hold $1.6 billion in capital. We can reduce our capital requirement and thereby increase our capital surplus just by permitting these highly liquid assets to mature without replacement. So the $3.9 billion of stated access, plus 1.6 in capital applied to short-term assets is $5.5 billion, which I view as potential capital.

*      *      *

[Robert J. Levin, Executive Vice President and Chief Business Officer]

The next subject I would like to talk about is capital. Our operating philosophy for capital is to manage it to protect ourselves against market scenarios more adverse than we expect. It's a conservative approach to managing the capital. In this regard, we are putting more emphasis on the guaranty businesses, both Single Family and Multifamily than on the on-balance sheet portfolio which of all the businesses consumes the most capital. In January, the portfolio size declined slightly. Clearly by managing the size of our portfolio, including by purchasing fewer mortgage assets than liquidations, the portfolio is a lever to manage our capital, but what is really important here is we will constantly reassess our capital allocation throughout the business, throughout the year, which we expect will have some volatility.

*      *      *

[David Hochstim, Bear Stearns – Analyst]

I wonder if Peter is there, about the type of bridging opportunities that exist right now, in terms of wider OEF, even though your debt spreads are widening out and I guess, if you could talk a little bit about the prospect of getting some relief from the 30% capital surcharge from OFHEO and how you might think about deploying that capital to grow and accelerate the – make the bridge, I guess stronger and shorter. That's a start then I have a follow-up.

[Peter Niculescu, Executive Vice President, Capital Markets]

*      *      *

The investment opportunity is there but then there are investment opportunities throughout our businesses right now. And I will pass it on to Dan to talk about the capital surplus.

[Mudd]

Yes, David. I think there are two things, and I talked about them in my remarks. One is to be conservative in terms of protecting the capital that we have, but the other is to be aware that we are trying to build for the future. I think that investors should expect us through the period of this turmoil to manage our capital account very conservatively, with respect to dividends and buybacks. I think we need to be long capital and well, as I said, stay above those regulatory levels whether the requirements are in place or not. To go back to the numbers, we closed the fourth quarter with $45.5 billion of capital. That was $13.5 billion almost above the – the regulatory requirements – the statutory minimum – and about four above the OFHEO requirement.

So as you can see by doing the math there, there's about $13 billion above the statutory requirement. The 30% OFHEO requirement was put in place against those uncertainties from the restatement in '01 to '04. As I noted, I think we worked diligently and in very good cooperation with OFHEO to address all of those 81 remediation items, embodied, certainly in the 10-K, in the clean SOX opinion. And as you know, OFHEO made a statement today and we really welcome and appreciate Director Lockhart's comments, which I think lay a path for us to move through the consent order, but through that, to continue to manage the capital very conservatively, given the uncertainties in a troubled market. So we'll conserve capital. We will continue those discussions to access the capital that is there above the statutory minimum. And I think us being able to apply that capital to both sides of the equation I talked about, fulfilling our role as a guarantor and insurer, and in an environment that's taking losses but at the same time, to be able to provide liquidity to a market that really needs it, you know, is in, really, everybody's interest right now. I'm pleased that we are moving in that direction.

[Hochstim]

What I was wondering is, would it make sense – it would appear that the growth would be so accretive, wouldn't you have some interest in adding capital if you get relief, obviously from the 30%, that gives you that capacity.

*       *       *

[Mudd]

The way I would think about the capital piece of it is – what I try to do is create a number of different levers that we can operate in order to manage the capital account. When it made sense last year to be able to go in and access the preferred market, I think that put us in a good position going through the end of the year and going through the conditions you describe. At the same time, in various of our comments we talked about the liquid investment portfolio, which is above the – well above the required size. There's capital underneath that that could be accessed. If we liquidate at current speeds, Pete, I would say at $10 or $11 billion or so per month

out of the portfolio. That could be used to generate capital or that could be used to reinvest at an attractive rate. Right now, we see that there are more opportunities that are clearer, and hash out better for us on the guaranty side but we are running both businesses to be conservative through the crisis and successful in the longer term. . . .

[Niculescu]

　　　. . . No, **I think we're in a situation where we have meaningful capital surplus and we're intending to maintain that meaningful capital surplus throughout the housing crisis**. However long that lasts. And we'll be managing our activities, including our balance sheet in order to maximize returns our investors and maximize our liquid potential given the available capital that we have in the market place now.

　　　　　　　　*　　　*　　　*

[Brad Ball]

　　　Okay. And then, Dan I had a follow-up question on capital. I just wanted to be clear. It sounds like you are continuing to allocate each dollar of additional excess capital you have available to the part of the business that requires the least but has the best returns. So the guaranty business we just talked about. However, despite the fact that we may see accretive opportunities to invest capital in the retained portfolio, you are not in a position where would you say, go into the market, raise additional capital in order to invest there at this point in time. That's not part of your capital strategy?

[Mudd]

　　　That's – I probably would have said it about exactly the way you said it. That is our view. We have a number of levers that we can – that we can undertake that start with the operational activities that we have undertaken, that start with progress on the discussions around OFHEO – and access to that capital that – that continues what I think we're right now in a position where we keep that as a longer term option on the table, but **there are no current plans to go back to the market for capital** because we have all of those other levers that are turned on, producing capital, putting us into an increasingly – into a comfortable position based on where we are in the market right now.

41.　　　On May 6, 2008, Fannie Mae issued its results for the first quarter of 2008, in a press

release which stated in part:

Fannie Mae today reported financial results for the quarter ended March 31, 2008. The company reported a net loss of ($2.2 billion), compared with a fourth quarter 2007 net loss of ($3.6 billion). . . .  Core capital totaled $42.7 billion at the end of the quarter, $5.1 billion above the company's current regulatory requirements.

The company also announced its plan to raise $6 billion in new capital through public offerings of common stock, non-cumulative mandatory convertible preferred stock and non-cumulative, non-convertible preferred stock. The new capital will enable Fannie Mae to maintain a strong, conservative balance sheet, enhance long-term shareholder value, and provide stability to the secondary mortgage market.

Fannie Mae said that its regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), had lifted the May 2006 Consent Order, and would reduce the current OFHEO-directed requirement from 20 percent capital to 15 percent upon the successful completion of the company's capital-raising plan. The company said OFHEO also indicated its intention to reduce the capital surplus by an additional 5 percentage points to a 10 percent surplus requirement in September 2008, based upon the company's continued maintenance of excess capital well above OFHEO's regulatory requirement, and no material adverse change to the company's ongoing regulatory compliance.

As part of the company's announced plan to raise capital, Fannie Mae's Board of Directors said it intends to reduce the company's quarterly common stock dividend beginning with the third quarter of 2008 to $0.25 per share, which will make available approximately $390 million of capital annually.

\*      \*      \*

Mudd added, "The additional capital we're raising will bolster our "protect and grow" strategy – it will allow us to maintain a strong, conservative balance sheet through the housing correction, pursue growth opportunities to enhance long-term shareholder value, and provide liquidity and stability to the secondary market. Having a larger capital cushion will permit us to operate and grow from a position of strength."

\*      \*      \*

## Capital Update

Fannie Mae's stockholders' equity was $38.8 billion as of March 31, 2008, compared with $44.0 billion as of December 31, 2007.

Core capital as of March 31, 2008 was an estimated $42.7 billion, compared with $45.4 billion as of December 31, 2007. The company's capital exceeded the statutory minimum by $11.3 billion, or 36.2 percent, and the statutory minimum plus the OFHEO-directed 20 percent surplus by $5.1 billion, or 13.5 percent.

On March 19, 2008, OFHEO reduced the capital surplus requirement established by Fannie Mae's May 2006 Consent Order with OFHEO from 30 percent to 20 percent. OFHEO also announced that Fannie Mae was in full compliance with the Consent Order. In addition, OFHEO removed the limitation on the size of Fannie Mae's mortgage portfolio, effective March 1, 2008. Subsequent actions regarding the capital surplus requirement are described on page one of this release.

Capital-raising plan: Fannie Mae is raising $6 billion in new capital through underwritten public offerings of new securities. The company commences today two offerings totaling $4 billion of common stock and non-cumulative mandatory convertible preferred stock. This offering will be followed in the very near future by an offering of non-cumulative, non-convertible preferred stock.

Net proceeds of the offerings will be used for general corporate purposes, including to enable the company to maintain a strong, conservative balance sheet, enhance long-term shareholder value, and provide stability to the secondary mortgage market, as noted on page one of this release.

\*      \*      \*

Alt-A and Subprime Private-Label Securities. Fannie Mae recognized $1.1 billion in losses during the first quarter of 2008 on mortgage-related securities backed by Alt-A and subprime loans that were classified as trading securities.

In addition, the company recorded $52 million of other-than-temporary impairment on $751 million of unpaid principal balance of subprime private-label securities classified as available-for-sale (AFS). This decision was made after management concluded (based on credit analysis including internal stress test scenarios on these securities) that it was no longer probable that the company would collect all of the contractual principal and interest amounts due, or no longer intended to hold the securities until recovery. Gross unrealized losses related to Alt-A and subprime securities classified as AFS totaled $8.0 billion as of March 31, 2008, compared with $3.3 billion as of December 31, 2007, driven by widening credit spreads in the market.

\*      \*      \*

## Fair Value Update

Fair value of net assets: Fannie Mae also reported a $23.6 billion decline in the non-GAAP estimated fair value of its net assets, from $35.8 billion at year-end 2007 to $12.2 billion as of March 31, 2008. The widening of mortgage-to-debt spreads caused a decline of roughly $8.4 billion. In addition, the fair value of guaranty obligations increased by approximately $16.0 billion. This increase resulted both from an increase in the underlying risk in the company's credit guaranty book of business, as declining home prices continued to adversely affect mark-to-market loan-to-value ratios, and from an increase in the estimate of the risk premium required to take mortgage credit risk in the current market, as indicated by the pricing of new guaranty business.

## Changes in Fair Value Accounting

Fannie Mae's financial results for the first quarter of 2008 were affected by its adoption of the following new accounting standards relating to the valuation of the financial instrument it holds.

- *Fair Value Option.* In connection with its adoption of Statement of Financial Accounting Standards No. 159, *The Fair Option for Financial Assets and Financial Liabilities* (SFAS 159), effective January 1, 2008, Fannie Mae elected to report a larger portion of its financial instruments at fair value, with changes in the fair value of these instruments included in its results of operations. In connection with the company's election to report additional financial instruments at fair value, it now reports all changes in the fir value of its trading securities, debt and derivatives collectively in the "Fair value losses, net" line item of its condensed consolidated statement of operations.

- *Fair Value Measurements.* In connection with the company's adoption of *SFAS* No. 157, *Fair Value Measurements* (SFAS 157), on January 1, 2008, Fannie Mae implemented a prospective change in its method of measuring the fair value of the guaranty obligations it incurs when it enters into guaranty contracts. Accordingly, the company no longer recognizes losses or records deferred profit in its financial statements at inception of its guaranty conracts issued after December 31, 2007.

  This change had a favorable impact on the company's results of operations for the quarter. Although the company no longer recognizes losses at the inception of its guaranty contracts, it will continue to accrete previously recognized losses into its guaranty fee income over time until these losses have been fully amortized. The change in the company's method of measuring the fair value of its guaranty obligations contributed to a significant decline in the non-GAAP estimated fair value of its net assets as of March 31, 2008.

  \*      \*      \*

## Outlook

  \*      \*      \*

- Capital. Management believes that the additional capital being raised, as described in this release, will enable the company to pursue growth and investment opportunities while also maintaining a prudent capital cushion in a volatile and challenging market through 2008 and 2009. Although future credit conditions are difficult to predict, the company plans capital using stress scenarios that, among other things, assume credit losses that are significantly higher than its current estimates, including default rate assumptions developed from the company's experience with the economic conditions in California in the 1990s, extrapolated for most of the nation. Management believes that credit losses will increase in 2009 relative to 2008.

42.     On May 6, 2008, the Company filed its Form 10-Q for the first quarter of 2008, which included the same financial results as previously reported.  The Form 10-Q also contained virtually identical certifications by Mudd and Swad as contained in Fannie Mae's Form 10-Q for the first quarter of 2007, as cited above.

43.     On May 6, 2008, on the Company's first quarter 2008 earnings conference call, defendants made the following statements:

[Mudd]

[W]e're commencing the capital raise that has been much discussed recently. a total of $6 billion raised from a combination of preferred convertible and common, as well as dividend actions plus a continued release of regulatory capital will put us in the position to protect the balance sheet as the housing crisis plays itself out.  And as importantly, it will enable us to attack the full range of market opportunities without capital restrictions.

*          *          *

Let me now close out on the brief discussion of the capital plan. Our strategy for working through this period is to protect and grow. That means protecting the Company by building and conserving capital and setting aside the right amount of loss reserves as we continue to work to reduce foreclosures and credit losses. This strategy also means growing our business as we help stabilize the market and perform our mission. That also takes capital.

So, today, we're undertaking a plan to raise in total, $6 billion in new capital. We plan to raise this capital through public offerings of common convertible preferred and perpetual preferred securities. The roadshow for that starts today. Our Board of Directors also intends to reduce our common dividend in the right third quarter of this year by 29 percent to $0.25 a share a quarter.  Importantly, as I noted, our regulator, OFHEO, has said that it lifted our May 2006 consent order based on the remediation we've completed, and OFHEO also indicated it would reduce the capital surplus requirement to about half of what it was at year-end, when we complete this capital raise.

So, taking together, all of those factors mean that we will have more capital to protect the balance sheet, to grow the business, and to serve the market.  So, all told, including this prospective capital raise that we're undertaking starting today, we will go into the belly of this cycle with about $48 billion in core capital which is about $17 billion above our statutory capital level.

We've said before that this is the time to be long capital and this plan firmly gets us there. We plan to harness the capital we're raising for three goals – one, to attain a position of unquestioned capital strength; two, to pursue the best business opportunities we have seen without constricting capital; and three, to step out and play a major role in helping the market recover better and sooner and to the benefit of all investors in housing whether they be consumers or originators or realtors or homebuilders or investors in Fannie Mae.

You already know from participating in past calls that we have made huge investments in systems, infrastructure, people, and finance in order to create the foundation for a strong profitable business. Now, add to that the capital to protect and grow the Company through the downturn. And then, as we emerged from the housing crisis, you'll have a company that will hold a solid position at the center of a large critical market, a leading market share, and a role that remains humble and customer focused but is pivotal nonetheless. As the market turns and takes its move upward into the right, our numbers will respond in kind.

\*       \*       \*

[Levin]

The first point is that all three of our businesses are operating full bore. We have no capital rationing going on. Each business, the Portfolio business, the Single-Family business, and the Multifamily business, are pursuing attractive business opportunities and with our capital raise, should be able to continue to do so without being short capital.

\*       \*       \*

[David Hochstim]

Dan, I wonder could you just explain the link between the consent order and the remaining 15 percent capital surcharge. Why doesn't the removal of the consent order eliminate that surcharge completely?

\*       \*       \*

[Mudd]

What the change in terms of the excess capital requirement does is not to reduce the overall level of capital that we're holding. In fact, we are raising capital. As I pointed out in the call, David, we are well above the levels of minimum capital. I think both we and OFHEO and most everybody you would talk to in the market at this point agrees that it's prudent to be long capital. But as you restore that number back toward the original levels of capital, it provides us with additional flexibility to respond to the market on both sides.

\*       \*       \*

We are sizing our capital and we are managing our risk to reflect actually being – we have thousands of scenarios, but think about it broadly as four or five scenarios. One scenario is things get better. Not using that scenario. Another scenario is things stay flat. Not using that scenario. Another scenario is our prior version, which has, some declines in it, and the next one shows where we are right now. *We are sizing capital to reflect home price declines that go beyond that. And that overall decline then produces a peak to trough number of 15 to 19 percent national home price average. and again, to use the algorithm, that puts you in a 25% plus Case Schiller decline*.

\*     \*     \*

[Bob Napoli, Piper Jaffray – Analyst]

Last question on credit losses and peak credit losses and trying – in your base case or your most likely case where 13 to 17 basis points, this year, obviously you were at 12, so you're looking for losses to move up through the year. When do you think credit losses from your forecast of housing for this year and next year, when do you think credit losses peak and can you give a range on the peak? Is the peak, 20 to 30 is your best guesstimate today? Or where is that peak relative to what you're seeing in 2008, and when?

[Mudd]

. . . Revenue is up, market share up, customer penetration up, and we continue to see lots of opportunities for high-quality, well-priced assets.

We are raising $6 billion in capital, reducing the dividend, all to build capital to make sure we get through this belly in really impregnable shape. We will use this capital to protect the balance sheet through the downturn and we will use it to maximize these opportunities. We're happy that the regulator has helped us move back to a position that we've wanted to get to, of being in a more normal posture as a strongly regulated company but out from [under the] consent order and with some more capital to deploy in the market.

44.     On May 8, 2008, the Company issued a press release entitled "Fannie Mae Prices

Offerings of $2.25 billion of Common Stock and $2.25 billion of Mandatory Convertible Preferred

Stock." The release stated in part:

Fannie Mae today priced $2.25 billion, or 82 million shares, of a new offering of its common stock at $27.50 per share.

The company also announced that it priced $2.25 billion, or 45 million shares, of 8.75 percent Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 (CUSIP 313586745).

*    *    *

Net proceeds of the offerings will be used for general corporate purposes, including enabling the company to maintain a strong, conservative balance sheet, enhance long-term shareholder value, and provide stability to the secondary mortgage market.

45.     On May 13, 2008, the Company issued a press release entitled "Fannie Mae Prices Offering of $2 Billion of Preferred Stock," which stated in part:

Fannie Mae today priced $2 billion, or 80 million shares, of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, designated as Series T. The Series T preferred stock (CUSIP 313586737) has a stated value of $25 per share and a dividend rate of 8.25 percent per annum. Fannie Mae will have the option to redeem all or part of the preferred stock on or after May 20, 2013. It is expected to be issued on May 19, 2008.

Net proceeds of the offering will be used for general corporate purposes, including enhancing the company's capital position, providing additional market liquidity and pursuing new business opportunities.

## THE TRUTH BEGINS TO COME TO LIGHT

46.     On July 7, 2008, Lehman Brothers Equity Research published an analyst report stating that the Financial Accounting Standards Board was considering a new rule that may include removing the qualified special purpose entity concept from what is known as FAS 140, which would have the effect of requiring off-balance-sheet assets to be brought onto balance sheets. Fannie Mae had $2.27 trillion in off-balance-sheet MBS. If forced to bring those securities onto its balance sheets, Fannie Mae's capital requirements would jump by more than $46 billion.

47.     As a result of that disclosure, Fannie Mae's stock declined from a closing price on the previous trading day of $18.78 per share to $15.74 on July 7, 2008, a 16% decline, as artificial inflation came out of the stock price.

48.     On July 8, 2008, a FASB spokesman confirmed that there was no exception for Fannie Mae in the then-current draft of the proposed FAS 140 rule referenced in the Lehman Brothers analyst report.

49.     On July 9, 2008, *Bloomberg* reported that, despite having been given a credit rating of Aaa by Moody's Investors Service, credit default swaps tied to Fannie Mae were trading at prices implying a rating five levels lower, or A2.  *Bloomberg* quoted analyst Paul Miller at Friedman, Billings, Ramsey & Co., stating "Fannie and Freddie are going to have to raise more capital and nobody thinks they're going to be able to raise capital when they need to.  It's going to be very expensive."

50.     On July 9, 2008, Fannie Mae priced a new $3 billion issue of two-year benchmark notes at a yield of 3.272%, marginally higher than the coupon of 3.25%, an indication that investors were demanding a higher yield – and lower price – before they would buy the debt.  The spread, only 74 basis points more than treasuries, was the widest since Fannie Mae first sold two year notes in 2000 and triple what it paid in June 2006.

51.     On July 10, 2008, former St. Louis Federal Reserve Board President William Poole stated in an interview that Fannie Mae was technically insolvent.

52.     As a result of this disclosure, Fannie Mae's stock declined from a closing price the previous day of $15.31 per share to close at $13.20 per share on July 10, 2008, a 14% decline, as artificial inflation came out of the stock price.

53.     Also on July 10, 2008, *Business Week* stated in an article entitled "Fannie, Freddie Resume Their Free Fall":

> Fannie and Freddie are trapped in a vicious cycle.  The companies will have to raise capital through stock sales, and the multibillion-dollar amounts they have to raise could result in a massive dilution of shareholders' equity.  In anticipation, investors have been dumping the shares, driving their prices sharply lower.  And the devalued currency of Fannie and Freddie shares means they will have to sell even more shares.

54.     On July 11, 2008, *The New York Times* published an article titled "U.S. Weighs Takeover of Two Mortgage Giants," which stated in part:

Alarmed by the growing financial stress at the nation's two largest mortgage finance companies, senior Bush administration officials are considering a plan to have the government take over one or both of the companies and place them in a conservatorship if their problems worsen, people briefed about the plan said on Thursday.

55.     As a result of these disclosures, Fannie Mae's stock declined from a closing price the previous trading day of $13.20 per share to close at $10.25 per share on July 11, 2008, a 22% decline, as artificial inflation came out of the stock price.

56.     On July 11, 2008, the Company released a "Statement by Chuck Greener, Senior Vice President; on Fannie Mae's Capital Adequacy," which stated in part:

Fannie Mae raised $7.4 billion of additional capital in May, for a total of more than $14 billion in new capital since November of 2007. Our capital level is substantially above both our statutory minimum capital and the OFHEO-required 15 percent surplus over minimum capital. In fact, we have more core capital, and a higher surplus over our regulatory requirement, than at any time in this company's history.

As we work through this tough housing market, we are maintaining a strong capital base, building reserves for our credit losses, and generating solid revenues as our business continues to serve the market. We also have access to ample sources of liquidity, including access to the debt markets. The company issued more than $24 billion in debt this week alone, including a $3 billion Benchmark Notes® sale that was oversubscribed. In short, Fannie Mae remains well equipped to fulfill our critical role in the housing finance system, today and in the future. We will provide a full financial update and outlook when we report second-quarter results in early August.

57.     On July 13, 2008, Treasury Secretary Henry M. Paulson issued the following statement:

Fannie Mae and Freddie Mac play a central role in our housing finance system and must continue to do so in their current form as shareholder-owned companies. Their support for the housing market is particularly important as we work through the current housing correction. . . . GSE debt is held by financial institutions around the world. Its continued strength is important to maintaining confidence and stability in our financial system and our financial markets. Therefore we must take steps to address the current situation as we move to a stronger regulatory structure. In recent days, I have consulted with the Federal Reserve, OFHEO, the SEC, Congressional leaders of both parties and with the two companies to develop a three-part plan for immediate action. The President has asked me to work with Congress to act on this plan immediately. First, as a liquidity backstop,

the plan includes a temporary increase in the line of credit the GSEs have with Treasury. Treasury would determine the terms and conditions for accessing the line of credit and the amount to be drawn. Second, to ensure the GSEs have access to sufficient capital to continue to serve their mission, the plan includes temporary authority for Treasury to purchase equity in either of the two GSEs if needed. Use of either the line of credit or the equity investment would carry terms and conditions necessary to protect the taxpayer. Third, to protect the financial system from systemic risk going forward, the plan strengthens the GSE regulatory reform legislation currently moving through Congress by giving the Federal Reserve a consultative role in the new GSE regulator's process for setting capital requirements and other prudential standards. I look forward to working closely with the Congressional leaders to enact this legislation as soon as possible, as one complete package.

58.     As a result of this disclosure, Fannie Mae's stock declined from a closing price the previous trading day of $10.25 per share to close at $9.73 per share on July 14, 2008, a 5% decline, as inflation came out of the stock price.

59.     On July 30, 2008, President Bush signed a housing rescue bill which included a Fannie Mae bail out. Specifically, it provided Fannie Mae with an unlimited line of credit at the U.S. Treasury (increased from $2.25 billion) and authorized the Treasury to purchase shares in Fannie Mae if necessary.

60.     On August 8, 2008, Fannie Mae issued a press release entitled "Fannie Mae Reports Second Quarter 2008 Results; Net Loss of $2.3 billion; Credit-Related Expenses More Than Offset Higher Revenue and Fair Value Gains; Core Capital of $47 billion Exceeds Regulatory Requirements; Company to Take Additional Actions to Manage Capital; Will Eliminate Acquisitions of New Alt-A Business and Strengthen Credit Loss Mitigation; Quarterly Dividend Cut to $0.05 Per Share," which stated in part:

**Capital Conservation and Enhancement**

1.     **Reducing the common stock dividend** from $0.35 per share to $0.05 per share, effective for the third quarter, to preserve $1.9 billion in capital through 2009.

2. **Reducing annual operating** costs 10 percent by year end 2009 as the company drives the strategic priorities of credit risk management and revenue generation. Administrative expenses will have already been reduced approximately 35 percent, from $3.1 billion in 2006 to an estimated $2.0 billion in 2008.

3. **Increasing our guaranty fees**, including a 25 basis point increase in our adverse market delivery charge, as well as other risk-based pricing changes, announced this week.

4. **Managing the balance sheet** to ensure the most efficient use of capital. Providing market liquidity will be the priority for our portfolio activities, and purchases will be concentrated in high-spread assets to generate the maximum amount of revenue per dollar of risk capital. As a result, the company will balance profitable portfolio growth opportunities in the near term with prudent capital conservation through the current housing cycle.

## Credit Risk Management

1. **Improving underwriting guidelines to eliminate higher-risk loans**. Over 60 percent of our losses have come from a small number of products, but especially Alt-A loans. Through our recent underwriting changes, the volume of these products has declined more than 80 percent from their peak levels. We have already made underwriting changes to mitigate risk characteristics that drove those losses. After considered analysis, we will eliminate newly originated Alt-A acquisitions by year end.

2. **Increasing our workout ratio** from approximately 50 percent in 2007 to 56 percent in the first half of the year. The company has set a workout ratio goal of 60 percent by year end, reflecting a substantial expansion of its loss mitigation activities, personnel and initiatives.

3. **Ramping up defaulted loan reviews** to pursue recoveries from lenders, focusing especially on our Alt-A book. The objective is to expand loan reviews where the company incurred a loss or could incur a loss due to fraud or improper lending practices. To achieve this, we are increasing post-foreclosure loan reviews from 900 a month in January to 4,000 a month by the end of the year, expanding our quality-control reviews for targeted products and practices, and are on track to double our anti-fraud investigations this year. We expect this effort to increase our credit loss recoveries in 2008 and 2009.

4. **Augmenting our foreclosed property strategy**, including the opening of offices in Florida and California to closely manage the

sales of our properties in these states. We have expanded our network of firms to assist in property disposition to ensure we have adequate capacity to sell the additional properties we expect. To date, under this approach we have been able to process the increased volume of foreclosed property sales without an increase in cycle times or excessive price concessions. Finally, we are evaluating various proposals we have received from third parties involving the sale of properties in bulk transactions.

"In addition, we are in discussions with the Federal Housing Finance Agency (FHFA) regarding the capital and safety and soundness framework envisioned in the recently-enacted Federal Housing Finance Regulatory Reform Act of 2008. The FHFA Director has indicated that the May 2008 agreement with OFHEO and the current OFHEO-directed capital requirement continue to apply. At the same time, we will continue to work closely with the FHFA, the Federal Reserve, the Department of Treasury, Congress and our partners in the industry so that we continue to provide a critical, reliable source of mortgage funding and liquidity in the years to come," added Mudd.

61.     Then, on September 7, 2008, *MarketWatch* issued an article entitled "Washington takes over Fannie Mae, Freddie Mac – End of an era comes, as Paulson says equity buy wouldn't have been enough," which stated in part:

In the biggest government bailout in U.S. history, the Treasury said Sunday that regulators are seizing control of home mortgage giants Fannie Mae and Freddie Mac.

Under a sweeping plan, the two companies will be run by the government indefinitely, with the two current chief executives to be replaced and the government investing up to $100 billion in each firm to keep them solvent.

The Treasury said that stock in the company will continue to trade, although powers of stockholders will be suspended until government control ends.

In order to improve the availability of mortgages, Treasury will start buying Freddie and Fannie's mortgaged-backed debt in the open market. The companies will also end all lobbying of the government and eliminate dividends.

Together, Fannie Mae and Freddie Mac form the cornerstones of the U.S. mortgage market and own or guarantee almost half the home loans in the country's roughly $12 trillion mortgage market. Over the past year, the companies have recorded combined losses of around $14 billion.

The move puts the U.S. government at risk to lose tens of billions of dollars.

Burt Ely, a banking regulatory expert in Washington, said there was no way to know how much the takeover would ultimately cost the taxpayer.

"We're flying in the dark here," Ely said. A rough estimate may not be possible for a few months, he added.

**Necessary action**

The end for Fannie and Freddie's independence came shortly after 11:00 am, when Treasury Secretary Henry Paulson told reporters that a careful review of the two mortgage giant's books made it "necessary to take action."

James Lockhart, the head of Federal Housing Finance Agency which will now oversee Freddie and Fannie, said the recession in the housing market ultimately ate away at the two firms' capital.

"As house prices, earnings and capital have continued to deteriorate, Fannie and Freddie's ability to fulfill their mission has deteriorated. In particular, the capacity of their capital to absorb further losses while supporting new business activity is in doubt," Lockhart said.

There were reports that auditors called in by Treasury and FHFA had found accounting irregularities at the two firms and that their capital base was smaller than expected.

At first, Paulson had talked in terms of an equity investment in the two firms. But after the review, a full-scale takeover of the two firms was seen as the only option.

Federal Reserve Chairman Ben Bernanke said that he fully supported the government takeover.

"These necessary steps will help to strengthen the U.S. housing market and promote stability in our financial markets," Bernanke said.

**FHFA in charge, CEOs leaving**

Technically, the government placed the two companies in conservatorship.

The FHFA will assume the power of the board and management.

Paulson said the move won't eliminate Freddie and Fannie's common stock, but "does place common shareholders last in terms of claims on the assets of the enterprises."

Preferred stock shareholders will be "second, after the common shareholders, in absorbing losses," he said.

One quirk in the plan is that Treasury will allow Fannie and Freddie to actually increase their mortgage portfolios over the next year.

The move will also replace the chief executives of both Fannies Mae (FNMFannie Mae and Freddie Mac.

Fannie Mae Chief Executive Daniel Mudd and Freddie Mac CEO Richard Syron will leave their positions after a brief transitional period.

Mudd will be replaced by Herb Allison, the former vice chairman of Merrill Lynch, and the former chairman of the TIAA-CREF teachers' pension funds.

Syron will be replaced by David Moffett, who was the vice chairman and chief financial officer of U.S. Bancorp.

In essence, the plan is similar to a Chapter 11 bankruptcy that will give the two companies breathing room to reorganize.

Paulson said the plan was a "time out" to stabilize the two companies. Congress will have to decide their future role and structure, he said.

"Monday morning the business will open as normal, only with stronger backing for the holders of mortgage backed securities, senior debt and subordinated debt," Lockhart said

## Government buying stock, MBS

To support the plan, Treasury will purchase up to $100 billion in each company to ensure they maintain a positive net worth.

If the FHFA determines that Fannie and Freddie's liabilities have exceeded its assets under accounting rules, the Treasury will contribute cash capital to the firms to make up the difference, receiving senior preferred stock in return.

It will also buy mortgage-backed securities from the firms in the open market, with a lending facility held at the Federal Reserve Bank of New York.

Under the terms of the proposal, the government would make periodic injections of funds by buying either convertible preferred shares or warrants in the two companies as needed, as opposed to a large, up-front cost.

## Massive assets involved

The bailout involves total assets that would dwarf the savings-and-loan rescue in the 1980s that shook the banking sector to its core.

Fannie and Freddie hold roughly $1.5 trillion in direct debt, guarantees on which could be as large as $5 trillion as well as possible off-balance sheet obligations that could reach $3 trillion, according to recent estimates from Ladenburg Thalmann & Co.

Fannie Mae's market capitalization stands at $7.5 billion and Freddie Mac's is about $3.3 billion.

Together, Fannie Mae and Freddie Mac form the cornerstones of the U.S. mortgage market and own or guarantee almost half the home loans in the country's roughly $12 trillion mortgage market. Over the past year, the companies have recorded combined losses of around $14 billion.

Some reports estimated the government's cash injection ultimately could be between $15 billion and $20 billion.

"In the end, the ultimate cost to the taxpayer will depend on the business results of [Freddie and Fannie] going forward," Paulson said.

**Finally over**

The plan ends a long downward spiral for the firms, created to help expand home ownership and provide a secondary market for home loans.

Because they were created by government, the two firms enjoyed more favorable terms in the marketplace. Investors around the world viewed their debt as virtually risk-free.

Word of the Treasury Department takeover first came out late Friday, and sent the shares of both companies plunging in after-hours trading, with Fannie Mae giving up 25% of its value and Freddie Mac falling by about 20%.

Those losses only added to the misery that has already wiped out some 80% of the companies' share values this year.

Under the agreement, Treasury will immediately receive warrants to purchase common stock of each company representing 79.9% of the common stock of each firm.

Treasury will also receive $1 billion of senior preferred stock in each firm.

All dividends for preferred stockholder has been suspended, a move which prompted S&P to cut its rating on Fannie and Freddie's preferred stock to junk grade. . . .

Beginning at the end of the first quarter of 2010, the two firms will start repaying Treasury on a quarterly basis.

Fannie and Freddie's retained mortgage and mortgage-backed securities portfolio may not exceed $850 billion as of the end of 2009 and must decline by 10% per year until it reaches $250 billion.

The Treasury plan also helps the 12 Federal Home Loan Banks. Some of these banks have been lending large sums to mortgage firms this year and as a result, have been the focus of concern in the markets.

Under the agreement, these banks will be able to get loans from Treasury.

But Lockhart said he didn't foresee problems at the home loan banks.

"The Federal Home Loan Banks have performed remarkably well over the last year as they have a different business model than Fannie and Freddie and a different capital structure that grows as their lending activity grows. They are joint and severally liable for the bank system's debt obligations and all but one of the 12 are profitable," Lockhart said.

**Ripple effect**

The changes to Fannie and Freddie promises to have an impact on how Americans buy and sell houses for years to come.

When firms like Washington Mutual, Wachovia and other big banks make home loans, they sell them to Fannie and Freddie, who then package the loans into pools and resell them to investors, or hold them themselves.

The rise of the securitization market means some of the most toxic debt securities backed by risky loans have made their way around the global banking system.

Fannie and Freddie long enjoyed the implied support of the federal government that has allowed them access to capital in the market at advantageous terms.

Banks and thrifts are in the business of making loans, and there is no bigger loan the average U.S. consumer will take on than a mortgage. Without buyers like Fannie and Freddie, big mortgage lenders would be in even more trouble than they are. . . .

Banks and thrifts also hold more than $1 trillion in Fannie and Freddie bonds because they were considered as good as cash. Without a bailout, banks and thrifts would have to raise more capital because Fannie and Freddie debt would have to be written down or sold.

However, Paulson said that the federal banking agencies report only a "limited number" of small banks have holdings of Fannie and Freddie assets "that are significant compared to their capital."

The agencies called on banks worried that their capital would be diminished below regulatory standards to contact Washington so that restoration plans can be undertaken.

**End of an era**

Fannie Mae was created in 1938 as Congress attempted to grow the secondary mortgage market and expand home financings after the Great Depression.

Freddie Mac was formed in 1970 as a competitor and with the same intention in mind.

Fannie Mae and Freddie Mac provide liquidity in the mortgage market by investing in home loans made by banks and other financial institutions, insuring payment of those loans, and selling them into the secondary market.

But the two were generally allowed to have less capital in reserve than other financial firms, so when the mortgage bubble burst and the contagion spread from low-quality loans to the higher quality loans Fannie and Freddie deal with, they had less of safety net.

In recent months, investors and political figures fiercely debated the idea of a government takeover or some other form of rescue.

Critics of the idea – including many Republicans and longtime opponents of the two mortgage agencies – had argued the firms own mismanagement caused their downfall and should be allowed to fail.

However, damaging accounting scandals, questionable management, inadequate capital reserves and a crashing residential real estate market proved too much for even the Bush administration.

During an election year in which the housing market meltdown has become a central issue, the market lost confidence in the mortgage lenders and their financing costs rose to unsustainable levels.

Republican and Democratic leaders alike began to call for Washington to take greater steps to safeguard the capital structure of the government-sponsored enterprises

62. On September 8, 2008, Fannie Mae stock opened at $1.91 per share, down from a close of $7.04 per share on September 5, 2008, a 72% decline.

63. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) The decline in the U.S. housing market rendered Fannie Mae undercapitalized;

(b)     Fannie Mae's December 2007 capital raise did not meet its capital needs;

(c)     Fannie Mae's May 2008 capital raise did not meet its capital needs;

(d)     Although Fannie Mae had more capital than its regulator required, it did not have "surplus capital" as defendants claimed; and

(e)     Fannie Mae's publicly disclosed financial results misrepresented the financial condition of the Company.

## FANNIE MAE'S FALSE FINANCIAL REPORTING

64.     During the Class Period, defendants issued false financial reports which misrepresented the Company's financial condition and inflated the Company's reported net worth. Defendants improperly accounted for Fannie Mae's investments, deferred tax assets and guaranty obligations, thus overstating the Company's assets and understating its liabilities in order to avoid having the Company's net worth fall below the minimum capital amount required by regulators.

65.     The results issued during the Class Period were included in a Form 10-K and Forms 10-Q filed with the SEC. The results were also included in press releases disseminated to the public.

66.     Fannie Mae's financial statements were not a fair presentation of the Company's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

67.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need

not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

68. During the Class Period, defendants failed to properly account for Fannie Mae's impaired investments in violation of GAAP. A fundamental precept of GAAP is that impairment of financial securities that is deemed to be other than temporary should be recorded as a charge against earnings. This impairment includes credit risk, where borrowers are not expected to pay. FASB Statement of Financial Accounting Standards ("SFAS") No. 115, *Accounting for Certain Investments in Debt and Equity Securities*, ¶16, states in part:

> For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary. . . . For example, if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment shall be considered to have occurred. If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss).

(Footnote omitted.)

69. As of December 31, 2007, Fannie Mae held $74 billion in risky privately packaged, subprime and Alt-A mortgage securities. Fannie Mae only wrote down these risky investments by $4.6 billion or 6% at a time when large banking institutions were taking much more substantial write-downs. Moreover, Fannie Mae only recorded $1.4 billion of the write-down as a permanent write-down. The temporary adjustment was considered to be a mark-to-market adjustment and did not hurt Fannie Mae's net income or net worth. For the first six months of 2008, Fannie Mae recorded only an additional $714 million charge as a permanent write-down despite the fact that a good portion of Fannie Mae's portfolio was severely delinquent. Defendants failed to properly account for the Company's impaired investments, as doing so would have negatively affected Fannie Mae's net worth.

70.    Additionally, during the Class Period, defendants failed to properly account for Fannie Mae's deferred tax assets in violation of GAAP. SFAS No. 109 requires that a company must recognize its deferred income taxes. A deferred tax asset or liability is recognized for the estimated future tax effects attributable to temporary differences and tax carry forwards. Temporary differences result from timing differences between the value of assets or liabilities for financial accounting purposes and their value for tax purposes and from timing differences between the recognition of gains and losses in financial statements and their recognition in a tax computation.

71.    A deferred tax asset is reduced by a valuation allowance if "based on the weight of available evidence, it is *more likely than not* . . . that some portion or all of the deferred tax assets will not be realized." SFAS No. 109, ¶17(e) (emphasis in original). A company balances positive and negative evidence to determine whether or not it will generate enough income in the foreseeable future to realize its entire deferred tax asset. In making its determination, a company should consider the existence of cumulative losses in recent fiscal years, its operating results history, and adverse unsettled circumstances and forecasted future taxable income. "Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years." SFAS No. 109, ¶23.

72.    As of June 30, 2008, Fannie Mae's deferred tax asset had grown from $9.9 billion at the end of the third quarter 2007 to $20.6 billion. This amount represented a large portion of the Company's net worth. As of June 30, 2008, Fannie Mae's core capital was $50 billion, meaning that over 41% of the Company's core capital was composed of the Company's deferred tax asset. Despite all of the negative evidence concerning Fannie Mae's operations, defendants failed to record a valuation allowance against its deferred tax asset. Defendants failed to properly account for the Company's deferred tax assets as doing so would have negatively affected Fannie Mae's net worth.

73.     During the Class Period, defendants further failed to properly account for Fannie Mae's guaranty obligations in violation of GAAP.  In accounting for financial guarantees, a company is required to establish an allowance for guaranty obligations, *i.e.*, a reserve for the estimated amount of losses related to the guarantees.  GAAP, as set forth in SFAS No. 5, ¶8, states:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.      Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.      The amount of loss can be reasonably estimated.

(Emphasis in original.)

74.     Fannie Mae generates revenue by absorbing the credit risk of mortgage loans and mortgage-related securities in exchange for a guaranty fee.  The guarantees expose Fannie Mae to credit losses on the mortgages and mortgage-related securities.  As a result, Fannie Mae records a guaranty reserve to cover the expected amount of losses associated with its guaranty obligations.  As of June 30, 2008, Fannie Mae's guaranty book of business stood at $2.8 trillion.  On a "fair value" balance sheet, which involves valuing every asset and liability at current market value, Fannie Mae's guaranty obligations were valued at $59.8 million.  Nonetheless, Fannie Mae's obligations for the period were recorded for book purposes at $16.4 million despite the fact that a large amount of the guarantees were tied to risky subprime or Alt-A loans.  Defendants failed to properly account for the Company's guaranty obligations as doing so would have negatively affected Fannie Mae's net worth.

75. Due to these accounting improprieties, defendants presented Fannie Mae's financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e) The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance,

those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

76.     Further, the undisclosed adverse information is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## LOSS CAUSATION/ECONOMIC LOSS

77.     By misrepresenting Fannie Mae's financial statements, the defendants presented a misleading picture of the Company's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Fannie Mae's business was not as healthy as represented, defendants falsely concealed the extent of Fannie Mae's exposure to mortgage-related problems.

78. These claims of profitability caused and maintained the artificial inflation in Fannie Mae's stock price throughout the Class Period and until the truth about its future earnings was revealed to the market.

79. Defendants' false and misleading statements had the intended effect and caused Fannie Mae stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $40.69 per share.

80. As a direct result of defendants' admissions and the public revelations regarding the truth about Fannie Mae's profitability and its actual business prospects going forward, Fannie Mae's stock price plummeted 13.8%, falling from $15.31 per share on July 9, 2008 to close at $13.20 per share on July 10, 2008, a decline of $2.11 per share.

81. On July 11, 2008, Fannie Mae's stock price plummeted another 22%, falling from $13.20 per share on July 10, 2008 to close at $10.25 per share on July 11, 2008, a decline of $2.95 per share, and fell another $0.52 per share, or 5%, to $9.73 on July 14, 2008. Finally, on September 8, 2008, Fannie Mae's stock price opened at $1.91 per share from a close on September 5, 2008 of $7.04 per share, a 72% decline.

82. These drops removed the inflation from Fannie Mae's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

83. Plaintiff incorporates ¶¶1-82 by reference.

84. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Fannie Mae publicly traded securities during the Class Period.

86. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fannie Mae publicly traded securities. Plaintiff and the Class would not have purchased Fannie Mae publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

87. Plaintiff incorporates ¶¶1-86 by reference.

88. The Individual Defendants acted as controlling persons of Fannie Mae within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Fannie Mae stock, the Individual Defendants had the power and authority to cause Fannie Mae to engage in the wrongful conduct complained of herein. Fannie Mae controlled the

Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

89. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Fannie Mae publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants.

90. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Fannie Mae has over one billion shares of common stock outstanding, owned by hundreds if not thousands of persons.

91. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)    whether the 1934 Act was violated by defendants;

    (b)    whether defendants omitted and/or misrepresented material facts;

    (c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

    (e)    whether the prices of Fannie Mae publicly traded securities were artificially inflated; and

    (f)    the extent of damage sustained by Class members and the appropriate measure of damages.

92.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

93.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

94.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff's reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 8, 2008   COUGHLIN STOIA GELLER
            RUDMAN & ROBBINS LLP
          SAMUEL H. RUDMAN
         DAVID A. ROSENFELD


         /S/ Samuel H. Rudman
        SAMUEL H. RUDMAN

       58 South Service Road, Suite 200
       Melville, NY 11747
       Telephone: 631/367-7100
       631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

C:\Documents and Settings\dgonzales\Local Settings\Temporary Internet Files\OLK194\Cpt Fannie Mae (3).doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

JOHN GENOVESE ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 3/27/08 | 2,000 shares | $24.50 |
| | | |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 9/8/08 | 2,000 | $ 3.60 |
| | | |
| | | |

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro-rata share of any recovery.

FANNIE MAE

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __8__ day of September 2008.

_____
JOHN GENOVESE

- 2 -

FANNIE MAE