# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE FANNIE MAE 2008 SECURITIES
LITIGATION

Master File No. 08 Civ. 7831 (GEL)

**JOINT CONSOLIDATED AMENDED**
**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Donald R. Hall
Hae Sung Nam
Jeffrey P. Campisi
Melinda D. Rodon
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

**LABATON SUCHAROW LLP**
Jonathan M. Plasse
Richard T. Joffe
Laura Killian Mummert
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**BERMAN DeVALERIO**
Glen DeValerio
Jeffrey C. Block
Bryan A. Wood
Autumn W. Smith
One Liberty Square
Boston, Massachusetts 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194

U.S. DISTRICT COURT
S.D.N.Y.
09 JUN 22  PM 11: 37
RECEIVED

*Lead Counsel for the Lead Plaintiffs and for the Proposed Classes*

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION TO THE EXCHANGE ACT CLAIMS ................................................ 2

II.   JURISDICTION AND VENUE FOR EXCHANGE ACT CLAIMS ............................... 9

III.  EXCHANGE ACT PARTIES ............................................................................................ 9

IV.   FANNIE'S BUSINESS AND OPERATIONS .................................................................. 13

V.    THE EXCHANGE ACT DEFENDANTS' FRAUDULENT SCHEME ........................ 17

VI.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................................ 56

VII.  FALSE AND MISLEADING STATEMENTS................................................................. 56

VIII. THE GOVERNMENT PLACES FANNIE INTO CONVERATORSHIP..................... 120

IX.   FALSE FINANCIAL STATEMENTS............................................................................ 124

X.    LOSS CAUSATION......................................................................................................... 159

XII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON THE
      MARKET DOCTRINE .................................................................................................... 168

XII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................. 169

XIII. EXCHANGE ACT COUNTS ......................................................................................... 170

XIV. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................... 192

XV.   SECURITIES ACT COUNTS......................................................................................... 232

XVI.  CLASS ACTION ALLEGATION ................................................................................. 240

1.      Lead Plaintiffs Massachusetts Pension Reserves Investment Management Board ("PRIM") and Boston Retirement Board ("Boston") (collectively, the "Massachusetts Public Pension Funds") bring this federal securities class action on behalf of themselves and a class of others similarly situated consisting of all persons and entities that, between November 8, 2006 and September 5, 2008, inclusive (the "Class Period"), purchased or otherwise acquired Federal National Mortgage Association ("Fannie," "Fannie Mae," or the "Company") *common stock* and/or *options* and were thereby damaged (the "Common Stock Class").  Lead Plaintiff Tennessee Consolidated Retirement System ("TCRS") brings this federal securities class action on behalf of itself and a class of others similarly situated consisting of all persons and entities that during the Class Period purchased or otherwise acquired Fannie *preferred stock* and were thereby damaged.  The claims alleged herein arise under Sections 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77l and 77o; Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  The class action allegations, which apply to all counts herein, are detailed at pages 240, ¶¶835-845.

2.      Lead Plaintiffs' allegations are based upon the investigation of Lead Counsel which included, among other things, a review and analysis of (1) Fannie's public filings with the United States Securities and Exchange Commission (the "SEC"); (2) reports and/or press releases regarding Fannie prepared by its regulators, the Office of Federal Housing Enterprise Oversight ("OFHEO") and the Federal Housing Finance Agency ("FHFA"); (3) Congressional testimony regarding Fannie and the housing and mortgage crisis from, among other individuals, current and former members of the Company's senior management, industry experts and the director of OFHEO and the FHFA; (4) publicly available trading information; (5) articles in the

general and financial press; (6) interviews with confidential witnesses and non-public, internal

Company documents obtained by Lead Counsel; and (7) the pleadings in certain other litigation.

## I.   INTRODUCTION TO THE EXCHANGE ACT CLAIMS

3.      On September 7, 2008, James Lockhart, the director of FHFA, Fannie's regulator,

stunned investors by announcing that Fannie—always purportedly a model of safety and

financial stability—would be placed under conservatorship.  This move was necessitated by

Fannie's losing gamble with risky subprime and "Alt-A" loans (*i.e.*, loans that were approved for

borrowers with slightly higher credit scores than subprime borrowers but that had little to no

documentation).  In direct contradiction to its conservative and prudent reputation, Fannie

embarked on a multi-year strategy to shift its focus away from investing in, guaranteeing, and

securitizing safe, "plain vanilla" loans and toward risky subprime and "Alt-A" loans.  The

Exchange Act Defendants (as defined herein) hid this material shift from investors and continued

to depict Fannie as a picture of safety in the mortgage industry.  The Exchange Act Defendants

fostered this illusion by failing to disclose and/or misstating the Company's ability to adequately

gauge the risk of subprime and Alt-A loans and utilizing factually dishonest accounting that

improperly propped up Fannie's capital reserves by understating combined loan loss reserves and

overstating Fannie's loan and deferred tax assets.  As United States Senator Richard Shelby

stated in a September 8, 2008 interview with *Bloomberg* while explaining why Fannie was

placed in conservatorship, "**They found out [Fannie Mae] had a house of cards**. . . [O]nce [the

U.S. Treasury Department] got someone looking closely at [Fannie's] books, they realized there

just wasn't adequate capital there." (Emphasis added.)

4.      Throughout the Class Period, Fannie crafted a pristine public image as one of the

lowest-risk financial institutions in the world.  Fannie was chartered by the United States

Congress in 1968 with a statutory mission to provide stability, liquidity and affordability to the

U.S. housing market.  Consistent with the requirements of its Congressional charter, the Company had long been a cautious investor in safe, conventional mortgages.  At the beginning of the Class Period, Fannie's senior executives specifically reported that the Company was staying away from riskier loans, such as no-document Alt-A loans, and would only consider getting involved with them on a limited basis if Fannie was paid for the extra risk it was taking. But its public image and statements were at odds with reality; there was a very different story behind the scenes.

5.      By the mid-2000s, the mortgage market was rapidly expanding in the direction of high-risk, non-prime mortgage loans, and Fannie's market share was dropping rapidly.  At the same time, Fannie was under increasing pressure to take on more risk by purchasing and securitizing these non-prime mortgage loans.  In particular, Fannie's largest customer, Countrywide—with whom Fannie had a longstanding and lucrative relationship—threatened to sell its loans directly to Wall Street rather than to Fannie unless the Company bought a bigger piece of its highest-risk loans.

6.      As the housing market changed, Fannie was presented with a fateful choice.  As set forth in a June 2005 internal presentation ("June 2005 Presentation") that was found by Congressional investigators in the files of Fannie's now-former CEO, Defendant Daniel H. Mudd ("Mudd"), Fannie could either "stay the course" by continuing to focus on low-risk, traditional, 30-year fixed-rate mortgages or "meet the market" by focusing on high-risk, non-prime mortgage loans thereby generating higher revenue and profits, but exposing the Company to unprecedented risk.

7.      The Exchange Act Defendants chose to meet the market and caused Fannie to secretly deviate from its public persona as one of the lowest-risk financial institutions in the

world.  Yet, Fannie faced a problem.  It was ill-prepared to "meet the market."  As noted in the June 2005 Presentation, the Company lacked "capabilities and infrastructure" as well as "knowledge of the credit risks."  The Exchange Act Defendants knowingly caused Fannie to begin accumulating high-risk loans without the resources—both human and structural—to identify and manage the credit risk associated with such loans.  In fact, in October 2006, at the same time that the Company was continuing to dramatically ramp up its investment in high-risk, non-traditional loans, Fannie's Chief Risk Officer, Defendant Enrico Dallavecchia ("Dallavecchia"), warned Mudd that he had "a serious problem with the control process around subprime limits . . . . **There is a pattern emerging of inadequate regard for the control process**." (Emphasis added.)  Dallavecchia repeated his internal warning in July 2007, telling Mudd that Fannie was "not even close" to having proper risk controls.  As Mudd later admitted at a December 2008 Congressional hearing, he was warned in October 2006 that Fannie "[was] rushing into billions of dollars worth of subprime loan purchases without really knowing what [it was] doing."

8.     Because Fannie lacked the capabilities to assess the credit risks of high-risk, non-traditional loans, its move to "meet the market" was essentially an undisclosed high stakes gamble without adequate ability to judge the risk of the bet.  As Marc Gott, a former director in Fannie's loan servicing department told the New York Times in October 2008, "**We didn't really know what we were buying** . . . . **This system was designed for plain vanilla loans and we were trying to push chocolate sundaes through the gears**." (Emphasis added.)[1]

9.     Despite these known facts, the Exchange Act Defendants began a radical shift in Fannie's business focus from high-quality prime loans to extremely risky non-prime and

---

[1]     Charles Duhigg, *Pressure to Take More Risk, Fannie Reached Tipping Point*, New York Times (Oct. 4, 2008).

nontraditional loans, including subprime and Alt-A loans.  Throughout much of the Class Period, the Exchange Act Defendants failed to disclose Fannie's existing, and mounting, exposure to such loans. By year-end 2006, unbeknownst to investors, Fannie had a monstrous undisclosed $345 billion to Alt-A and subprime assets. By December 2007, the Company had total subprime and Alt-A exposure of at least $405 billion.

10.    Moreover, by the fall of 2006, Fannie, in analyzing the housing market, realized that its foray into the subprime/Alt-A market would result in massive losses.  Numerous internal reports pointed to severe declines in housing prices and offered projections of serious delinquencies and default rates that would adversely affect Fannie.

11.    In particular, at the end of 2006, Fannie, deeply concerned about home value decline, assembled a team to build a home price model forecast.  The result was a PowerPoint document, completed in January 2007, called the "Home Price Forecasting Report."  According to this report, which was not made public during the Class Period, Fannie projected a 50% decline in home prices in the near term.

12.    Notwithstanding Fannie's inadequate risk control and its projections of impending massive declines in home prices and increases in delinquency and default rates, the Exchange Act Defendants continued to tell investors that, regardless of the condition of the subprime/Alt-A mortgage market, the Company's book of business was strong because it was only purchasing products "comparable to the conventional book of business" and "the credit quality of [its Alt-A] looks like the credit quality of the rest of [its] book."

13.    Thus, as the Exchange Act Defendants transformed Fannie from a low-risk, conservative institution into a highly-leveraged entity with massive risk exposure, they falsely represented to investors that Fannie's credit profile and underwriting standards were strong and

unchanged.  Accordingly, investors had no way of knowing that Fannie was no longer the same prudent mortgage investor and guarantor it had been for decades.

14.     Fannie's misrepresentations misled even sophisticated research analysts.  For example, on February 28, 2007, Bear Stearns issued a research report that stated, in part:  "[T]o date the [C]ompany has limited its exposures to sub-prime and Alt A loans …. [Fannie] believes its credit performance will remain significantly better than most other market participants …." Further, on May 9, 2007, JP Morgan issued an analyst report which stated:  "Single-family credit quality remains good, and what little exposure Fannie has to higher risk subprime and Alt-A products is largely credit enhanced to minimize Fannie's losses."

15.     Even as it accumulated hundreds of billions of dollars of risky loans, Fannie falsely reassured investors that it had a healthy core capital cushion—a crucial financial safety net the Company was required to maintain to protect against both a downturn in the mortgage market and other financial losses—that would allow it to absorb any losses.  The Company regularly affirmed to investors that its core capital level was well above the minimum required by federal regulators—an amount woefully inadequate to protect against the losses that the Exchange Act Defendants knew Fannie was facing based on its inadequate risk controls and internal projections regarding the housing market.

16.     The Exchange Act Defendants supported their false representations that Fannie had a comfortable core capital cushion by:  (1) not increasing the Company's combined loss reserves to a level to account for its projected housing downturn; (2) failing to recognize appropriate *other than temporary impairments* for the Company; and (3) carrying on its books as an asset a multi-billion dollar tax credit that was never viable.  Even with its aggressive and incorrect financial reporting, the Company could barely meet the capital requirements set by the

government.  In fact, Fannie's bets on risky loans with an insufficient capital cushion put the Company in the position of having little to no room for error.  With massive credit risk exposure and inadequate capital, the Company was poised at the edge of a precipice.  By concealing this fact from investors, the Exchange Act Defendants distorted the truth about Fannie's profitability, safety and soundness and thereby artificially inflated the value of Fannie's securities during the Class Period.

17.     As the housing market continued to crater in late 2007 and 2008, Fannie's financial position became increasingly more difficult to hide.  By this time, Fannie's internal projections had become a reality.  With actual housing prices plunging and borrowers—particularly the high-risk borrowers who took out subprime loans—defaulting in huge numbers, the Exchange Act Defendant could no longer continue the charade and was forced to admit that Fannie was swamped by massive losses.  Once the government discovered the truth, it had no choice but to assume control of Fannie as conservator.

18.     By the start of the Class Period, the Exchange Act Defendants had set in motion the events that led to Fannie's destruction.  The Exchange Act Defendants blatantly ignored the specific warnings from Fannie's Chief Risk Officer that the Company did not have the risk controls in place to monitor and assess the risks of subprime/Alt-A products.  They knew that they were gambling with Fannie's—as well as investors'—future by blindly rushing into subprime mortgage investments, but they decided simply to disregard the danger.  As Columbia Business School professor and mortgage expert Charles W. Calomiris concluded in a written statement to Congress in December 2008, Fannie made a "conscious decision to encourage the underestimation of risk in subprime and Alt-A lending."[2]

---

[2]     Written Statement of Charles W. Calomiris Before the Committee on Oversight and Government Reform, U.S. House of Representatives, Dec. 9, 2008, at 2 ("Calomiris Statement").

19.     In the hours and days following the government takeover, federal officials confirmed the utter falsity of the Exchange Act Defendants' Class Period representations to investors regarding Fannie's purportedly low-risk credit profile and adequate capital cushion.  As Dallas Fed President Richard Fisher stated in a September 8, 2008 speech, quoted by *Bloomberg*, federal examiners "**concluded that the capital of these institutions was too low relative to their exposure.**"  (Emphasis added.)  In a September 23, 2008 report to Congress, FHFA Director Lockhart confirmed that "the credit profile at [Fannie] followed the market down in 2006 and 2007—**without commensurate pricing for risk**."  (Emphasis added.)  As one pair of mortgage experts concluded:

> [T]he [Fannie Mae] propaganda machine purposefully misled people into believing that it was keeping risk low and operating under an adequate prudential regulatory regime.
>
> — Wallison and Calomiris, *The Last Trillion Dollar Commitment—The Destruction of Fannie Mae and Freddie Mac*, September 2008

20.     During the Class Period, the Exchange Act Defendants knew of Fannie's exposure to the risks and caused Fannie to sell more than $14 billion common and preferred shares and more than $439 billion in bonds and other debt securities.  As a result of Fannie's false and misleading statements, investors have suffered billions in losses:  on September 8, 2008, the first day of trading after the government announced the conservatorship, Fannie's common stock price plunged nearly 90%—from $7.04 to $0.73.  The price of Fannie's preferred shares similarly declined.  The Exchange Act Defendants are also responsible for earlier losses stemming from the partial corrective disclosures leading up to that final shock to the market.  In light of the foregoing, Lead Plaintiffs bring this action seeking to recover the billions of dollars in damages caused by the Exchange Act Defendants' violations of the federal securities laws.

## II.      JURISDICTION AND VENUE FOR EXCHANGE ACT CLAIMS

21.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

22.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. §§ 1391(b) and (c); and the order of the Judicial Panel of Multidistrict Litigation, dated February 11, 2009, transferring all related actions pending in other districts to the United States District Court for the Southern District of New York.  Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District, and Fannie's stock trades on the New York Stock Exchange ("NYSE").

23.      In connection with the acts and omissions alleged in this Joint Consolidated Amended Class Action Complaint ("Complaint"), all of the Exchange Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.      EXCHANGE ACT PARTIES

**A.      Plaintiffs**

24.      Lead Plaintiff TCRS is a defined benefit pension plan that serves Tennessee state employees, higher education employees, K-12 public school teachers and employees of political subdivisions who have elected to participate in the plan.  TCRS purchased or acquired Fannie securities as set forth in the supplemental certification, attached hereto.

25.      Lead Plaintiff PRIM manages public pension funds established for the benefit of current and retired Massachusetts employees and public school teachers.  PRIM purchased or acquired Fannie securities as set forth in the supplemental certification, attached hereto.

26.     Lead Plaintiff Boston oversees the management of retirement system funds on behalf of current and retired employees of The City of Boston.  Boston purchased or acquired Fannie securities as set forth in the supplemental certification, attached hereto.

**B.     Federal National Mortgage Association**

27.     Defendant Fannie is a government-sponsored enterprise ("GSE") chartered by Congress, with its principal place of business located at 3900 Wisconsin Avenue NW, Washington, DC 20016-2892.  Fannie is owned by the Company's shareholders, and the Company's equity securities were listed and traded on the NYSE during the Class Period. Fannie operates in the U.S. secondary mortgage market by providing funds to mortgage lenders through the purchase of mortgages and mortgage-related securities.  Fannie also issues and guarantees mortgage-related securities.

**C.     Exchange Act Officer Defendants**

28.     Defendant Daniel H. Mudd was President, Chief Executive Officer ("CEO") and a director of Fannie during the Class Period.  In his role as CEO, Mudd chaired the Management Executive Committee, which was responsible for reviewing and overseeing Fannie's overall risk management, which included addressing:  (1) issues referred to it by Fannie's risk committees; (2) matters that involved multiple types of risks; and (3) other significant business and reputational risks.  When the government took over Fannie, the Company announced that Mudd would be fired.  Mudd signed each of the Company's Forms 10-K and 10-Q filed during the Class Period.

29.     Defendant Robert T. Blakely ("Blakely") was Chief Financial Officer ("CFO") and Executive Vice President of Fannie during the Class Period until August 17, 2007, when he stepped down from his position as CFO.  Blakely stayed on as Vice President until his retirement in January 2008.  Blakely signed the Company's 2004, 2005 and 2006 Forms 10-K.

30.     Defendant Stephen M. Swad ("Swad") was CFO and Executive Vice President of Fannie from August 2007 until his resignation on August 28, 2008.  Swad signed Fannie's 2007 Form 10-K and its Forms 10-Q for each quarter of 2007 and for the first two quarters of 2008.

31.     Defendant Enrico Dallavecchia was Executive Vice President and Chief Risk Officer ("CRO") during the Class Period until August 2008.  In his role as CRO, Dallavecchia chaired the Allowance for Loan Losses Oversight Committee, which reviewed and approved the methodology and the amount of Fannie's allowance for loan losses and reserve for guaranty losses (combined loss reserves) on a quarterly basis.  In addition, as CRO, Dallavecchia had an oversight role regarding credit, market, operational and liquidity risks.  Among other things, Dallavecchia warned Defendant Mudd that Fannie's risk management systems were inadequate.  Dallavecchia made a number of false and misleading statements in conference calls during the Class Period.

32.     Defendants Mudd, Blakely, Swad and Dallavecchia are referred to herein collectively as the "Exchange Act Officer Defendants."  Each of the Exchange Act Officer Defendants made knowingly false and misleading statements concerning, *inter alia*, Fannie's financial performance, capital adequacy and risk exposure in public filings and statements and in other public presentations and speeches.

33.     Throughout the Class Period, Defendants Mudd and Fannie's CFOs, Blakely and Swad, were responsible for ensuring the accuracy of Fannie's public filings and other public statements, and they personally attested to and certified the accuracy of Fannie's financial statements.

34.     It is appropriate to treat the Exchange Act Officer Defendants as a group for pleading purposes and to presume that the false and misleading information contained in

11

Fannie's public filings, press releases and other statements, as alleged herein, are the collective actions of this narrowly defined group of defendants. By virtue of their high level positions at Fannie, each of the Exchange Act Officer Defendants directly participated in the day-to-day management of Fannie and each was privy to confidential, proprietary information about Fannie's business, operations and practices. The Exchange Act Officer Defendants were involved or participated in drafting, reviewing, approving and/or disseminating the false and misleading statements alleged in the Complaint. They were thus aware that the statements were being made, and they nonetheless approved or ratified them in violation of the federal securities laws.

35.     As officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, and trades on the NYSE and is also governed by the provisions of the federal securities laws, the Exchange Act Officer Defendants each had a duty to disseminate promptly accurate and truthful information with respect to Fannie's financial condition, performance, operations and business practices and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Fannie's publicly traded securities would be based upon truthful and accurate information. The Exchange Act Officer Defendants' misrepresentations and omissions during the Class Period violated the federal securities laws.

**D.     Deloitte & Touche LLP**

36.     Defendant Deloitte & Touche LLP ("Deloitte") served as the Company's auditor during the Class Period. Deloitte audited Fannie's financial statements and management's report on the effectiveness of internal control over financial reporting for the years ended December 31, 2006 and 2007. Deloitte provided unqualified opinions on Fannie's consolidated financial statements in Fannie's Forms 10-K for 2006 and 2007, for each respective fiscal year. Further, in

the 2007 Form 10-K, Deloitte provided an unqualified opinion on the effectiveness of Fannie's internal control over financial reporting.  Deloitte's unqualified opinions were materially false and misleading because Deloitte did not perform its audits of Fannie's financial statements in accordance with generally accepted auditing standards ("GAAS") and such financial statements were presented in a manner which violated generally accepted accounting principles ("GAAP") for the reasons set forth below at ¶¶423-520.  Deloitte maintains an office in New York, New York..  Claims against Deloitte are brought solely by Lead Plaintiffs TCRS and Boston.

37.     Fannie and the Exchange Act Officer Defendants are referred to herein as the "Exchange Act Defendants."

### IV.     FANNIE'S BUSINESS AND OPERATIONS

**A.     Fannie Is a Leading, Important Player in the Mortgage Market**

38.     Fannie is the nation's largest source of financing for home mortgages and one of the world's chief non-bank financial services firms.  The Company's common stock was listed and publicly traded on the NYSE under the ticker "FNM" during the Class Period.  Certain series of Fannie's preferred stock traded on the NYSE during the Class Period.

39.     At the end of 2006, Fannie had reported stockholder equity of $41.5 billion, making it one of the most prominent companies on the NYSE.  By comparison, a company such as Microsoft had stockholder equity of approximately $40 billion for the same time period.  Indeed, as Ladenburg Thalman analyst Richard X. Bove noted in a July 2008 research report, Fannie's assets approached the size of those held by the Federal Reserve.

40.     Fannie was chartered as a GSE in 1968 by the United States Congress for the purpose of providing liquidity in the secondary mortgage market to increase the availability and affordability of homeownership.  The other GSE is its sister organization, Freddie Mac (also referred to herein as "Freddie").  Although a GSE is government-chartered, it is a private

shareholder-owned and controlled institution that, while lacking an express government guarantee, benefits from the perception that the government stands behind its securities and financial obligations.

**B.    Fannie Has Two Symbiotic Businesses**

41.    Fannie operates exclusively in the secondary mortgage market and does not loan money directly to consumers.  The foundation of its business is supported by two separate, but important pillars—its *credit guaranty* business and its *portfolio investment* business.  With both businesses' lifeblood consisting primarily of acquired mortgages, the two generally flourish or flounder in tandem.  Fannie refers to these two businesses together as its "mortgage credit book of business."[3]

42.    Fannie's role in the *credit guaranty* business is to be financially responsible for borrowers' defaults.  During the Class Period, Fannie purchased mortgages from lenders— mortgages it put into trusts for purposes of holding them separate from its other assets—and then packaged them into mortgage-backed securities ("MBS").[4]  Then, for a fee, Fannie *guaranteed* its MBS holders that the borrowers whose mortgages made up the MBS would, in fact, timely pay their interest and principal.

43.    On a regular basis, usually once or twice a year, Fannie bargained individually with each lender to determine (a) the types of loans that Fannie would accept from them and (b) the "guaranty fee" that the lender would pay Fannie.  Fannie was typically compensated for providing a guarantee by retaining a portion of the borrowers' interest payments going into the MBS trust.  While the guarantee obligation was Fannie's alone, it typically hedged that credit

---

[3]    According to Fannie's 2007 Form 10-K, the *credit guaranty* side of Fannie's business represented 73% of Fannie's book of business, and the *portfolio investment* side represented 25%.

[4]    Purchasers of Fannie MBS were buying a beneficial interest in pools of mortgage loans and other mortgage-related securities issued by Fannie.

risk by either obtaining separate guarantees from third parties, such as lenders that originated the mortgages, or contracting with financial guarantors.

44.     On the *portfolio investment* side, Fannie held mortgage loans, mortgage-related securities and other securities that it purchased from commercial banks for its own investment purposes. The mortgage-related securities in which Fannie invested included both MBS created by third parties—referred to as "private label" MBS—and Fannie MBS. Fannie funded these portfolio purchases by issuing short and long term debt and debt securities to domestic and international capital market investors. Fannie profited to the extent that the income from mortgage assets and other investments in its portfolio exceeded the low amount of interest it was paying its debt-holders.

**C.     Capitalization Played a Critical Role in Fannie's Businesses**

45.     Though the MBS did not appear on Fannie's balance sheet because they were held in separate trusts, the nature of the guarantee agreement was such that Fannie itself could become liable for it. Because Fannie was on the hook for default on the *guarantee side* of the business, having enough capital to cover its credit obligations was critically important to Fannie's success. Accordingly, to the extent that defaults and delinquencies increased, Fannie would be required to increase loss reserves which would effectively reduce its capitalization. Further, losses in asset value on the *investment* side of the business, such as an unanticipated increased expectation of loan defaults for loans held in Fannie's own portfolio, reduced capitalization by reducing the value of its assets.

46.     *Core capital* is a key metric of Fannie's financial health. It is the sum of Fannie's outstanding common stock and certain preferred stock, paid-in capital and retained earnings. Pursuant to the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 ("1992 Act"), Fannie is required to maintain certain minimum levels of core capital.

15

47.     Under the 1992 Act, OFHEO[5] has the authority to appoint a conservator to run Fannie if "minimum capital requirements" are not met; the OFHEO is required to do so if capital reaches a statutorily-defined critically low level.  A conservator succeeds to the rights of the Board of Directors, officers and shareholders.  In other words, Fannie's ability to meet its core capital requirements was vital to its continuation as a publicly traded company.  Accordingly, Fannie's core capital was a metric closely followed by investors.

**D.     Fannie's Charter Places Restrictions on the Type of Loans in Which Fannie Can Transact, With a Clear Emphasis on Safety**

48.     As stated in an OFHEO "Report of the Special Examination of Fannie Mae," dated May 2006:  "Fannie Mae senior management promoted an image of the Enterprise as one of the lowest-risk financial institutions in the world and as 'best in class' in terms of risk management, financial reporting, internal control, and corporate governance."

49.     As explained in Fannie's 2006 10-K, under its charter, Fannie is not allowed to purchase or securitize mortgage loans with original principal balances larger than a certain limit, which, during 2006 and 2007, was $417,000 for a single-family residence.

50.     Similarly, Fannie's charter requires credit enhancement on any conventional single-family loan purchased or securitized by Fannie with a loan-to-value ratio of over 80%.

51.     As further explained in Fannie's 2006 10-K, Fannie is required under its charter "to obtain approval of the Secretary of HUD for any new conventional mortgage program that is significantly different from those approved or engaged in prior to the enactment of the [1992 Act]."

52.     Throughout the 1990s, the mortgages purchased and securitized by Fannie remained overwhelmingly 30-year (*i.e.*, long term) fixed rate, prime mortgages.

---

[5]     OFHEO was the agency that that regulated Fannie prior to FHFA.

53.     Fannie's long-standing conservative reputation together with regulatory restrictions understandably gave investors false comfort – comfort that the Exchange Act Defendants exploited.

## V.     THE EXCHANGE ACT DEFENDANTS' FRAUDULENT SCHEME

54.     The Exchange Act Defendants named below in Counts I and II are liable for violations of the Exchange Act arising out of the sale of Fannie common shares and preferred shares during the Class Period.

**A.     Subprime and Non-Prime Loans Fueled the Growth and Crash of the United States Housing Market**

**1.     The Growth**

55.     In the early part of this decade, low interest rates and easy credit conditions, followed by the availability of ample debt options, sparked a housing boom.  With eager potential purchasers, the seemingly always-escalating value of real estate and a supply of properties that trailed demand, lenders loosened their lending standards and offered more and more loans to higher-risk borrowers.  During the early part of this decade, home prices rose exponentially faster than 25 years preceding it and at a dramatically faster rate than income.  Somewhat illogically, between 2001 and 2006, while the premium charged by subprime lenders over prime lenders shrunk by approximately 50%, the credit ratings of the subprime borrowers declined.  In other words, while the risk of default went up, the cost of the loan went down.

56.     To keep pace with a market that seemed increasingly out of reach, buyers sought less traditional loan structures that allowed them to keep more expensive home purchases affordable.  For example, one widely-used structure was the adjustable rate mortgage ("ARM"), which had a two-part interest payment system: (a) several years at a very low rate, with (b) a jump to a higher adjustable rate for the remainder of the loan term.  Borrowers generally

17

assumed that they would re-finance before the jump in rates. But that assumption required stable rates to keep loans affordable, as well as level or rising home prices to ensure property values would cover the principal of the new loan, with room to spare.

57.     During this period, buyers of all stripes attempted to buy new homes. Many did not have the credit or income history to justify lenders providing them with prime (*i.e.,* long-term, quality) loans. But as interest rates dropped, mortgage *investors* became dissatisfied with the limited returns that they were getting from traditional loan investments. They had an appetite for riskier debt, and loan originators obliged by expanding into the subprime and Alt-A market. In 2003, less than 11% of originations were non-prime (subprime or Alt-A); by 2006, more than one-third of all originations fit that category. During this period, "Alt-A originations increased almost fivefold."

### 2.     The Crash

58.     Securitizing riskier loans was premised on the notion that one could obtain return while passing the risk to others. Securitization of subprime and non-prime loans (*i.e.*, the creation of MBS) was fueled by the nexus of investor appetite and high ratings provided by the ratings agencies for these tranched instruments.

59.     A construction boom had followed on the heels of the housing rush, and by this period, with demand satiated, there was a surplus of inventory on the market. According to the National Association of Realtors, during the year that started with the third quarter of 2006, home prices actually declined by 1.5%. The S&P/Case-Shiller Index puts the decline at 3.2%.

60.     Home prices stopped rising in 2006. With property values maintaining or dropping (and with already scant equity evaporating), refinancing became a problem for those very borrowers who needed it the most—those in fear of rising interest rates. Borrowers who did not have verified income or sufficient documentation similarly began to have loan payment

problems.  Foreclosure rates began to noticeably increase in "early 2006," which can be

attributed to the increase in the origination of subprime and other nontraditional mortgages,

increases in short-term interest rates and declining home prices.

61.    In the months prior to this critical period, after previously shunning this high risk

market, Fannie belatedly entered and aggressively began to increase its position in subprime/Alt-

A products.   The Exchange Act Defendants abandoned Fannie's reputation as a bastion of

safety.  As the subprime/Alt-A market grew, the Exchange Act Defendants felt that the Company

was missing out on all of the action and, in an effort to stay relevant and find return, they

directed Fannie down a fateful path of pursuing higher risk loans even though they knew and/or

recklessly disregarded that Fannie's infrastructure was ill-equipped to handle such risk.

**B.    In Order to Maintain Market Share and Increase Returns, the Exchange Act
Defendants Severely Altered Fannie's Strategy and Caused it to Pursue Higher-Risk
Subprime and Alt-A Loans**

**1.    The Exchange Act Defendants Saw the Market Passing the Company
By—It Risked Losing Market-Share, and its Loans Yielded
Unsatisfying Returns**

62.    By the mid-2000s, the credit market was quickly expanding beyond Fannie's

comfort zone of safe, fixed rate loans, and into the abyss of riskier mortgage products, such as

subprime and Alt-A loans and related securities.  To the extent that there was business

opportunity in these new credit areas, it was passing Fannie by; Fannie's market share was

dropping dramatically.  As reported in Fannie's Form 10-K for 2004, which was filed in

December 2006, "[d]uring 2005, our estimated market share of new single-family

mortgage-related securities issuance was 23.5%, compared to 29.2% in 2004 and 45.0% in

2003."

63.    CEO Mudd recognized this diminishing return.  As he stated in an October 5,

2008 New York Times article entitled *Pressured to Take More Risks, Fannie Reached Tipping*

*Point*, "Fannie Mae faced the danger that the market would pass us by. . . . We were afraid that lenders would be selling products we weren't buying . . . ."

64.     Indeed, Fannie faced direct pressure from its biggest lender.  The October 5, 2008 article reported on a meeting between Mudd and Countrywide Financial CEO Angelo Mozilo in or around late 2004/early 2005:

> Shortly after he became chief executive, Mr. Mudd traveled to the California offices of Angelo R. Mozilo, the head of Countrywide Financial, then the nation's largest mortgage lender. Fannie had a longstanding and lucrative relationship with Countrywide, which sold more loans to Fannie than anyone else.  But at that meeting, Mr. Mozilo . . . threatened to upend their partnership unless Fannie started buying Countrywide's riskier loans.  Mr. Mozilo . . . told Mr. Mudd that Countrywide had other options. For example, Wall Street had recently jumped into the market for risky mortgages. . . . "You're becoming irrelevant," Mr. Mozilo told Mr. Mudd, according to two people with knowledge of the meeting who requested anonymity because the talks were confidential. In the previous year, Fannie had already lost 56 percent of its loan-reselling business to Wall Street and other competitors.  "You need us more than we need you," Mr. Mozilo said . . . .

### 2.     The Exchange Act Defendants Knew and/or Recklessly Disregarded the Immense Risk of the Subprime/Alt-A Market

65.     The Exchange Act Defendants materially altered Fannie's risk profile by accumulating subprime and Alt-A mortgage products and understood, but did not disclose, that they were exposing Fannie to massive risk. Certain executives at the Company warned against its new strategic direction as Fannie had studied this market before.  Edward J. Pinto, a former Fannie chief credit officer who testified before the U.S. House of Representatives Committee on Oversight and Government Reform on December 9, 2008 (the "December 9 Hearing"), noted in his written statement that "[i]n the early-1990s Fannie and Freddie publicly announced they were no longer buying [Alt-A] loans because they were too risky."[6]

---

[6]     Written Statement of Edward J. Pinto Before the Committee on Oversight and Government Reform, U.S. House of Representatives, Dec. 9, 2008, at 9 ("Pinto Statement").

66.     In his testimony at the December 9 Hearing, Charles W. Calomiris (Henry Kaufman Professor of Financial Institutions, Columbia Business School), explained while subprime and non-prime loans serve a purpose, they require that: (a) a risk premium be paid for the extra risk the lender is taking on and (b) balance in the loan portfolio so that it is not too heavily weighted toward these riskier loans.  "The problem with these sorts of loans arises . . . when the risk is not priced properly . . . . [In such cases] the subprime portfolios may grow to be too large, may earn too little income and may be securitized with too high leverage, all of which results from the underestimation of their risk."[7]

67.     Shortly before accumulating material amounts of subprime and non-prime mortgage products, Fannie was specifically warned of the high risks of entering this market and Fannie's lack of resources to gauge such risk.  According to an internal Fannie presentation dated June 27, 2005 (the "June 27 Presentation"), the Exchange Act Defendants knew that Fannie faced obstacles in its ability to meet the market, including lack of: 1) capabilities and infrastructure and 2) knowledge of the credit risks.

68.     Moreover, as the June 27 Presentation noted, market participants were not appropriately pricing for risk.  The premium spreads between rates charged by subprime over prime lenders had narrowed significantly since 2001.  Further, a Fannie document from March 2005 noted that:  "Although we invest almost exclusively in AAA-rated securities, there is a concern that rating agencies may not be properly assessing the risk in these securities."

69.     According to the June 27 Presentation, due to Fannie's perception that the market was passing it by, the Company faced two choices:  (1) stay the course with safer loans or (2) meet the subprime and non-prime market.  If Fannie did nothing, it would face lower revenue

---

[7]     Written Statement of Charles W. Calomiris before the Committee on Oversight and Government Reform, U.S. House of Representatives, Dec. 9, 2008 ("Calomiris Statement").

and growth and would continue to lose market share.  On the other hand, as the Exchange Act Defendants knew, meeting the market involved more known risk, which Fannie was ill-suited to monitor and assess.

70.     Accordingly, at the time of the June 27 Presentation, Fannie's Single Family Guaranty Business group recommended that Fannie choose the safer option—"stay the course"—and advocate a public position that educated the public of housing risks, but also dedicate resources to develop a subprime infrastructure, modeling capabilities for alternative markets, and a conduit capability.  However, the immediate lure of revenues from subprime and Alt-A loans proved too tempting for the Exchange Act Defendants to forego, and the Exchange Act Defendants caused Fannie to quickly enter into the subprime/Alt-A market knowing that Fannie did not have the internal controls in place to monitor these riskier products.

71.     On June 26 and 27, 2006, Fannie's senior management met for a weekend retreat in Cambridge, Maryland  to discuss future strategies.  The result was a report dated July 7, 2006, that, according to Congressional testimony, was circulated to Mudd and other top executives. The report set forth Fannie's "New business model and growth initiatives."  One initiative described Fannie's new focus on the subprime market:  "Single Family's strategy is to say 'yes' to our customers by increasing purchases of sub-prime and Alt-A loans, reducing 'cut outs', and implementing new customer strategies."

### 3.     The Exchange Act Defendants Covertly Altered Fannie's Loan Investment Strategy—From Safety to Risk—While Misleading Investors About its True Exposure

72.     During late 2005/early 2006—behind the scenes and with little to no announcement or fanfare—the Exchange Act Defendants began to make radical changes in the make-up of its book of business and its underwriting practices.  One internal Company document described in a December 10, 2008 New York Times article termed the shift as an "**underground**

**effort**[] to develop a subprime infrastructure and modeling for alternative markets." (Emphasis added.)

73.     Fannie made a concerted effort to enter the subprime and Alt-A market. The results were dramatic—a forceful expansion into those loan areas. As the Washington Post reported on September 24, 2008, in *Affordable-Housing Goals Scaled Back; Fannie Mae, Freddie Mac to Provide Less Support Than In Years Past*, "Roughly 33 percent of the companies' business involved buying or guaranteeing these risky mortgages, compared with 14% in 2005." Fannie itself reported in its 2007 Form 10-K, filed on February 27, 2008, that by the end of 2006, Fannie had $345 billion in exposure to Alt-A assets.

74.     Throughout much of the Class Period, the Exchange Act Defendants failed to disclose the Company's existing and mounting exposure to subprime and Alt-A loans.

> a.   During a public conference call on December 11, 2006, there was only a single reference to Alt-A loans. Peter Niculescu, the Executive Vice President for Capital Markets, noted that Private Label securities in Fannie's portfolio included "some Alt-A."
>
> b.   During a public conference call on February 27, 2007, when asked about Alt-A loans, Mudd responded that "we don't have so much that this is a major, significant exposure on our books."
>
> c.   Nearly contemporaneously, in mid-2007, as described further herein, the Exchange Act Defendants determined that Fannie's exposure to subprime was too great which was not disclosed until Mudd admitted a year later during a May 6, 2008 conference call, that Fannie largely stopped purchasing or guaranteeing new Alt-A loans.

   d.   Fannie did not frame its true exposure to risky mortgage products, such as Alt-
        A, until August 16, 2007, when it published its 2006 Form 10-K.

75.   Fannie's financial condition was in peril because of the Company's aggressive

pursuit of risky mortgages.  Fannie disclosed its 2005 Alt-A exposure for the first time in its First

Quarter 2008 Investor Summary, published on May 6, 2008, where the Exchange Act

Defendants stated that by the end of 2005, Fannie was carrying $187 billion of Alt-A loans.  In

2006, Fannie carried $276 billion of Alt-A on its books and, by year end 2007, as disclosed in

Fannie's 10-K for the year 2007, Fannie's $2.7 trillion single-family conventional mortgage

credit book contained $350.6 billion of Alt-A loans and MBS backed by Alt-A.

76.   A review of Fannie's 2007 Form 10-K reveals that, by the end of 2007, Fannie's

credit risk exposure was so immense that it was equal to nearly half its total assets.  As of

December 31, 2007, the Company's total assets equaled approximately $882 billion.  Yet, of the

total of $2.8 trillion in credit exposure Fannie had as of September 30, 2007, $405 billion was

connected to subprime and Alt-A loans.  With total assets of $882 billion and Alt-A and

subprime exposure of $405 billion, Fannie's exposure to subprime and Alt-A loans was

equivalent to a stunning 45% of its total assets.

**C.   Though the Exchange Act Defendants Were Bullish on Fannie's Abilities Publicly,
      Fannie's Risk Controls Were Unequal to the Challenge of the Alt-A and Subprime
      Markets, and Disproportionately Negative Results Followed**

   **1.   Publicly, the Exchange Act Defendants Touted Fannie's Ability to
         Manage Risk for Subprime and Alt-A Investing**

77.   As alleged above, despite Fannie's strong reputation as a highly risk-averse

investor, the Exchange Act Defendants recognized in mid-2006, when analyzing whether to

materially increase Fannie's exposure to the subprime and non-prime markets, that the Company

lacked critical risk-management resources and skills to weather them.  Nevertheless, the

Exchange Act Defendants primed the market to believe that Fannie maintained a strong credit book of business and that its exposure to subprime and Alt-A loans was limited.  For example, Fannie stated:

- "We believe that our assessment and approach to the management of credit risk continued to contribute in the third quarter of 2006 to the maintenance of a credit book of business with strong credit characteristics." (Nov. 8, 2006 Form NT 10-Q); and

- "[I]t is a very strong credit book. That will bode us very well as we move into what is going to be a very different housing environment." (December 6, 2006 conference call).

78.     On February 27, 2007, Mudd repeated that "we have a book of business with very strong credit risk characteristics . . . . [O]ur exposures to some of the high-risk segments are extremely low for subprime, an estimated 2.2% of our total single-family credit book of business at the end of '06."  Further, on the same day, Tom Lund ("Lund"), Executive Vice President in charge of Fannie's Single Family Mortgage Business, made the following statements concerning Fannie's exposure to Alt-A and subprime mortgages:

Our participation has continued to remain in the higher credit quality segments of alternative documentation. . . .

[W]e have told you we're only going to participate when we think we get the right price/risk equation. . . . and we feel good about the pricing . . . we have put on the books.

79.     The market believed the Exchange Act Defendants' false statements.  On February 7, 2007, Bear Stearns issued an analyst report stating that "[t]he [C]ompany made a strategic decision in 2005 NOT to participate in the market for exotic mortgage products,

particularly those in the subprime segment because pricing did not adequately reflect the risk.

Fannie Mae did not want to support a market that it believed was unsound."

80.    On February 27, 2007, Prudential Equity Group LLC analysts Matthew Park and

Tony Hill issued an analyst report which stated that:

> [W]e expect Fannie Mae to perform better relative to the overall industry due to the statutory requirements for conforming mortgages and the relatively limited exposure to riskier non-traditional mortgage products.
>
> Fannie Mae's exposure to the subprime mortgage credit risks appears limited. First, Fannie Mae estimates that approximately 0.2% of its single-family mortgage credit book of business as of December 31, 2006 consisted of subprime mortgage loans or structured Fannie Mae MBS backed by sub-prime mortgage loans. Fannie Mae generally employs credit enhancement (such as mortgage insurance) which should reduce its credit exposure to the potential credit quality deterioration of these loans.
>
> Second, Fannie Mae estimates that private-label mortgage securities backed by subprime mortgage loans accounted for approximately 2% of its single-family mortgage credit book of business as of December 31, 2006. The fact that the company has focused on purchasing highly-rated tranches of these MBS should limit FNM's exposure.

81.    Further, on February 28, 2007, Bear Stearns issued a research report that stated, in

part: "To date the company has limited its exposures to sub-prime and Alt A loans . . . . [Fannie]

believes its credit performance will remain significantly better than most other market

participants . . . ."

82.    On May 2, 2007, the Exchange Act Defendants falsely repeated that

approximately 2% of its single-family mortgage credit book of business as of December 31,

2006 was subprime.  Further, on May 2, 2007, during Fannie's conference call with analysts,

Dallavecchia, Fannie's Chief Risk Officer, asserted that "[o]n average, the credit characteristics

of our Alt-A portfolio is comparable to the conventional book of business that we have."  Later

during the same conference call, Lund, joined in with the same talking point, asserting that "[o]n

the Alt-A side . . . the credit quality of that book looks like the credit quality of the rest of our book."

83.     On May 9, 2007, JP Morgan issued an analyst report which stated, in part, "Single-family credit quality remains good, and what little exposure Fannie has to higher risk subprime and Alt-A products is largely credit enhanced to minimize Fannie's losses."

84.     On July 27, 2007, Bear Stearns issued a report that stated "Credit quality remains very high.  The subprime mortgage crisis is not affecting Fannie Mae's loss experience.  Delinquencies remain very low."  The analysts also stated that they "continue to see Fannie Mae as much more of a beneficiary of the current subprime/mortgage market crises than a victim, and expect the [C]ompany's business volumes to grow as the market pays more attention to risk."

85.     On November 18-19, 2007, Bear Stearns issued reports that stated in part that "we believe the [C]ompany still faces far less credit risk than most other mortgage market participants" and that "[c]learly, severity is increasing with lower home prices, but we believe the [C]ompany's attention to underwriting and risk will result in significantly lower losses than most other mortgage market participants."

86.     The Exchange Act Defendants continued to bolster Fannie's false public persona.  As an example, the Company changed its policy on when to recognize a loss on a defaulted loan during a period where more loans were defaulting.  The New York Times reported in a September 7, 2008 article that, after scrutinizing Fannie's books, federal regulators became concerned that Fannie further "**mischaracterized [its] financial health by relaxing [its] policies on when to recognize a loss on a defaulted loan, according to people familiar with the review.  For years, [Fannie has] effectively done that when a loan is 90 days past due.  But, in recent months, [Fannie] said [it] would extend that to two years.**  As a result, tens of

27

thousands of loans that previously would have been marked down have maintained their value."
(Emphasis added.)

87.     In yet another example of the Exchange Act Defendants falsely minimizing Fannie's true risk exposure, according to Confidential Witness 1, a former Fannie Customer Account Risk Manager who reviewed loans being proposed for purchase by Fannie's lender-customers,[8] Fannie had a category of loans called "Expanded Approval" which it did not classify as being subprime but, which, if compared with Fannie's guidelines for what constituted a subprime loan, was in fact subprime.

### 2.     Though They Realized the Company's Risk Was Extensive, the Exchange Act Defendants Failed to Support or Enforce Risk Control

88.     As reported by the *Washington Post* on December 9, 2008, as long ago as March 2005, Fannie's *former* Chief Risk Officer, Adolfo Marzo, wrote to Defendant Mudd "to warn that entering new areas of the mortgage market represented significant risk," including the area of loans "that required little documentation . . . ."

89.     Fannie's Chief Risk Officer for the Class Period similarly had concerns that Fannie's risk controls were defective at the same time as the Company was taking on more risk in the form of subprime/non-prime mortgages.  On October 28, 2006, in a pointed email to Mudd, Dallavecchia complained as follows:

> Dan, I have a seri[ous] problem with the control process around subprime limits.
>
> The business actions in terms of ramping up business much faster than what would be consistent with the $5 [billion] limit for [the] year end we agreed upon

---

[8]     Confidential Witness 1 is a former Fannie employee who worked for the Company from February 2006 through January 2009.  Confidential Witness 1 started with Fannie as an Account Associate, during which time she worked on the Company's account with the mortgage lender Countrywide Financial.  In January 2008, she was promoted to Customer Account Risk Manager   In her role working with Countrywide, Confidential Witness 1 gained specific knowledge as to Fannie's evaluation of loans from Countrywide.  Further, as a Customer Account Risk Manager, Confidential Witness 1 gained insight into Fannie's overall loan evaluation process.

less than two months ago is de facto preventing me to exercise my reserved authority to determine limits without damaging relationships with customers.

This is on top of the recent lack of process on the Chase deal (also a limit excess on concentration and debt to income ratios), and after we approved twice (in March and in June) to buy loans without having completed the new business initiative.

There is a pattern emerging of inadequate regard for the control process.

90.     At the December 9 Hearing, Mudd confirmed that he understood Dallavecchia's email meant that Fannie was "ramping up too quickly on the subprime purchases and this acceleration prevented [Dallavecchia] from determining appropriate risk limits."  Congressman Bruce Braley asked Mudd whether the e-mail meant that Dallavecchia "believed that you were rushing into billions of dollars worth of subprime loan purchases without really knowing what you were doing.  Isn't that what he is saying here?"  Mudd responded, "Yes."  Mudd also agreed with Congressman Braley's comment that "if the control processes [we]re not in proper working order, it prevent[ed] you from following a rational decision-making model …."

91.     Instead, according to Confidential Witness 2, a former risk modeler who worked for Fannie as Director of Risk Management in the Business Analytics division (which was overseen by Dallavecchia's chief risk office) from May 1993 until August 2007,[9] Fannie did not evaluate the risk of the subprime mortgage pools it bought; it did not have a model to evaluate them.  As late as August 2007, Fannie was still building those models.

92.     According to Confidential Witness 2, because Fannie did not have the ability to analyze pools in-house, it instead relied on ratings issued by ratings agencies, such as Moody's, to guide its mortgage pool purchases.

---

[9]     Confidential Witness 2 has specific knowledge of Fannie's credit risk as well as its modeling procedures and capabilities.  Confidential Witness 2 was also privy to an internal home price forecasting report that warned top management at Fannie that home prices were about to suffer a massive decline.

93.    As the Exchange Act Defendants subsequently admitted, in Fannie's 2006 Form 10-K, filed on August 16, 2007, "the prevalence of loans made based on limited or no credit or income documentation also increases the likelihood of future increase in delinquencies or defaults on mortgage loans.  An increase in delinquencies or defaults likely will result in a higher level of credit losses, which in turn will reduce our earnings."

94.    Fannie's own analytics predicted a surge in loan delinquencies by early 2007. Beginning in January 2007, Eric Rosenblatt, a Vice President ("VP") of Credit Risk for the Company's Single Family business, began producing a Comprehensive Credit Risk Assessment Report (the "Risk Report") that provided a detailed review of Fannie's overall credit risk. According to Confidential Witness 2, the Risk Report "had a way of showing whether a loss attribute was worse than expected . . . . [For example y]ou could see what high LTV loans were doing."  The Risk Report was updated on a monthly basis, said Confidential Witness 2, and was "a key thing consumed by the business people" in the Single Family division — it was distributed to "anyone in [the] Single Family business or credit."  The Report was posted on the Company's internal website, for consumption by senior executives, which includes the Exchange Act Officer Defendants.  Confidential Witness 2 recalled that, by August 2007, the Credit Risk department was "getting very worried" about the risks of Alt-A loans based on loss projections set forth in the monthly Risk Reports.  In addition, Confidential Witness 2 stated, Rosenblatt ran an "internal quarterly portfolio review" of Alt-A loans at that time which specifically showed "the performance of Alt-A had started to deteriorate." The quarterly portfolio review result would have been posted on the internal web site as part of the Risk Report, again for consumption by senior executives including the Exchange Act Officer Defendants.

95.     Fannie's analytics further predicted a massive decline in the housing market. According to Confidential Witness 2, in late 2006, Fannie was worried about a rapid decline in home prices that would wipe out Fannie's core capital.  According to Confidential Witness 2, in January 2007, Rosenblatt also assigned a team to build a home price model forecast.  The result was a Power Point document, completed in January 2007, called the "Home Price Forecasting Report."  This report, which was a component of the Risk Report, was built using home prices from forty different regions of the country.  The report showed that income was *far below* what it took to sustain the housing market and that home prices would therefore decline dramatically. According to Confidential Witness 2, Fannie saw a negative 50 percent drop in home prices in three to five years.  Based on this forecast of home price decline, for the first time in Fannie's history the report predicted "over a billion dollars—up from $300 to $400 million dollars—in losses.  We finally broke a billion."

96.     Confidential Witness 3 who, in her role as a Senior Business Manager in Fannie's Enterprise Risk Services department had direct knowledge of the Company's credit risk profile,[10] recalled that by late 2006 Fannie had produced internal reports warning of declining home prices and increased loan delinquency rates.  These reports went to "senior [Vice-Presidents] and senior leadership," which includes the Exchange Act Officer Defendants.  According to this source, there was no question that Fannie's senior leadership such as the Exchange Act Officer Defendants would have been aware of the dire warnings in the reports because the information from these reports came from the top down.  In other words, in order for someone in Confidential Witness 3's position to have knowledge of the information in the reports, senior leadership would have had to approve release of such information.

---

[10]     Confidential Witness 3 is a former Fannie employee who worked for the Company from 2004 through early 2009.  In her position, she had direct knowledge of the decision-making that shaped the credit risk profile of Fannie's Single Family business.

97.     Thus by late 2006, the Exchange Act Defendants knew that their venture into risky subprime and Alt-A mortgages and mortgage related products was going to result in severe losses.  In an effort to prolong the inevitable, the Exchange Act Defendants continued to pursue risky mortgages in pursuit of higher revenue.  Fannie's Subprime Business Unit recommended to the Credit Risk Committee that the Company commit $11.25 billion more to subprime loans in 2007 than it did in 2006.

98.     Even while proceeding with their risky strategy of accumulating subprime/non-prime products, the Exchange Act Defendants never remedied the fact that Fannie lacked the risk control processes to assess and monitor the heightened risk.

99.     Dallavecchia warned Mudd and the Company's Chief Operating Officer, Michael Williams, that cuts to his division's budget would materially impair Fannie's ability to manage risk.  On July 16, 2007, Dallavecchia wrote an email to Williams and stated the following:

> **Doing the budget for n[e]xt year off my forecast and with a 16pct further reduction in budget is at best being ill informed or maybe . . . [is] due to malice.**  I find it offe[n]sive to my intelligence and that of my staff.
>
> **The company has one of the weakest control processes I [have] ever witness[ed] in my career . . . .  This company really doesn't get it, we are not even current and we are already back to the old days of scraping on controls and people** . . . .

(Emphasis added.)

100.     That same day, Dallavecchia forwarded to Mudd the email that he had sent to Williams and further stated, in part, the following:

> In a nutshell, I am very upset as I had to stand at the Board meeting today and hear that we have the will and money to change our culture and support taking more credit risk.
>
> *            *            *
>
> It was inappropriate what was said today to the Board as if I had all the necessary means and budget to act on the strategic plan.  **I do not even think that with**

**what I was given for 2008 is adequate for the current risk, considering how far we already are from adequate market practices.** I had no part in some Board members asking questions on having the means to execute, but I cannot let the impression stand, as my credibility and reputation with them will be at stake.

*      *      *

…I can only infer malice from some of your directs…when they are fully aware that CRO is in full build up mode, that I took leadership not only in cutting expenses from CRO but for the whole risk discipline this year, and that **I have been saying that we are not even close to have proper control processes for credit, market and operational risk. I get a 16pct budget cut. Do I look stupid?** And if they didn't act with malice, I would propose that maybe they don't get how you run budget custs [sic].

(Emphasis added.)

101.    None of these facts were disclosed to the investing public. Instead, the Exchange Act Defendants maintained that Fannie's financial condition was sound and the risks it had taken were prudent. On September 20, 2007, Mudd testified before Congress that Fannie could "provide more liquidity help to the home finance market today without taking risks we are not capable of managing" and that Fannie had "vastly reduced [its] material control weaknesses."

**D.    The Exchange Act Defendants Did Not Take Protective Steps to Reduce the Risk Associated With Fannie's Investments in and Guarantees of High-Risk Debt**

102.    At the same time that the Exchange Act Defendants shifted the business focus away safe, "plain vanilla" loans and toward risky subprime and Alt-A loans, they failed to seek appropriate protection for the Company's enhanced risk through such things as higher pricing, stringent underwriting standards and financial guarantor hedging.

103.    As explained by Professor Calomiris in his written testimony for the December 9 Hearing, subprime and non-prime loans may serve a legitimate purpose but require (a) a premium to be paid for the extra risk the lender is taking on and (b) balance in the loan portfolio so that it is not too heavily weighted toward these riskier loans:

The problem with these sorts of loans arises . . . when the risk is not priced properly as the result of either a distorting government subsidy or a market failure. In the presence of such distortions, subprime portfolios may grow to be too large, may earn too little income and may be securitized with too high leverage, all of which results from the underestimation of their risk. If this happens in the extreme, as during the current financial crisis, the excessive lending and leveraging can lead to a systemic threat to the financial system.[11]

### 1. The Exchange Act Defendants Failed to Properly Price Fannie's Guarantees Related to Alt-A Loans

104.    The Exchange Act Defendants failed to price Fannie's guarantees for MBS backed by Alt-A loans to compensate for the loans' increased risk and the correspondingly increased likelihood that the loans would default and leave Fannie liable for the remaining principal and loan payments.

105.    As reported by the New York Times in an October 5, 2008 article focusing on the period between 2005 and 2007, a "former senior Fannie executive" explained that the Exchange Act Defendants "understood that [Fannie was] now buying loans that [it] would have previously rejected, and that **the models were telling us that [Fannie was] charging way too little**." (Emphasis added.)  As FHFA director Lockhart confirmed in his September 23, 2008 report to Congress, "the credit profile at [Fannie] followed the market down in 2006 and 2007—**without commensurate pricing for risk**." (Emphasis added.)

### 2. The Exchange Act Defendants Did Not Maintain Fannie's Underwriting Standards

106.    Fannie also failed to adequately monitor the underwriting of the lenders from which it acquired mortgage loans.

107.    In the pursuit of ever-greater profits and market share, the Exchange Act Defendants essentially advocated abandoning Fannie's underwriting standards:  Congressional testimony given at the December 9 Hearing indicated that beyond the $11.25 billion in additional

---

[11]    Calomiris Statement, at 2.

subprime loans that Fannie's Subprime Business Unit proposed on January 17, 2007 to the Credit Risk Committee, the Unit also proposed **eliminating** restrictions on the volume of mortgages Fannie could purchase with lower borrower scores and unverified income.

108.   According to Confidential Witness 1, who in her role as a Customer Account Risk Manager had a detailed knowledge of Fannie's loan evaluation process, the Exchange Act Defendants loosened Fannie's guidelines for the quality of the loans it would accept as early as 2006. For example, the Company accepted FICO scores that were as low as 500.

109.   The Exchange Act Defendants also pulled back on the Company's use of Desktop Underwriter ("DU"), an automatic underwriting program that had previously been used to help screen out especially high risk loans. As former Fannie CEO Franklin Raines ("Raines") testified to Congress at the December 9 Hearing, "it appears that in taking on [high-risk] loans, Fannie Mae had altered its underwriting standards by, for example, not running many of those loans through [DU], an automated tool that helps lenders evaluate and price credit risk." Indeed, Lund admitted in the August 8, 2008 analyst conference call that "[a] significant portion of Alt-A doesn't go through DU."

### 3.   The Exchange Act Defendants Failed to Manage Credit Risk Exposure by Allowing, for Critical Customer Relationships, Internal Rule-Bending of Policies Designed to Insulate the Company from Risk

110.   Exhibiting a desire both to please lenders with whom Fannie had lucrative relationships and to obtain higher-risk/higher-yielding loans, the Exchange Act Defendants demonstrated an unwillingness—beyond already lax controls—to manage risk, as demonstrated by Fannie's relationship with its key customer/lending partners Countrywide Financial and IndyMac.

(a)     **Countrywide**

111.    Countrywide was Fannie's largest supplier; it delved heavily into subprime and non-prime loans.  As mentioned previously, Countrywide CEO Anthony Mozilo put direct pressure on Fannie CEO Mudd for Fannie to start buying Countrywide's riskier loans, noting "You need us more than we need you."

112.    The relationship was one of continual pressure and disregard of internal rules and procedures.  Fannie made exceptions to its loan and servicing criteria for Countrywide. According to Confidential Witness 4—a former Operations Manager in the Credit Loss Management ("CLM") Operations group, who coordinated loan document review for loans that had been selected for review during Fannie's quality control review process[12]—Countrywide's working relationship with the CLM group deteriorated during the Class Period.  Specifically, starting in late 2007, Countrywide refused to cooperate with Fannie's loan review process. According to Fannie's normal review policies, once a loan was selected for review, Fannie's policies and procedures required that the loan documentation be turned over within 45 to 60 days.  If that deadline was not met, Fannie would, as a matter of course, ask the lender to repurchase the loan.  But starting in late 2007, Confidential Witness 4 observed that there were a very excessive 6,000 to 7,000 requested Countrywide files that had been requested, but had yet to be produced within the required timeframe.

---

[12]     Confidential Witness 4 is a former Fannie employee who worked for the Company from August 2006 through August 2008.  From August 2006 until the end of 2007, Confidential Witness 4 was a member of the Central Business Analysis Team (CBAT)—a group which provided technology and business support to Credit Loss Management (CLM) and the National Underwriting Center (NUC), as well as the National Property Disposition Center (NPDC).  In early 2008, Confidential Witness 4 assumed the role of Operations Manager in the CLM group, and remained in this role until he left Fannie in August 2008.  The overall responsibility of CLM is to monitor credit loss management on Fannie's single family book of business.  As a CLM operations manager, one of Confidential Witness 4's main responsibilities was to coordinate the loan review process, including loans that experienced early payment defaults or were foreclosed.

113.    According to Confidential Witness 1, a former Account Associate at Fannie who worked specifically with Countrywide, the mortgage lender was Fannie's biggest client and was given "more room" than other lenders.  When Countrywide spoke, said Confidential Witness 1, "Fannie Mae jumped."  Fannie feared that if it did not cater to Countrywide, the lender would take its business elsewhere.

114.    Under the Company's risk management guidelines, when a certain significant number of outstanding files accumulate, a trigger acts to prevent the lender from selling to Fannie (at least until the risk issue is resolved), or else change the terms of their agreement.  According to Confidential Witness 4, Fannie disregarded its policies and procedures and did not enforce the trigger for the Countrywide relationship.

115.    Also, according to Confidential Witness 4, Fannie and Countrywide disagreed on the amount Countrywide should have to pay Fannie to repurchase certain loans that Fannie had the right to put back to lenders.  In the Spring of 2008, there was a directive from the VP for CLM setting the repurchase value that Fannie would seek from original lenders at 92% of the value of the loan.  But, in the Spring of 2008, when Fannie sought to have Countrywide repurchase approximately $680 to $690 million in loans, the VP of Sales in charge of the Countrywide relationship was told to accept just $120 million—materially less than 92% of the amount sought.

### (b)    IndyMac

116.    Prior to late 2007, IndyMac only had a limited relationship with Fannie.  In November 2007, after its primary sales pipeline—the secondary market—completely dried up, IndyMac announced massive losses for the third quarter of 2007, and its survival depended on it finding another repository for its loans.   In an attempt to find such a repository, IndyMac began to focus on loans that could be sold to the GSEs.  According to IndyMac's 2007 Annual Report,

sales to GSEs such as Fannie increased to 48% of total loan distribution for the year ended December 31, 2007, which was $71.2 billion.

117.     Many of these loans were seriously flawed: According to Teri Buhl, an investigative reporter for the *New York Post*, after IndyMac was seized by regulators in July 2008, Fannie asked IndyMac to repurchase between $1 and $10 billion in loans because IndyMac violated representations and warranties on various loans sold to Fannie that continued to be serviced by IndyMac.  According to Buhl, IndyMac originated billions of dollars of loans that experienced early payment defaults or were made under fraudulent conditions.

118.     Fannie had advance warning of IndyMac's fraudulent loans in 2006, but nevertheless increased its exposure to that company anyway.  As alleged in *Folsom v. IndyMac Bancorp, Inc. et al,* 2:08-cv-03812-GW-VBK (C.D. Cal.), Michelle Leigh ("Leigh"), First Vice President and Division Head of Post Production Quality Control in the Consumer Lending Group at IndyMac from August 4, 2004 to September 2006, specifically told Fannie of IndyMac's failure to comply with regulatory guidelines.  Leigh was responsible for sampling and reviewing all IndyMac loans.  In her position, she prepared a preliminary report that identified 63 findings of significant problems in the loans that she had reviewed.  These findings showed that the loan documentation was fraudulent.  For instance, she identified a loan with a "stated income" of $90,000, but the borrower's loan file disclosed that she earned $11.00 per hour as a cafeteria cashier at Disneyland.  The report, despite the objection of Leigh, was revised.  Accordingly, on September 8, 2006, Leigh wrote to Fannie complaining about this issue, a warning Fannie failed to heed.  Despite this warning, Fannie continued to purchase, and actually increased its purchase of, loans from IndyMac.

4.      **Fannie Did Not Diversify the Portion of its Book of Business That Was Concentrated in Geographically Risky States**

119.     During a housing boom, geographic areas that have experienced exceptional appreciation in home prices are at risk for correspondingly disproportionate decreases when prices decrease.  Fannie's book of business was concentrated in states that had been particularly affected by the real estate boom, leaving the Company with massive risk exposure:  falling home prices lead to rising delinquencies, as the prices fall below unpaid mortgage principal.

120.     In past filings, Fannie had identified California—and California alone—as a geographic source of risk.  In **each** of its Forms 10-K's for the years **2004**, **2005** and **2006**, which were filed, respectively, on December 6, 2006, May 2, 2007, and August 16, 2007, the Exchange Act Defendants only claimed concentrations in California—"Except for California . . . no other significant concentrations [of Fannie's book of business] existed in any state."

121.     However, unknown to the investing public, Fannie also had concentrations in other high risk geographic areas.  On November 9, 2007, when it filed its 2007 third quarter 10-Q, Fannie disclosed:  "We have also experienced a significant increase in delinquency rates in loans originated in California, Florida, Nevada and Arizona.  These states had previously experienced very rapid home price appreciation and are now experiencing home price declines."  Elsewhere in the filing, Fannie noted its exposure in California and Florida:  "California and Florida . . . represent the two largest states in our single family mortgage credit book of business . . . ."[13]  And building on those disclosures, Fannie's 2008 first quarter 10-Q, filed before the start of trading on May 6, 2008, stated that "[o]ur credit losses for the quarter were concentrated primarily in our Alt-A and other higher risk loan categories, in loans originated in 2005 through

---

[13]        Only a year later did investors learn just how substantial the Florida concentration was—Fannie's 2008 Second Quarter 10-Q Investor Summary, dated August 8, 2008, disclosed that approximately $199 billion of Fannie's single-family mortgage credit book of business was located in Florida, including approximately $33 billion of Alt-A.

2007, and in areas of the country experiencing steep declines in home prices (such as **Florida**,

**California**, **Nevada** and **Arizona**) . . . ."  (Emphasis added.)

122.    Indeed, California, Florida, Nevada, and Arizona had been and were states in

which Fannie's book of business had significant concentrations, and in which Fannie was at risk

for experiencing disproportionate amounts of credit losses.

**5.      The Exchange Act Defendants Did Not Protect against, or Disclose, Fannie's Significant Exposure to Financially Unsound Mortgage Guarantors**

123.    Fannie had significant exposure to unsound financial mortgage guarantors.

Financial guaranty contracts, which assure the collectability of payments and principal on

guaranteed MBS if the loans underlying the MBS go into default or delinquency, were crucial to

the smooth operation of Fannie's business.  If the guarantors fail, so too do the good values of

the securities they guarantee.  Where it was probable that any of the companies, or financial

guarantors, that provide such contracts to Fannie would not fulfill their obligations, the value of

the securities that Fannie insured would be impaired.

124.    Starting no later than November 2007, many financial guarantors were

downgraded by credit ratings agencies and had seen their stock prices significantly decline,

materially increasing the risk that they would fail to fulfill their obligations.   Both the Wall

Street Journal (on November 8, 2007) and EuroWeek (on November 9, 2007) published articles

warning that the financial guarantors were in fiscal danger as a result of their exposure to

subprime mortgages.

125.    In December 2007 and early January 2008, there was a series of downgrades of

the credit ratings of major financial guarantors.

126.    The events starting in November 2007 demonstrated it was probable that Fannie's

financial guarantors would be unable to fulfill their contractual obligations to Fannie.  Fannie

had exposure to financial guarantors of at least $12.3 billion as of December 31, 2006 and $11.8 billion as of December 31, 2007.  However, Fannie did not start to disclose such concentration of risk to investors until February 27, 2008, in the Company's annual report for the year ended December 31, 2007.

127.    The Exchange Act Defendants were further aware that the financial deterioration of financial guarantors and that the risk of non-payment had materially increased because, according to Fannie's SEC filings, Fannie managed its exposure to financial guarantors through in-depth analyses of their financial position and stress analyses of their financial guarantees and available capital.  Such in-depth analyses surely would have revealed that extreme circumstances that led to the guarantors' credit downgrades.

128.    Fannie's undisclosed exposure to its financial guarantors was highly material.  As the Company stated in its quarterly report for the quarter ended September 30, 2008—after the government takeover: "**we do not believe that we can rely on all of our counterparties to repay us in full in the future** . . . . Further downgrades in the ratings of our financial guarantor counterparties could result in a reduction in the fair value of the securities they guarantee, which could adversely affect our earnings, liquidity, financial condition and net worth." (Emphasis added.)

**E.    Fannie's Lack of Control Mechanisms or Desire to Enforce Then-Existing Protocols Buckled Fannie's Finances**

129.    In the end, as the Exchange Act Defendants knew, Alt-A and subprime loans proved for Fannie to be more risky and damaging than traditional loans.  Accepting reduced documentation led to greater default risk.  Alt-A loans generally had riskier characteristics, and Fannie's loans were no exception.

- As one example, as disclosed in Fannie's 2008 Credit Supplement, filed with the SEC on February 26, 2009, at the end of 2008, 26.7% of Fannie's Alt-A loans also involved adjustable rate rather than fixed rate mortgages.  Because borrowers stretch themselves financially to borrow and rely on stable housing prices and interest rates, the risk of default is greater.

- As another example, at the end of 2008, 22.2% of Fannie's Alt-A also involved mortgages on "other-than-principal residences."  Mortgages on other-than-principal residences are considered riskier to lenders and purchasers than mortgages on principal residences because a borrower is more likely to be fully committed to paying back the mortgage if he or she must do so in order to continue living in their home.  Indeed, many mortgages on other-than-principal residences are examples of speculation.

130.    As discussed above at ¶¶ 12, 82-84, while Dallavecchia and Lund were assuring analysts—in the presence of CEO Dan Mudd, CFO Robert Blakely, and future CFO Steve Swad—that the Alt-A in Fannie's book of business had the same credit quality as the rest of that book, Fannie had determined that the credit quality of the Alt-A in Fannie's book of business was so poor, and the default expectations so grim, that Fannie should significantly scale back their endeavor into Alt-A mortgages and mortgage related securities.  Not only had the Exchange Act Defendants not yet disclosed their exposure to subprime and Alt-A loans, but they also reached the point where they determined they had too much risk and had to stop.

131.    In mid-2007, with the expectation of crushing losses, Fannie significantly reduced its investments in, and guarantees of, new Alt-A loans.  As Defendant Mudd stated in a May 2008 call with analysts—approximately a year later: "We stopped largely doing Alt-A a year

ago, the concentration is a late '05, '06 or early '07 kind of a book . . . the Alt-A book [is] where we are seeing a disproportionate share of our losses . . . ."

132.    According to Confidential Witness 2, by the time he left in August 2007—just as Fannie was drastically pulling back on its new investments in Alt-A loans—the Company appointed a Vice President of subprime lending within its Single Family division and began "trying to build a model for sub prime" in a last ditch attempt to "evaluate loans bought directly from lenders like Countrywide."

133.    Indeed, the Exchange Act Defendants' expectations of increased losses came to fruition:  as disclosed in Fannie's 2009 First Quarter Credit Supplement, although Alt-A debt accounted for only 10% of Fannie's Single-Family Conventional Mortgage Credit Book of Business in that quarter, it was responsible for 39.2% of the quarterly credit losses.  Mr. Pinto testified at the December 9 Hearing that while expected defaults on non-prime loans originated in 2005 were 8%, they were nearly 40% for those originated in 2007.

**F.    Fannie's Core Capital Was Materially Inflated and Fell Below the Company's Regulatory Minimum Capital Requirements**

134.    As discussed above, at least by the beginning of the Class Period, the Exchange Act Defendants knew and/or recklessly disregarded that Fannie's risk controls were not capable of adequately monitoring and assessing the risk of the subprime and Alt-A loans Fannie had in its book of business and continued to acquire.  In fact, Defendant Mudd, testifying before Congress at the December 9 Hearing admitted that he was told by Fannie's Chief Risk Officer, Defendant Dallavecchia, that Fannie was "rushing into billions of dollars of subprime loan purchases without really knowing what [it was] doing."

135.    Moreover, by late 2006, as previously discussed, Fannie's Business Analytics division was predicting a massive housing market decline–with housing prices forecast to drop

up to 50% in the near term, or three to five years–due to, among other things, income growth being well below what was needed to sustain the housing market.

136.     Fannie was required to, but failed to, make material adjustments to its reported combined *loss reserves*, *other than temporary impairment* and *deferred tax assets* to reflect the facts alleged above.  The chart below depicts, by way of example, conservative estimates of the accounting changes Fannie was required to make under GAAP.  Had these estimated changes been made, Fannie's core capital surplus would have been materially reduced by the first quarter of 2007, and Fannie would have failed to meet its OFHEO-directed minimum capital requirement by no later than the first quarter of 2007.[14]

### OFHEO-DIRECTED MINIMUM CAPITAL AND STATUTORY MINIMUM CAPITAL

|  | FY '06 10-K | Q1 '07 10-Q | Q2 '07 10-Q | Q3 '07 10-Q | FY '07 10-K | Q1 '08 10-Q | Q2 '08 10-Q | Q3 '08 10-Q | FY '08 10-K |
|---|---|---|---|---|---|---|---|---|---|
| **Core Capital** | 41,950 | 41,710 | 42,690 | 41,713 | 45,373 | 42,676 | 46,964 |  |  |
| **Understatement of combined loss reserves** | (592) | (874) | (1,132) | (1,021) | (570) | (994) | (1,317) | (1,136) |  |
| **Understatement of other than temporary impairment** |  |  |  | (32) | (691) | (1,416) | (2,334) | (2,739) |  |
| **Overstatement of deferred tax asset** |  | (6,956) | (5,290) | (8,367) | (8,367) | (13,206) | (16,004) | (21,400) |  |
|  |  |  |  |  |  |  |  |  |  |
| **Core capital adjusted for these misstatements** | 41,358 | 33,880 | 36,268 | 32,293 | 35,745 | 27,060 | 27,309 | 8,630 | (8,641) |
| **OFHEO-Directed Minimum** | 38,166 | 38,386 | 39,426 | 39,393 | 41,505 | 37,602 | 37,525 |  |  |
| **Surplus** | 3,192 | (4,506) | (3,158) | (7,100) | (5,760) | (10,542) | (10,216) |  |  |
| **% Surplus** | 8% | -12% | -8% | -18% | -14% | -28% | -27% |  |  |

---

[14]     These estimates are offered by way of example only: larger accounting adjustments–which would have driven core capital even further below the required minimums–may well have been required.

**OFHEO-DIRECTED MINIMUM CAPITAL AND
STATUTORY MINIMUM CAPITAL**

| | FY '06 10-K | Q1 '07 10-Q | Q2 '07 10-Q | Q3 '07 10-Q | FY '07 10-K | Q1 '08 10-Q | Q2 '08 10-Q | Q3 '08 10-Q | FY '08 10-K |
|---|---|---|---|---|---|---|---|---|---|
| **Core capital adjusted for these misstatements** | 41,358 | 33,880 | 36,268 | 32,293 | 35,745 | 27,060 | 27,309 | 8,630 | (8,641) |
| **Statutory Minimum Capital** | 29,359 | 29,528 | 30,328 | 30,303 | 31,927 | 31,335 | 32,631 | 33,024 | 33,552 |
| **Surplus** | 11,999 | 4,352 | 5,940 | 1,990 | 3,818 | (4,275) | (5,332) | (16,379) | (42,193) |
| **% Surplus** | 41% | 15% | 20% | 7% | 12% | -14% | 16% | -50% | -126% |

137.    As revealed later, Fannie's severe undercapitalization was at the very heart of the reasons that Fannie was put into conservatorship on September 7, 2008.

**G.    Fannie's Mandatory Capital Requirements**

138.    Pursuant to the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 ("1992 Act"), Fannie is required to maintain a certain minimum amount of core capital—a critical measure of the Company's financial strength and viability. The more core capital Fannie held, the better equipped the Company was to cover any unexpected losses.

139.    The core capital minimum threshold, set by the 1992 Act, includes two key requirements. The first is a statutory minimum capital requirement, which essentially requires the Company's assets to exceed its liabilities by a certain ratio. As stated in Fannie's 2007 10-K, "[f]or purposes of the statutory minimum capital requirement, we are in compliance if our core capital equals or exceeds our statutory minimum capital requirement." Statutory minimum capital is generally the sum of (a) 2.5% of on-balance sheet assets; and (b) 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances.

140.    The second key capital requirement to which Fannie is subject is a heightened OFHEO-directed minimum capital requirement.  This requirement came about as part of an OFHEO consent order directed to Fannie that addressed prior accounting misstatements.  The OFHEO-directed minimum capital requirement set benchmarks for Fannie to meet and initially mandated that the Company maintain a 30% capital surplus **above** its statutory minimum capital requirement.  By the end of the second quarter of 2008, the OFHEO-directed minimum had been reduced to 15% in excess of the statutory requirement, after having been at 20% the quarter before.

141.    A review of Fannie's credit risk exposure highlights the critical role played by the Company's capital.  As of September 30, 2007, Fannie had total credit exposure of $2.8 trillion, and approximately $405 billion of that amount consisted of exposure to subprime and Alt-A loans.  Given Fannie's significant exposure to high-risk, non-prime loans, its capital was a crucial bulwark against potential losses.

142.    During the Class Period, as set forth in the tables below, the Exchange Act Defendants reported that Fannie held a substantial surplus over its statutory minimum capital and OFHEO-directed minimum capital requirements.

## REPORTED
## STATUTORY MINIMUM CAPITAL
## AND
## OFHEO-DIRECTED MINIMUM CAPITAL

|  | FY '06 10-K | Q1 '07 10-Q | Q2 '07 10-Q | Q3 '07 10-Q | FY '07 10-K | Q1 '08 10-Q | Q2 '08 10-Q | Q3 '08 10-Q | FY '08 10-K |
|---|---|---|---|---|---|---|---|---|---|
| As Reported |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
| Core Capital | 41,950 | 41,710 | 42,690 | 41,713 | 45,373 | 42,676 | 46,964 | 16,645 | (8,641) |

| Statutory Minimum Capital | 29,359 | 29,528 | 30,328 | 30,303 | 31,927 | 31,335 | 32,631 | 33,024 | 33,552 |
|---|---|---|---|---|---|---|---|---|---|
| Surplus | 12,591 | 12,182 | 12,362 | 11,410 | 13,446 | 11,341 | 14,334 | (16,379) | (42,193) |
| % Surplus | 43% | 41% | 41% | 38% | 42% | 36% | 44% | -50% | -126% |
| | | | | | | | | | |
| OFHEO-Directed Minimum | 38,166 | 38,386 | 39,426 | 39,393 | 41,505 | 37,602 | 37,525 | | |
| Surplus | 3,784 | 3,324 | 3,264 | 2,319 | 3,868 | 5,074 | 9,439 | | |
| % Surplus | 9.9% | 8.7% | 8.3% | 5.9% | 9.3% | 13.5% | 25.2% | | |

143.    The surpluses in the tables above were illusory.  The Exchange Act Defendants propped up Fannie's balance sheet—and thus its capital—by failing to establish adequate *loss reserves* and overstating the value of key assets, including its *deferred tax assets*, thus avoiding a negative impact to the Company's retained earnings.  Because retained earnings are a component of Fannie's core capital, any additions to combined *loss reserves* or reduction to the value of Fannie's assets would have immediately caused core capital to decline by the same amount.  The Exchange Act Defendants also failed to recognize sufficient *other than temporary impairment* to its *available-for-sale* securities.  The Company did not recognize unrealized losses *available-for-sale* securities to be other than temporarily impaired, and therefore segregated them in accumulated other comprehensive income ("AOCI"), which is excluded from Fannie's core capital. Thus by failing to recognize sufficient amounts of *other than temporary impairment*, the Company excluded losses that would have negatively impacted core capital.  As a result of the financial misstatements, Fannie's core capital level appeared much higher than it actually was.

1. **Fannie Avoided a Write-down of Core Capital by Failing to Properly Increase its Combined Loss Reserves and Other Than Temporary Impairment**

144.     The Exchange Act Defendants avoided a writedown of core capital because they failed to make:  (1) timely additions to the Company's combined *loss reserves* to address an expected rise in the default rates on its mortgages loans; and (2) proper additions to the *other than temporary impairment* the Company recognized to the fair value of its *available-for-sale* loans.

a.      **Increases to Combined Loss Reserves**

145.     *Loss reserves* are reserves of capital Fannie sets aside to absorb estimated credit losses to both its portfolio of loans held for investment purposes and to the loans that back the MBS that the Company guarantees.

146.     Given the Company's statement in its 2006 Form 10-K that it "expect[ed] our overall serious delinquency rates to increase in 2007," its January 2007 internal forecast of a 50% drop in housing prices over a three to five year period and numerous internal reports generated in the fall of 2006 projecting severe declines in housing prices and increases in delinquency and default rates, there was a sharp increase in Fannie's probable credit losses by the fourth quarter of 2006.  Yet, the Exchange Act Defendants failed to make a correspondingly substantial increase to the Company's combined *loss reserves* until the fourth quarter of 2007— an entire year later.

147.     In the fourth quarter of 2007, the Company finally increased its *loss reserves* from $1.4 billion to $3.4 billion—even though the value of Fannie's entire mortgage book of business had already been flat and the market decline had been underway for at least a year.

148.     Even after the Exchange Act Defendants finally increased Fannie's combined *loss reserves*, the adjustment was not in line with the Company's actual expectations regarding future

loss trends.  The Exchange Act Defendants stated in Fannie's third quarter 2007 Form 10-Q that the housing and market downturn had worsened during 2007 and was expected to continue during 2008, and that, as a result, delinquencies and foreclosures would increase during the remainder of 2007 and into 2008.  Yet, after increasing Fannie's combined *loss reserves* in the fourth quarter of 2007, the Company gradually increased the percentage of its mortgage book it took as combined *loss reserves*.  These increases were inadequate to cover the deterioration in Fannie's mortgage book as evidenced by the fact that in the fourth quarter of 2008, the Company made a massive increase to its combined *loss reserves* from $15.6 billion to $24.8 billion.

149.    In particular, Fannie's combined *loss reserves* set aside to absorb estimated credit losses were dwarfed by its actual credit risk exposure to the subprime and Alt-A loans for which it provided guarantees.  For example, as set forth in the table below, Fannie's guaranty credit risk exposure was a massive $2.6 trillion as of September 30, 2007, while its combined *loss reserves* for the fourth quarter of 2007 were only $1.4 billion.  Given this fact, the Company's loss reserves clearly were insufficient.  The table below illustrates the additions to the Company's combined *loss reserves* during the Class Period:

**\*(numbers in millions)**

| Allowance for loan losses: | Q4 '06 | Q1 '07 | Q2 '07 | Q3 '07 | Q4 '07 | Q1 '08 | Q2 '08 | Q3 '08 | Q4 '08 |
|---|---|---|---|---|---|---|---|---|---|
| Loans held for investment | 379,027 | 381,622 | 387,322 | 394,945 | 397,214 | 403,442 | 412,776 | 399,637 | 415,065 |
| Allowance for loan losses | 340 | 312 | 337 | 395 | 698 | 993 | 1,476 | 1,803 | 2,923 |
| Allowance as % of loans | 0.09% | 0.08% | 0.09% | 0.10% | 0.18% | 0.25% | 0.36% | 0.45% | 0.70% |
| | | | | | | | | | |
| Reserve for guaranty losses: | | | | | | | | | |
| Outstanding Fannie MBS and other guarantees | 1,915,457 | 2,017,471 | 2,080,676 | 2,163,173 | 2,139,481 | 2,374,033 | 2,442,886 | 2,502,254 | 2,459,383 |
| Reserve for guaranty losses | 519 | 618 | 821 | 1,012 | 2,693 | 4,202 | 7,450 | 13,802 | 21,830 |
| Reserve as % of average outstanding | 0.03% | 0.03% | 0.04% | 0.05% | 0.13% | 0.18% | 0.30% | 0.55% | 0.89% |

150.     Because the Exchange Act Defendants failed to make timely additions to Fannie's combined *loss reserves* to cover the expected deterioration in its mortgage book of business, the Company's core capital appeared to be far more substantial that it actually was.

### b.     *Other Than Temporary Impairment* **Recognition**

151.     Fannie also avoided a reduction of its core capital by failing to adequately recognize "*other than temporary impairment*" to the fair value of its *available-for-sale* assets, which are securities that are neither held principally for the purpose of trading in the near term, nor held to maturity.  These assets, which included Fannie's Alt-A and subprime private label

50

mortgage securities, constituted a significant portion of its mortgage book:  33% of total assets at the end of 2007 and 30% at the end of 2008.

152.    Unlike declines in the fair value of other types of securities, declines in the fair value of *available-for-sale* securities bypass the income statement — meaning the changes do not impact net income — **unless** they have become "other than temporary."  Instead, such declines in value are held as unrealized losses in AOCI, and do **not** impact a company's capital.

153.    According to Fannie's own Forms 10-K, *available-for-sale* securities with no prospect for an imminent recovery in value, are other than temporarily impaired.[15]  Because the mortgage market declined severely starting in 2006, and given that, as stated above, Fannie expected its "serious delinquency rates to increase in 2007" and further had an internal forecast of a 50% drop in housing prices over a three to five year period, there was virtually no prospect for a near-term reversal of the unrealized losses to Fannie's *available-for-sale* securities.

154.    Even though there was in effect no possibility for a near-term reversal of the unrealized losses to Fannie's *available-for-sale* securities, the Company reported very little *other than temporary impairment* relative to the amount of unrealized loss to those securities.  For example, at the end of the second quarter of 2008, Fannie reported $6.6 billion in unrealized loss to its *available-for-sale* securities but recognized only $507 million in *other than temporary impairment*.

155.    Indeed, from the third quarter of 2007 through the second quarter of 2008, Fannie recorded only $1.4 billion in *other than temporary impairment* for all four quarters.  The Company classified the remainder of the unrealized loss as "temporary", so that it had **no** impact on capital.  Then, in the last two quarters of 2008, Fannie recorded $6.4 billion in *other than*

---

[15]    An additional factor is the duration of impairment.

*temporary impairment*—over four times as much as it recorded in the previous four quarters combined.  The following tables show: (1) Fannie's investment in *available-for-sale*-securities and the related unrealized losses on those securities, as reported, for the relevant periods; and (2) the *other than temporary impairment* the Company recorded from the third quarter of 2007 through the fourth quarter of 2008:

| AVAILABLE FOR-SALE INVESTMENT AND LOSSES | | | | | | |
|---|---|---|---|---|---|---|
| ($ in millions) | Q3 '07 | Q4 '07 | Q1 '08 | Q2 '08 | Q3 '08 | Q4 '08 |
| | | | | | | |
| **Assets on Balance Sheet:** | | | | | | |
| *Available-for-sale*, at fair value | $315,012 | $293,557 | $228,228 | $245,226 | $262,054 | $266,488 |
| | | | | | | |
| **Stockholders' Equity on Balance Sheet:** | | | | | | |
| Unrealized losses on available-for sale securities, net of tax[16] | 292 | 4,156 | 2,339 | 4,270 | 6,740 | 5,487 |
| Income tax benefit | 157 | 2,238 | 1,260 | 2,299 | 3,629 | 2,954 |
| Unrealized losses on available-for sale securities, before tax (not reported) [17] | 449 | 6,394 | 3,599 | 6,569 | 10,369 | 8,441 |

| OTHER THAN TEMPORARY IMPAIRMENT | | | | | | |
|---|---|---|---|---|---|---|
| ($ in millions) | Q3 '07 | Q4 '07 | Q1 '08 | Q2 '08 | Q3 '08 | Q4 '08 |
| | | | | | | |
| **Other-than-temporary impairment before tax (reported as part of investment losses)** | $(84) | $(727) | $(55) | $(507) | $(1,843) | $(4,569) |

---

[16]     This amount is reported as a component of the line item titled "accumulated other comprehensive income" in the stockholders' equity section of the balance sheet.

[17]     The unrealized losses are shown net of the tax benefit in the stockholders' equity section of the balance sheet.  Subtracting the tax benefit from the unrealized loss net of tax provides the reader of the financial statements with the total unrealized loss due to declines in market value.

156.   Because Fannie failed to recognize adequate amounts of *other than temporary impairment* during the Class Period, its core capital was materially overstated.

## 2.   Fannie Avoided a Drastic Write-down of Core Capital by Failing to Establish a Valuation Allowance against its *Deferred Tax Assets*

157.   Fannie avoided a drastic reduction in core capital by failing to establish a valuation allowance to significantly reduce the size of its *deferred tax assets*.

158.   *Deferred tax assets* may be used to reduce subsequent periods' income tax expenses.  They can arise in years in which a company incurs losses.  During the Class Period, a material part of Fannie's net worth consisted of these assets:  at the end of 2007, for example, the Company's $13 billion in tax deferred assets made up nearly 30% of its $44 billion in shareholder's equity.  By the second quarter of 2008, the Company's *deferred tax assets* had grown to $20.6 billion and made up nearly 50% of its $41 billion in shareholder's equity.

159.   Critically, the *deferred tax assets* had no value unless it was more likely than not that Fannie would generate a profit and pay taxes.  If Fannie incurred future losses, there would be no income tax expense for the *deferred tax assets* to reduce and the assets could not be utilized.

160.   To the extent that it was "more likely than not" that Fannie would not generate enough taxable earnings to use its *deferred tax assets*, it was supposed to record a reserve account called a "valuation allowance" to reduce the size of those assets on its balance sheet.

161.   In its third quarter 2008 Form 10-Q, the Company admitted that it had already been in a "cumulative book taxable loss position for more than a twelve-quarter period."  In other words, by the start of the Class Period, Fannie **already** had failed to generate taxable income for several quarters.  As the Company admitted in its third quarter 2008 Form 10-Q, "[f]or purposes of establishing a deferred tax valuation allowance, this cumulative book taxable

loss position is considered significant, objective evidence that [Fannie] may not be able to realize some portion of our *deferred tax assets* in the future."

162.     Fannie also had little hope for generating future taxable income sufficient to be able to realize its *deferred tax assets*.  As stated in Fannie's 2006 Form 10-K,  by late 2006 to early 2007, Fannie expected its "serious delinquency rates to increase in 2007" and the Company's own analytics division forecast a 50% drop in housing prices over a three to five year period (¶95).

163.     By the end of 2007, the negative evidence indicating that Fannie would be unable to generate taxable income sufficient to allow it to realize its *deferred tax assets* had only increased.  As the Company admitted in its third quarter 2007 Form 10-Q, the deterioration of the mortgage market was expected to continue during 2008.  By February 1, 2008, prior to Fannie's issuance of its 2007 Form 10-K, consensus analyst reports published by Thompson Financial, a service that collects various analyst expectations and then averages them to come up with a consensus, forecast a 2008 calendar year loss for the Company.  Moreover, with each successive quarter, the size of the consensus analyst estimate of the Company's losses increased.  Yet, Fannie did not establish **any** valuation allowance against its *deferred tax assets* during the Class Period.

164.     The Exchange Act Defendants' failure to establish a valuation allowance against Fannie's significant *deferred tax assets* to reflect the likelihood that it would be unable to utilize those assets made it appear as though the Company's core capital was adequate when in fact the Company was very undercapitalized.

165.     Indeed, as the Washington Post commented in a September 30, 2008 article, "In the weeks leading up to the [September 2008 federal government] takeover, government

examiners looking through Fannie Mae['s] … books worried about what made up the capital [it was] claiming.  For instance, [it] counted as part of [its] capital certain tax credits [it was] due.  But the tax credits could only be applied against profits.  Since the [C]ompany [was] experiencing big losses, the tax credits had little immediate value."

166.    As set forth in the tables at ¶136, above, if Fannie had established even a conservative valuation allowance to account for even a portion of its *deferred tax assets* in conjunction with possible conservative estimates of Defendants' other financial misstatements detailed herein, it would have failed to meet its OFHEO-directed minimum capital requirement by no later than the first quarter of 2007.

167.    Had the Company established a valuation allowance to account for the full value of its *deferred tax assets*, the impact to core capital would have been even greater.  For example, by the second quarter of 2008, Fannie's deferred tax asset balance had grown to $20.6 billion.  The Company reported core capital for the second quarter of 2008 of $47 billion — a seeming surplus of approximately $9 billion over its OFHEO-directed minimum capital requirement of $37.5 billion, and $15 billion over its required statutory minimum capital of $33 billion.  But, if, for example, Fannie established a valuation allowance to account for the $20.6 billion amount of its deferred tax asset as of the second quarter of 2008, its core capital would have declined to $26.4 billion—$11.2 billion less than its OFHEO-directed capital minimum, and $6.3 billion less than its statutory minimum.

168.    As a further confirmation that Fannie avoided a drastic reduction to its core capital by failing to establish a valuation allowance against its *deferred tax assets*, in the third quarter of 2008, Fannie finally wrote down the value of the $26 billion in *deferred tax assets* it had accumulated, dramatically reducing their value by over 80% to $21.4 billion.  As a result, the

Company's core capital plunged from $47 billion to only $16.6 billion, less than half of the $33 billion in statutory minimum capital it was required to maintain.

169.     If not for the misstated results in Fannie's financial statements, investors would have had substantial additional prior warning that the Company's core capital was inadequate, that Fannie was unsafe and unsound, and the Company was in imminent danger of being taken over by the Government.

<strong>VI.          CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT</strong>

170.     Lead Plaintiffs further allege that the Exchange Act Defendants participated in an extensive fraud throughout the Class Period to expose the Company and its investors to highly risky securities with the hope of financial reward.  As alleged above, a comprehensive investigation by Lead Plaintiffs has uncovered specific facts demonstrating that the Exchange Act Defendants knew (and/or recklessly disregarded) and concealed the fact that the Company was, contrary to its public posturing, growing its revenue and market-share by purchasing and guaranteeing high-risk subprime and Alt-A loans and misstating and/or omitting to disclose the true nature of its capital capacity and strength and its ability to assess and manage risk, among other things.

<strong>VII.          FALSE AND MISLEADING STATEMENTS</strong>

171.     Lead Plaintiffs repeat and reallege each of the materially false and misleading statements set forth above in ¶¶3-170, as if fully set forth herein.  The false and misleading statements further detailed below were made with scienter during the Class Period.  The Exchange Act Defendants made these statements in, among other things, Fannie's SEC filings, public conference calls, press releases, statements to the media and Congressional testimony.

172.    As detailed below, during the Class Period, the Exchange Act Defendants,

knowingly or with reckless disregard, misled Lead Plaintiffs and the other members of the

Classes by making materially misleading statements or omissions, detailed herein:

a.    Fannie failed to adequately monitor the underwriting by the lenders from which it acquired mortgage loans, which had the effect of increasing the amount of poorly-underwritten, high-risk loans purchased or guaranteed by the Company (¶¶106-118).

b.    Even as Fannie dramatically ramped up its investment in subprime and Alt-A mortgages and related securities, Fannie's risk controls were inadequate and the Company lacked the ability to measure the credit risk of such securities and, specifically:

   i.    in stark contrast to Fannie's statements throughout the Class Period that it carefully monitored the credit risk of loans it purchased, as stated by Confidential Witness 2, as late as August 2007 the Company did not have its own credit analysis models but instead relied solely on the judgment of ratings agencies (¶¶91-92); and

   ii.    by the beginning of the Class Period, Defendant Dallavecchia had sounded the alarm that Fannie's risk controls were materially defective and incapable of assessing the risks of the Company's subprime investments: in October 2006, Dallavecchia complained to Mudd that Fannie was "ramping up" its subprime business such that the Company was exceeding its own limits on risk exposure and that  "[t]here is a pattern emerging of inadequate respect for the control process."

c.    That Exchange Act Defendants falsely maintained that Fannie's credit book of business had strong credit characteristics when, in fact:

   i.    Fannie had a massive credit risk exposure to Alt-A and subprime mortgages and related securities; and

   ii.    In January 2007, as Exchange Act Defendants knew or recklessly disregarded, Fannie's business analytics division predicted a 50% decline in home prices and warned that such a decline would drastically increase the Company's losses and wipe out core capital (¶¶94-96).

d.    That the credit risk profile of Fannie's Alt-A and subprime mortgages and related securities was materially more risky than the credit profile of Fannie's portfolio of conventional 30 year fixed mortgages because, among other reasons (¶¶102-133):

   i.    those loans included risky speculator loans for vacation homes and investment properties; and/or

     ii.    those loans were concentrated in housing markets with abnormally high foreclosure rates, including not only California, but also Florida, Nevada and Arizona.

   e.    Contrary to statements that Fannie's subprime and Alt-A assets were of equal credit quality to its conventional loan assets, those assets in fact were significantly riskier than the Company's conventional loan assets (¶¶102-133).

   f.    In July 2007, Fannie materially lowered its risk management capabilities by sharply cutting the Chief Risk Officer's budget and staff: as Dallavecchia complained to Mudd and the Company's Chief Operating Officer, Michael Williams, on or around July 16, 2007, Fannie had one of "the weakest control processes" he had ever witnessed, the Company's budget was inadequate for Fannie's risk exposure and that it was not even close "to having proper control processes for credit, market and operational risk."

   g.    Rather than increase its guaranty fees to compensate for the increased risk of non-prime loans, including subprime and Alt-A, Fannie failed to seek appropriate protection for its enhanced risk (¶¶104-105).

   h.    By the beginning of the Class Period, Fannie failed to disclose that it already had a material exposure to Alt-A loans and MBS; during the Class Period until mid-2007, the exposure to Alt-A loans and MBS increased materially; and Fannie's concerns about the risky credit profile of these loans and MBS was such that Fannie largely stopped purchasing those loans and MBS.

## A.    November 8, 2006 Form NT 10-Q

   173.    On November 8, 2006, the Exchange Act Defendants caused Fannie to file a

Form NT 10-Q for the period ending September 30, 2006 (the "Nov. 8 NT 10-Q") and stated the

following concerning the Company's Alt-A and subprime exposure:

> We have increased our participation in [Alt-A and subprime] types of products where we have concluded that it would be economically advantageous or that it would contribute to our mission objectives. Our participation in these products reflects our assessment of anticipated guaranty fee income in light of our expectation for potentially higher credit losses. We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types. . . . **We believe that our assessment and approach to the management of credit risk continued to contribute in the third quarter of 2006 to the maintenance of a credit book of business with strong credit characteristics.**

(Emphasis added.)

174.     These statements were materially false and misleading because Fannie's credit book of business did not have strong credit characteristics, but rather, by the beginning of the Class Period Fannie had massive exposure to billions of dollars of risky subprime and Alt-A mortgage loans.  Specifically, these statements were materially false and misleading for the reasons set forth in ¶172 (a)-(b), (c)(i), (d), and (g)-(h).

**B.     Fannie's 2004 Annual Report**

175.     On December 6, 2006, the Exchange Act Defendants caused Fannie to file its annual report with the SEC on Form 10-K (the "2004 Annual Report") that stated the following concerning the impact of trends in the mortgage market on the Company:

> In recent years, an increasing proportion of single-family mortgage loan originations has consisted of non-traditional mortgages such as interest-only mortgages, negative-amortizing mortgages and sub-prime mortgages, and demand for traditional 30-year fixed-rate mortgages has decreased.  We did not participate in large amounts of these non-traditional mortgages in 2004 and 2005 because we determined that the pricing offered for these mortgages often was insufficient compensation for the additional credit risk associated with these mortgages.

176.     The 2004 Annual Report further stated that other than California, "no other significant concentrations [of non-traditional loans] existed in any state."

177.     The statements in ¶¶175-176 were false and misleading for the reasons set forth in ¶172 (a)-(c)(i), (d), and (g)-(h).

**C.     December 7, 2006 Conference Call**

178.     On December 7, 2006, Fannie conducted a conference call (the "Dec. 7 Conference Call").  Lund, who at the time ran Fannie's Single-Family Credit Guaranty business, stated: "if you look at the tables in the [2004] 10-K … that shows the credit characteristics, it is a very strong credit book.  That will bode us very well as we move into what is going to be a very different housing environment."

179.    These statements were false and misleading for the reasons set forth in ¶¶172 (a)-(c)(i), (d), and (g)-(h).

**D.    February 23, 2007 Reuters News Interview**

180.    On February 23, 2007, in an interview with *Reuters News*, Mudd falsely assured the public that: "We have a very small subprime effort . . . . We have entered the market prudently with a lot of standards and high credit quality."  Mudd added that Fannie's subprime investments constitute "well below 2 percent of our book."

181.    These statements were materially false and misleading for the reasons set forth in ¶¶172 (a)-(d) and (g)-(h).

**E.    February 27, 2007 Form NT 10-K, Conference Call and Related Statements**

182.    On February 27, 2007, the Exchange Act Defendants caused Fannie to file a Form NT 10-K with the SEC (the "Feb. 27 NT 10-K").  The Company represented that Fannie's foray into the subprime and Alt-A market was a careful and prudent one:

> Alt-A loans are generally defined as loans with lower or alternative documentation requirements, while sub-prime loans typically are made to borrowers with weaker credit histories… [W]e have increased our participation in these types of products by developing strategies to better support business, where we have concluded that it would be economically advantageous and/or that it would contribute to our mission objectives.  Our participation in these products reflects our assessment of anticipated guaranty fee income in light of our expectation for potentially higher credit losses.  We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types.

183.    These statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose the material facts set forth in ¶172 (a)-(d) and (g)-(h).

184.    Also on February 27, 2007, Fannie conducted a conference call with investors (the "Feb. 27 Conference Call").  On the call, Dallavecchia further represented that, to the extent

it invested in subprime and Alt-A loans, Fannie did so carefully and with the benefit of strong

risk controls:

> [W]e have increased our participation in subprime product in 2006.  **Our purchases have been prudent and have been made when we concluded that they would contribute to our mission objectives or they would generate a profitable return.** . . . **[W]e participate in the subprime market in accordance with parameters that were agreed between my team and the business leaders.  These parameters were developed to carefully calibrate exposure to layered risk, for example, the exposure to the combination of high loan-to-value duration and stated accommodation. . . . [W]e have acquired subprime loans from selected lender partners whose underwriting practices and standards we reviewed. . . .  I believe that our activity in the subprime market represents an appropriate and prudent engagement in a segment that has been important to the housing market in this country. . . .** I would advise that you consider our exposure in light of the strength of the risk characteristics I have described and the immaterial size of our participation in the subprime market.

*    *    *

> I think from a control and risk underwriting standpoint, we want to continue maintaining prudent underwriting standards.  One thing that we always look very carefully to is the layering of the risk, not that all subprime loans are bad, but there's some conditions where all the risks are layered one on top of the other, which makes the risk higher.  And we want to make sure that we understand the risk and we are remunerated for it.

(Emphasis added.)

185.    Further, during the February 27, 2007 Mudd repeated that "we have a book of

business with very strong credit risk characteristics….Our exposures to some of the high-risk

segments are extremely low for subprime, and estimated 2.2% of our total single-family credit

book of business at the end of '06."  Further, when asked about Alt-A loans, Mudd responded

that "we don't have so much that this is a major, significant exposure on our books."

186.    The statements in ¶184-185 were false and misleading because the Exchange Act

Defendants misrepresented and/or failed to disclose the material facts set forth in ¶172(a)-(d) and

(g)-(h).  In particular, these statements were at odds with the dire warnings Dallavecchia had

61

previously sounded in his internal October 2006 email to Mudd regarding Fannie's inability to assess and manage the risks of subprime loans.

187.    In response to a question during the February 27 Conference Call by Citigroup analyst Brad Ball regarding Fannie's strategy with respect to no-doc and low-doc loans, Fannie executives Dallavecchia and Lund falsely represented that Fannie's risk controls for Alt-A loans were so strong that such loans did not carry a heightened risk of default:

> [Dallavecchia]: On no-doc or limited documentation. . .  , **you have many instances where a lower level of documentation is not a clear indication that there is a heightened risk for default.**  But if you start compounding low-level documentation, low FICO score, high loan-to-value ratio, maybe high debt-to-income ratio, then it becomes a critically more riskier loan.  So that is how we tend to look at that.
>
> *        *        *
>
> [Lund]: [Y]ou can't look at a single factor.  What we have tried to talk about historically is layering of risk–documentation, loan to values, credit scores–and we look very broadly at all of these things.  And I don't think you can separate it from subprime, because I think low documentation began to bleed into subprime and it made it very difficult to even distinguish one from the other.  We look at all these characteristics individually and then combined.  And … we also looked at economic factors–home prices, things of that nature.  And then the final point is we look at the price available to cover the risk associated with that product.  And when we think those characteristics are in line and the underwriting is prudent around that, we can participate.
>
> *        *        *
>
> [Dallavecchia]: [W]e are trying to work with our lender partners to review the standards that they utilize to generate, to originate these loans. We work with them in defining the type of standards that we are comfortable with with regard to the risk profile and the return that we can gain on the product. And therefore, we do not really exclude the specific segment a priori. We want to see what is the layering of the risk. We want to understand what is the return for the layer on the risk. And then we determine if we feel that there is a proper risk/reward for that type of risk.

(Emphasis added.)

188.     These statements above were false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose the facts set forth in ¶172 (a)-(d) and (g).

189.     Also on the February 27 Conference Call, Mudd and Dallavecchia made the following statements concerning home sales:

> [Mudd]:  We all see the projections for declining home sales, housing starts and perhaps an actual drop in overall home prices this year on a national basis. . . . I want to emphasize, though, through all of this that Fannie Mae is in a good position, not only to weather the period ourselves, but even to help the market weather the period. . . .  Looking at the market generally, despite some short-term and largely regional challenges, we remain very bullish on housing in the longer term, and we believe that as the market grows, we too will grow.
>
> [Dallavecchia]:  [W]e are well positioned to absorb the potential impact of a slight decline in home prices in 2007.

190.     In so stating, the Exchange Act Defendants misrepresented and/or failed to disclose the facts set forth in ¶172 (c).

191.     On the Feb. 27 Conference Call, Lund emphasized that Fannie's "participation has continued to remain in the higher credit quality segments of alternative documentation . . . . [W]e have told you we're only going to participate when we think we get the right price/risk equation . . . and we feel good about the pricing . . . we have put on the books."  On that same call, Mudd further trumpeted Fannie's risk controls: "With the creation of the CRO position and the CRO office also came an appropriate set of processes and controls that went around that . . . that involved a process of setting standards and setting limits."  Mudd added: "We have enough engagement so far to be knowledgeable about the market, but we don't have so much that this is a major, significant exposure on our books."

192.     These statements were false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose the material facts set forth in ¶¶172 (a)-(d) and (g)-(h).

193.     The Company's statements led investors to believe that its exposure to subprime and Alt-A mortgages was limited and that the Company credit performance would be better than that of other market participants. For example, on February 28, 2007, Bear Stearns issued a research report that stated, in part, "To date the company has limited its exposures to sub-prime and Alt A loans . . . . [Fannie] believes its credit performance will remain significantly better than most other market participants. . . ."

**F.     March to April 2007 Congressional Testimony**

194.     On March 15, 2007 Mudd testified as follows before the United States House of Representatives Committee on Financial Services (the "Financial Services Committee") with regard to Fannie's exposure to subprime loans:

> We said a couple of years ago that this [subprime] market was evolving in a direction that we didn't like.  The layering of some of the products presented excessive risk to consumers.  We stepped away from it.

> *        *        *

> [Subprime is] less than 2.5 percent of our book. It's 80 percent insured. It's highly unsubordinated. We've been in it very carefully, consistent with some very strong anti-predatory lending guidelines we have.

195.     On April 17, 2007, when he further testified before the Financial Services Committee, Mudd again represented that Fannie's "[subprime] exposure remains relatively minimal – less than 2.5 percent of our book of business can be defined as subprime."

196.     Mudd's statements to Congress were materially false and misleading for the reasons set forth in ¶¶172 (a)-(d) and (h).

**G.     Fannie's May 2, 2007 Earnings Release, 2005 Annual Report and Conference Call**

197.    On May 2, 2007, Fannie issued a news release that disclosed the Company's financial results for 2005 and the Company filed its annual report for the year ended December 31, 2005 with the SEC on Form 10-K (the "2005 Annual Report").

198.    The 2005 Annual Report stated that Fannie had increased its exposure to non-traditional mortgages such as loans with lower credit quality, loans with reduced documentation and loans to fund investor properties only where "we concluded that it would be economically advantageous or that it would contribute to our mission objectives."  Fannie further represented that it applied its risk controls to limit the financial hazards of such loans:

> We consider the risk of default in determining our guaranty fee and purchase price. . . .  We have worked to enhance our credit analytics and data to better understand, assess and price for the risks associated with these products to allow us to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types.

199.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(c) and (g)-(h).

200.    The 2005 Annual Report reiterated that subprime loans made up only a small portion of its book of business: "The percentage of our single-family mortgage credit book of business consisting of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans represented approximately 0.2% of our single-family mortgage credit book of business as of December 31, 2006."  In the 2005 Annual Report, Fannie added "To date, our purchases of subprime mortgage loans generally have been accompanied by the purchase of credit enhancements that materially reduce our exposure to credit losses on these mortgages."  Finally, in the same Report, Fannie represented that:

> We estimate that approximately 2% of our single-family mortgage credit book of business as of December 31, 2006 consisted of private-label mortgage-related securities backed by subprime mortgage loans and, to a lesser extent,

resecuritizations of private-label mortgage-related securities backed by subprime mortgage loans.  We believe our credit exposure to the subprime mortgage loans underlying the private-label mortgage-related securities in our portfolio is limited because we have focused our purchases to date on the highest-rated tranches of these securities.

201.    In actuality, Fannie's subprime holdings were highly risky and the Company had significant subprime exposure.  As such, these statements were false and misleading for the reasons set forth in ¶172 (a)-(c) and (g)-(h).

202.    The 2005 Annual Report also stated that other than California, "no other significant concentrations existed in any state."  This statement was false and misleading for the reasons set forth in ¶172 (d)(ii).  Fannie had exposure to other high-risk states.

203.    Also on May 2, 2007, Fannie conducted a conference call with investors (the "May 7 Conference Call").

204.    During the May 2 Conference Call, KBW analyst, Fred Cannon, asked: "One of the major criticisms in [Alt-A and subprime] has been the lack of income criteria and documentation of income. And I was wondering what kind of standards you're looking for as you invest in both areas moving forward?"  Mudd and Lund responded to this question as follows:

> [Mudd]:  [T]he important characterization of all of our efforts with respect to subprime and Alt-A . . . is that we stood back from the market.  We adhered to our standards . . . . [N]ow the marketplace is moving back toward us."  . . . .
>
> So if you go too far down the path that says that we're changing our standards or changing our risk criteria, I think you wind up in the wrong place. Rather, I think we have stayed pretty steady….It's just that now, we are emerging as the best outlet for it . . . .
>
> [Lund]:  On the Alt-A side . . . the credit quality of that book looks like the credit quality of the rest of our book . . . our philosophy has always been price to the risk.  **And we have maintained that."**

(Emphasis added.)

205.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(e) and (g)-(h).

206.    On the May 2 Conference Call, in response to a question posed by Merrill Lynch analyst, Ken Bruce, regarding Fannie's opportunities in the Alt-A sector in light of the dislocation in the subprime and Alt-A market, Lund and Dallavecchia reassured him as follows:

> [Lund]:  On the subprime and Alt-A front, I think we see significant opportunity for us as a Company.  As Dan mentioned a little bit earlier, on a lot of these products and the layered risk that existed in the market, we backed away because we did not see the risk/return equation being appropriate.
>
> That has obviously had significant dislocation in the last x number of months. We have seen much tighter underwriting guidelines.  We have seen significant credit spread widening.  As a result, we've seen the market really move back more towards where Fannie Mae was.
>
> *      *      *
>
> [Dallavecchia]:   [T]he Alt-A products [are] [not subprime]. **On average, the credit characteristics of our Alt-A portfolio is comparable to the conventional book of business that we have. . . .** And given the mortgage market experience on credit [deterioration], I want to give you a picture of the quality of our Alt-A assets.  The weighted average FICO of our Alt-A book is comparable to the FICO of our single-family credit book, which was 720 FICO scores as of December of last year.  And the FICO of Alt-A book obviously has a wider distribution than the rest of our book. But as you can guess from the average of 720, is a very strong credit quality.
>
> Second, in recent years, Alt-A has been predominantly associated with the ARM market, with the floating rate, the resetting markets, which accounts for approximately [70]% of the issuance of [non-agencies]. In contrast, the majority of our Alt-A portfolio is comprised of fixed-rate mortgages.
>
> And finally, Fannie Mae uses credit enhancements to reduce our exposure to credit losses.  And a significant proportion, about two times greater than our conventional portfolio, in our Alt-A book is covered by (multiple speakers) credit enhancement.
>
> As such, although there has been a weakness in terms of the slow down of house prices' appreciation, I feel fairly comfortable that we continue to maintaining [sic] a solid credit portfolio.

(Emphasis added.)

207.    On the same May 2 Conference Call, Blakely said "We have already disclosed the strong characteristics for our credit book of business through year-end 2006, and our minimal exposure to subprime loans and securities backed by subprime loans."

208.    The Exchange Act Defendants' reassurances as to Fannie's Alt-A and subprime holdings in ¶¶206-207 were false and misleading for the reasons set forth in ¶172(a)-(e) and (g)-(h).

**H.    May 9, 2007 Form NT 10-Q**

209.    On May 9, 2007, the Exchange Act Defendants caused Fannie to file a Form NT 10-Q with the SEC (the "May 9 NT 10-Q").  In addition to reiterating the statements in its prior Forms NT 10-Q and NT 10-K, as detailed above, ¶¶173-174, 182-183,  the Company stated the following concerning the Company's exposure to Alt A and subprime mortgages:

> We have continued to work with our lender customers to support a broad range of mortgage products, including Alt-A and subprime products, which have represented an increased proportion of mortgage originations in recent years. . . . **We believe that our assessment and approach to the management of credit risk contributed to the maintenance of a conventional single-family mortgage credit book of business with strong credit characteristics in the first quarter of 2007. . . .**  During 2006 and 2007, mortgage lenders have experienced higher levels of delinquencies relating to subprime loans.  **We believe our credit exposure to the subprime mortgage loans underlying the private-label mortgage-related securities in our portfolio is limited because we have focused our purchases on the highest-rated tranches of these securities to date.**

(Emphasis added.)

210.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(d) and (g)-(h).

211.    The Company's statements reaffirmed investors' belief that its exposure to subprime and Alt-A mortgages was limited and that the Company's credit performance would be

better than that of other market participants. For example, on May 9, 2007, J.P. Morgan issued a

research report that stated, in part, the following:

> Single-family credit quality remains good, and what little exposure Fannie has to higher risk subprime and Alt-A products is largely credit enhanced to minimize Fannie's losses.

## I.    Fannie's August 16, 2007 News Release, 2006 Annual Report and Conference Call

212.    On August 16, 2007, Fannie issued a news release concerning its financial results

for 2006 (the "Aug. 16 News Release").  The Aug. 16 News Release quoted CEO Mudd as

stating:

> We made a decision several years ago to step back from the riskier margins of the mortgage market.  That decision cost us significant market share at that time, but as the market began to correct, particularly in the latter half of 2006, we began to get some of that market share back.

> *       *       *

> While we do expect our credit loss ratio to increase in 2007 from continuing strain in the housing market, we believe Fannie Mae is well positioned to weather the turmoil in the mortgage market. . . .

> *       *       *

> Though the housing market continues to cool in 2007 and the credit environment remains challenging, I believe Fannie Mae is well situated for the future," Mudd said.  "Strategic decisions we made in the past several years – particularly with respect to our discipline in the non-traditional parts of the mortgage finance market – have positioned us to do well as the housing market stabilizes. . . .

213.    These statements were materially false and misleading for the reasons set forth in

¶172 (a)-(g).  Contrary to Mudd's assertions, Fannie had not been disciplined in its approach to

pricing and managing credit risk.  Indeed, by mid-2007, Fannie materially reduced its purchase

of Alt-A loans, evidencing the Company's concern about its exposure and the risky credit profile

of these loans.

214.    The Aug. 16 News Release stated, in part, that Fannie reported combined loss reserves of $859 million and core capital of $41.95 billion.

215.    These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined *loss reserves*, understated *other than temporary impairments* to its assets, overstated *deferred tax assets*, and materially overstated core capital.

216.    The Aug. 16 News Release stated the following concerning credit risk:

**The Single-Family book of business grew at a rate of 7.2 percent**.  This growth rate – somewhat slower than the overall market – reflects the company's strategic decision to limit participation in certain non-traditional segments of the market when management concluded that pricing did not adequately reflect underlying risks in assets made available for securitization.

217.    The Aug. 16 News Release also included a "Discussion of Credit Book of Business" using data as of June 30, 2007 that stated, in part, the following concerning Fannie's credit book of business and exposure to Alt-A and subprime loans:

**How would you characterize the quality of your current single-family mortgage credit book of business?**

We believe our conventional single-family mortgage credit book has characteristics that reflect our historically disciplined approach to risk management.  Our book is highly diversified based on date of origination, geography and product type.

\*       \*       \*

**How would you characterize your exposure to Alt-A loans?**

As of June 30, 2007, we have purchased or guaranteed approximately $310 billion of Alt-A loans, or 12 percent of our single-family mortgage credit book of business … we believe that our guaranteed Alt-A loans have more favorable credit characteristics than the overall market of Alt-A loans.

\*       \*       \*

**How would you characterize your exposure to subprime loans?**

70

\*     \*     \*

Our acquisition of subprime loans has increased in recent years, but remains a very small percentage of our single family mortgage credit book.  We have reduced our exposure to credit losses through the purchase of credit enhancement. We have also invested in highly rated private-label securities backed by subprime mortgage loans – primarily the highest rated tranches of these securities at the time of acquisition.

Our single-family mortgage credit book of business has approximately $5.1 billion, or 0.2%, of subprime mortgage loans or structured MBS backed by subprime mortgage loans as of June 30, 2007.  We believe that the subprime loans in our single-family mortgage credit book of business have more favorable credit characteristics than the overall market of subprime loans.

\*     \*     \*

**Aside from your traditional core business, subprime and Alt A, are there other segments/product features in your book of business that could be viewed as particularly sensitive to further declines in home prices and/or further regional weakness in employment?  What is Fannie Mae doing to mitigate risk in these segments?**

Certain product features and loan attributes are often associated with a greater degree of credit risk.  For example, loans with low FICO scores, high LTV ratios, and negative amortization typically contribute to higher levels of delinquency, default and credit losses.  We have taken a disciplined approach in our acquisition of mortgage loans with these features and generally limit our participation in these segments to where we are able to appropriately price for the risks.

218.    The statements in ¶¶216-217 were false and misleading for the reasons set forth in

¶172 (a)-(h).

219.    The "Discussion of Credit Book of Business" stated, in part, the following

concerning Fannie's loss sensitivity:

**What is your credit exposure assuming a 5 percent immediate drop in home prices?**

We estimate that, as of December 31, 2006, our loss sensitivity to an immediate 5 percent decline in home prices is $1.96 billion, after the effect of credit enhancement.  This represents the additional expected losses, over the life of

existing mortgages, which would result from the one-time home price decline relative to expectations.

220.    This statement was false and misleading for the reasons stated in ¶172 (c)(ii).

221.    On August 16, 2007, the Exchange Act Defendants caused Fannie to file its annual report with the SEC on Form 10-K (the "2006 Annual Report"), signed by Mudd and Blakely.

222.    The 2006 Annual Report repeated Fannie's financial results and financial condition as set forth in the Aug. 16 News Release.

223.    These statements were false and misleading for the reasons set forth in ¶215.

224.    The 2006 Annual Report stated the following as to the credit profile of Fannie mortgage credit book of business:

> **Market and Economic Factors Affecting Our Business**
> ***Market Environment: 2001 to Mid-2006 . . .***
>
> As the composition of loan originations shifted from fixed-rate mortgages to a greater share of higher risk, less traditional mortgages, we concluded that the market's pricing of a significant portion of these loans did not appropriately reflect the underlying, and often layered, credit risks associated with these products. Based on this assessment, we made a strategic decision to forgo the guaranty of a significant proportion of mortgage loans because they did not meet our risk and pricing criteria. . . . We believe . . . that this decision has helped us maintain a mortgage credit book of business with strong credit characteristics overall.

225.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(d).

226.    The 2006 Annual Report also represented that Fannie's subprime and Alt-A investments were minimal:

> We believe that the limited scale and disciplined nature of our participation in the subprime market has helped to protect the company from a material adverse impact of the recent disruption in that market to date.  We estimate that, as of June 30, 2007, subprime mortgage loans or structured Fannie Mae MBS backed by

subprime mortgage loans represented approximately 0.2% of our single-family mortgage credit book of business.   As of June 30, 2007, we had invested in private-label securities backed by subprime mortgage loans totaling $47.2 billion, which represented approximately 2% of our single-family mortgage credit book of business.

\*       \*       \*

12% and 11% of our single-family mortgage credit book of business as of June 30, 2007 and December 31, 2006 respectively, consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans, and approximately 1% of our single-family mortgage credit book of business consisted of private-label mortgage-related securities backed by Alt-A mortgage loans . . . as of both June 30, 2007 and December 31, 2006.

227.   The 2006 Annual Report further stated:

We believe that our approach to the management of credit risk during the past several years has contributed to our maintenance of a credit book with strong credit characteristics overall, as measured by loan-to-value ratios, credit scores and other loan characteristics that reflect the effectiveness of our credit risk management strategy.

\*       \*       \*

**Single-Family Business**

Our conventional single-family mortgage credit book of business remained relatively strong from 2004 to 2006.   We believe that our assessment and approach to the management of credit risk during these years allowed us to maintain a conventional single-family mortgage credit book of business with strong credit risk characteristics as evidenced by our credit losses, which remained low during the three-year period from 2004 to 2006.   We are focused on understanding and serving our customers' needs, strengthening our relationships with key partners, and helping lenders reach and serve new, emerging and nontraditional markets by providing more flexible mortgage options, including Alt-A and subprime products, which have represented an increased proportion of mortgage originations in recent years.   We have increased our participation in these types of products where we have concluded that it would be economically advantageous and/or that it would contribute to our mission objectives.   Our participation in these products reflects our assessment of anticipated guaranty fee income in light of our expectation for potentially higher credit losses.   We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types.   Our assessment of these dynamics will continue to determine the timing and level of our acquisitions of these types of mortgage products.

*       *       *

**Credit Risk Management**

…The degree of credit risk to which we are exposed will vary based on many factors, including the risk profile of the borrower or counterparty, the contractual terms of the agreement, the amount of the transaction, repayment sources, the availability and quality of collateral and other factors relevant to current market conditions, events and expectations. **We evaluate these factors and actively manage, on an aggregate basis, the extent and nature of the credit risk we bear, with the objective of ensuring that we are adequately compensated for the credit risk we take, consistent with our mission goals.**

*       *       *

*Acquisition Policy and Standards*

We use proprietary models and analytical tools to price and measure credit risk at acquisition. **Our loan underwriting and eligibility guidelines are intended to provide a comprehensive analysis of borrowers and mortgage loans based upon known risk characteristics.**

(Emphasis added.)

228.    The statements in ¶¶226-227 were false and misleading because Fannie's

participation in the subprime market was neither limited in scale nor disciplined in nature.

Indeed, the Exchange Act Defendants failed to disclose the material facts set forth in ¶172 (a)-(d)

and (f)-(h).

229.    The 2006 Annual Report included the following statements concerning Fannie's

chief risk office:

**RISK MANAGEMENT . . . .**

*Chief Risk Office*
The Chief Risk Office is an independent risk oversight organization with responsibility for oversight of credit risk, market risk, operational risk and liquidity risk. The Chief Risk Officer is responsible for establishing our overall risk governance structure and providing independent evaluation and oversight of our risk management activities. In 2006 and 2007, we centralized oversight of our

74

business continuity efforts, information security programs, corporate insurance program and SOX Finance Team under our Operational Risk Oversight function within the Chief Risk Office to further strengthen our existing operational risk programs.

230.    These statements were false and misleading because Fannie's Chief Risk Office was not independent and had not been strengthened.  In fact, in July 2007, Fannie materially lowered its risk management capabilities by materially reducing the Chief Risk Officer's budget and staff.  With respect to the budget and personnel cut, Dallavecchia complained to Mudd and Williams on or around July 16, 2007 that Fannie had one of "the weakest control processes" he had ever witnessed, that the Company's budget was inadequate for Fannie's risk exposure and that Fannie "was not even close" to having proper control processes for credit, market and operational risk.  As alleged in ¶¶99-100, instead of strengthening the Chief Risk Office, Fannie weakened the office by materially reducing its budget.

231.    The 2006 Annual Report also stated:

We use internally developed models to assess our sensitivity to credit losses based on current data on home values, borrower payment patterns, non-mortgage consumer credit history and management's economic outlook.  We examine a range of potential economic scenarios to monitor the sensitivity of credit losses. Our models indicate that home price movements are an important predictor of credit performance.  We disclose on a quarterly basis the estimated impact on our expected credit losses from an immediate 5% decline in single-family home prices for the entire United States, which we believe is a stressful scenario based on housing data from OFHEO.  Historical statistics from OFHEO's house price index reports indicate the national average rate of home price appreciation over the last 20 years has been about 5.3%, while the lowest national average annual appreciation rate in any single year has been 0.3%.  However, we believe that the decline in home prices in 2007 is likely to continue.

232.    These statements were false and misleading for the reasons set forth above in ¶172 (c)(ii).

233.    The 2006 Annual Report included the following statements concerning Fannie's financial statements:

Management believes that the consolidated financial statements included in this report fairly present in all material respects the company's financial position, results of operations and cash flows for the periods presented.

*      *      *

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM. . . .

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Fannie Mae and consolidated entities as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America. . . .

/s/ Deloitte & Touche LLP
Washington, DC
August 15, 2007

234.    These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined loss reserves and materially overstated core capital.

235.    The 2006 Annual Report included the following statements concerning Fannie's concentration of risk:

**Concentrations of Credit Risk**

The geographic dispersion of our Single-Family business has been consistently diversified over the three years ended December 31, 2006, with our largest exposures in the Southeast region and the Western region of the United States, each of which represented 24% of our single-family conventional mortgage credit book of business as of December 31, 2006.  Except for California, where 16% and 17% of the gross unpaid principal balance of our conventional single-family mortgage loans held or securitized in Fannie Mae MBS as of December 31, 2006 and 2005, respectively, were located, no other significant concentrations existed in any state.

236.    These statements were false and misleading for the reasons set for in ¶172 (d)(ii).

76

237.    The 2006 Annual Report included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Mudd and Blakely.  The SOX Certifications stated, in part, the following:

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

238.    The SOX Certifications were materially false and misleading for the reasons set forth in ¶172 (b) and because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined loss reserves and materially overstated core capital.

239.    Also on August 16, 2007, Fannie disclosed an Investor Summary concerning the 2006 Annual Report (the "2006 Investor Summary") that included Fannie's financial results for 2006 that are alleged above in ¶214.

240.    These statements were false and misleading for reasons set forth above in ¶215.

241.    Also on August 16, 2007, the Company conducted a conference call with investors (the "Aug. 16 Conference Call") in which the following statements were made:

[Mudd] "[O]ur risk position is excellent . . . We're more than adequately capitalized . . . the Alt-A loans we guarantee have more favorable credit characteristics than the overall market of Alt-A loans, including a weighted average FICO score of 720 and low exposure to high LTVs."

[Dallavecchia regarding the guarantee business] "[L]et me look ahead quickly to 2007 and 2008"… [t]he market is returning to more rational products and pricing."

[Mudd]: [04 through 06 the market changed] but] "our underwriting . . . our due diligence, our audit of these firms has remained the same . . . we fundamentally held our standards where they were."

242.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(d) and (f)-(h).

243.    Also during the Aug. 16 Conference Call, the following statements were made:

[Dallavecchia]: [W]e have or guaranteed approximately $310 billion in Alt-A loans at June 30. That is about 12% of our total book. Importantly we generally acquire loans originated at Alt-A from our traditional lender partners. We will review then approve of lenders underwriting guidelines, and I'm very familiar with your [sic] origination practices. The Alt-A mortgages originated by these lenders will typically follow an origination path similar to that used for originating [prime] mortgages. So we believe that the Alt-A loans we guarantee have more favorable credit characteristics than the overall market of Alt-A loans, including a weighted average FICO score of 720 and low exposure to high LTVs. . . . We also hold $34.5 billion in private-label securities backed by Alt-A loans. These securities have a weighted average subordination of nearly 20%. An important point for both our supply and Alt-A backed securities is our use of stress tests to assess potential losses under multiple scenarios. We include the scenarios as severe as two consecutive years of 10% declines in home prices, coupled with the two consecutive years of 2% increase in interest rates. And the outcome of these scenarios project better (inaudible) loss and cash flow even under the direst scenario. . . .

[Hisey]: I think as Enrico mentioned, we do do a lot of testing of the cash flow, and that is considered in looking at any impairments. And because of the strong cash flows that he mentioned, we don't see any impairments in those asset classes.

244.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(h).

245.    On the Aug. 16 Conference Call, both Mudd and Dallavecchia asserted that Fannie is projecting home price declines of about 2% for 2007 and 4% for 2008. Later on the same call, in response to KBW analyst Fred Cannon's question regarding regional expectations for home price declines in the major markets in California and Florida, Fannie's Chief Economist said the following:

The areas that are going to have the weakest prices are those that have the weakest job growth numbers, so continuing places like Michigan and Ohio. But in the major markets of California, we probably will see some fairly big declines but after years of huge run-ups. So the net impact is still going to be that most of the houses in those areas are still well above the values where people bought them. But we should expect some big declines just as we saw in the early '90s, perhaps some double-digit declines in some of those areas.

246.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(h).

247.    On August 17, 2007, the *Washington Post* reported that "District-based Fannie Mae said it was less vulnerable to the turmoil than other players in the mortgage industry and could wind up with a larger share of the market.  'We'll come out of this in pretty good shape,' chief executive Daniel H. Mudd told analysts."

248.    This statement was materially false and misleading as Mudd knew and had reasons to know that Fannie was not in good shape for the reasons set forth in ¶172 (a)-(h).

**J.    September 10-11, 2007 Lehman Brothers 5th Annual Financial Services Conference**

249.    At the September 10, 2007 Lehman Brothers Financial Services Conference, Lund said,

> [W]e believe the nature of our participation in these [subprime and Alt-A] segments and our use of credit enhancements has mitigated our potential loss exposure to a significant degree. . . .
>
> For Alt-A, our total exposure is $345 billion, or about 13% of our book. Approximately $310 billion of the total loans that we own are guarantee. [sic] A couple of important points that I think differentiate these holdings from what you might see in the broader market.
>
> First, we generally acquire loans originated as Alt-A from our traditional lender partners.  We review and approve lenders' underwriting guidelines, and are very familiar with their origination practices.  Alt-A loans originated by these lenders will typically follow an origination path similar to what will be used for prime mortgages.
>
> **Second, and partly as a result of my first point, the credit characteristics of our Alt-A loans are more favorable than what you would see in the overall market, including a weighted average FICO of 720 and a low exposure to high LTVs.**  Lastly, we own about $43.5 billion in securities backed by Alt-A loans.  These securities have a weighted average subordination of 20%, and they are subjected to stress testing to assess potential losses under multiple scenarios. And the outcome of these scenarios project very little cash flow loss even under the most dire scenarios.

> **In light of these factors, I believe we have engaged in non-traditional segments in the market in an appropriate and prudent way.**  We largely limited our participation in more conservative traunches of these products, and we've taken additional steps to mitigate our loss exposure.

*       *       *

> [David Berson said]: Given the high level of unsold inventories and given that we expect the housing markets to continue to trend downward maybe for another year, home price declines are likely for awhile.  We think into '09. For this year and using a broad measure of home prices, price declines of 2%, maybe a little more, are likely for next year maybe around 4%."

(Emphasis added.)

250.    These statements were materially false and misleading for the reasons set forth in ¶172 (a)-(h).

251.    On September 20, 2007, Defendant Mudd testified before Congress that Fannie could "provide more liquidity help to the home finance market today without taking risks we are not capable of managing" and that Fannie had "vastly reduced [its] material control weaknesses."

252.    These statements were false and misleading for the reasons set forth in ¶172 (b) and (g) and as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially overstated core capital.

**K.   Fannie's November 9, 2007 News Release, Financial Results for Three and Nine Months Ended September 30, 2007 and Conference Call**

253.    On November 9, 2007, Fannie issued a news release that disclosed its financial results for three and nine months ended September 30, 2007 (the "Nov. 9. News Release").  The Nov. 9 2007 News Release quoted Mudd as stating the following:

> During the last year, we vastly reduced our material weaknesses in internal controls, expanded our risk-management functions, reduced our headcount, and cut our operating expenses," Mudd said.  "The company is in solid shape to support the market, and is in better shape to benefit when the market correction ends."

*       *       *

"At the same time, our book of business is growing, our guaranty revenue is rising, and our market share is returning. **Further, in 2007 we're seeing the value of some of the tough choices we made in recent years to hold on to our credit discipline. Those choices have shielded us from the worst effects of the housing and mortgage market correction."**

(Emphasis added.)

254. Mudd's statements were materially false and misleading because investors did not have a current picture of Fannie's performance and Fannie was not in solid shape. As alleged above in ¶¶134-169, in violation of GAAP, the Exchange Act Defendants materially misstated Fannie's financial results. Mudd's statements were false and misleading for the further reasons set forth in ¶172 (b) and (f).

255. The Nov. 9 News release stated the following concerning Fannie's core capital:

Fannie Mae's core capital in the third quarter was $41.7 billion, $2.3 billion above the level mandated by the OFHEO-directed 30 percent capital surplus requirement.

256. This statement was false and misleading because, as alleged in ¶¶134-169, in violation of GAAP the Exchange Act Defendants materially overstated Fannie's its core capital.

257. The Nov. 9 News Release stated the following concerning Fannie's exposure to subprime and Alt-A securities:

**<u>Subprime and Alt-A Securities</u>**

Fannie Mae holds private-label mortgage securities (PLS) backed by subprime or Alt-A loans. Of the total $76.2 billion of such PLS on its books, $42.4 billion are backed by subprime loans and $33.8 billion are backed by Alt-A loans.

\*     \*     \*

The unrealized losses on these subprime and Alt-A securities, totaling about $900 million, reflects current market values of these securities and is included on an after-tax basis in Accumulated Other Comprehensive Loss for the first nine months of the year. We have not recorded any impairment on these securities, as

they continue to be investment-grade and we have the intent to hold these securities until the unrealized loss is recovered or the securities mature.

258.     These statements were false and misleading for the reasons set forth in ¶172 (a)-(d),  (f) and (h).

259.     Also on November 9, 2007, the Exchange Act Defendants caused Fannie to file the First Quarter 2007 10-Q with the SEC which was signed by Mudd and Swad.

260.     The First Quarter 2007 10-Q set forth Fannie's financial results and financial condition for the first quarter of 2007.  The First Quarter 2007 10-Q further stated the following concerning Fannie's financial statements for the period ended March 31, 2007:

### Basis of Presentation

The accompanying condensed consolidated financial statements have been prepared in accordance with GAAP for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X.  Accordingly, they do not include all of the information and footnotes required by GAAP for complete consolidated financial statements.  In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included.

261.     These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined loss reserves, materially overstated *deferred tax assets* and materially overstated core capital.

262.     The First Quarter 2007 10-Q stated the following concerning Fannie's exposure to subprime mortgages:

Subprime loans: . . . Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages.  In order to respond to the current subprime mortgage crisis and provide liquidity to the market, we intend to increase our purchase of subprime mortgages.  **We will determine the timing and level of our acquisition of subprime mortgage loans in the future based**

**on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.**

(Emphasis added.)

263.   These statements were false and misleading for the reasons set forth in ¶172 (a)-(b)  and (f).

264.   The First Quarter 2007 10-Q included SOX Certifications signed by Mudd and Swad that were substantially the same as the SOX Certifications alleged in ¶237.

265.   The SOX Certifications were materially false and misleading for the reasons set forth in ¶238.

266.   Also on November 9, 2007, the Exchange Act Defendants caused Fannie to file the Second Quarter 2007 10-Q with the SEC.  The Second Quarter 2007 10-Q was signed by Mudd and Swad.

267.   The Second Quarter 2007 10-Q stated that as of June 30, 2007, Fannie reported combined *loss reserves* of $1.158 billion, *deferred tax assets* of $11.6 billion and core capital of $42.69 billion.

268.   These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants understated combined loss reserves overstated *deferred tax assets* and overstated core capital.

269.   The Second Quarter 2007 stated the following concerning Fannie's exposure to subprime and Alt-A mortgages:

*Subprime Loans:*  . . .  Approximately 0.2% of our total single-family mortgage credit book of business as of June 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans.  This percentage increased to approximately 0.3% as of September 30, 2007.  Less than 1% of our single-family business volume for the nine months ended September 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans.  Our acquisitions of subprime mortgage loans have a combination

84

of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages.  In order to respond to the current subprime mortgage crisis and provide liquidity to the market, we intend to increase our purchase of subprime mortgages.  **We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.**

*Alt-A and Subprime Securities:*

\*       \*       \*

**We have not recorded any impairment of the securities classified as available-for-sale, as they continue to be rated investment grade and we have the intent and ability to hold these securities until the earlier of recovery of the unrealized loss amounts or maturity.  As of November 8, 2007, all of our private-label mortgage-related securities backed by Alt-A mortgage loans were rated AAA and none had been downgraded or placed under review for possible downgrade.**

(Emphasis added.)

270.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(d), (f) and (h).

271.    The Second Quarter 2007 10-Q stated the following concerning Fannie's financial statements:

**Basics of Presentation**

The accompanying condensed consolidated financial statements have been prepared in accordance with GAAP for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X.  Accordingly, they do not include all of the information and footnotes required by GAAP for complete consolidated financial statements.  In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included.

272.    This statement was false and misleading  because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined *loss reserves*, materially understated *other than temporary impairments*, materially overstated *deferred tax assets* and materially overstated core capital. .

273.     The Second Quarter 2007 10-Q included SOX Certifications signed by Mudd and Swad that were substantially the same as the SOX Certifications alleged in ¶237.

274.     The SOX Certifications were materially false and misleading for the reasons set forth in ¶¶238.

275.     Also on November 9, 2007, the Exchange Act Defendants caused Fannie to file its Third Quarter 2007 Form 10-Q with the SEC.  The Third Quarter 2007 10-Q was signed by Mudd and Swad.

276.     The Third Quarter 2007 Form 10-Q stated that as of September 30, 2007, Fannie reported combined *loss reserves* of $1.407 billion, *deferred tax assets* of $9.9 billion, *other than temporary impairments* of $84 million and core capital of $41.713 billion.

277.     These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined *loss reserves*, materially understated *other than temporary impairments*, materially overstated *deferred tax assets* and materially overstated core capital.

278.     The Third Quarter 2007 10-Q stated with regard to Fannie's core capital: "We continue to maintain a strong capital position, and our access to sources of liquidity has been adequate to meet our funding needs."

279.     These statements were false and misleading because as alleged in ¶¶134-169, by the end of the quarter ended September 30, 2007, Fannie's core capital was materially overstated.

280.     The Third Quarter 2007 10-Q stated that "Our acquisitions of Alt-A mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages."

281.    This statement was false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that the Company had acquired Alt-A for which it failed to adequately increase the guarantee fee charged to loan originators to compensate Fannie for the increased credit risk.

282.    The Third Quarter 2007 Form 10-Q made the following misrepresentations, which minimized Fannie's credit risk exposure to subprime and Alt-A mortgages:

*Subprime Loans:* . . .  Approximately 0.3% of our total single-family mortgage credit book of business as of September 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans.  Less than 1% of our single-family business volume for the nine months ended September 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans.  Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages.  In order to respond to the current subprime mortgage crisis and provide liquidity to the market, we intend to increase our purchase of subprime mortgages.  We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.

*Alt-A and Subprime Securities:*

\*       \*       \*

In 2007, we began to acquire a limited amount of subprime-backed private-label mortgage-related securities of investment grades below AAA.  As of September 30, 2007, approximately $441 million in unpaid principal balance, or 1%, of the subprime-backed private-label mortgage-related securities in our portfolio had a credit rating of less than AAA.  All of these subprime-backed mortgage-related securities with a credit rating of less than AAA were classified as trading securities in our condensed consolidated balance sheets as of September 30, 2007.

\*       \*       \*

**We have not recorded any impairment of the securities classified as available-for-sale, as they continue to be rated investment grade and we have the intent and ability to hold these securities until the earlier of recovery of the unrealized loss amounts or maturity.**

\*       \*       \*

87

Increased delinquencies and credit losses relating to our mortgage assets and the mortgage loans that back our Fannie Mae MBS continue to adversely affect our results of operations and could affect our financial condition.

We are subject to increased credit risk exposures related to subprime and Alt-A mortgage loans that back our private-label mortgage-related securities investments, and any increased delinquency rates and credit losses could adversely affect the yield on or value of our investments, which could negatively affect our earnings and financial condition.

We invest in private-label mortgage-related securities that are backed by Alt-A and subprime mortgage loans.  In October 2007, Standard & Poor's downgraded the credit ratings of a small number of private-label securities held in our portfolio that are backed by subprime mortgage loans, and Moody's placed under review for possible downgrade several additional subprime-backed private-label securities held in our portfolio.  In recent months, mortgage loan delinquencies and credit losses generally have increased, particularly in the subprime and Alt-A sectors.  In addition, home prices in many states have declined, after extended periods during which home prices appreciated.  If delinquency and loss rates on subprime and Alt-A mortgages continue to increase, or there is a further decline in home prices, we could experience reduced yields or losses on our investments in private-label mortgage-related securities backed by subprime or Alt-A loans.  In addition, the fair value of these investments may be adversely affected.  A reduction in the fair value of these investments could negatively affect our earnings and financial condition.

(Emphasis added.)

283.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(d), (f) and (h).  Indeed, as the Exchange Act Defendants knew, by that time Fannie faced severe losses resulting from its massive subprime and Alt-A exposure.

284.    The Third Quarter 2007 10-Q explained Fannie's management of its institutional counterparty credit risk–but misrepresented the enormity of the increase to its counterparty risk:

Our potential exposure to the risks associated with our dependence on the institutional counterparties to provide services that are critical to our business has increased in recent months, and our earnings and liquidity may be reduced if one or more of our institutional counterparties defaults on its obligations to us.

Our primary exposure to institutional counterparty risk is with our mortgage insurers, mortgage servicers, lender customers, depository institutions, dealers that commit to sell mortgage pools or loans to us, issuers of investments held in our liquid investment portfolio, and derivatives counterparties.  Our business with

many of these institutional counterparties is heavily concentrated… [A]s of September 30, 2007, our ten largest single-family mortgage servicers and their affiliates serviced 78% of our single-family mortgage credit book of business, and Countrywide Financial Corporation and its affiliates, which is our largest single-family mortgage servicer, serviced 23% of our single-family mortgage credit book of business.

285.    These statements were false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that it made material exceptions to its risk management guidelines for Countrywide, Fannie's largest customer.  Starting in late 2007, Confidential Witness 4 observed that there were 6,000-7,000 outstanding loans that Fannie had selected to review.  Countrywide failed to provide the information, which under Fannie's guidelines should have triggered a limitation of Fannie's business with Countrywide.  However, Fannie failed to enforce the triggers on Countrywide, violating Fannie's risk management guidelines.

286.    The Third Quarter 2007 10-Q stated the following concerning Fannie's credit loss sensitivities:

Pursuant to our September 1, 2005 agreement with OFHEO, we agreed to disclose on a quarterly basis the estimated impact on our expected credit losses from an immediate 5% decline in single-family home prices for the entire United States, which we believe is a stressful scenario based on housing data from OFHEO.

287.    These statements were false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that in January 2007, Fannie's business analytics division was predicting a 50% decline in home prices over three to five years that would materially increase Fannie's losses and wipe out Fannie's core capital.

288.    The Third Quarter 2007 10-Q stated the following concerning Fannie's financial statements:

**Basis of Presentation**

89

The accompanying condensed consolidated financial statements have been prepared in accordance with GAAP for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X.  Accordingly, they do not include all of the information and footnotes required by GAAP for complete consolidated financial statements.  In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included.

289.    These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined loss reserves, materially understated *other than temporary impairment*s, materially overstated *deferred tax assets* and materially overstated core capital.

290.    The Third Quarter 2007 10-Q included SOX Certifications signed by Mudd and Swad that contained substantially the same statements as in ¶237.

291.    These statements were false and misleading for the reasons set forth above in ¶¶238.

292.    Also on November 9, 2007, the Company conducted a conference call (the "November 9 Conference Call") with analysts in which Dallavecchia made the following misrepresentations as to Fannie's exposure to subprime mortgages:

> Our subprime exposure is composed basically of two large buckets, one bucket which are the PLS securities.  We talk about that; we have talked about the fact that they are conforming loans, then they have over a 30% subordination and an average maturity of two years.  So I won't spend more time on that.  The remaining part bucket, which is really the loans that we own which are subprime loans, and that is about $7 billion of that. On those, I would point out to you that a good 55% are fixed-rate and that most of them have – are a principal residence so they are not loans that we believe are owned by investors.  At least that's what our underwriting has told us.  For those loans, even in a worse market, the price drops.  **I think that we're going to have losses but it's very difficult to infer large losses for the whole company just based on how the subprime, the very small amount of subprime loans that we have, how the effect would be on everyone.**

(Emphasis added.)

293.    On the November 9 Conference Call, Mudd represented that "[w]e see home prices falling by an average of 2% nationwide this year and 4% next year" and "[g]oing forward, projecting a 4% national decline in home prices and a scenario where there's not a nationwide recession, we could see our credit loss ratio move into the range of 8 to 10 basis points next year."

294.    The statements in ¶¶292-293 were false and misleading for the reasons set forth in ¶172 (a)-(f).

295.    Also on the November 9 Conference Call, the following statements were made:

[Mudd]: **We've already tightened our underwriting and pricing, really going back to the early summer of '07 where we began requiring higher down payments, more documentation and higher credit scores.** That came after the period where we made a specific decision not to get into some of the riskier segments of the market. Just this week we have announced a nationwide increase in our single-family guarantee fee to make sure that we are compensated for the risks that we manage. . . ."

\*        \*        \*

Now, looking ahead, we expect the current market trends to continue through next year. We see home prices falling by an average of 2% nationwide this year and 4% next year . . . .

\*        \*        \*

[Lund]: [T]he '06 and '07 books are clearly not going to be the credit quality books that we saw previously. But you've got to remember where we're coming from is from a historical low, too, in terms of credit losses. So, when we look at our projections moving forward, that we take that into account.

[Mudd]: [T]he underwriting standards on our side have always stayed fairly constant.

\*        \*        \*

[An analyst asks given exposure to subprime and Alt-A, couldn't things get "a lot worse."]  [Mudd in response]: [A]re we prepared for scenarios that are somewhat historical? Yes.

(Emphasis added.)

296.     These statements were false and misleading because the Exchange Act

Defendants misrepresented and/or failed to disclose that, even to the extent Fannie tightened its

underwriting and pricing, the damage was already done:  the Company was exposed to billions

of dollars of Alt-A and subprime mortgages and MBS that were acquired pursuant to materially

looser underwriting guidelines and Fannie failed to adequately price for the risk it assumed.

Further, the Exchange Act Defendants failed to disclose the facts set forth in ¶172(a)-(b) and (f),

and (h).

297.     During the November 9 Conference Call, Defendant Mudd falsely reassured

investors that:  "We now carry $11.4 billion in capital above the Congressionally mandated

minimum capital and $2.3 billion above the OFHEO-mandated 30% surcharge over that."

298.     This statement was false and misleading because--as alleged in detail and with

specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially

overstated core capital.

299.     Fannie's false representation above in ¶297 concerning its core capital led

investors to believe that the Company was adequately capitalized.  For example, in a November

9, 2007 analyst report, a Fox-Pitt analyst stated "[W]e believe that the company has sufficient

capital to continue to grow."  Further, Fannie's reassurances to investors convinced investors that

Fannie properly reported the value trading securities.  On November 13, 2007, Fox-Pitt

published an analyst report that stated, among other things, the following:

> Some have questioned the marks on the company's subprime and alt-A trading
> securities, about 2% on average, and questioned whether capital could be
> consumed by further writedowns.  We think this reflects a lack of understanding
> and note the following: a) this reflected true market pricing; b) these securities
> have significant credit enhancement below them (34% on subprime, well in
> excess of current estimates of vintage losses) and vary considerably from the

securities tracked by the ABX index. For example, FNM's subprime securities have a shorter duration than the securities tracked by the ABX, so all things being equal, the same widening in spreads would result in a smaller mark-to-market for FNM securities.

**L.     November 16, 2007 Conference Call**

300.    On November 16, 2007, Fannie conducted a conference call with investors in order to further discuss the Company's financial results for the three and nine months ended September 30, 2007. An analyst asked why Fannie was issuing more preferred if their capital is adequate. In response Swad stated "we believe we can make investments and earn returns well above our cost of capital."

301.    Swad's response was false and misleading because --as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially overstated core capital.

**M.     Preferred Series R Offering**

302.    On November 16, 2007 Fannie issued 20,000,000 shares of 7.625 Non-Cumulative Preferred Stock Series R at $25 per share pursuant to an Offering Circular (the "Preferred Series R Offering Circular"). The Preferred Series R Offering Circular incorporated by reference the following documents: (i) the 2006 Annual Report; and (ii) the First, Second and Third Quarter 2007 10-Qs.

303.    The documents incorporated by reference in the Preferred Series R Offering Circular were materially false and misleading for the reasons set forth in ¶¶221-238 (identifying false and misleading statements in the 2006 Annual Report); ¶¶259-291 (identifying false and misleading statements in the First, Second and Third Quarter 2007 10-Qs).

304.    The Preferred Series R Offering Circular contained the following statements downplaying the impact of the deteriorating mortgage market on Fannie's financial condition:

**Current Market Trends May Continue to Adversely Affect Our Financial Condition, Results of Operations, and Market Share**

As described in the Third Quarter 10-Q, our net income declined in the first nine months of 2007 due to derivatives fair value losses, a significant reduction in net interest income, significantly higher losses on certain guaranty contracts and a substantial increase in credit-related expenses. If some or all of the market trends that contributed to these results continue to negatively affect our net income, they will continue to cause a reduction in our retained earnings and, as a result, in the amount of our core capital. In order to maintain our statutory and OFHEO-directed minimum capital surplus, we may be required to take actions, or refrain from taking actions, to ensure that we maintain or increase our core capital.

305.     These statements were false and misleading because the Exchange Act Defendants knew or had reason to know that some or all of the market trends identified would continue to negatively affect the Company's financial condition for the reasons set forth above in ¶172 (a)-(d)(i),(e)-(h).

**N.     Preferred Series S Offering**

306.     On December 6, 2007, Fannie issued 280,000,000 shares of Fixed-to-Floating Rate Non-Cumulative Preferred Stock Series S pursuant to an Offering Circular (the "Series S Offering Circular").  The Series S Offering Circular incorporated by reference the following documents: (i) the 2006 Annual Report; and (ii) the First, Second and Third Quarter 2007 10-Qs.

307.     The documents incorporated by reference in the Preferred Series S Offering Circular were materially false and misleading for the reasons set forth in ¶¶221-238 (identifying false and misleading statements in the 2006 Annual Report); ¶¶259-291(identifying false and misleading statements in the First, Second and Third Quarter 2007 10-Qs).

**O.     Mudd's Testimony Before the Senate Committee on Banking on February 7, 2008**

308.     On February 7, 2008, in testimony before the Senate Committee on Banking, Housing and Urban Affairs (the "Banking Committee"), Mudd issued a strong reassurance as to Fannie's capital adequacy, stating: "We presently have more capital than at any time in our

existence as a public company. This will protect us from the downside impact of the housing crisis."

309.    This statement was materially false and misleading because --as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially overstated core capital.

310.    Also on February 7, 2008, during testimony before the Senate Banking Committee, Mudd downplayed Fannie's exposure to subprime loans and represented that the Company carefully managed the exposure it did have:

MUDD:  Subprime represents... Less than 1 percent of our book.

SENATOR RICHARD SHELBY:  Are they performing?

MUDD:  They are [performing].  And we look at those very closely in terms of their performance.  We look very closely at where they're rated, but we do have our own separate rating system.

There is credit enhancement, mortgage insurance, other forms there, but we also stress test that and discount that, if need be.

We're watching it very closely.

311.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(c) and (f).

312.    During that same February 7, 2008 testimony before the Banking Committee, in response a question as to whether, "[g]iven Countrywide's recent financial problems and loan performances, do you have any concerns as to the quality of those purchases?", Mudd answered "We review [the Countrywide loans] very carefully. . . . [W]**e have good confidence in that portfolio**."  (Emphasis added.)

313.    These statements were false and misleading because, in stark contrast to Mudd's false representations that Fannie carefully reviewed the loans it purchased from Countrywide,

Fannie actually made material exceptions to its risk management guidelines for Countrywide. Specifically in late 2007, Confidential Witness 4 observed that there were 6,000-7,000 outstanding loans that had Fannie had selected to review. According to Confidential Witness 4, Countrywide failed to provide the information necessary to conduct such reviews, which under Fannie's guidelines should have triggered a limitation of Fannie's business with Countrywide. However, unbeknownst to investors, Fannie failed to enforce the triggers on Countrywide, violating Fannie's risk management guidelines.

**P.      February 27, 2008 News Release, 2007 10-K and Conference Call**

314.    On February 27, 2008, Fannie issued a news release that disclosed the Company's fourth quarter and full-year 2007 results (the "Feb. 27 News Release").  The Feb. 27 News Release quoted Mudd and Swad as follows:

> [Mudd]:  Our strategy for moving through another tough year is to protect and conserve our capital base, and control credit losses. We have also increased our credit loss reserves.  Finally, we will also provide liquidity to the market by growing our guaranty business as we build a very strong credit book. These steps will help us do our part to maintain a liquid, stable and affordable mortgage market — and also position us well when the market recovers.
>
> *      *      *
>
> [Swad]:  To bolster our capital, we issued $7.8 billion of preferred stock, net of fees, in the fourth quarter, and we will continue to evaluate further avenues to conserve our capital and reduce the impact of market disruptions on our capital base.

315.    These statements were false and misleading because --as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined loss reserves and materially overstated core capital.

316.    The Feb. 27 News Release stated that as of December 31, 2007, Fannie reported combined *loss reserves* of $3.391 billion, *deferred tax assets* of $8.367 billion, *other than temporary impairments* of $727 million and core capital of $45.373 billion.

317.    These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined *loss reserves*, materially understated *other than temporary impairments*, materially overstated *deferred tax assets* and materially overstated core capital.

318.    The Feb. 27 News Release further disclosed that Fannie "revised" the projected for home prices that it had just disclosed on Nov. 9, 2007, and stated the following:

> With this filing, Fannie Mae has revised its projections for home prices. The company previously said it expected home prices to decline nationwide by 4 to 5 percent in 2008, with a total peak-to-trough decline of 10 to 12 percent. The company now expects home prices to decline nationwide by 5 to 7 percent in 2008, with a total peak-to-trough decline of 13 to 17 percent, which includes significant expected regional home price declines in 2008.

319.    These statements were false and misleading because the Exchange Act Defendants knew or recklessly disregarded that home prices nationwide would decline materially more than the Company reported, meaning the Company's "revised" home price projections were materially understated.  In fact, according to Confidential Witness 2, in January 2007, Fannie's business analytics division was predicting a 50% decline in home prices over three to five years that would materially increase Fannie's losses and wipe out Fannie's core capital.

320.    The Feb. 27 News Release stated the following concerning Fannie's exposure to subprime and Alt-A securities:

> Fannie Mae holds private-label mortgage securities (PLS) and Fannie Mae-guaranteed securities backed by subprime or Alt-A mortgage assets.  Of the total $73.9 billion of such securities on its books, $41.4 billion are backed by subprime mortgage assets and $32.5 billion are backed by Alt-A loans.

321.    These statements were false and misleading because for the reasons set forth in ¶172 (a)-(c), (f) and (h).

322.    Also on February 27, 2008, Fannie published a "2007 10-K Investor Summary" that included the same financial results for the quarter and year ended December 31, 2007, as set forth in ¶316.

323.    These statements were false and misleading for the reasons set forth above in ¶317.

324.    Also on February 27, 2008, the Exchange Act Defendants caused Fannie to file the 2007 10-K (the "2007 Annual Report"), which was signed by Mudd and Swad.

325.    The 2007 Annual Report included Fannie's fiscal year 2007 financial results as previously set forth in the Feb. 27 News Release above at ¶316.

326.    These statements were false and misleading for the reasons set forth above in ¶317.

327.    The 2007 Annual Report included the following statements concerning Fannie's capital:

> Our principal strategy for responding to the current challenging market conditions is to prudently manage and preserve our capital, while building a solid mortgage credit book of business and continuing to fulfill our chartered mission of providing liquidity, stability and affordability to the secondary mortgage market. We identify below a number of the steps we have taken and are taking to achieve that strategy.
>
> ***Managing and Preserving Capital***
>
> During the second half of 2007, our business activities were constrained by our need to maintain regulatory capital at required levels. We took steps to bolster our regulatory capital position during the second half of 2007 by:
> • issuing preferred stock totaling $8.9 billion;
> • announcing a 30% reduction in our common stock dividend effective for the first quarter of 2008;
> • managing the size of our investment portfolio; and

• limiting or forgoing business opportunities that we otherwise would have pursued.

\*     \*     \*

In addition, our total capital was $48.7 billion as of December 31, 2007, a surplus of $24.0 billion, or 97%, over our estimated statutory-risk based capital requirement of $24.7 billion for the period.  Our total capital was $42.7 billion as of December 31, 2006, a surplus of $15.8 billion, or 58.9%, over our statutory risk-based capital requirement of $26.9 billion for the period.

\*     \*     \*

We expect the downturn in the housing market and the disruption in the mortgage and credit markets to continue to negatively affect our earnings in 2008, and therefore to continue to negatively affect the amount of our core capital.  **We believe we will maintain a sufficient amount of core capital to continue to meet our statutory and OFHEO-directed minimum capital requirements through 2008.**

(Emphasis added.)

328.    These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially overstated core capital.

329.    In the 2007 Annual Report, Fannie falsely represented that, after an evaluation in accordance with GAAP requirements, it had concluded it would be able to realize its *deferred tax assets*:

**We must evaluate our ability to realize the tax benefits associated with our deferred tax assets quarterly.  In the future, we may be required to record a material expense to establish a valuation allowance against our deferred tax assets, which likely would materially adversely affect our earnings, financial condition and capital position.**

As of December 31, 2007, we had approximately $13.0 billion in net *deferred tax assets* on our consolidated balance sheet that we must evaluate for realization on a quarterly basis under Statement of Financial Accounting Standards ("SFAS") No. 109, *Accounting for Income Taxes* ("SFAS 109").  *Deferred tax assets* refer to assets on our consolidated balance sheets that relate to amounts that may be used to reduce any subsequent period's income tax expense.  Consequently, our ability to use these *deferred tax assets* in future periods depends on our ability to generate sufficient taxable income in the future.

If, in a future period, negative evidence regarding our ability to realize our *deferred tax assets* (such as a reduction in our projected future taxable income) outweighed positive evidence, we could be required to record a material expense to establish a valuation allowance against our *deferred tax assets* at that time. Recording a material expense of this type would likely have a material adverse effect on our earnings, financial condition and capital position.

*     *     *

We recorded net *deferred tax assets* of $13.0 billion and $8.5 billion as of December 31, 2007 and 2006, respectively, arising to a large extent from differences in the timing of the recognition of derivatives fair value gains and losses for financial statement and income tax purposes. **We currently have not recorded a valuation allowance against our net deferred tax assets as we anticipate it is more likely than not that the results of future operations will generate sufficient taxable income to allow us to realize the entire tax benefit.** If we continue to experience losses or sustained significant decreases in our earnings, we may not be able to realize all of our *deferred tax assets*, which would require that we establish a valuation allowance that could materially adversely affect our earnings, financial condition and capital position.

(Emphasis added.)

330.     These statements were false and misleading because as alleged in ¶¶134-169,

Fannie knew that it was "more likely than not" that it would fail to generate sufficient taxable

income to realize its *deferred tax assets* and that those assets were materially overstated.

331.     The 2007 Annual Report included the following statements concerning Fannie's

credit risk management:

> ***Building a Solid Mortgage Credit Book of Business by Managing and Mitigating Credit Exposure***
> We have implemented a variety of measures designed to help us manage and mitigate the credit exposure we face as a result of our investment and guarantee activities. These measures include:
> • establishing guidelines designed to limit our credit exposure, including tightening our eligibility standards for mortgage loans we acquire;
> • limiting losses associated with our guaranty contracts by increasing our guaranty fees and implementing an adverse market delivery charge to compensate us for the added risk we incur during this period of increased market uncertainty; and
> • working to mitigate realized credit losses, both by working closely with our servicers to enhance our ability to act promptly when borrowers fall behind on their loan payments and by offering an expanded array of loss mitigation alternatives.

332.     In its 2007 Annual Report Fannie represented that it "closely monitor[ed] housing and economic market conditions and loan performance to manage and evaluate our credit risks, adjusting our eligibility requirements and pricing as necessary to ensure that we are appropriately compensated for risk".  The Company further stated in the 2007 Annual Report that

> Our loan underwriting and eligibility guidelines are intended to provide a comprehensive analysis of borrowers and mortgage loans based upon known risk characteristics … **We have policies and various quality assurance procedures that we use to review a sample of loans to assess compliance with our underwriting and eligibility criteria.** If we identify underwriting or eligibility deficiencies, we may take a variety of actions, including increasing the lender credit loss sharing or requiring the lender to repurchase the loan, depending on the severity of the issues identified.

(Emphasis added.)

333.     The statements in ¶¶331-332 were false and misleading because, as described in ¶¶111-115 above, the Exchange Act Defendants misrepresented and/or failed to disclose that Fannie made material exceptions to its risk management guidelines for Countrywide, Fannie's largest customer.

334.     The 2007 Annual Report contained the following statements minimizing Fannie's credit risk exposure to Alt-A and subprime mortgages:

> Alt-A mortgage loans, whether held in our portfolio or backing Fannie Mae MBS, represented approximately 16% of our single-family business volume in 2007, compared with approximately 22% in 2006 and 16% in 2005, respectively. During 2007, private-label securitization of Alt-A loans significantly decreased and Fannie Mae assumed a larger role in acquiring Alt-A mortgage loans; however, the actual amount of our acquisitions of Alt-A loans decreased in 2007 from 2006. **In order to manage our credit risk in the shifting market environment, we lowered maximum allowable LTV ratios and increased minimum allowable credit scores for most Alt-A loan categories. We also limited our acquisition of some documentation types and made other types ineligible for delivery to us. Finally, we implemented pricing increases to reflect the higher credit risk posed by these mortgages**. As a result of these eligibility restrictions and price increases, we believe that our volume of Alt-A mortgage loan acquisitions will decline in future periods.

We estimate that Alt-A mortgage loans held in our portfolio or Alt-A mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by Alt-A mortgage loans, represented approximately 12% of our total single-family mortgage credit book of business as of December 31, 2007, compared with approximately 11% and 8% as of December 31, 2006 and 2005, respectively.  **The majority of our Alt-A mortgage loans are fixed-rate, and the weighted average credit score of borrowers under our Alt-A mortgage loans is comparable to that of our overall single-family mortgage credit book of business.**

\*       \*       \*

Subprime mortgage loans, whether held in our portfolio or backing Fannie Mae MBS, represented less than 1% of our single-family business volume in each of 2007, 2006 and 2005.  **Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages.**  We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.

We estimate that subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by subprime mortgage loans, represented approximately 0.3% of our total single-family mortgage credit book of business as of December 31, 2007, compared with 0.2% and 0.1% as of December 31, 2006 and 2005, respectively.

(Emphasis added.)

335.    These statements were false and misleading for the reasons set forth in ¶172 (a)-(f) and (h).

336.    The 2007 Annual Report included the following statements concerning Fannie's credit loss sensitivities:

We use internally developed models to assess our sensitivity to credit losses based on current data on home values, borrower payment patterns, non-mortgage consumer credit history and management's economic outlook.  We also review and compare publicly available credit loss analyses and predictions.  We examine a range of potential economic scenarios to monitor the sensitivity of credit losses.  Our models indicate that home price movements are an important predictor of credit performance.  Due to the continued housing market downturn and our expectation that home prices will decline further in 2008, we expect a significant increase in our credit-related expenses and credit loss ratio.

Pursuant to our September 2005 agreement with OFHEO, we disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. For purposes of this calculation, we assume that, after the initial 5% shock, home price growth rates return to the average of the possible growth rate paths used in our internal credit pricing models. The present value change reflects the increase in future expected credit losses under this scenario, which we believe represents a reasonably high stress scenario because it assumes an instantaneous nationwide decline in home prices, over the future expected credit losses generated by our internal credit pricing models without this shock.

337.    These statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that in January 2007, Fannie's business analytics division was predicting a 50% decline in home prices over three to five years that would materially increase Fannie's losses and wipe out Fannie's core capital.

338.    The 2007 Annual Report included SOX Certifications signed by Mudd and Swad that were substantially the same as set forth above at ¶237.

339.    These statements were materially false and misleading for the reasons set forth in ¶238.

340.    Also on February 27, 2008, Fannie conducted a conference call with investors (the "February 2008 Conference Call") during which the following statements were made:

[Fannie's Executive Vice President of Capital Markets, Peter Niculescu]: [W]e have meaningful capital surplus and we're intending to maintain that meaningful capital surplus . . . .

[Mudd]: [T]here are no current plans to go back to the market for capital. . . .

341.    These statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that, as alleged in ¶¶134-169, in violation of GAAP, Fannie was severely undercapitalized.

342.   Fannie successfully misled the market: on February 27, 2008, J.P. Morgan issued an analyst report that stated in part that "We rate Fannie Mae Overweight to reflect our view that capital is secure and Fannie should experience a prolonged period of ROE expansion as we work through and eventually exit the current credit crisis."

343.   On the February 2008 Conference Call, Mudd reported that Fannie projected a larger decline in home prices, but still did not disclose that Fannie predicted a 50% decline in home prices over three to five years. Mudd said:

> We now expect home prices to decline nationwide by 5 to 7% this year on average, instead of the 4 to 5% decline we last projected.  So we have moved that projection for home price declines up one notch.  Second, we do not expect national home prices to bottom out until late '09, and that drives a peak-to-trough decline on average nationally in the range of 13 to 17%, which is, again, a notch up from the last projection of 8 to 12%.

344.   This statement was materially false and misleading for the reason set forth in ¶172 (c)(ii).

## Q.   Fannie's May 6, 2008 News Release, Financial Results for the Period Ended March 31, 2008 and Conference Call

345.   On May 6, 2008, Fannie issued a news release in which it disclosed its financial results for the period ended March 31, 2008 (the "May 6 News Release").

346.   The May 6 News Release stated that as of March 31, 2008 Fannie reported combined *loss reserves* of $5.195 billion, *deferred tax assets* of $17.806 billion, *other than temporary impairments* of $55 million and core capital of $42.676 billion.

347.   These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined loss reserves, materially understated *other than temporary impairment*s, materially overstated *deferred tax assets* and materially overstated core capital.

348.   In the May 6 News Release, Mudd represented that the additional capital Fannie was raising through stock offerings would "bolster our 'protect and grow' strategy–it will allow us to maintain a strong, conservative balance sheet through the housing correction."  In the News Release, Fannie also emphasize that it had a core capital surplus:

> **Core capital as of March 31, 2008 was an estimated $42.7 billion, compared with $45.4 billion as of December 31, 2007.  The company's capital exceeded the statutory minimum by $11.3 billion, or 36.2 percent, and the statutory minimum plus the OFHEO-directed 20 percent surplus by $5.1 billion, or 13.5 percent.**
>
> *              *              *
>
> Management believes that the additional capital being raised, as described in this release, will enable the company to pursue growth and investment opportunities while also maintaining a prudent capital cushion in a volatile and challenging market through 2008 and 2009.

(Emphasis added.)

349.   These statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that Fannie did not have a strong, conservative balance sheet.  As alleged in ¶¶134-169, in violation of GAAP, the Exchange Act Defendants materially understated combined *loss reserves*, materially understated *other than temporary impairments*, materially overstated *deferred tax assets* and materially overstated core capital.

350.   The May 6 News Release stated the following concerning Fannie's exposure to Alt-A and subprime securities:

> Alt-A and Subprime Private-Label Securities.   Fannie Mae recognized $1.1 billion in losses during the first quarter of 2008 on mortgage-related securities backed by Alt-A and subprime loans that were classified as trading securities.
>
> In addition, the company recorded $52 million of other-than-temporary impairment on $751 million of unpaid principal balance of subprime private-label securities classified as *available-for-sale* (AFS).  This decision was made after management concluded (based on credit analysis including internal stress test

scenarios on these securities) that it was no longer probable that the company would collect all of the contractual principal and interest amounts due, or no longer intended to hold the securities until recovery. Gross unrealized losses related to Alt-A and subprime securities classified as AFS totaled $8.0 billion as of March 31, 2008, compared with $3.3 billion as of December 31, 2007, driven by widening credit spreads in the market.

351.    These statements were materially false and misleading for the reasons set forth in ¶172(a)-(c), (f) and (h).

352.    The May 6 News Release stated the following concerning Fannie's outlook for home prices:

> Management's preliminary estimate is that home prices declined by approximately 3 percent during the first quarter of 2008, which exceeded the pace of the decline anticipated when the company provided its full year forecast of home price declines of 5 to 7 percent for 2008. Therefore, the company is updating its full-year estimate for home price declines in 2008 to a range of 7 to 9 percent on a national basis, with significant regional differences in the rate of home price declines.

353.    These statements were materially false and misleading for the reason set forth in ¶172 (c)(ii).

354.    In anticipation of certain offerings of common and preferred stock, on or around May 2, 2008 Fannie published "Fannie Mae Capital Raise Roadshow" that included Fannie's financial results for the periods ended March 31, June 30, September 30 and December 31, 2007 and March 31, 2008 and stated, among other things, the following:

Transaction Rationale

- Maintain a strong, conservative balance sheet
- Build capital to allow Fannie Mae to operate and grow from a position of strength
- Maintain a prudent capital cushion in a volatile and challenging market through 2008 and 2009 . . . .
- Strong balance sheet and capital through housing market downturn
- Volatility in credit and housing markets dictates the need for a larger capital cushion

355.     These statements were materially false and misleading because as alleged in ¶¶134-169, Fannie's balance sheet was not conservative and its capital was materially overstated. These statements were materially false and misleading for further the reasons set forth in ¶¶259-291 (identifying materially false and misleading statements in 10-Qs for the periods ended March 31, June 30 and September 30, 2007); ¶¶324-339 (identifying materially false and misleading statements in the 10-K for 2007); and ¶¶358-367 (identifying materially false and misleading statements in 10-Q for the period ended March 31, 2008).

356.     The Fannie Mae Capital Raise Road Show stated that Fannie was actively monitoring counterparties and enhancing counterparty collateral requirements.

357.     These statements were materially false and misleading because, as set forth above at ¶¶111-115, the Exchange Act Defendants misrepresented and/or failed to disclose that Fannie made material exceptions to its risk management guidelines for Countrywide. Further, these statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that Fannie settled a loan repurchase dispute with Countrywide in May 2008 for approximately $0.23-0.26 on the dollar for a claim of $680-690 million, which was a violation of the Fannie's stated policy concerning repurchase requests, as alleged in ¶115.

358.     Also on May 6, 2008, the Exchange Act Defendants caused Fannie to file its First Quarter 2008 Form 10-Q with the SEC (the "First Quarter 2008 10-Q").  The First Quarter 2008 10-Q was signed by Mudd and Swad.

359.     The First Quarter 2008 10-Q included the statements concerning Fannie's financial condition and results as in the May 6 News Release above in ¶346, which were materially false and misleading for the reasons set forth in ¶347.

360.    The First Quarter 2008 10-Q stated the following concerning Fannie's capital:

***Preserving and Building Capital***
We intend to continue to take aggressive management actions to preserve and further build our capital. OFHEO's reduction of the capital surplus requirement will facilitate our capital management efforts and enhance our ability to provide additional liquidity and stability to the secondary mortgage market.

\*       \*       \*

We took several capital management actions to ensure compliance with our regulatory capital requirements during the first quarter of 2008, including: managing the size of our investment portfolio; selling assets to reduce the amount of capital that we were required to hold and to realize investment gains; and reducing our common stock dividend.  We also elected not to take advantage of some opportunities to purchase mortgage assets at attractive prices and made other changes to our business practices to reduce our losses and expenses during the first quarter of 2008.

\*       \*       \*

We continue to carefully monitor the current volatile market conditions to determine the impact of these conditions on the amount of our available capital and our capital management goals.  We may take a variety of actions in addition to those described above to further preserve and build our capital, including: issuing additional preferred, convertible preferred or common stock; further reducing or eliminating our common stock dividend; forgoing purchase and guaranty opportunities; reducing the size of our investment portfolio through liquidations or by selling assets; changing our current business practices to reduce our losses and expenses; and reclassifying a portion of our investment securities from held for trading to *available-for-sale*.

361.    These statements were materially false and misleading because as alleged in

¶¶134-169, the Exchange Act Defendants misrepresented and/or failed to disclose that Fannie

materially overstated its core capital, and that it was severely undercapitalized

362.    The First Quarter 2008 10-Q stated the following concerning Fannie's subprime

and Alt-A securities:

To date, the credit downgrades of our Alt-A and subprime securities classified as AFS have not resulted in our recognizing significant other-than-temporary writedowns on these securities.  As of March 31, 2008, we had recognized cumulative other-than-temporary impairment totaling $222 million on our investments in Alt-A and subprime securities, of which $52 million was

recognized in the first quarter of 2008. Although we consider recent external rating agency actions or changes in a security's external credit rating as one criterion in our assessment of other-than-temporary impairment, a rating action alone is not necessarily indicative of other-than-temporary impairment.

363.    These statements were materially false and misleading for the reasons set forth in ¶172(a)-(c), (f) and (h).

364.    The First Quarter 2008 10-Q stated the following concerning Fannie's credit loss sensitivity:

Pursuant to our September 2005 agreement with OFHEO, we disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. Table 17 shows for first lien single-family whole loans we own or that back Fannie Mae MBS as of March 31, 2008 and December 31, 2007, the credit loss sensitivity results before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancement. The increase of $625 million in the net credit loss sensitivity to $5.2 billion as of March 31, 2008, from $4.5 billion as of December 31, 2007 was primarily attributable to the continued decline in home prices during the first quarter of 2008.

365.    These statements were materially false and misleading for the reason set forth in ¶172(c)(ii).

366.    The First Quarter 2008 10-Q included SOX Certifications signed by Mudd and Swad that were substantially the same as these alleged in ¶237.

367.    These statements were materially false and misleading for the reasons set forth in ¶¶238.

368.    On the May 6, 2008 analyst conference call (the "May 6 Conference Call"), Mudd once again reported that Fannie projected a larger decline in home prices, stating that:

Home prices concurrently have declined faster than anyone anticipated. So we are updating our forecast. In the first quarter, home prices -- national average home prices fell by about 3%. Given that decline which was accelerated from the prior quarter, we changed our outlook for home price declines for the whole year. Instead of a 5% to 7% decline or an ensuing 13% to 17% peak to trough which is what we talked about the last time, we now see home prices falling about 7% to

9% for the year which would then lead to a 15% to 19% peak to trough decline average national home prices.

369.    Mudd's statement was materially false and misleading because, contrary to his representation that home price declines of 15% to 19% were "faster than … anticipated," Fannie anticipated a 50% drop in home prices over the near term.

370.     On the May 6 Conference Call, the following statements were made concerning risk management:

> [Mudd]: Well, let me start and then either Rob or Mike Quinn, who is our Single-Family Chief Credit Officer, can jump in.…  [M]ost of our business model is built off of a set of reps and warranties that the originators provide to us.  So, we have always had a history of enforcing those reps and warranties.  Because the documentation is lower in the Alt-A book which is after all the point of Alt-A, that's an area that we make sure that we focus on. With that, I would let Mike Quinn pick up.

> [Quinn]: Thanks Dan.  [or ellipsis] Yes, every loan that defaults, we do an underwriting review to make sure it didn't tie out to our guidelines and what our contract with the lender was.  So we're doing those review reviews of old loans that default.  And we're issuing more make-whole and repurchase request that the volume has increased of that.

371.    These statements were materially false and misleading because Fannie was not doing an underwriting review of every loan that defaulted.  As alleged in ¶¶111-115, Fannie made material exceptions to its risk management guidelines for Countrywide, and, further, misrepresented and/or failed to disclose that Fannie violated its stated policy regarding repurchase requests when it settled a loan repurchase dispute with Countrywide in May 2008.

**R.    May 8, 2008–Common Stock Offering Circular**

372.    On May 8, 2008, Fannie offered 82,000,000 shares of common stock pursuant to an Offering Circular dated May 8, 2008 (the "May 8 Common Stock Offering Circular").  The May 8 Offering Circular included an overview of Fannie's financial results for the quarter ended March 31, 2008 and stated that the overview "should be read in conjunction with our unaudited

condensed consolidated financial statements and other financial information set forth in our

Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2008, filed with the

SEC on May 6, 2008."

373.    The May 8 Offering Circular incorporated by reference the following documents:

Fannie's 2007 10-K and 2008 First Quarter 10-Q.

374.    The documents incorporated by reference in the May 8 Common Stock Circular

were materially false and misleading set forth in ¶¶358-367 (identifying materially false and

misleading statements in the 10-Q for the quarter ended March 31, 2008); and ¶¶324-339

(identifying materially false and misleading statements in the 10-K for 2007).

375.    The May 8 Offering Circular stated that as of March 31, 2008 Fannie held core

capital of $42.676 billion and stated the following concerning Fannie's *deferred tax assets*:

> **We must evaluate our ability to realize the tax benefits associated with our deferred tax assets quarterly.  In the future, we may be required to record a material expense to establish a valuation allowance against our deferred tax assets, which likely would materially adversely affect our earnings, financial condition and capital position.**
>
> As of March 31, 2008, we had approximately $17.8 billion in net *deferred tax assets* on our consolidated balance sheet that we must evaluate for realization on a quarterly basis under Statement of Financial Accounting Standards No. 109, *Accounting for Income Taxes*.
>
> \*          \*          \*
>
> If, in a future period, negative evidence regarding our ability to realize our *deferred tax assets* (such as a reduction in our projected future taxable income) outweighed positive evidence, we could be required to record a material expense to establish a valuation allowance against our *deferred tax assets* at that time. Recording a material expense of this type would likely have a material adverse effect on our earnings, financial condition and capital position.

(Emphasis added.)

376.    These statements were materially false and misleading because as alleged in

¶¶134-169, the Exchange Act Defendants misrepresented and/or failed to disclose that Fannie

was severely undercapitalized and, further, that negative evidence regarding the Company's ability to realize its *deferred tax assets* far outweighed any positive evidence, and that, as such, Fannie should have established a valuation allowance against those assets.

**S.      May 8, 2008 – Preferred Series 2008-1 Offering Circular**

377.    Also on May 8, 2008, Fannie offered 45 million shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 shares of preferred shares Series 2008-1 pursuant to an Offering Circular dated May 8, 2008 (the "2008-1 Offering Circular").  The 2008-1 Offering Circular included an overview of Fannie's financial results for the quarter ended March 31, 2008 and stated that the overview "should be read in conjunction with our unaudited condensed consolidated financial statements and other financial information set forth in our Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2008, filed with the SEC on May 6, 2008."  The 2008-1 Offering Circular incorporated by reference Fannie's 2007 10-K and 2008 First Quarter 10-Q.

378.    These statements were materially false and misleading for the reasons set forth in ¶374.

379.    The 2008-1 Offering Circular repeated the statements concerning *deferred tax assets* and core capital that were stated in the May 8 Common Stock Offering Circular set forth above at ¶375.

380.    These statements were materially false and misleading for the reasons set forth in ¶376.

**T.      May 13, 2008 – Preferred Series T Offering Circular**

381.    On May 13, 2008, Fannie offered 80,000,000 shares of 8.25% Non-Cumulative Preferred Stock, Series T shares of preferred stock pursuant to an Offering Circular dated May

13, 2008 (the "Series T Offering Circular").  The Series T Offering Circular included an overview of Fannie's financial results for the quarter ended March 31, 2008 and stated that the overview "should be read in conjunction with our unaudited condensed consolidated financial statements and other financial information set forth in our Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2008, filed with the SEC on May 6, 2008."

382.   The Series T Offering Circular incorporated by reference the following documents: Fannie's 2007 10-K and 2008 First Quarter 10-Q.

383.   These statements were materially false and misleading for the reasons set forth in ¶374.

384.   The Series T Offering Circular repeated the statements concerning *deferred tax assets* and core capital that were stated in the May 8 Common Stock Offering Circular as set forth above at ¶375.

385.   These statements were materially false and misleading for the reasons set forth in ¶376.

**U.     July 2008 Statements Concerning Capital Adequacy**

386.   On July 11, 2008, Chuck Greener, Fannie's Senior Vice President issued a statement falsely reassuring investors that:

> Our capital level is substantially above both our statutory minimum capital and the OFHEO-required 15 percent surplus over minimum capital.  **In fact, we have more core capital, and a higher surplus over our regulatory requirement, than at any time in this company's history.**
>
> As we work through this tough housing market, we are maintaining a strong capital base, building reserves for our credit losses, and generating solid revenues as our business continues to serve the market.

(Emphasis added.)

387.    On July 11, 2008, *Dow Jones Newswires*, reported that Mudd said that Fannie continues "to hold more than adequate capital reserves and maintain access to liquidity from the capital markets."

388.    On July 17, 2008, the *Associated Press* reported that Mudd stated Fannie was "very unlikely" to need a cash infusion from the government to survive the housing bust.

389.    The statements in ¶¶386-388 were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that, in stark contrast to Fannie's reassurances that it was well capitalized, as alleged in ¶¶134-169, Fannie materially overstated its core capital and was in fact severely undercapitalized

## V.    Fannie's August 8, 2008 News Release, Financial Results for the Quarter ended June 30, 2008 and Conference Call

390.    On August 8, 2008, Fannie issued a news release that disclosed the Company's financial results for the period ended June 30, 2008 (the "Aug. 8 News Release"). As quoted in the Aug. 8 News Release , Defendants Mudd and Swad offered the following reassurances as to Fannie's safety and soundness, and its ability to generate revenue:

> [Swad]: [D]espite the turmoil in the market, our guaranty volumes and strong portfolio spreads demonstrate the underlying strength of Fannie Mae's core business and its ability to generate revenue in a very challenging market. . . .

> [Mudd]: We are taking the necessary steps to meet the needs of our lending partners, provide liquidity to the market, and channel global capital into housing. The housing market will inevitably stabilize and recover, and we are working to make sure Fannie Mae will be at the center of that recovery, for our shareholders and the market we serve.

391.    As Defendants Mudd and Swad knew or recklessly disregarded, Fannie was sinking under the weight its losses by that time, rendering their statements above materially false and misleading.

392.    The Aug. 8 News Release stated that as of June 30, 2008, Fannie reported combined *loss reserves* of $8.926 billion, *deferred tax assets* of $20.604 billion, *other than temporary impairments* of $507 million and core capital of $46.964 billion.

393.    These statements were false and misleading because--as alleged in detail and with specificity in ¶¶134-169 above--in violation of GAAP, the Exchange Act Defendants materially understated combined *loss reserves*, materially understated *other than temporary impairments*, materially overstated *deferred tax assets* and materially overstated core capital.

394.    Also on August 8, 2008, Fannie issued an Investor Summary for the period ended June 30, 2008 that repeated statements concerning Fannie's financial results for the period ended June 30, 2008 that were set forth in the Aug. 8 News Release.

395.    These statements were materially false and misleading for the reasons set forth in ¶¶393.

396.    Also on August 8, 2008, the Exchange Act Defendants caused Fannie to file its Second Quarter 2008 Form 10-Q with the SEC (the "Second Quarter 2008 10-Q").  The Second Quarter 2008 10-Q was signed by Mudd and Swad.

397.    The Second Quarter 2008 10-Q repeated the information set forth in the Aug. 8 New Release concerning Fannie's financial condition and results, as set forth at ¶392.

398.    These statements were materially false and misleading for the reasons set forth in ¶393.

399.    The Second Quarter 2008 10-Q stated the following concerning credit loss sensitivities:

> Pursuant to our September 2005 agreement with OFHEO, we disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States.  Table 17 shows

the credit loss sensitivity before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancement, as of June 30, 2008 and December 31, 2007 for first lien single-family whole loans we own or that back Fannie Mae MBS. The sensitivity results represent the difference between our base case scenario of the present value of expected credit losses and credit risk sharing proceeds, derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices. The increase in the credit loss sensitivities since December 31, 2007 reflects the decline in home prices during the first half of 2008 and the current negative near-term outlook for the housing and credit markets. These higher sensitivities also reflect the impact of updates to our underlying credit loss estimation models to capture the credit risk associated with the rapidly changing and worsening of conditions in the housing market. An environment of continuing lower home prices affects the frequency and timing of defaults and increases the level of credit losses, resulting in greater loss sensitivities. Although the anticipated credit risk sharing proceeds have increased as home prices have declined, the expected amount of proceeds resulting from a 5% home price shock are lower. As home prices decline, the number of loans without mortgage insurance that are projected to default increases. . . . .

400. These statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that in January 2007, Fannie's business analytics division was predicting a 50% decline in home prices over three to five years that would materially increase Fannie's losses and wipe out Fannie's core capital.

401. The Second Quarter 2008 10-Q included SOX Certifications signed by Mudd and Swad that were substantially the same as set forth in ¶237.

402. These statements were materially false and misleading for the reasons set forth in ¶238.

403. On the August 8, 2008 analyst conference call (the "August 8 Conference Call"), Mudd stated the following about Fannie's exposure counterparty risk:

> [M. DeVries]: [Lehman Brothers Analyst] [C]ould you discuss the extent to which and you know, if at all, you have factored in counterparty risk with the financial guarantors and the MIs [mortgage insurance] in your reserving and impairments that you've taken?

[D. Mudd]:     We've as a broad matter, we've moved with the installation of the Chief Risk Officer function, we have created the systems and the ability to look at our counterparty exposure to all of our counterparties on a divisible basis or on an aggregate basis.

We look at that.  We measure that.  We understand where the risk is and as you've seen some of the larger counterparty changes along the way, with respect to some of the originators or some of the servicers that have changed form or as, for example, in the case of IndyMac, we've been able to manage through those by using that system; getting ahead of the curve, and having a very high degree of recovery.

*       *       *

[G. Gordon]:  OK, thanks.  The other is, I guess, sort of a counterparty risk in your loss mitigation efforts.  Obviously, the people you're going back to collect in most cases are your clients; your customers delivering loans.  How does that limit your ability to collect and obviously, there've been a number of bankruptcies of lenders.  How does that limit your ability to collect?

[D. Mudd]:     So that said, in the situations that have been more publicized recently, I think it would go back, Gary, to my prior comment, which is we monitor these in advance.  We see where there are signs of stress.  The big concern there for us is that we're able to get in front and ensure that there's uninterrupted servicing because by-and-large you know the underlying quality of the loans is what it is, but it's the servicing that you don't want to have interrupted.  And we have been able to very efficiently, very quickly, and somewhat painlessly move those servicing books into hands where the servicing will continue uninterrupted.  With that Tom can give you a little flavor of the discussions.

[T. Lund]:     Sure.  Let me just reiterate what Dan said.  I mean this is a practice that we have had in place forever.  This is the way we operate with our customers.  Our customers understand this and as a team we've done a very good job, in a very tough environment managing counterparties.  And I think part of the reason is we've got people on the ground; we're inside these people's shops.  We have a great understanding of what they do.

In terms of the rep and warrant, our customers make rep and warrants to us and when the products that they sell meet the contracts.  They're very clear about what they're due.  They know how we do this.  We have ongoing discussions.  This is not a surprise to them.  I wouldn't even put this in an adversary way.  This is an understanding about how this business gets done.  It partly creates the efficiency in the secondary market

and it's well accepted.  So I would say these continued discussions are ongoing and we're successful in that as we go forward.

404.   These statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that Fannie did not have a high degree of recovery concerning repurchase requests against Countrywide and that it was not true that Fannie was able to manage its exposure to IndyMac and have "a very high degree of recovery." Specifically, the Exchange Act Defendants misrepresented and/or failed to disclose, as alleged in ¶¶111-115, that Fannie settled a loan repurchase dispute with Countrywide in May 2008 for approximately $0.23-0.26 on the dollar for a claim of $680-690 million and that, as alleged in ¶¶116-118, Fannie was aware that loans it had purchased from IndyMac were defective, and in fact, Fannie had asked IndyMac to repurchase between $1 and $10 billion in loans after IndyMac had been seized by regulators in July 2008.  These statements were materially false and misleading for the further reason that in July 2007, Fannie materially lowered its risk management capabilities by materially reducing the Chief Risk Officer's budget and staff, as alleged in ¶¶99-100.

405.   On the August 8 Conference Call, KBW analyst Fred Cannon asked "I believe your deferred tax asset rose to about $20 billion at the end of the quarter and is there any risk to that asset in either a GAAP or a regulatory framework on a go-forward basis?"  Swad responded as follows:

> [W]hat we do is we make an assessment on the recoverability based on the taxable income the company generates.  And just remember that our taxable income is higher than our book income because there's no reserve building expense.  There's no 03-3 charge.  There's no spreading of G-fees that we get in cash and so, based on that, we think it's sufficient to recover the asset.

406.   This statement was materially false and misleading because, as alleged above in ¶¶134-169, the value of the *deferred tax asset* was materially overstated.  Indeed, after the

118

government put Fannie into a conservatorship less than a month later, the Company wrote off a

significant amount of the *tax deferred asset*, thus leaving Fannie drastically undercapitalized.

407.    Also on the August 8 Conference Call, the following statements were made:

[Swad]:        "We will remain above the surplus capital requirement for
the remainder of 2008."

[Mudd]:        "[O]ur capital is in good position for '08"

[Swad concerning Fannie's *deferred tax assets*]:       "[W]e think [our
taxable income] is sufficient to recover the asset."

408.    Also on August 8, 2008, Reuters News reported that Fannie stated that it was

"Important to remain long on capital," that its capital position is of the utmost importance and

that Mudd stated said Fannie will be making "aggressive" moves to maintain capital.

409.    The statements in ¶¶407-408 were materially false and misleading because the

Exchange Act Defendants misrepresented and/or failed to disclose that as alleged in ¶¶134-169,

Fannie had materially overstated *deferred tax assets* and core capital.

410.    According to Fannie's 10-Q for the second quarter of 2008, Fannie's core capital

was, as of the end of that quarter, still in excess of the statutory "minimum capital requirement"

and "OFHEO-directed minimum capital."  On July 11, 2008, Fannie issued a statement insisting

that it had a "substantial" excess over both the minimum and the OFHEO-directed capital

requirements, and trumpeting that **"we have more core capital, and a higher surplus over our

regulatory requirements, than at any time in this company's history."**  (Emphasis added.)

411.    However, as alleged in ¶¶134-169, this was untrue.  Indeed, less than one month

later, the FHFA appointed a conservator for Fannie and announced that the Company already

was undercapitalized as of the end of the second quarter of 2008.

## VIII.   THE GOVERNMENT PLACES FANNIE INTO CONSERVATORSHIP

412.    On July 30, 2008, President Bush signed The Housing and Economic Recovery Act of 2008 (the "2008 Act").  Under the 2008 Act, OFHEO was replaced by FHFA.  In addition, the circumstances under which FHFA could exercise its discretion to impose a conservatorship on Fannie were broadened to include when Fannie is in "[a]n unsafe or unsound condition to transact business."  The statute also gave FHFA discretion to downgrade Fannie's capital adequacy classification, if it determined that Fannie is in "an unsafe or unsound condition."

413.    According to a July 14, 2008 New York Times article, even as Fannie insisted it had plenty of capital to weather the financial storm, the Bush administration asked Congress to approve a sweeping rescue package that would empower officials to inject billions of federal dollars into Fannie and Freddie through investments and loans.

414.    On September 6, 2008, Fannie Mae's massive, ongoing fraud finally came to an abrupt halt.  On that date, *MarketWatch* reported:

> The Treasury Department is expected to announce as early as this weekend a plan to bail out and recapitalize collapsing home mortgage giants Fannie Mae and Freddie Mac in one of the biggest government rescues in U.S. history. Such a plan would end a long downward spiral for the firms
>
> *        *        *
>
> Rep. Barney Frank (D. Mass.) confirmed in a statement Saturday that Treasury Secretary Henry Paulson is set to put the federal government in control of the two troubled mortgage owners  .  .  . According to media reports citing unnamed sources close to the negotiations, the government is expected to take at least temporary control of [Fannie and Freddie Mac] and place the troubled firms under the umbrella of the Federal Housing Finance Agency. Fannie Mae Chief Executive Daniel Mudd and Freddie Mac CEO Richard Syron are expected to leave their positions soon after the federal bailout is complete.

415.    On September 7, 2008, on the heels of the Exchange Act Defendants' Class Period-long assurances regarding Fannie Mae's subprime and Alt-A loan exposure and the

adequacy of its capital, the government came to Fannie's financial rescue.  On that date, the

FHFA issued a statement announcing that it "will act as the conservator to operate [Fannie] until

[it is] stabilized," and that "as the conservator, FHFA will assume the power of the Board and

management."  Under the conservatorship, in addition to taking over Fannie's management, the

U.S. Government became the Company's majority owner and, potentially, its primary lender.  As

the Wall Street Journal reported on September 8, 2008, "[t]he Treasury will acquire $1 billion of

preferred shares in each company [*i.e.*, Fannie and Freddie] without providing immediate cash,

and has pledged to provide as much as $200 billion to the companies as they cope with heavy

losses on mortgage defaults."

416.    On September 7, 2008, the New York Times printed an article that revealed the

full, stunning extent of the fraud at Fannie—it had made accounting decisions that overstated

both capital available and financial stability:

> Indeed, one person briefed on the company's finances said Freddie Mac had made
> accounting decisions that pushed losses into the future and postponed a capital
> shortfall until the fourth quarter of this year, which would not need to be disclosed
> until early 2009. **Fannie Mae has used similar methods**, but to a lesser degree.
>
> *        *        *
>
> Fannie Mae ha[s] also inflated [its] financial position[] by relying on deferred-tax
> assets—credits that [Fannie] ha[d] built up over the years that can be used to
> offset future profits. Fannie maintains that its worth is increased by $36 billion
> through such credits … But such credits have no value until [Fannie] generate[s] a
> profit—something [it] ha[s] failed to do over the last four quarters, and something
> that is increasingly unlikely within the next year … One analyst estimates
> [Fannie], in the future, would have to collect roughly double the profits of the past
> five years for the credits to become usable. Most financial institutions are not
> allowed to count such credits as assets in the manner used by Fannie …
> Regulators and auditors may question the companies' use of deferred-tax credits
> because they cannot be sold to anyone else and they would disappear in a
> receivership. **And, if those credits were not counted as assets, both companies
> would probably fall below the capital threshold they are required to hold.**
>
> Finally, regulators are said to be scrutinizing whether [Fannie was] trying to
> manage [its] earnings by maneuvering the timing of reserves set aside to offset

losses from defaulted loans.  Each quarter, [Fannie] … gradually increased [its] loss reserves … **However, regulators and auditors felt strongly that [Fannie] should have identified larger potential losses immediately, and set aside much more from the beginning.**

Other companies, like private mortgage insurers, have identified much larger losses and have set aside much larger amounts of capital. Fannie … has delayed the recognition of such losses, dribbling out bad news with each quarterly announcement, **suggesting a strategy to manage the recognition of losses.**

**Finally, regulators are concerned that [Fannie has] mischaracterized [its] financial health by relaxing [its] policies on when to recognize a loss on a defaulted loan, according to people familiar with the review. For years, [Fannie has] effectively done that when a loan is 90 days past due.  But, in recent months, [Fannie] said [it] would extend that to two years.**

(Emphasis added.)

417.    The federal government takeover was based upon Fannie's failure to manage its credit risk or to meet its capital requirements, despite Fannie's attempt to convince otherwise. As FHFA director Lockhart confirmed in a September 23, 2008 written statement to Congress, "the determination to appoint a conservator" was based on several concerns, of which the very first was "accelerating safety and soundness weaknesses, **especially with regard to credit risk, earnings outlook, and capitalization**." (Emphasis added.)  Testifying that same day, as reported in the Washington Post on September 24, 2008, director Lockhart put the blame for Fannie's collapse squarely on non-prime and non-traditional loans:

Fannie Mae and Freddie Mac purchased and guaranteed "many more low documentation, low-verification and non-standard" mortgages in 2006 and 2007 "than they had in the past." He said the companies increased their exposure to risks in 2006 and 2007 despite the regulator's warnings.

Roughly 33 percent of the companies' business involved buying or guaranteeing these risky mortgages, compared with 14 percent in 2005. Those bad debts on mortgages led to billions of dollars in losses at the firms.

418.    In his testimony at the December 9 Hearing, Mr. Pinto described Fannie as having "engaged in 'an orgy of junk mortgage development' that turned the two mortgage-finance

giants into vast repositories of subprime and similarly risky loans…," as reported by the New York Times the next day.

419.    Fannie's failure to timely report its undercapitalization, and to disclose other facts from which that undercapitalization could have been deduced, prevented the members of the Classes from adequately anticipating the government takeover and, in this way, among others, caused the members of the Classes to suffer damages.   As the New York Times noted in its September 7, 2008 article, as a result of the conservatorship:

> [I]t appears that investors who own the companies' common stock will be virtually wiped out; preferred shareholders, who have priority over other shareholders, may also wind up with little.

In another September 7, 2008 article on the federal government takeover of Fannie Mae, the New York Times further reported that Fannie's shareholders "will suffer. [Fannie] would stop paying any dividends on [its] common shares, and any new capital provided by the Treasury Department would have financial priority over the existing preferred and common stock."

420.    The prices of Fannie securities plunged as a result of the fraud alleged herein and have never recovered.  The day after Fannie was placed into conservatorship—September 8, 2008, which was the next trading day—Fannie common stock plunged nearly **90%** from $7.04 to $0.73, on heavy trading volume of more than 585,000,000 shares—a massive increase over the previous days' trading volume of approximately 83,000,000.

421.    Similarly, the preferred shares plummeted by between approximately 63%-92% over the previous day's closing price.

422.    As indicated above, as numerous partial revelations of Fannie's true financial condition and future business prospects were revealed to the market, the full extent of the fraud and false and misleading financial reporting became known. The misrepresentations and omissions detailed herein which centered on the Company's exposure to non-traditional and non-

prime mortgages and the adequacy of its capital, were connected by a common underlying purpose and pattern.  The Exchange Act Defendants' motivation was to artificially inflate the price of Fannie's equity securities, thus misleading the market into believing Fannie continued to be a model of safety and stability and causing the market to expect and anticipate that Fannie would survive the mortgage market downturn with aplomb.  But when the price of the Company's securities dropped upon revelation of Fannie's true financial condition concealed by the fraud, Lead Plaintiffs and the Classes suffered losses proximately caused by the fraud alleged herein.

### IX.   THE EXCHANGE ACT DEFENDANTS KNOWINGLY OR AT LEAST RECKLESSLY REPORTED FALSE FINANCIAL RESULTS

423.    The Exchange Act Defendants' deceptive concealment of Fannie's true exposure to the subprime and Alt-A mortgage market during the Class Period was bolstered by the Company's false and misleading financial reporting.  During the Class Period, the Company's financial statements were materially untrue due to its failure to comply with GAAP, which are those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

424.    As alleged herein, the Exchange Act Defendants turned a blind eye to the fast-deteriorating mortgage market and the Company's massive risk exposure, and failed to properly account for the increased credit risk inherent in Fannie's portfolio and resultant estimated credit losses.  As set forth in greater detail below, the Exchange Act Defendants failed to timely add to

the Company's combined *loss reserves*, failed to recognize adequate amounts of *other than temporary impairment* to *available-for-sale* securities and overstated the value of Fannie's *deferred tax assets*.  By misstating Fannie's financial statements, the Exchange Act Defendants failed to disclose the Company's capital shortfall to investors and made it appear—falsely—that the Company met its capital requirements.

425.    By presenting untrue and misleading financial statements as represented above, the Exchange Act Defendants knowingly or recklessly presented Fannie's financial results and statements in a manner that violated, in addition to the specific GAAP provisions set forth herein, at least the following provisions of GAAP:

a.    The principle that loan impairments be recognized when it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the agreement (Statement of Financial Accounting Standards ("SFAS") No. 114);

b.    The principle that loan *loss reserves* recognize credit losses when it is probable that a loss has been incurred and the amount can be reasonably estimated (SFAS No. 5);

c.    The principle that decreases in future cash flows expected to be collected on certain loans or debt securities transfers be recognized as impairments (American Institute of Certified Public Accountant's Statement of Position ("SOP") 03-3;

d.    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

e.    The concept that financial reporting should provide information that is useful to

present to potential investors and creditors and other users in making rational investment, credit, and similar decisions (Concepts Statement No. 1, ¶34);

f.   The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

g.   The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

h.   The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about past performance to help assess the prospects for an enterprise. Although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

i.   The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

j.   The concept of completeness, which means that nothing is left out of the

information that may be necessary to ensure that it validly represents underlying

events and conditions (Concepts Statement No. 2, ¶79); and

k. The concept that conservatism be used as a prudent reaction to uncertainty to try

to ensure that uncertainties and risks inherent in business situations are adequately

considered. The best way to avoid injury to investors is to try to ensure that what

is reported represents what it purports to represent. (Concepts Statement No. 2, ¶¶

95, 97).

426.   As set forth above in ¶¶138-140, Fannie Mae was required to maintain capital

levels that were at least as high as certain regulatory minimums.  Specifically, Fannie had to

meet a statutory minimum capital requirement, calculated as a percentage of shareholder's

equity, and OFHEO-directed minimum capital, calculated as a percentage over the statutory

minimum capital.

427.   When Fannie adds to its combined *loss reserves*, it records a charge to the

provision for credit losses on its income statement, resulting in lower earnings.  By failing to

make timely additions to Fannie's *loss reserves*, the Exchange Act Defendants materially

overstated Fannie's core capital and failed to disclose that it was actually so undercapitalized that

its core capital was below the minimum amount required by regulators.  Similarly, the Company

does not recognize unrealized losses from *available-for-sale* securities to be other than

temporarily impaired and therefore, segregated them in AOCI, which is excluded from Fannie's

core capital. Thus, by failing to recognize sufficient amounts of *other than temporary*

*impairment*, the Company excluded losses that would have negatively impacted core capital.

Finally, whenever the value of any asset, including *deferred tax assets*, is written down, there is a

direct, dollar-to-dollar reduction of net income and retained earnings.  Because retained earnings

are a component of Fannie Mae's core capital, any asset write-down would have immediately caused core capital to decline by the same amount.

428.    Despite knowing that Fannie's seemingly substantial core capital was merely an illusion created by their false financial accounting, throughout the Class Period, the Exchange Act Defendants falsely reported that Fannie's core capital substantially exceeded both the statutory minimum capital requirement and the OFHEO-directed minimum capital requirement (as set forth in the table at ¶142).

429.    Stunningly, as late as July 2008—only two months before the federal government took Fannie over because it was severely undercapitalized—the Exchange Act Defenants offered the following false and misleading statements of material facts as reassurance to investors: "[O]ur capital level is substantially above our statutory minimum capital level and the OFHEO-required 15 percent surplus over minimum capital.  In fact, we have more core capital, and a higher surplus over our regulatory requirements, than at any time in [the Company's] history."

430.    After the federal government seized control of Fannie and scrutinized the Company's books, it became clear that the Exchange Act Defendants had perpetrated an accounting fraud in order to manufacture core capital out of thin air.

431.    Bloomberg.com reported on September 8, 2008, in an article entitled *Treasury Found 'House of Cards' at Fannie, Freddie, Shelby Says*, that examiners from Morgan Stanley, hired by the Treasury Department to scrutinize Fannie's financial condition, and the Federal Reserve found that Fannie's capital "was too low relative to [its] exposure" and further, "that capital in and of itself was of a low quality."  In addition, examiners found that Fannie's accounting allowed it "to overstate the value of their reserves."

432.     A Wall Street strategies analyst affirmed this conclusion in a September 8, 2008 analyst report:  "[T]he catalyst of the takeover was most likely triggered by a discovery by Morgan Stanley, who was hired by the government to look over Fannie Mae's books, **that the Company had adjusted its accounting methods such that it looked as if the Company had more capital than it actually did.**" (Emphasis added).

### (1) The Exchange Act Defendants Understated Fannie's Combined Loss Reserves and Overstated Core Capital As A Result.

433.     During the Class Period—when Fannie Mae's holdings of risky, Alt-A and subprime loans increased significantly and when the Company stated that it expected credit losses to increase—the Exchange Act Defendants made only minimal increases to its combined *loss reserves* (as illustrated in the table at ¶149, above).  As a result, Fannie's *loss reserves* did not reflect the massive losses the Exchange Act Defendants knew the Company would incur.

434.     Fannie is required under SFAS No. 5, Accounting for Contingencies, to establish reserves to absorb estimated credit losses to (a) its portfolio of loans held for investment purposes and (b) the loans making up the Fannie MBS that the Company guarantees.  Fannie labels these accounts, respectively, as the allowance for loan losses and the reserve for guaranty losses, and maintains them as separate accounts on its consolidated balance sheet.  The Company collectively refers to these accounts as the loan *loss reserves*.

435.     Under  SFAS No. 5, paragraph 8:

An estimated loss from a loss contingency … shall be accrued by a charge to income if *both* of the following conditions are met:

      a.      Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be **probable** that one or more future events will occur confirming the fact of the loss.

     b.    The amount of loss can be reasonably estimated.[18]

(Emphasis added.)

436.    The American Institute of Certified Public Accountants Audit & Accounting

Guide (the "AA" Guide), *Depository and Lending Institutions*, ¶9.34, clarifies the meaning of

"probable" as used in SFAS No.5 for purposes of determining estimated loan losses.  The AA

Guide, ¶9.34, provides:

> *Probable* means the future event or events are likely to occur; **however, the conditions for accrual are not intended to be so rigid that they require virtual certainty before a loss is accrued.**  The conditions may be considered in relation to individual loans or groups of loans.  However, if the conditions are met, a loss should be recognized even though the particular loans that are uncollectable may not be identifiable, such as large groups of loans for which credit losses have been incurred but which have not been associated with specific loans.

(Emphasis added.)

437.    SEC Financial Reporting Release ("FRR") 28, § 401.09, Accounting for Loan

Losses by Registrants Engaged in Lending Activities, further provides:

> Because the allowance and the related provision for loan losses are key elements of financial statements of registrants engaged in lending activities, it is critical that those judgments be exercised in a disciplined manner that is based on and reflective of adequate detailed analyses of the loan portfolio.

438.    According to its Form 10-K filings, Fannie uses the same methodology to

determine both the allowance for loan losses and the reserve for guaranty losses, as the relevant

factors affecting credit risk are the same for each.  To establish the combined *loss reserves*, the

Company evaluates factors including loss severity trends and historical default experience.  The

loss forecast model used by the Company to determine the allowance for loan losses was

---

[18] Once the loss becomes probable, the duration of time until the loss occurs is irrelevant.  The provisions of SFAS No. 5 have been confirmed by SFAS No. 114, *Accounting by Creditors for Impairment of a Loan (an amendment of FASB Statement Nos. 5 and 15)* and FIN No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others (an interpretation of FASB Statements Nos. 5, 57 and 107, and rescission of FASB Interpretation No. 34).*

purportedly "**regularly update[d] to incorporate current loan performance data, monitor the delinquency and default experience of our homogenous loan pools, and adjust our underlying estimates and assumptions as necessary to reflect our view of current market and economic conditions."** (Emphasis added.)  Based on the inadequacies described below, this could not have been the case.

439.    By the end of 2006, Fannie Mae's credit profile had deteriorated significantly, due in large part to the massive increase in its holdings of risky, Alt-A mortgages and related securities products.  As a result, by the time Fannie issued its 2006 Form 10-K on August 16, 2007, the Exchange Act Defendants knew that Fannie's increased holdings of Alt-A and subprime loans would result in substantially higher credit losses.  Indeed, a full nine months before issuing the 2006 Form 10-K, Fannie stated in its third quarter 2006 Form 10-Q NT, filed on November 8, 2006, that its "participation" in subprime and Alt-A carried with it an "**expectation for potentially higher credit losses**." (Emphasis added.)  The Company further stated in its 2006 Form 10-K NT, filed on February 27, 2007, that due to slowing home price appreciation in 2007 and an expectation that home prices would decline in 2007, "**we expect our credit losses to increase**." (Emphasis added).  In its first quarter 2007 Form 10-Q NT, filed on May 9, 2007, Fannie repeated that "we believe credit losses will increase in future periods."

440.    In January 2007, Fannie produced the internal "Home Price Forecasting Report", which projected a 50% price drop in home prices in the near term, or next three to five years and predicted, for the first time in Fannie's history, over a billion dollars in losses.  This internal home price forecast further alerted the Exchange Act Defendants to the fact that Fannie's probable credit losses had increased.

441.    By the middle of 2007, as described earlier in ¶¶130-131, the Exchange Act
Defendants were so certain that Fannie's massive Alt-A holdings would lead to increased credit
losses that they materially reduced Fannie's purchases of and guarantees of new Alt-A
mortgages.  In fact, the Exchange Act Defendants expectations of increased losses were borne
out. As disclosed in Fannie's 2009 First Quarter Credit Supplement, during that quarter, although
Alt-A debt accounted for only 10% of Fannie's Single-Family Conventional Mortgage Credit
Book of Business, it was responsible for 39.2% of the quarterly credit losses.

442.    Growing delinquencies in Fannie's mortgage book of business also alerted the
Exchange Act Defendants to the fact that the combined *loss reserves* should have been
substantially increased starting in the fourth quarter of 2007.  In January 2007, Fannie produced
the internal "Home Price Forecasting Report" that projected a 50% price drop in home prices in
the near term, or next three to five years and predicted, for the first time in Fannie's history, over
a billion dollars in losses.

443.    The Exchange Act Defendants claimed that Fannie monitored current loan
performance data and consider ongoing market conditions in determining the amount of its
combined *loss reserves*.  Yet, despite the sharp increase in probable credit losses that had
occurred by the fourth quarter of 2006 and the ever increasing evidence throughout 2007 of such
losses, the Company delayed making the dramatic increases in its *loss reserves* required under
GAAP until the fourth quarter of 2007—a full year later.

444.    In the fourth quarter of 2007, Fannie finally increased its combined *loss reserves*,
from only $1.4 billion to $3.4 billion—an increase that was 140% higher than the largest amount
recorded in any previous quarter, even though the value of Fannie's entire mortgage book of
business had already been flat, and the market decline already underway, for at least a year.

445.     The Exchange Act Defendants knew or recklessly disregarded that, in particular, Fannie's reserve for guaranty losses should have been drastically increased, as the guaranty loss reserves were dwarfed by Fannie's credit risk exposure to the subprime and Alt-A loans for which it provided guarantees.  For example, as set forth in the table at ¶149 Fannie's guaranty credit risk exposure was a massive $2.6 **trillion** as of September 30, 2007, while its *loss reserves* for the fourth quarter were only $2.7 **billion**—one-tenth of one percent.

446.     After increasing its *loss reserves* in the fourth quarter of 2007, the Company gradually increased the percentage of its mortgage book it took as combined *loss reserves*. These increases, however, proved inadequate to cover the deterioration in Fannie's mortgage book:  the Company's fourth quarter 2008 results included a further massive increase to its combined *loss reserves* of $28 billion.  Hence, the Exchange Act Defendants continued to violate GAAP by failing to make timely additions to the Company's loss reserves.

447.     The Exchange Act Defendants knew or recklessly disregarded that the Company's *loss reserves* did not reflect the massive losses the Company actually expected.

448.     By failing to make timely additions to Fannie's loss reserves, the Exchange Act Defendants fraudulently made it appear that Fannie's core capital was higher than it actually was.

449.     As alleged above in ¶86, the Exchange Act Defendants further bolstered the false illusion of financial health by changing the Company's policy on when to recognize a loss on a defaulted loan from 90 days of missed payments to two years.  By lengthening this period at a time when the turmoil in the mortgage market meant that, if anything, an even shorter period for loss recognition was appropriate, the Exchange Act Defendants violated the fundamental precept of GAAP that conservatism be used as a prudent reaction to uncertainty to try to ensure that

uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.  (Concepts Statement No. 2, ¶¶ 95, 97).  The Exchange Act Defendants' decision to avoid recognizing a loss on a defaulted loan with fewer than two years of missed payments was completely at odds with this precept.

### (2) Losses from Other Than Temporary Impairments Were Understated and Core Capital Was Overstated as a Result

450.    The Exchange Act Defendants concealed substantial investment losses from investors until the end of 2008 by improperly delaying recognition of *other than temporary impairment* to the fair value of Fannie's *available-for-sale* assets.  These assets, which included the Company's Alt-A and subprime private label mortgage securities, constituted a significant portion of Fannie's mortgage book:  33% of total assets at the end of 2007 and 30% at the end of 2008.

451.    Fannie was required to mark its *available-for-sale assets* to market, *i.e.*, report them at fair market value, at each balance sheet date.  Statement of Financial Accounting Standards No. 115, Accounting for Certain Investments in Debt and Equity Securities ("SFAS 115"), ¶¶ 12 (b) and 13.

452.    Unlike declines in the fair value of other types of securities, declines in the fair value of *available-for-sale* securities bypass the income statement — meaning the changes do not impact net income — **unless** they have become "*other than temporary*."  Instead, the changes in fair value are excluded from earnings and reported as an unrealized loss in a separate component of shareholders equity in accumulated other comprehensive income ("AOCI") until the securities are sold.  SFAS 115, ¶¶ 13, 16.

453.     According to Fannie's Forms 10-K, if a security suffered a decline in fair value to below its amortized cost (*i.e.,* the value at which it is listed on the balance sheet) and the Company determined there was no prospect for an imminent recovery of value, the security was considered to be *other than temporarily impaired*.  Fannie stated that, in determining whether an impairment was other than temporary, it evaluated factors including the duration and the severity of the impairment.  If the Company judged a decline in value to be other than temporary, it was required to write down the assets to fair market value and record the amount of the write down in earnings as a realized loss.  SFAS 115, ¶ 16.

454.     From the third quarter of 2007 through the third quarter of 2008, (as illustrated above in the table at ¶115) Fannie recorded only $3.2 billion in *other than temporary impairment* for all five quarters.  The Company classified the remainder of the unrealized loss as temporary, meaning it had **no** impact on capital.

455.     The Exchange Act Defendants knew or recklessly disregarded that, because the mortgage market declined severely starting in 2006 and, given that, as stated above, Fannie expected its "serious delinquency rates to increase in 2007" and further that Fannie had an internal forecast of a 50% drop in housing prices over a three to five year period, there was virtually no prospect for a near-term reversal of the unrealized losses to Fannie's *available-for-sale* securities.  Yet, the Exchange Act Defendants reported very little *other than temporary impairment* relative to the amount of unrealized loss to *available-for-sale*.  For example, even though at the end of the third quarter of 2007 the Exchange Act Defendants knew there was no prospect of a near-term recovery of the nearly $500 million in unrealized losses from Fannie's *available-for-sale* securities, and despite the nine months plus duration of the loss impairment, Fannie recognized only $84 million in *other than temporary impairment* for that quarter.

456.    At the end of the second quarter of 2008, Fannie's unrealized losses from its *available-for-sale* securities had increased to $6.6 billion.  At that time, given the deterioration of the housing market, there was no prospect for an imminent recovery in value.  Even though it was painfully clear to the Exchange Act Defendants that it was not at all probable that Fannie would collect all amounts due on its subprime and Alt-A investments in accordance with their contractual terms, thereby rendering such investments other than temporarily impaired pursuant to SFAS No. 115, Fannie Mae recognized only $507 million in *other than temporary impairment*.

457.    A fundamental precept of GAAP is that conservatism be used as a prudent reaction to uncertainty to help ensure that uncertainties and risks inherent in business situations are adequately considered and that prudent reporting be based on healthy skepticism.  FASB Statement of Concepts No. 2, ¶¶95, 97.  The Exchange Act Defendants violated this fundamental precept and other GAAP standards noted herein by failing to timely record an *other than temporary impairment* to the value of Fannie's investments that it classified as *available-for-sale* securities in its financial statements.

458.    After the end of the Class Period, when the Exchange Act Defendants were no longer able to conceal Fannie's capital inadequacy and the Company was forced to operate under the direction of FHFA as its conservator, Fannie recorded in its 2008 Form 10-K *other than temporary impairment* of $4.6 billion in the fourth quarter alone—more than the total of **all** *other than temporary impairment* recorded in the five previous quarters.  In its Form 10-K, Fannie stated that the additions to its *other than temporary impairment* reflected the substantial challenges in the housing, mortgage and capital markets during 2008. . . . as well as the deepening economic recession and extremely challenging financial environment".

459. By waiting until the fourth quarter of 2008 to recognize this $4.6 billion in *other than temporary impairment*, Fannie concealed a material amount of investment losses from the third quarter of 2007 through the third quarter of 2008. Indeed, the very same factors that caused Fannie to recognize *other than temporary impairment* in the value of its *available-for-sale* securities after the end of the Class Period were in existence prior to and during the Class Period.

460. By failing to recognize adequate amounts of *other than temporary impairment* during the Class Period, the Exchange Act Defendants caused Fannie's core capital to be materially overstated.

### (3) Fannie Improperly Accounted For Its Deferred Tax Assets, And Overstated Core Capital As A Result.

461. As described above in ¶¶157-169, during the Class Period, Fannie failed to establish a valuation allowance to account for the amount of its *deferred tax assets*—a key asset that comprised a material portion of the Company's net worth—even though it knew those assets were nearly worthless.[19]

462. During the Class Period, the Exchange Act Defendants falsely and materially misrepresented that Fannie would be able to realize all of its *deferred tax assets*.

463. Under GAAP, Fannie was required to assess whether or not it would generate sufficient taxable income in the foreseeable future to recognize all of its *deferred tax assets*. As soon as it became "more likely than not" that its future income would not be large enough to allow it to realize all of the assets, the Company was required to record a valuation allowance to reduce the size of those assets on its balance sheet. SFAS No. 109, ¶17 (e), *Accounting for Income Taxes* ("SFAS No. 109"). In making this determination, the Company had to consider, among other things, forecasted future taxable income, and the existence of cumulative losses in

---

[19] By the second quarter of 2007, the Company's *deferred tax assets* made up nearly 30% of its net worth, and by the second quarter of 2008, nearly 50%.

recent fiscal years.  Under accounting guidance, "[f]orming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years."  SFAS No. 109, ¶23.

464.    In Fannie's 2007 Form 10-K and in its first quarter 2008 Form 10-Q, the Exchange Act Defendants represented that Fannie had determined it would generate sufficient future taxable income to utilize all of its *deferred tax assets*.  Even as the mortgage market continued to decline in 2008, the Exchange Act Defendants sought to allay investor fears over the Company's ability to generate profits and offered false reassurances that the Company would produce sufficient taxable income to realize its *deferred tax assets* despite the deteriorating market conditions.  In its second quarter 2008 Form 10-Q, the Company stated:

> Based on our forecasts of future taxable income, which include assumptions about the depth and severity of home price depreciation and credit losses, **we anticipate that it is more likely than not that our results of future operations will generate sufficient taxable income to allow us to realize our deferred tax assets. Therefore, we did not record a valuation allowance against our net deferred tax assets as of June 30, 2008 or December 31, 2007.**

(Emphasis added.)

465.    The Exchange Act Defendants also falsely reassured investors that, even though the Company's book income as reported in its financial statements was dropping, its "taxable income" would be adequate to allow it to use its *deferred tax assets*.  As late as August 8, 2008, Defendant Swad, falsely represented to investors that "our taxable income is higher than our book income" and "we think it's sufficient to recover the [deferred tax] asset."   Investors had no way to discern that Fannie Mae's taxable income was insufficient to allow it to realize its *deferred tax assets*:  a "taxable loss position" is not the same as, and cannot necessarily be inferred from, an earnings loss as reported in a financial statement filed with the SEC.

466.    The Exchange Act Defendants knew or recklessly disregarded that it was "more likely than not" that Fannie would continue to incur substantial losses and that its cumulative book taxable loss position would continue throughout 2008.

467.    As set forth above in ¶162, Fannie had little hope for generating future taxable income sufficient to be able to realize its *deferred tax assets*, because it expected its "serious delinquency rates to increase in 2007" and the Company's own analytics division forecast a 50% drop in housing prices over a three to five year period and increased default and delinquency rates in mortgage loans.

468.    At fiscal-year-end 2007, the Company reported a net loss of $2.6 billion, and the Exchange Act Defendants knew that Fannie's prospects for 2008 were bleak.  Indeed, Fannie stated in its third quarter 2007 Form 10-Q that the housing and mortgage market downturn worsened in 2007 and was expected to continue in 2008, and it forecast higher delinquencies and foreclosures for the remainder of 2007 and 2008.  The Company further stated that "[b]eginning with the third quarter of 2007, [the housing and mortgage market downturn and resulting delinquencies and foreclosures] have had a significant effect on our business … these factors will continue to affect our financial condition and results of operations at the end of 2007 and into 2008."

469.    Even under a positive scenario in which Fannie posted a profit, the Company's prospects for generating enough taxable income to realize the full value of its *deferred tax assets*—as the Exchange Act Defendants knew—were effectively nil.  For example, in order to use the $13 billion of *deferred tax assets* it held at the end of 2007, based on a corporate tax rate of 35%, the Company would have required near-term earnings of $37 billion.[20] Even during the

---

[20] The amount of income needed to use the asset is calculated by taking the deferred tax asset at the end of 2007 ($13 billion) and dividing it by the corporate statutory tax rate (of 35%).  In other words, the $37 billion in earnings

housing boom of 2003 to 2006, Fannie only reported income of $23 billion—making it a virtual impossibility that, in 2008, the Company would earn the $37 billion in income required to utilize the full amount of its *deferred tax assets*.

470.    Despite the known facts indicating that Fannie would not generate the profits needed to realize its *deferred tax assets*, the Exchange Act Defendants failed to establish a valuation allowance against Fannie's $13 billion in cumulative *deferred tax assets* as of the fourth quarter of 2007.  The Company continued to accumulate *deferred tax assets* throughout the Class Period, without establishing a valuation allowance: the Company's *deferred tax assets* grew from $8.5 billion at the end of 2006 to nearly $13 billion in the fourth quarter of 2007 and to over $20 billion in the second quarter of 2008.

471.    In the third quarter of 2008, Fannie disclosed for the first time that it was unable to utilize its *deferred tax assets*.  The Company took a $21.4 billion charge to establish a valuation allowance against the $36 billion in *deferred tax assets* it had accumulated by the third quarter of 2008, reducing the value of those assets to $4.6 billion as of September 30, 2008.  The Company's core capital plunged from $47 billion to only $16.6 billion, less than half of the $33 billion in statutory minimum capital it was required to maintain.  In its third quarter 2008 Form 10-Q, Fannie stated that it wrote down the value of its *deferred tax assets* due to "challenges experienced in the housing, mortgage and financial markets throughout 2008 [that] continued to increase significantly during the third quarter of 2008."  The Company also cited the uncertainty surrounding its future business model as a result of its placement into conservatorship by the FHFA on September 6, 2008.

472.    In actuality, under accounting guidance, the Exchange Act Defendants should

---

multiplied by the tax rate of 35% yields the amount of taxable income Fannie Mae would have needed to use all of its $13 billion cumulative year-end 2007 in *deferred tax assets*.

have established a valuation allowance against Fannie's *deferred tax assets* well before the third

quarter of 2008.  As the Company admitted in its third quarter 2008 Form 10-Q, it had already

"been in a cumulative taxable book loss position for more than a twelve-quarter period" and that

"[f]or purposes of establishing a deferred tax valuation allowance, this cumulative book taxable

loss position is considered significant, objective evidence that [Fannie] may not be able to realize

some portion of our *deferred tax assets* in the future."  The Company disclosed in its first and

second quarter 2008 Forms 10-Q that it had been in a cumulative book taxable loss position as of

the end of each of those quarters.  However, as set forth above, Fannie specifically reassured

investors that, despite its prior quarterly financial statement losses, it expected to generate

enough taxable income in the future to be able to utilize the *deferred tax assets*.

473.    As set forth in the table at ¶136 above, if the Exchange Act Defendants had

established even a conservative valuation allowance to account for a portion of its *deferred tax

assets*, in conjunction with conservative potential estimates of Fannie's other financial

misstatements detailed herein, Fannie would have failed to meet its OFHEO-directed minimum

capital requirement by no later than the first quarter of 2007.  With different estimates, the

impact to capital reserves could have been more severe.

**(4)**    Deloitte's Knowing or Reckless Disregard of GAAS

474.    The following allegations against Defendant Deloitte are brought by Lead

Plaintiffs TCRS and Boston.

475.    Deloitte knowingly or at least with reckless disregard violated Generally

Accepted Auditing Standards ("GAAS")[21] by failing to perform a proper GAAS audit, thus

---

[21] GAAS includes Statements on Auditing Standards ("SAS") issued by the Auditing Standards
Board of the American Institute of Certified Public Accountants ("AICPA"), which are codified
in *AICPA Professional Standards* under the prefix "AU."

leading to the filing of false and misleading statements regarding Fannie's financial condition. As set forth above, these statements were materially false and misleading and in violation of GAAP in that, among other things, they misrepresented and failed to disclose that Fannie materially understated combined *loss reserves* and *other than temporary impairments* and overstated *deferred tax assets*, thereby materially overstating Fannie's core capital.  Deloitte consistently represented that it performed its audits in a manner consistent with GAAS, the auditing standards that provide principles for audit quality and the objectives to be achieved in an audit.  Such representations were materially false, misleading and without a reasonable basis.

476.    Indeed, as alleged herein, Deloitte's audits amounted to no audit at all, in that Deloitte knew of or recklessly disregarded numerous red flags alerting Deloitte that Fannie's financial statements were materially misstated and were not in accordance with GAAP.  Deloitte further identified after the fraud was discovered that it identified various material weaknesses in Fannie's internal control over financial reporting in Fannie's 2008 Form 10-K, issued after the fraud was discovered—information it knew and or should have known, but for its reckless disregard, in 2006 and 2007.

### i.      Deloitte Failed To Follow GAAS Provisions

477.    Deloitte failed in its obligations to follow GAAS provisions.  Specifically, as independent auditors, Deloitte was required to plan, conduct and report on the results of its audits, in compliance with GAAS.  When making an investment decision, investors rely on the independent auditor's opinion with respect to a company's financial statements and its assessment of the effectiveness of a company's internal controls.

478.    According to GAAS, Deloitte was required to be keenly aware of matters relating to, among other things, Fannie's business and the industry in which the Company operated;

Fannie's accounting policies and procedures; Fannie's financial risks; audit risks in the mortgage banking industry; and Fannie's financial statement items likely to require adjustment. As Fannie's auditors, Deloitte had access to the Company's books and records throughout the Class Period.[22]

479.    Deloitte knowingly or recklessly failed to qualify, modify or abstain from issuing its materially false and misleading audit opinions on Fannie's financial statements issued during the Class Period when it knew or recklessly disregarded that Fannie's accounting violated GAAP.

480.    Deloitte was engaged to perform an integrated audit of financial statements and internal controls over financial reporting. The work it performed as part of its audit of internal controls over financial reporting should have enabled it to tailor its audit approach to auditing accounting estimates, such as Fannie's deferred tax assets or its loss reserves because, as part of the audit of internal controls over financial reporting, Deloitte was required to obtain an understanding of the process Fannie's management used to develop significant estimates and to test controls over all relevant assertions related to these estimates to gain assurance that Fannie processed transactions in the manner as represented.  [AAG-DEP ¶ 9.47].

481.    With respect to auditing of accounting estimates, GAAS required Deloitte to evaluate the reasonableness of these estimates in the context of the financial statements taken as

---

[22] The Public Company Accounting Oversight Board ("PCAOB"), established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms.  On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, *Generally Accepted Auditing Standards*, and related interpretations in existence on that date.  Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003.  For simplicity, all references to GAAS hereinafter include the standards of the PCAOB.

a whole.  [AU § 342.04].   To evaluate the reasonableness of these estimates, Deloitte was first

required to understand how Fannie developed these estimates.  Based on that understanding,

Deloitte should have employed one or a combination of the following approaches:

    a.     Review and test the process used by Fannie to develop the estimates;

    b.     Develop an independent expectation of the estimates to corroborate the reasonableness of Fannie's estimates based on Deloitte's understanding of the facts and circumstances by using other key factors or alternative assumptions about those factors.  In other words, Deloitte could have used its own model or approach to arrive at its own estimate and compare that to Fannie's estimate; and/or

    c.     Review subsequent events or transactions occurring after the balance sheet date but prior to completion of fieldwork.  An evaluation of an estimate or of a key factor or assumption may be minimized or unnecessary as a subsequent event or transaction can be used in evaluating their reasonableness.  This is especially important since Fannie did not file its 2006 Form 10-K with the SEC until August 16, 2007 and did not file the Forms 10-Q for the first three quarters of 2007 until November 9, 2007.

[AU §§ 342.10, 342.12, 342.13]

482.   GAAS provides that in many situations, the auditor should assess the

reasonableness of an accounting estimate by performing procedures to test the process used by

management to make the estimate.  The following are procedures the auditor may consider

performing when using this approach:

    a.     Identify whether there are controls over the preparation of accounting estimates and supporting data that may be useful in the evaluation.  These controls assure an approach that is consistently applied.

    b.     Identify the sources of data and factors that management used in forming the assumptions, and consider whether such data and factors are relevant, reliable, and sufficient for the purpose based on information gathered in other audit tests.  This step would have ensured that Deloitte knew, or was reckless in not knowing, that Fannie did not update its models or have the capability to assess the risks associated with its non-conventional loans.

c.    Consider whether there are additional key factors or alternative assumptions about the factors.  Again, Deloitte knew, or was reckless in not knowing, that Fannie did not consider important risk factors when arriving at its estimate of combined loss reserves, which would have had implications for the valuation of deferred tax assets and other than temporary impairment.

d.    Evaluate whether the assumptions are consistent with each other, the supporting data, relevant historical data and industry data.  Deloitte knew, or was reckless in not knowing, that the assumptions were heavily dependent on historical approaches that did not adequately consider the changing economic environment or consider the materially heightened risks associated with Alt-A and subprime loans and related securities.

e.    Analyze historical data used in developing the assumptions to assess whether the data is comparable and consistent with data of the period under audit and consider whether such data is sufficiently reliable for the purpose.

f.    Consider whether changes in the business or industry may cause other factors to become significant to the assumptions.

g.    Review available documentation of the assumptions used in developing the accounting estimates and inquire about any other plans, goals and objectives of the entity, as well as consider their relationship to the assumptions.

h.    Consider using the work of a specialist regarding certain assumptions.

i.    Test the calculations used by management to translate the assumptions and key factors into the accounting estimate.

[AU §342.11]

483.    GAAS cautions that due to the potential for bias, an auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors on which estimates are based.  [AU § 342.04]

484.    As of December 31, 2007, Fannie recorded deferred tax assets of $13 billion and had made no valuation allowance against these assets based on its assessment that it was more likely than not that the results of future operations would generate sufficient taxable income to allow Fannie to realize the entire tax benefit.  (2007 Form 10-K, pages 82, F-58).  Deloitte was required to evaluate Fannie's assertion regarding its projections of future taxable income and

145

availability of deductions during future periods.  This process would have involved

independently valuing the evidence (both positive and negative) in support of Fannie's assertion

that no allowance was necessary as of December 31, 2007.  SFAS 109 states that:

> All available evidence, both positive and negative, is considered to determine whether, based on the weight of that evidence, a valuation allowance is needed for some portion or all of a deferred tax asset.  Judgment must be used in considering the relative impact of negative and positive evidence.  The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified.  *The more negative evidence that exists (a) the more positive evidence is necessary and (b) the more difficult it is to support a conclusion that a valuation allowance is not needed.*
> [SFAS 109, Summary]

> If, based on the weight of available evidence, it is more likely than not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized, the valuation allowance should be [established in the amount] sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized. [SFAS 109 ¶ 17]

485.    Based on Fannie's disclosures in its 2006 Form 10-K, filed with the SEC on

August 16, 2007, that it expected the downturn in the housing market to continue for the rest of

2007 and into 2008, and the Company's internal projections of massive declines in the housing

market, Deloitte was required to evaluate with a heightened degree of professional skepticism

any evidence (such as projections of future taxable income) that Fannie used to enable it to

outweigh the negative evidence supporting the need for a valuation allowance.  It is

inconceivable that when Fannie's forms 10-Q for the first three quarters of 2007 were filed with

the SEC on November 9, 2007, that Deloitte could support Fannie's assertion that it was "more

likely than not" that it would generate sufficient earnings to enable the use of its deferred tax

assets.  Fannie was already suffering losses in the third quarter 2007 and, as alleged herein, the

Exchange Act Defendants knew or recklessly disregarded that a decline would continue.

486.     As of September 30, 2008, Fannie recorded a $21.4 billion valuation allowance for its deferred tax assets reducing them to just $4.6 billion.  Among factors cited by Fannie was that it was "in a cumulative book taxable loss position for more than a 12 quarter [i.e., three year] period." (Third Quarter 2008 Form 10-Q, page 169)  This was hardly a new development that occurred during 2008 and should have been considered, and properly weighted, by Deloitte in its analysis of Fannie's deferred tax assets.

ii.     <strong><u>Combined Loss Reserves and Other than Temporary Impairments</u></strong>

487.     Deloitte was responsible for evaluating whether there was substantial doubt about Fannie's ability to continue as a going concern for a reasonable period of time, but not beyond December 31, 2008 (one year beyond the date of Fannie's financial statements).  [AU § 341.02]  GAAS notes that "it is not necessary to design audit procedures solely to identify conditions and events that, when considered in the aggregate, indicate there could be substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. The results of auditing procedures designed and performed to achieve other audit objectives should be sufficient for that purpose."  [AU § 341.05]

488.     Despite evidence to the contrary such as deteriorating housing and credit market and its impact on Fannie and increasing credit losses, Deloitte's February 26, 2008 audit opinion on Fannie's 2007 financial statements did not include an explanatory paragraph indicating that there was substantial doubt about Fannie's ability to continue as a going concern for a reasonable period of time.  [AU § 341.12]  In September 2008, Fannie was placed into government conservatorship, entered into a lending agreement with U.S. Treasury to have access to a secured government lending facility and received a commitment from the U.S. Treasury to provide up to $100 billion in as needed funding to help Fannie maintain positive net worth thereby avoiding a

mandatory trigger of receivership under the Regulatory Reform Act.  (Third Quarter 2008 Form 10-Q, pages 147- 148)

489.    However, as alleged herein, each of these conditions existed and were capable of being discovered well prior to 2008.  Deloitte either knew of and failed to disclose or was reckless in failing to uncover these material weaknesses.

### iii.    Deloitte Failed To Exercise Due Professional Care and Professional Skepticism

490.    General Standard No. 3 requires an auditor to exercise due professional care in the performance of the audit and preparation of the report.  AU §230.07 (§230.07) states that "[d]ue professional care requires the auditor to exercise professional skepticism.  Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence."  In addition, the auditor should use "the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective valuation of evidence."  AU §230.07 (§230.07).

491.    Deloitte was required to obtain a level of knowledge of Fannie's business sufficient to enable it to obtain an understanding of the events, transactions and practices that may have a significant effect on Fannie's financial statements. [AU §§ 311.06, 328.48, 328.49].

492.    Further, Deloitte was required to obtain knowledge of matters that relate to the nature of Fannie's business, its organization and its operating characteristics and to consider matters affecting the industry in which Fannie operates, such as: i) current and expected economic conditions; ii) government regulations; iii) accounting practices common to the industry; iv) competitive conditions; and v) financial trends and ratios, including Fannie's measures of core capital.  [AU § 311.06].

493.     GAAS also required Deloitte to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the Fannie's financial statements.  [AU § 150.02]

494.     Also, the AICPA *Audit & Accounting Guide* ("A&A") for lending institutions provides independent accountants with guidance for high-risk areas of material misstatements. "The following factor[] relating to loans may be indicative of material misstatement . . . [h]igh rate of growth in loan portfolio."  An example of Deloitte's reckless violation of General Standard No. 3 relates to Fannie's material understatement of combined loss reserves as alleged in ¶¶144-150, 433-449.  Specifically, in setting loss reserves, Fannie did not take into account the fact that the Company had inadequate risk controls for subprime and Alt-A loans and that it was projecting significant decreases in home prices and increases in default and delinquency rates.

495.     According to GAAS, Deloitte was required to know that in mortgage banking companies, the risk of borrower default is traditionally a high risk area, and even more so for Fannie considering its increased exposure to subprime and Alt-A loans and lack of adequate risk controls.  With that knowledge, Deloitte was required to exercise due professional care, in conducting its audits, including paying special attention to combined loss reserves, other than temporary impairment and deferred tax assets, all of which were affected by the expected and continued decline in home prices and increased default and delinquency rates.

496.     Deloitte should have performed substantive procedures for all significant accounts and disclosures in the financial statements.[23]  [AU § 319.107].  Thus, Deloitte would have had to test Fannie's methodologies and assumptions about its combined loss reserves and understand its reasons for not impairing the unrealized losses on its available-for-sale securities.  If Deloitte had

---

[23] *Substantive procedures* are procedures performed to detect material misstatements and primarily include tests of details of classes of transactions, account balances, disclosures and analytical procedures.  [AU § 319.108]

performed the procedures described above (which are basic to any mortgage company audit), the only reasonable professional conclusion they could have drawn would have been that Fannie's combined loss reserves and other than temporary impairments were understated and deferred tax assets were overstated throughout the Class Period and that the Company's financial statements were in violation of GAAP.

      iv.    **Deloitte Ignored Or Was Reckless In Its Disregard For Significant**
                *Red Flags*

497.    GAAS Standards of Fieldwork require an auditor to properly plan and supervise his staff.  Specifically, Standard of Fieldwork No. 1 requires the auditor to plan the audit, which "involves developing an overall strategy for the expected conduct and scope of the audit." AU §311.03 (§311.02).

498.    If Deloitte had fulfilled its responsibilities under GAAS as identified in Standard of Fieldwork No. 1 (which are basic to any mortgage company audit), the only reasonable professional conclusion it could have drawn would have been that Fannie's process for risk control and adjusting for loan losses was flawed to the point that it materially overstated Fannie's financial results and its core capital.  Deloitte failed to obtain a sufficient understanding of Fannie's business and the industry in which it operated which was necessary to perform its audits and, therefore, knowingly or recklessly violated GAAS.

499.    There were numerous red flags during the Class Period that were sufficiently obvious so as to put Deloitte on notice as to Fannie's fraudulent activity, and Deloitte acted either knowingly or with reckless disregard in giving an unqualified audit opinion for Fannie's financial statements issued during the Class Period despite these clear signs of fraud.  The

following facts, as set forth more fully above in ¶¶72-133 constitute red flags warning Deloitte that Fannie's financial statements were materially false and misleading:

- Deloitte recklessly disregarded Fannie's radical departure away from investing in, guaranteeing, and securitizing safe, "plain vanilla" loans and toward risky subprime and "Alt-A" loans, which, as described above, the Exchange Act Defendants hid from investors and continued to depict Fannie as a picture of safety in the mortgage industry. In particular, over 70% of Fannie's investments in Alt-A, subprime and adjustable rate loans were placed on the books during the period from 2005 to 2007;

- Deloitte expressed an unqualified opinion on Fannie's internal control over financial reporting in its 2007 Form 10-K.  The Company's defective risk controls were documented internally: indeed, in October 2006, at the same time that the Company was continuing to dramatically ramp up its investment in high-risk, non-traditional loans, Fannie's Chief Risk Officer, Defendant Dallavecchia, specifically warned Mudd that the Company's risk controls were incapable of evaluating the risks of non-prime loans.  In his July 16, 2007 email to Michael Williams, Dallavecchia wrote "the Company has one of the weakest control processes I ever witness[ed] in my career. … And we have not even address[ed] taking on more risk."  In light of Company's material accumulation of non-prime loans, Deloitte violated GAAS by failing to expand or otherwise properly conduct its audits to investigate Fannie's risk controls, including the Company's ability to accurately evaluate the risks of non-prime loans; and

- Deloitte recklessly disregarded Fannie's numerous internal reports pointing to severe declines in housing prices and offering projections of serious delinquencies and default rates that would adversely affect Fannie; in particular, the Company's statement in its

2006 Form 10-K that it "expect[ed] our overall serious delinquency rates to increase in 2007," and its January 2007 internal forecast of a 50% drop in housing prices over a three to five year period.

500.    Deloitte violated GAAS by, inter alia, failing to properly conduct its audits with regard to Fannie's combined loss reserves, other than temporary impairments and deferred tax assets.

> **v.    Deloitte's Audit on Internal Control Over Financial Reporting That is Integrated with an Audit of Financial Statements was Reckless**

501.    Not surprising, Deloitte identified the following material weaknesses in Fannie's internal control over financial reporting just a year later in Fannie's 2008 Form 10-K:

- Board of Directors and Audit Committee—The Company's Board of Directors and its Audit Committee lacked oversight authority with respect to disclosure controls and procedures.

- Disclosure Controls and Procedures—The Company's disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to the Federal Housing Finance Agency that is needed to meet the Company's disclosure obligations under the federal securities laws.

- Model Inputs for Assessment of Other-Than-Temporary-Impairment for Private-label Mortgage-related Securities —The Company did not maintain effective internal control over financial reporting with respect to the design of its controls over certain inputs to models used in measuring expected cash flows for the other-than-temporary-impairment assessment process for private-label mortgage-related securities. Specifically, the design of the controls over these model inputs did not require full testing or proper validation for accuracy of modifications prior to use in the Company's other-than-temporary impairment assessment.  As a result, an incorrect modification to a model input was made in the fourth quarter of 2008 and initially used in the Company's other-than-temporary impairment assessment.
(2008 Form 10-K, pages 222 – 223)

502.     However, as alleged herein, each of these conditions existed and were capable of being discovered well prior to 2008.  Deloitte either knew of and failed to disclose or was reckless in failing to uncover these material weaknesses.

**vi.      As a Result of Deloitte's Failures To Comply With GAAS, It Failed To Adjust Combined Loss Reserves and Other than Temporary Impairments**

503.     Deloitte was required to verify that Fannie's combined loss reserves were adequate for its estimated losses.  [AAG-DEP ¶ 8.133]   The primary objectives of Deloitte's audit procedures for credit losses should have been to obtain sufficient appropriate evidence that:

a.     the allowances for loan losses and liability for other credit exposures are appropriate and in accordance with GAAP to cover the amount of probable credit losses inherent in the loan portfolio at the balance-sheet date.

b.     the allowances are not excessive, as long as the loan portfolio is reflected at net realizable value.

c.     credit losses and other items charged or credited to the allowance for loan losses, such as loan charge-offs and recoveries, have been included in the financial statements at appropriate amounts.

d.     disclosures are adequate.

504.     These objectives would have been met by testing Fannie management's estimates of the loss reserves based on available and relevant information regarding loan collectability.  [AAG-DEP ¶ 9.45]   In determining the nature timing, and extent of its audit procedures, Deloitte should have considered factors that are significant to the estimate of the amount of the allowance, such as

a.     composition of the loan portfolio, including the Alt-A and subprime loans and related securities.

b.     potential problem loans, including loans classified by regulatory agencies.

c.     trends in loan volume by major categories, especially categories experiencing rapid growth, and in delinquencies and restructured loans.

d.  previous loss and recovery experience, including timeliness of charge-offs.

e.  concentrations of loans to individuals and their related interests, industries, and geographic regions.

f.  size of individual credit exposures.

g.  quality of internal loan review and internal audit functions, and results of their work.

h.  charge-off, collection, and recovery policies and procedures.  Deloitte should have tested the propriety of charge-offs and recoveries.  [AAG-DEP ¶ 9.71]

i.  local, national, and international economic and environmental conditions.

505.   Deloitte also should have considered factors that are sensitive to variations, including:

a.  assumptions based on historical trends, such as the amount of late or partial payments in a particular period and the amount of charge-offs, can have a significant effect on estimates of the allowance.  The effects of changes in the composition of the loan holdings should also be considered.

506.   Finally, Deloitte should have considered factors that are subjective and susceptible to misstatement and bias, such as:

a.  the risk classification and allowance allocation given to problem loans.

b.  estimates of collateral values and the related assumptions that drive the determination of such values, such as cash flow estimates, discount rates, and projected occupancy rates.

c.  current economic or market conditions that in the future may affect a borrower's ability to meet scheduled repayments.

d.  contingencies.

[AAG-DEP ¶ ¶ 9.50, 9.57]

507.   As stated above, GAAS required Deloitte to gain an understanding of Fannie's business, its economic environment and its controls sufficient to plan and perform the audit.  At the beginning  of the Class Period, Fannie had embarked on a radical shift in focus from

conservative, prime loans to high-risk, subprime and Alt-A loans.  These types of loans created increased risks of default and losses to Fannie.

508.    Fannie also lacked the controls necessary to adequately evaluate these risks and to assess the adequacy of the related loss reserves.  Deloitte failed or at least was reckless in failing to implement audit procedures in response to the increased risk of loss and inadequate controls.

509.    Further, Fannie's own internal reports projected that housing prices would decrease dramatically resulting in severe increases in default and delinquency rates.  These factors were in turn contributing to increasing credit losses at Fannie.

510.    Deloitte was required by GAAS to take these changing market conditions and the higher-risk nature of the loans into consideration in evaluating Fannie's policies of determining its allowances for loan losses and reserves for losses on loan guarantees.  By the fourth quarter of 2007, it was obvious that the deteriorating housing market conditions coupled with the higher risk nature of the sub-prime, Alt-A and adjustable rate mortgage loans were translating into higher credit losses to Fannie.  The rate of credit losses, in terms of basis points, had doubled from the first quarter of 2006 to the fourth quarter of 2006 and had doubled again by the fourth quarter of 2007.  There was a 75% increase in the rate of credit losses in the fourth quarter of 2007 alone as compared with the third quarter of 2007.  One quarter later the rate of loss had increased another 40%.  Things were deteriorating quickly and GAAP required that the Company's allowances for losses reflect these conditions.

511.    With respect to the adequacy of its allowances for credit losses, Fannie was lagging the changes in the market, essentially playing catch up from the fourth quarter of 2006 up to the fourth quarter of 2008 when Fannie finally changed its methodology of estimating its allowance for loan losses and reserve for loan guaranty losses.  At this point in time, the

combined loss reserves were increased to a level representing nearly three times the annualized rate of the current quarter's credit losses.  Specifically, in the fourth quarter of 2008, the Company made a massive increase to its combined *loss reserves* from $15.6 billion to $24.8 billion.

512.     Similarly, Fannie's other than temporary impairment losses lagged the market. While the impairment losses were relatively constant in 2006 and 2007 at approximately $860 million each year, the losses rose to $6.9 billion in 2008 with $4.6 billion recognized in the fourth quarter of 2008 alone.  The timing of recognizing these impairment charges was clearly out of step with the changes in market conditions.

513.     Deloitte recklessly failed to consider these red flag market conditions in evaluating both Fannie's estimation of combines loss reserves and impairment charges and failed to obtain sufficient, competent, evidential matter to support the reasonableness of the Company's estimates.  Had it done so, it would have detected the material understatement that existed in the Company's combined loss reserves and impairment charges.

514.     GAAS also requires the auditor to obtain reasonable assurance as to the adequacy and fairness of the disclosures accompanying an entity's financial statements.  The auditor's report applies equally to these accompanying disclosures in the notes to the financial statements. Among the disclosures required by GAAP are those related to the Concentrations of Credit Risk.

515.     Among the glaring deficiencies in Fannie's disclosures of its Concentrations of Credit Risk is the failure to disclose that approximately 12% of its credit book of business in 2007 was comprised of the high-risk Alt-A loans.  In addition, Fannie failed to disclose the geographic concentrations of its credit book of business in Florida.  Florida represented over 7% of its exposure of Fannie's credit book of business.

**vii.   As a Result of Deloitte's Failures To Comply With GAAS, It Failed To Adjust  Deferred Tax Assets**

516.    As of December 31, 2007, Fannie recorded deferred tax assets of $13 billion and had made no valuation allowance against these assets based on its assessment that it was more likely than not that the results of future operations would generate sufficient taxable income to allow Fannie to realize the entire tax benefit.  (2007 Form 10-K, pages 82, F-58).  Deloitte was required to evaluate Fannie's assertion regarding its projections of future taxable income and availability of deductions during future periods.  This process would have involved independently valuing the evidence (both positive and negative) in support of Fannie's assertion that no allowance was necessary as of December 31, 2007.  SFAS 109, Summary, ¶ 17.

517.    Based on: (1) Fannie's disclosures in its 2006 Form 10-K, filed with the SEC on August 16, 2007, that it expected the downturn in the housing market to continue for the rest of 2007 and into 2008; and (2) the Company's internal projections of massive declines in the housing market, Deloitte was required to evaluate with a heightened degree of professional skepticism any evidence (such as projections of future taxable income) that Fannie used to enable it to outweigh the negative evidence supporting the need for a valuation allowance, had Deloitte undertaken the procedures required under GAAS, it is inconceivable that when Fannie's forms 10-Q for the first three quarters of 2007 were filed with the SEC on November 9, 2007, that Deloitte could support Fannie's assertion that it was "more likely than not" that it would generate sufficient earnings to enable the use of its deferred tax assets.  Indeed, Fannie was already suffering losses in the third quarter 2007 and, as alleged herein, the Exchange Act Defendants knew or recklessly disregarded that a decline would continue.

518.    As of September 30, 2008, Fannie recorded a $21.4 billion valuation allowance for its deferred tax assets reducing them to just $4.6 billion.  Among factors cited by Fannie was

that it was "in a cumulative book taxable loss position for more than a 12 quarter [i.e., three year] period." (Third Quarter 2008 Form 10-Q, page 169)  This was hardly a new development that occurred during 2008 and should have been considered, and properly weighted, by Deloitte in its analysis of Fannie's deferred tax assets.

### viii.    Deloitte Should Have Issued a Substantial Going Concern Warning

519.    Deloitte was responsible for evaluating whether there was substantial doubt about Fannie's ability to continue as a going concern for a reasonable period of time, but not beyond December 31, 2008 (one year beyond the date of Fannie's financial statements).  [AU § 341.02]  GAAS notes that "it is not necessary to design audit procedures solely to identify conditions and events that, when considered in the aggregate, indicate there could be substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. The results of auditing procedures designed and performed to achieve other audit objectives should be sufficient for that purpose."  [AU § 341.05]

520.    Despite evidence to the contrary such as deteriorating housing and credit market and its impact on Fannie and increasing credit losses, Deloitte's February 26, 2008 audit opinion on Fannie's 2007 financial statements did not include an explanatory paragraph indicating that there was substantial doubt about Fannie's ability to continue as a going concern for a reasonable period of time  [AU § 341.12]   In September 2008, Fannie was placed into government conservatorship, entered into a lending agreement with U.S. Treasury to have access to a secured government lending facility and received a commitment from the U.S. Treasury to provide up to $100 billion in as needed funding to help Fannie maintain positive net worth thereby avoiding a mandatory trigger of receivership under the Regulatory Reform Act.  (Third Quarter 2008 Form 10-Q, pages 147- 148.)

# X.     LOSS CAUSATION

521.    During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and in a course of conduct that artificially inflated the value of Fannie securities, and operated as a fraud or deceit on members of the Classes by misrepresenting the Company's business success and future business prospects, including but not limited to, misrepresentations regarding the Company's risk exposure to nonprime/non-traditional mortgage loans, its capital adequacy, its risk-assessment ability, and its financial reporting.

522.    As a result of the Exchange Act Defendants' fraudulent conduct as alleged herein, Fannie securities were artificially inflated throughout the Class Period.  When Lead Plaintiffs and other members of the Classes purchased their Fannie securities, the true value of such securities was substantially lower than the prices actually paid by Lead Plaintiffs and the other members of the Classes.

523.    The false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts, and to the investing public.  Those statements caused and maintained the artificial inflation of the price of Fannie shares, which consequently traded at prices in excess of their true value.  Partial disclosures during the Class Period of the Company's true condition concerning its exposure (in terms of both volume and quality) to non-prime and non-traditional loans, the state of capital availability, and the Company's lack of ability and/or willingness to control and manage risk, caused the price of Fannie's shares to decline, eliminating a portion of the inflation in the price of those securities.  That decline in value caused Lead Plaintiffs and the Classes economic harm.

524.    By misrepresenting the success of the Company's risk exposure, underwriting and capital adequacy, as well as ability to control risk, the Exchange Act Defendants presented a misleading picture of Fannie's business and prospects.  For example, often-repeated statements by Fannie executives that the Company's non-prime exposure was limited and that the quality of those loans was similar to Fannie's conventional book of business caused and maintained the artificial inflation in the prices of Fannie's securities throughout the Class Period, even as negative news reached the market, until the truth was finally revealed at the close of the Class Period.

525.    Lead Plaintiffs and other members of the Classes relied, to their detriment, on the Exchange Act Defendants' materially false and misleading statements and/or the integrity of the market, in purchasing their Fannie securities at artificially inflated prices during the Class Period. Had Lead Plaintiffs and the other members of the Classes known the truth, they would not have taken such actions.

526.    As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by Lead Plaintiffs and other members of the Classes, and maintained the artificial inflation in the prices of Fannie's equity securities throughout the Class Period and until the truth was revealed to the market.

**A.    Partial Disclosures Prior to the Government Take Over**

**1.    November 9, 2007 Non-Quantitative Disclosure of Risky Loan Exposure in Florida**

527.    On November 9, 2007, before trading began, the Exchange Act Defendants caused Fannie to file its Form 10-Q for the third quarter of 2007 and held a conference call with investors and analysts.  In the Form10-Q, Fannie reported a $1.4 billion loss for the quarter.  It

also disclosed for the first time that its book of business included a significant concentration in the state of Florida, where housing prices had risen disproportionately during the housing bubble and were therefore subject to a precipitous decline.

528.   Further, on November 10, 2007, The Wall Street Journal reported that, on November 9, the price of Fannie's stock had fallen 80 cents, or 1.6%, to $49, and focused on two aspects of Fannie's third quarter results:  (1) "home-loan losses," and (2) unrealized losses on "private-label securities backed by subprime and Alt-A mortgages."

### 2.   November 14-16, 2007 Fortune Magazine Article Regarding Accounting for Loan Losses

529.   On November 14, 2007, Fortune Magazine published an online article entitled "Fannie Mae's Fuzzy Math," which reported that, in its 10-Q for the third quarter of 2007, Fannie had changed the way it that calculated its credit loss ratio, making "its credit look better than it is."  Likening Fannie to Enron, the article explained that Fannie had removed from the calculation of its credit loss ratio certain credit losses subject to being accounted for under the American Institute of Certified Public Accountant's Statement of Position 03-3, which caused its credit loss ratio to look much lower than it would have been if Fannie had used its old method of accounting.

530.   During the three day period from November 14 through November 16, the price of Fannie's stock price dropped 17.3% from $49.20 to $40.69.

   a.   On the day the article was released, the price of Fannie's stock fell 2.80%, to $47.82.

   b.   The next day, Fannie's stock fell an additional 10%, to $43.04.  As explained by Bear Stearns, "We are unaware of any new information

other than an article published by a magazine on Wednesday that claims Fannie has changed its calculation of credit losses."

    c.   On November 16, 2007, before the market opened, Fannie held a special conference call to address the questions raised by the Fortune article regarding Fannie's accounting for its credit losses. The same day, the price of Fannie's stock fell another $2.35 per share, or 5.46%, to close at $40.69 per share.

531.    On November 17, 2007, a Saturday, The Wall Street Journal linked the price declines of Fannie's stock during the two previous days: "Fannie Mae continued falling, with a drop of 2.35, or 5.5%, to 40.69. The nation's biggest investor in home mortgages failed during a conference call to appease investors concerns about the way it accounts for loan losses. Its shares plunged 10% Thursday, when questions were raised by an article on Fortune magazine's Web site."

### 3.    February 27, 2008 Disclosure of Increased Credit Loss Reserves and Heightened Alt-A Fees

532.    On February 27, 2008, the Exchange Act Defendants caused Fannie to file its 2007 Form 10-K. In a report published on February 29, 2008, a *Wall Street Strategies* analyst said that the "Street consensus estimate called for a $1.24 loss," but Fannie reported a loss of $3.80 per share. The analyst noted that "[o]ur estimate did not take into account increased *loss reserves*." The 2007 Form 10-K thus provided another partial disclosure that Fannie previously had not properly recorded adequate combined *loss reserves*.

533.    The Company noted that in November 2007 it had announced and implemented price increases: "[W]e implemented pricing increases to reflect the higher credit risk posed by

[Alt-A] mortgages," and that "[a]s a result of these eligibility restrictions and price increases, we believe that our volume of Alt-A mortgage loan acquisitions will decline in future periods."

534.    As reported by Bloomberg, in early trading, Fannie's stock declined $1.87 per share, or approximately 7%, to $25.10 per share, though non-related positive news muted the immediate effect.  As subsequently reported by Wall Street Strategies, "[Fannie's stock loss] was quickly reversed when the [OFHEO] announced that, in light of the Company's achievement in avoiding delinquency of its financial statements, it will remove the caps on Fannie's mortgage portfolio."

###    4.    May 6, 2008 Disclosure Regarding Credit Losses in Alt-A, Recently-Originated Loans and Geographically Risky Loans

535.    On May 6, 2008, before the market opened, the Exchange Act Defendants caused Fannie to file its 10-Q for the first quarter of 2008, announcing a $2.2 billion loss, and reporting that "our credit losses for the quarter were concentrated primarily in our Alt-A and other higher risk loan categories, in loans originated in 2005 through 2007, and in areas of the country experiencing steep declines in home prices (such as Florida, California, Nevada and Arizona)."

536.    As reported by Bloomberg, on May 6, 2008, by 9:40 a.m., the price of Fannie's stock had fallen 5.1% to $26.85 per share.

###    5.    July 10-11, 2008 Disclosure Regarding Core Capital Deficiencies

537.    On July 10, 2008, the first of a series of partial disclosures revealing Fannie's core capital inadequacy emerged.  On Thursday, July 10, 2008, before the market opened, Bloomberg published an article entitled, "Fannie, Freddie 'Insolvent After Losses, Poole Says (Update 1)." The article quoted former St. Louis Federal Reserve President, William Poole: "**Congress ought to recognize that [Fannie Mae and Freddie Mac] are insolvent**."  (Emphasis added.)

538.    The stock market reacted dramatically to Poole's statement, which carried

particular credibility given Poole's former role as St. Louis Federal Reserve President. On July

10, 2008, the first day of trading after Poole's statement was made public, Fannie's stock price

dropped 13.78%, from $15.31 per share to $13.20 per share.  On July 11, 2008, the New York

Times noted that:  "On Thursday, the rapid sell-off of shares of Fannie and Freddie Mac came

after a former central banker made comments that the companies might not be solvent…"

539.    News about Fannie's capital inadequacy continued to emerge on July 11, 2008.

On that date, The New York Times published an article warning that the federal government was

weighing a takeover of Fannie, along with Freddie Mac:

> Alarmed by the growing financial stress at the nation's two largest mortgage
> finance companies, senior Bush administration officials are considering a plan to
> have the government take over one or both of the companies and place them in a
> conservatorship if their problems worsen, people briefed about the plan said on
> Thursday. . . . Under a conservatorship, the shares of Fannie and Freddie would
> be worth little or nothing.
>
> [¶]  Under a 1992 law, Fannie or Freddie could be put into conservatorship if their
> top regulator found that either one is "critically undercapitalized."  (Emphasis
> added.)

540.    On news that the federal government was considering a takeover of Fannie, the

price of Fannie's stock plummeted 22% from $13.20 per share on July 10, 2008 to $10.25 per

share at close on July 11, 2008.

541.    The Exchange Act Defendants attempted to mitigate the impact of the partial

disclosures as to Fannie's capital inadequacy and the potential for a government takeover.  On

July 11, 2008, in a statement issued after the market close, Fannie falsely reassured the market

that its capital was adequate: "Our capital level is substantially above our statutory minimum

capital level and the OFHEO-required 15 percent surplus over minimum capital.  **In fact, we

have more core capital, and a higher surplus over our regulatory requirements, than at any**

time in this company's history." (Emphasis added.)  Fannie's stock price nevertheless slid

slightly lower the next trading day, from $10.25 per share at close on July 11, 2008 to $9.73 per

share at close on July 14, 2008.  Likewise, each series of Fannie's preferred stock encompassed

by the Preferred Class definition declined substantially on July 10-11, 2008.

### 6.    August 8, 2008 Disclosure Regarding the Poor Credit Quality of Fannie's Alt-A Loans

542.    On August 8, 2008, the fact that the quality of Fannie's Alt-A mortgage loans was

far worse than the Exchange Act Defendants had previously represented came to light.  On that

date, the Exchange Act Defendants caused Fannie to file its 10-Q for the second quarter of 2008,

which reported an unexpectedly high $2.3 billion net loss—according to the Associated Press,

"more than triple what Wall Street expected."  Fannie disclosed that "Alt-A mortgage loans

represented approximately 11% of our total single-family mortgage credit book of business, and

accounted for 49% of our credit losses for the second quarter of 2008."  The outsized credit

losses caused by Fannie's Alt-A loans disclosed that the Exchange Act Defendants' earlier

claims that its Alt-A loans are no riskier than any of its other, conventional loans were false and

that such loans had unusually high risks.[24]

543.    On this news, Fannie's stock price fell to $9.05 per share by the close of trading,

which was a 9% drop from a closing price of $9.95 per share the day before.

### 7.    August 19-20, 2008 Disclosure Regarding Subprime and Alt-A Exposure

544.    On August 19, 2008, the Washington Post published an article entitled "Fannie's

Perilous Pursuit of Subprime Loans" which disclosed that, in early 2006 and 2007, the Exchange

---

[24]    The 10-Q Investor Summary, published that same day, further disclosed that approximately $199 billion of Fannie's single-family mortgage credit book of business was located in Florida, including approximately $33 billion of Alt-A—a much larger concentration of business in this risky geographical area than previously known.

Act Defendants aggressively expanded Fannie's subprime and Alt-A portfolio while giving "short shrift" to the risks they knew to be associated with such loans.  The Washington Post quoted internal Fannie documents, including a January 3, 2007 memo from Defendant Mudd to Fannie's Board in which he trumpeted that "[b]y entering new markets—especially Alt-A and subprime and guaranteeing more of our customers' products at market prices we met our goal of increasing market share from 22 to 25 percent."

545.    In response to this disclosure, the stock price dropped 2.28%, from $6.15 per share at close on August 18, 2008, to $6.01 per share at close on August 19, 2008.  Likewise, each series of Fannie's preferred stock included in the Preferred Class declined substantially on August 18, 2008.

546.    On August 20, 2008, the Washington Post's story was picked up and further distributed by the Dow Jones Newswire Services, which summarized the story and provided an internet link to where the original story appeared on the Washington Post's website.

547.    On this news, Fannie's stock price plummeted 26.8%, from $6.01 per share at close on August 19, 2008, to $4.40 per share at close on August 20, 2008.  Disclosure of the subprime and Alt-A exposure caused this drop.    Likewise, each series of Fannie's preferred stock encompassed by the Preferred Class definition declined substantially on August 19, 2008.

### 8.    September 7, 2008 Conservatorship Announcement and Related Discoveries

548.    On September 7, 2008, the FHFA issued a statement announcing that it had placed Fannie into conservatorship.  On September 8, 2008, the first day of trading after the government announced Fannie's conservatorship, the price of Fannie's common stock price plunged nearly **90%**, from $7.04 to $0.73.    Likewise, each series of Fannie's preferred stock encompassed by the Preferred Class declined substantially on September 8, 2008.

549.    The disclosures of the Company's true condition concerning its risk exposure and severe capital inadequacy caused the price of Fannie's shares to decline. That decline in value caused Lead Plaintiffs and the Classes economic harm.

**B.    Post-Class Period Events**

550.    In the wake of the federal government's announcement that it was imposing a conservatorship on Fannie, details continued to emerge confirming that Fannie fraudulently misled investors as to its risk profile and capital adequacy.

551.    On October 9, 2008, the FHFA announced that it was "classifying Fannie Mae and Freddie Mac as of June 30, 2008, **prior to the conservatorship**, as undercapitalized using FHFA's discretionary authority provided in the statute."  (Emphasis added.)

552.    On November 10, 2008, Fannie filed its 10-Q for the third quarter of 2008, its first financial statement filed under the government conservatorship and reported a net loss of $29 billion for the quarter—a loss three times larger than the total of all the losses reported by Fannie for the four previous quarters combined.

553.    At the December 9, 2008 Congressional Hearing, it was disclosed that, on October 28, 2006, Fannie's chief risk officer had sent CEO Mudd an e-mail warning about a "serious problem" at the company.  [See ¶¶ 89-90, above.]  He wrote "There is a pattern emerging of inadequate regard for the control process."  During the hearing it also was disclosed that, on July 16, 2007, the same Chief Risk Officer wrote yet another email to Mudd stating that the board of directors had been told falsely that "we have the will and the money to change our culture and support taking more credit risk. . . . I have been saying that we are not even close to having proper control processes for credit, market, and operational risk.  I get a 16 percent budget cut.  Do I look so stupid?"  [See ¶¶ 99-100, above.]

554.    On February 26, 2009, Fannie filed its 10-K for the year 2008, the first audited financial statement filed under the government conservatorship, and reported a net loss for the fourth quarter of $25.2 billion, bringing the total losses reported in the first two quarters under the government conservatorship to $54.2 billion, more than five times the total losses reported during the four quarters before the government take over.

555.    On February 26, 2009, Fannie also disclosed that it would need $15.2 billion from the government to cover a net worth deficit.

556.    On May 9, 2009, Fannie disclosed that it would need another $19 billion from the government, bringing to $34.2 billion the total amount required from the government to cover Fannie's net worth deficit to $34.2 billion.

## XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

557.    In bringing these claims, with regard to claims under the Exchange Act, Lead Plaintiffs and the members of the Classes are entitled to the presumption of reliance established by the fraud-on-the-market doctrine.  At all times relevant to this Complaint, the market for Fannie shares was an efficient market for the following reasons, among others:

a.    Fannie's equity securities—both common and preferred—met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Fannie filed periodic public reports with the SEC;

c.    Fannie shares were followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company and the value of its shares that were publicly available and entered the public marketplace; and

168

      d.   Fannie regularly issued press releases, which were carried by national and

          international news wires, and which were publicly available and entered into the

          public marketplace.

558.    As a result, the market for Fannie equity securities promptly digested current information regarding Fannie from all publicly-available sources and reflected such information in Fannie's equity securities prices. Under these circumstances, all purchasers of Fannie equity securities during the Class Period suffered similar injury through their purchase of Fannie equity securities at artificially inflated prices, and a presumption of reliance applies.

## XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

559.    The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading concerned statements of existing or historical fact or conditions.  Additionally, to the extent that any of the statements alleged to be false and misleading may be deemed to be forward looking statements, the Exchange Act Defendants are nevertheless liable for those statements because they were not identified as forward looking statements or, even if so identified, the statements were material, they were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward looking statements and, at the time each of those statements was made, the Exchange Act Defendants had actual knowledge that the particular forward looking statement was false or the forward looking statement was authorized and/or approved by an officer of Fannie who knew that the statement was false when made.  In addition, to the extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and the Exchange Act

Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

## XIII.   EXCHANGE ACT COUNTS

### COUNT I
### (For Violation of Section 10(b) and Rule 10b-5 Promulgated
### Thereunder, Against the Exchange Act Defendants)

560.     Lead Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  This Count is asserted against Defendants Fannie Mae, Mudd, Blakely, Swad, and Dallavecchia for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

561.     Fannie Mae and each of the Exchange Act Officer Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Fannie Mae, as specified herein.

562.     The Exchange Act Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's equity securities in an effort to maintain artificially high market prices for Fannie Mae's equity securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Exchange Act Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Exchange Act Officer Defendants are also sued as controlling persons of Fannie Mae, as alleged below.

563.     During the Class Period, the Exchange Act Defendants named in this Count:
(a) deceived the investing public, including Lead Plaintiffs and members of the Classes, as
alleged herein; (b) artificially inflated and maintained the market price of Fannie's common
stock and preferred stock; and (c) caused members of the Classes to purchase Fannie's common
stock and preferred stock at artificially inflated prices.

564.     Each of the Exchange Act Officer Defendants' primary liability, and controlling
person liability, arises from the following facts:  (a) each of the Exchange Act Officer
Defendants was a high-level executive and/or director at the Company during the Class Period;
(b) each of the Exchange Act Officer Defendants, by virtue of his/her responsibilities and
activities as a senior executive officer and/or director of the Company, was privy to and
participated in the creation, development and reporting of the Company's financial performance,
projections and/or reports; and (c) each of the Exchange Act Officer Defendants was aware of
the Company's dissemination of information to the investing public, which each knew or
disregarded with severe recklessness was materially false and misleading.

565.     As a result of the dissemination of the materially false and misleading information
and failure to disclose material facts, as set forth above, the market prices of Fannie's securities
and options were artificially inflated, at varying levels, throughout the Class Period.  In
ignorance of the fact that market prices of Fannie securities were artificially inflated, and relying
directly or indirectly on the false and misleading statements made by the Exchange Act
Defendants, or upon the integrity of the market in which such securities trade, and on the truth of
any misrepresentations made to appropriate agencies and to the investing public, at the time
when such statements were made, and/or on the absence of material adverse information that was
known or, with recklessness, disregarded by the Exchange Act Officer Defendants during the

Class Period, Lead Plaintiffs and the other members of the Classes acquired Fannie securities

during the Class Period at artificially high prices and were damaged thereby, as evidenced by,

among others, the stock price declines identified herein that released the artificial inflation from

Fannie's securities.

566.    At the time of said misrepresentations and omissions, Lead Plaintiffs and the

other members of the Classes were unaware of their falsity, and believed the false statements to

be true.  Had Lead Plaintiffs, the other members of the Classes and the marketplace known the

true nature of the operations of Fannie and the noncompliance with federal law, which was not

disclosed by the Exchange Act Defendants, Lead Plaintiffs and other members of the Classes

would not have purchased or otherwise acquired their Fannie securities during the Class Period,

or they would not have done so at artificially inflated prices which they paid.

567.    As a result of their making affirmative statements and reports to the investing

public, the Exchange Act Defendants had a duty to promptly disseminate truthful information

that would be material to investors in compliance with the integrated disclosure provisions of the

SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC

regulations, including accurate and truthful information with respect to the Company's

operations and performance, so that the market prices of Fannie's securities would be based on

truthful, complete and accurate information.

568.    In addition, the false and misleading statements made in the Company's published

documents (including but not limited to its press releases and SEC filings) constitute "group

published information," which Defendants Mudd, Blakely, Swad, and Dallavecchia were

responsible for creating.  During their respective terms of employment at Fannie, the other

Exchange Act Officer Defendants had direct involvement in the daily business of the Company

and participated in the preparation and dissemination of Fannie's "group published information." As such, they are personally liable for the false and misleading statements contained in the "group published information."

569.   More particularly, Defendants Mudd, Blakely, and Swad signed the Company's SEC filings attributed to each of them, below, and are personally liable for the following false and misleading statements that were contained in the "group published information:"

> a.   Defendant Mudd: the false and misleading statements in the 2004 Form 10-K filed on December 6, 2006; the 2005 Form10-K filed on May 2, 2007; the 2006 Form 10-K filed on August 16, 2007; the 2007 Form 10-K filed on February 27, 2008; and the Forms 10-Q for the first, second and third quarters of 2007 (all filed on November 9, 2007); and the first and second quarters of 2008, filed on May 6, 2008 and August 8, 2008, respectively;
>
> b.   Defendant Blakely: the false and misleading statements in the 2004, 2005 and 2006 Forms 10-K; and
>
> c.   Defendant Swad: the false and misleading statements in the 2007 Form 10-K; and the Forms 10-Q for the first, second and third quarters of 2007as well as the first and second quarters of 2008; .

570.   In addition to their personal liability for the false and misleading statements that were contained within the "group published information," Defendants Mudd, Blakely, Swad, and Dallavecchia each are also liable for the false and misleading statements that they personally made during the Class Period, as follows:

a. Defendant Mudd: his false and misleading statements in (1) the press releases issued on August 16, 2007; November 9, 2007; February 27, 2008; May 6, 2008; August 8, 2008; and (2) news reports on February 23, 2007; August 17, 2007; February 23, 2008; July 11, 2008; July 17, 2008; and August 8, 2008; (3) conference calls held on February 27, 2007; May 2, 2007; August 16, 2007; November 9, 2007; February 27, 2008; May 6, 2008; and August 8, 2008; and (4) Congressional testimony given on March 15, 2007; September 20, 2007; and February 7, 2008.

b. Defendant Blakely: his material omission during the May 2, 2007 conference call with analysts, during which he failed to correct the false and misleading statements by Defendants Dallavecchia and Lund that the credit quality of Fannie's Alt-A portfolio was comparable to Fannie's conventional book of business;

c. Defendant Swad: his false and misleading statements in: (1) the conference calls held on May 2, 2007; November 16, 2007; February 27, 2008; and August 8, 2008; and (2) press releases issued on February 27, 2008 and August 8, 2008; and

d. Defendant Dallavecchia: his false and misleading statements in the calls held on February 27, 2007 and November 9, 2007.

571.   Each of the Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even

though such facts were available to each of them.  Such defendants' material misrepresentations

and/or omissions were done knowingly or with severe recklessness and for the purpose and

effect of concealing Fannie Mae's operating condition and future business prospects from the

investing public and supporting the artificially inflated price of its equity securities.  As

demonstrated by the Exchange Act Defendants' misstatements of the Company's financial

condition and performance throughout the Class Period, each of the Exchange Act Officer

Defendants, if he did not have actual knowledge of the misrepresentations and omissions alleged,

was severely reckless in failing to obtain such knowledge by deliberately refraining from taking

those steps necessary to discover whether those statements were false and misleading.  Further

evidence of scienter is detailed herein.

**A.      The Exchange Act Officer Defendants Acted With Scienter**

572.      The allegations set forth above in ¶¶54-169 establish a strong inference that the

Exchange Act Officer Defendants acted with scienter in misrepresenting the Company's credit

risk profile and capital adequacy during the Class Period.  As officers in the Company, the

Exchange Act Officer Defendants were in a unique position to understand Fannie's increased

exposure to risk due to its increased investment in subprime and Alt-A loans, failure to manage

credit risk through tools such as higher guaranty fees and underwriting requirements, and its

capital requirements.  For example, as Chief Risk Officer of Fannie Mae during the Class Period,

Defendant Dallavecchia had an intimate understanding of the risk management tools and

processes in place at the Company and made it clear that those tools and processes were woefully

inadequate, if not completely absent.

573.      The Exchange Act Officer Defendants were privy to a number of internal

documents and emails produced during the Class Period that discussed the Company's

worsening credit profile.  For example, as set forth above in ¶¶94-96, as members of senior

management, the Exchange Act Officer Defendants received copies of internal Risk Reports by early 2007 forecasting a surge in loan delinquencies, as well as a home price model forecast predicting a 50% drop in home prices.

574.   Accordingly, the Exchange Act Officer Defendants knew or recklessly disregarded that Fannie misrepresented its risk exposure and risk controls and capital adequacy.

### 1.   Additional Facts Establishing That Defendants Mudd and Dallavecchia Acted with Scienter with Regard To Fannie's Risk Controls

575.   As set forth above in ¶¶77-87, the Exchange Act Officer Defendants repeatedly reassured the investing public during the Class Period that Fannie had the ability to successfully manage its credit risk.  Yet, according to Confidential Witness 2, who worked as a Director of Risk Management in the Business Analytics division overseen by Defendant Dallavecchia's Risk Office, Fannie did not evaluate the risk of the subprime mortgage pools it bought, did not have the ability to analyze pools in-house, and did not have a model to evaluate subprime loans and indeed was still building such models as late as August 2007.

576.   As set forth above in ¶¶89-90, 99-100, Defendant Dallavecchia, Fannie's Chief Risk Officer, specifically warned Defendant Mudd about the lack of internal controls in emails sent to Mudd on October 28, 2006 and July 16, 2007.  In Mudd's later testimony to Congress on December 9, 2008, he confirmed that he understood Dallavecchia to mean "that [Fannie was] rushing into billions of dollars worth of subprime loan purchases without really knowing what [it was] doing."  Indeed, Dallavecchia warned Mudd again, in a second email on July 16, 2007, that "I have been saying that we are not even close to have [sic] proper control processes for credit, market and operational risk.  I get a 16pct budget cut.  Do I look so stupid?"

577.   Defendant Dallavecchia specifically stated in an internal email that "[Fannie] has one of the weakest control processes I [have] ever witnessed in my career."

578.    Accordingly, Defendants Mudd and Dallavecchia knew that Fannie's risk controls were defective and thus incapable of adequately managing the risks related to the subprime and Alt-A market.

579.    Nonetheless, Mudd and Fannie cut Dallavecchia's budget two years in a row by a material amount.

580.    On September 20, 2007, notwithstanding Defendant Dallavecchia's July 2007 warnings and the budget reductions—which explicitly placed Defendant Mudd on notice of Fannie's nonexistent controls—Mudd testified before Congress that Fannie could "provide more liquidity help to the home finance market today without taking risks we are not capable of managing" and that Fannie had "vastly reduced [its] material control weaknesses."  These facts establish Defendant Mudd's conscious or reckless disregard for the truth in affirming to the investing public the sufficiency of Fannie's ability to manage its credit risk.

### 2.    Additional Facts Establishing That the Exchange Act Officer Defendants Acted With Scienter With Regard To Fannie's Guaranty Fee Pricing

581.    The fees Fannie charged for guaranteeing MBS backed by risky subprime and Alt-A loans were crucial to the safety and soundness of Fannie's business model.  By charging sufficiently high fees, Fannie could mitigate its exposure to potentially massive losses.

582.    Fannie's officers, including its CFOs during the Class Period, Defendants Blakely and Swad, who were responsible for the overall financial health of the Company and for allocating the funding for the purchases made by Fannie, could not have been ignorant of the foregoing described facts regarding allocation and pricing, without having been reckless in their ignorance.

583.    Moreover, at all relevant times, confidential pricing sheets showing the guarantee fees that Fannie intended to obtain from lenders were created on a regular basis and circulated

internally, including to Fannie's most senior officers.  As members of Fannie's senior management, the Exchange Act Officer Defendants knew or recklessly disregarded that Fannie's guaranty fees were inadequate to mitigate the risk of the subprime and Alt-A backing the MBS Fannie guaranteed.

      **3.**     **Additional Facts Establishing That The Exchange Act Officer Defendants Acted With Scienter With Regard To Fannie's Enforcement Of Underwriting Guidelines**

584.     The underwriting guidelines to which the Company mandated its lender-customers adhere, and the enforcement of those rules, which defined the Company's risk profile, were of critical importance to Fannie's business and operations.  In particular, the quality of the loans Fannie purchased and guaranteed directly impacted the Company's risk exposure.

585.     The Exchange Act Defendants knew or were reckless in not knowing that the lenders' underwriting was weak and failed to screen out high-risk loans, because, as the Exchange Act Officer Defendants repeatedly represented to the public, the Company closely monitored the level of quality of that underwriting.  As members of Fannie's senior management, the Exchange Act Officer Defendants were privy to this information and therefore knew or recklessly disregarded that Fannie's guaranty fees were inadequate and did not mitigate the risk of the subprime and Alt-A backing the MBS Fannie guaranteed.

      **4.**     **Additional Facts Establishing That the Exchange Act Officer Defendants Acted With Scienter With Regard To Fannie's Core Capital**

586.     As the Exchange Act Officer Defendants knew, as a GSE beholden to federal regulatory requirements, the Company's ability to meet its regulatory minimum capital levels was essential to its continued operation: if Fannie's core capital fell below the mandated regulatory minimum capital level, it was subject to severe penalties including a government takeover.  Further, the Company's core capital level was a key metric by which investors

determined whether Fannie would be able to survive the financial crisis.  Accordingly, the Company's core capital level was a vitally important measurement to which the market was highly attuned.

587.    Given the importance of the Company's core capital position, the Exchange Act Officer Defendants either knew or recklessly disregarded that Fannie's capital was overstated.

588.    In particular, Fannie's senior officers — and particularly Defendants Mudd, Blakely, and Swad, who were privy to all internal information relating to Fannie's business — could not have been ignorant of the foregoing described facts regarding Fannie's core capital requirements.

589.    The Exchange Act Officer Defendants also had a strong incentive to misstate Fannie's financial results in an effort to conceal its capital inadequacy.  As alleged herein, if the Exchange Act Officer Defendants had accurately reported Fannie's financial results during the Class Period, its core capital would have failed to meet regulatory capital requirements.

590.    The Exchange Act Officer Defendants made two accounting changes during the Class Period that bolstered the false illusion that Fannie was in good financial health: (1) excluding certain types of losses from its *credit loss ratio*—a key metric investors used to assess the credit quality of the Company's mortgages—in order to distort the ratio and make Fannie's credit profile appear better than it actually was; and (2) relaxing Fannie's policies on when to recognize a loss on a defaulted loan from 90 days past due to 2 years, causing tens of thousands of loans that previously would have been marked down to maintain their value.  The fact that Fannie excluded certain losses from its credit loss ratio and extended the recognition period out to two years creates a strong inference that Defendants were attempting to cover up Fannie's loan losses in any way they could.

591.    Once Morgan Stanley was retained by the U.S. Treasury Department to scrutinize Fannie's books and records, it came to the "troubling conclusion" that Fannie had used methods that had the effect of overstating its capital resources and financial stability.

592.    As alleged herein, FHFA Director Lockhart's acknowledgment, in his role as conservator of Fannie Mae, that Fannie was undercapitalized even *prior* to the government's seizure of Fannie, constituted an admission that many of Fannie's prior public statements and those made by its officers had been false or misleading.

**5.    The Termination of Fannie's Senior Officers' Employment Create An Inference of Scienter**

593.    When the U.S. government learned that Fannie had misrepresented its capital position to the public, it instituted a conservatorship over the Company and fired senior management.  The government decision to fire senior management lends further support to the inference that the Exchange Act Officer Defendants acted with scienter.  The Exchange Act Officer Defendants were motivated to keep Fannie's stock price artificially inflated and its credit rating inflated throughout the Class Period so that Fannie could issue over $14 billion of Preferred Stock and common stock at artificially inflated prices.  Fannie's proceeds from its securities issuances during the Class Period included:

| Security | Date | Proceeds |
|----------|------|----------|
| Preferred Series R | November 16, 2007 | $500 million |
| Preferred Series S | December 6, 2007 | $7 billion |
| Common Stock | May 8, 2008 | $2.255 billion |
| Preferred Series 2008-1 | May 8, 2008 | $2.25 billion |
| Preferred Series T | May 13, 2008 | $2 billion |

594.   Each of these securities was a direct or indirect obligation of Fannie and each was valued in material part on the basis of Fannie's financial statements and perceived financial strength, perceived ability to manage risks and reported capital.  Moreover, these shares all traded at prices closely correlated to the price of Fannie's common stock.

595.   These transactions would not have been consummated at the price set, had Fannie fully disclosed its true financial condition.

**6.     Executive Compensation**

596.   The Exchange Act Officer Defendants were also motivated to provide materially misleading disclosures in order to conceal Fannie's true financial condition and to maximize their own compensation, particularly during the fiscal years 2006 and 2007.

597.   Absent misrepresentations regarding Fannie's true performance and risk management practices, the Exchange Act Officer Defendants would have received materially less compensation in terms of not only cash bonuses, but also overall compensation.

598.   In particular, during the Class Period, Defendants Mudd, Blakely, and Swad were highly motivated to increase dramatically Fannie's subprime and Alt-A purchases in order to inflate their own personal compensation.  Fannie's executive compensation plan included

incentives that encouraged excessive risk-taking by Fannie's executives.  Fannie's compensation

plan offered Fannie executives go-for-broke incentives that motivated them to ignore risk.  Faced

with such skewed incentives, Fannie executives were motivated to place big bets on risky non-

traditional mortgages and securities backed by Alt-A and subprime mortgages.

599.    Specifically, Defendants Mudd, Blakely, and Swad were granted substantial cash

bonuses in 2006 and 2007 for meeting certain performance goals.  These performance-based

cash bonuses were approximately two to three times these executives' annual salaries.  For

example, in 2006 Defendant Mudd received $950,000 as his base salary, but $3,500,000 in cash

bonuses, or over three times the amount of his base salary.

600.    The performance-based cash bonuses were awarded, in part, for successfully

launching major strategic business initiatives.  Specifically, in 2006, the Board established

several performance goals used to determine the amount of cash bonuses it should award

executives.  One of these goals was expanding Fannie's market share and ramping up the

Company's exposure to subprime and Alt-A loans.

601.    For 2006, the Compensation Committee determined that the Company had met

110 percent of its corporate performance targets—including "successfully launch[ing] several

major strategic business initiatives."  The Board therefore determined that Company executives,

including Defendants Mudd and Blakely, should receive substantial cash bonuses at 110 percent

of target bonus levels.

602.    In 2007, the Compensation Committee again made recommendations to the Board

regarding the amount of cash bonuses to be paid to senior executives, including Defendants

Mudd, Blakely, and Swad, based on whether the Company had met performance goals including:

"*Business Goals.* Our business goals were to optimize our performance through the achievement of targets for new business, book growth, and economic returns."

603.    The Compensation Committee determined that despite Fannie's net loss and falling stock price in 2007, the Company had met or exceeded overall expectations for its performance goals in the aggregate, and therefore Company executives should be awarded cash bonuses at 80% of target levels.  Hence, Defendants Mudd, Blakely, and Swad were each granted substantial cash bonuses in 2007.

604.    In 2006 and into 2007, the key business initiative for the Company was the substantial expansion of Fannie's investment in subprime and Alt-A loans.  Indeed, according to an August 19, 2008 article in the *Washington Post*, on January 3, 2007, Mudd wrote a confidential memo to Fannie's Board in which he stated that one of Fannie's "achievements" in 2006 was "expanding its involvement in the market for subprime and other nontraditional mortgages," which Mudd called a step "toward optimizing [Fannie's] business."  According to this article, a month later, another internal Fannie document outlined the Company's plan to expand further into the subprime market by buying $11 billion more in "subprime/non-prime mortgages" in 2007, despite recognizing "the already weak performance of subprime loans."

605.    The Company had "approached its expansion of this business cognizant of the relatively weak credit performance of recent subprime originations, which were affected by issues relating to underwriting quality, home price de-appreciation . . . and risk layering," one February 2007 document said, referring to loans with multiple risky characteristics. "However, management expects improvement in the quality and credit performance of subprime mortgages originated this year."

606.     By March 2007, however, when Mudd sent the Board an update, he had to acknowledge that the subprime sector was "in partial meltdown" and reported to directors that Fannie Mae's investment in subprime mortgage assets totaled about $55 billion.

607.     The article further stated that other internal Fannie documents show that "even late in the housing bubble, Fannie Mae was drawn to risky loans by a variety of temptations, including the desire to increase its market share ...."  The Fannie documents obtained by The Washington Post "paint[ed] a picture of a company ... caught between the imperatives of increasing its market share while avoiding excessive risk.  In a bid to juggle these demands, the company's executives took on risks they either misunderstood or unduly minimized."

608.     The facts alleged above in ¶¶54-169 establish that the Exchange Act Officer Defendants did not misunderstand the risks but rather, were well aware of them and chose to forge ahead, knowingly or recklessly disregarding the consequences.

609.     According to that same Washington Post article, "'[b]y entering new markets — especially Alt-A and subprime—and guaranteeing more of [the Company's] customers' products at market prices, [Fannie] met [its] goal of increasing market share from 22 to 25 percent,'" Mudd wrote in a 2006 year-end report to the Fannie Board dated January 3, 2007."  "In other internal documents, there was a common refrain: one of Fannie Mae's objectives for 2006 was to "increase our penetration into subprime."  In an interview, Lund said "the company pursued the purchase of subprime loans in 2006 and 2007 at the request of lenders, who wanted Fannie Mae to take the loans off their books."  Yet as early as Spring 2005, Lund mused at a conference about the danger to borrowers, asking, "Are we setting them up for failure?"  Fannie Mae spokesman Brian Faith acknowledged to the Washington Post that in 2006 and 2007 Fannie Mae broadened its entry into the subprime market.

610.    As Defendant Mudd confirmed at a December 9, 2008 hearing before Congress, revenues were a component of the overall consideration for bonuses.  Hence, Defendants Mudd, Blakely, and Swad were motivated to increase substantially Fannie's subprime and Alt-A purchases—despite, as set forth above in ¶¶88-101— several warnings that Fannie's risk controls were inadequate—in order to generate revenue and artificially pump up the stock price.  By so doing, these Defendants were personally able to reap huge cash bonuses.  By sharply increasing holdings of Fannie Mae's subprime and Alt-A purchases, Defendants Mudd, Blakely, and Swad inflated the Company's revenues, thus ensuring large cash bonuses for themselves.

611.    In 2006 and 2007, Fannie also gave senior executives restricted stock awards with values of up to ten times the amount of the executive's base salary.  For example, in 2006 Defendant Mudd received a restricted stock award worth nearly $10 million, compared to a base salary of $950,000.

612.    Fannie's policies in 2006 and 2007 were to have a higher proportion of senior management's compensation be in the form of equity compensation than at comparable companies.  Fannie Mae's policy was for the CEO to hold Fannie common stock with value equal to five times his or her base salary.  For the other senior executives, the policy required them to hold Fannie Mae common stock with value equal to three times their base salary.

613.    Fannie's policy of having senior executives receive a high percentage of their compensation in the form of equity compensation meant that Exchange Act Officer Defendants were motivated to prop up Fannie's stock price by concealing the true extent of the Company's exposure to high-risk Alt-A and subprime loans, the Company's materially defective risk controls, and the fact that the Company was undercapitalized.  Notably, upon announcement of

the U.S. government's takeover of Fannie, the Secretary of the Treasury stated that Fannie would

"no longer be managed with a strategy to maximize common shareholder returns."

614.    The following table depicts the compensation of key executives in 2006:

| Executive | Base Salary ($) | 2006 Bonus ($) | 2006 Long-Term Incentive Award ($) | Total Compensation ($) |
|---|---|---|---|---|
| Daniel Mudd (CEO) | 950,000 | 3,500,000 | 9,999,947 | 14,449,947 |
| Robert Blakely (CFO) | 650,000 | 1,290,575 | 3,299,361 | 5,239,936 |

615.    The following table depicts the compensation of key executives in 2007:

| Executive | Base Salary ($) | 2007 Bonus ($) | 2007 Long-Term Incentive Award ($) | Total Compensation ($) |
|---|---|---|---|---|
| Daniel Mudd (CEO) | 990,000 | 2,227,500 | 9,000,000 | 12,217,500 |
| Stephen Swad (CFO) | 650,000 | 955,500 | 3,200,00 | 4,805,500 |
| Robert Blakely (former CFO) | 663,000 | 1,113,840 | 0 | 1,776,840 |

**7.    The Investigations by Law Enforcement Authorities and the SEC Suggest Wrongdoing**

616.    In separate articles by the New York Times on September 26, 2008 and the

Washington Post on September 30, 2008, it was reported that the United States Department of

Justice and the SEC had opened investigations into potential accounting, disclosure and

governance problems at Fannie, that the U.S. Attorney had convened a federal grand jury to issue

subpoenas to Fannie, and that the SEC had directed Fannie to preserve its records.

617.    The investigations and issuance of subpoenas by the U.S. Department of Justice

and the SEC as well as the convening of a grand jury further support the inference that the

Exchange Act Officer Defendants acted with scienter.

### 8.      Corporate Scienter

618.    The cumulative knowledge of all Fannie's agents is imputed to the Company.

The facts alleged herein create a strong inference that one or more officers of the Company acted

knowingly or recklessly in violating the securities laws.

619.    By virtue of the foregoing, Fannie Mae and the Exchange Act Officer Defendants

have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### COUNT II
### Violation of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder Against Deloitte

620.    This Count is brought by Lead Plaintiffs TCRS and Boston.

621.    Lead Plaintiffs TCRS and Boston repeat and reallege each and every allegation

set forth above as if fully set forth herein. This Count is asserted against Defendant Deloitte for

violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17

C.F.R. § 240.10b-5, promulgated thereunder.

622.    Deloitte, individually and in concert, directly and indirectly, by the use, means or

instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business,

business practices, performance, operations and future prospects of Fannie Mae, as specified

herein.

623.    Deloitte (a) employed devices, schemes, and artifices to defraud; (b) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements

not misleading; and (c) engaged in acts, practices, and a course of business which operated as a

fraud and deceit upon the purchasers of the Company's securities in an effort to maintain

artificially high market prices for Fannie Mae's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

624. During the Class Period, Deloitte: (a) deceived the investing public, including Lead Plaintiffs and members of the Classes, as alleged herein; (b) artificially inflated and maintained the market price of Fannie's common stock and preferred stock; and (c) caused members of the Classes to purchase Fannie's common stock and preferred stock at artificially inflated prices.

625. Deloitte had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were available to it. Deloitte's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Fannie's adverse operating condition and financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated herein, Deloitte had actual knowledge of the misrepresentations and omissions alleged, or was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

626. As a result of the fraudulent activities of Deloitte described above, in conjunction with the activities of the other defendants, the market prices of Fannie's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of Fannie securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, or upon the integrity of the market in which such securities trade, and on the truth of any misrepresentations made to appropriate agencies and to the investing public, at the time when such statements were made, and/or on the absence

of material adverse information that was known or, with recklessness, disregarded by Deloitte during the Class Period, Plaintiffs and the other members of the Classes acquired Fannie securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines identified herein that released the artificial inflation from Fannie's securities.

627.    At the time of said misrepresentations and omissions, Lead Plaintiffs and the other members of the Classes were unaware of their falsity, and believed the false statements to be true.  Had Lead Plaintiffs, the other members of the Classes and the marketplace known the true nature of the operations of Fannie and the noncompliance with federal law, which was not disclosed by Deloitte, Lead Plaintiffs and other members of the Classes would not have purchased or otherwise acquired their Fannie securities during the Class Period, or they would not have done so at artificially inflated prices which they paid.

628.    The market prices for Fannie Mae's securities declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein.

629.    By virtue of the foregoing, Deloitte violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

630.    As set forth above in ¶¶497-500, Deloitte recklessly disregarded numerous facts that constituted red flags warning Deloitte of problems with Fannie's financial statements, including Fannie's radical shift from conservative, prime loans to high-risk, non-prime loans; Fannie's defective risk controls and inability to accurately assess the risks inherent in such high-risk loans; and Fannie's numerous internal reports pointing to severe declines in housing prices

and offering projections of serious delinquencies and default rates that would adversely affect

Fannie.

631.    As a direct and proximate result of Deloitte's wrongful conduct, Lead Plaintiffs

and the other members of the Class suffered damages in connection with their respective

purchases and sales of the Company's securities during the Class Period, for which Defendant is

jointly and severally liable.

## COUNT III
### (For Violations of Section 20(a) of the Exchange Act, Against the Exchange Act Officer Defendants)

632.    Lead Plaintiffs repeat and reallege each of the allegations set forth above as if

fully set forth herein.  This Count is asserted against the Exchange Act Officer Defendants for

violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

633.    Fannie Mae is a primary violator of Section 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

634.    The Exchange Act Officer Defendants acted as controlling persons of Fannie Mae

within the meaning of Section 20(a) of the Exchange Act, as alleged herein, by reason of their

respective positions as officers of Fannie Mae and specific acts alleged above, their ability to

approve the issuance of statements, their ownership of Fannie Mae securities and/or by contract.

Each of the Exchange Act Officer Defendants had direct control and/or supervisory involvement

in the day-to-day operations of the Company during the Class Period, and therefore had the

power and authority to control or influence the particular transactions giving rise to the violations

of the Exchange Act by the Company as alleged herein, and exercised the same.

635.    By reason of their positions and/or status as officers of Fannie Mae during the

Class Period, the Exchange Act Officer Defendants are "controlling persons" of Fannie within

the meaning of Section 20(a) of the Exchange Act because they had the power and influence to

cause the Company to engage in the unlawful conduct complained of herein.  Because of their

positions of control, the Exchange Act Officer Defendants were able to, and did, directly or

indirectly, control the conduct of Fannie's business, the information contained in its filings with

the SEC, the public statements about its business, and/or the decision-making of Fannie Mae as

set forth herein.

636.    Each of the Exchange Act Officer Defendants was provided with or had access to

copies of the Company's reports, press releases, public filings and other statements alleged by

Lead Plaintiffs to be false or misleading prior to and/or shortly after these statements were issued

and had the ability to prevent the issuance of the statements or cause the statements to be

corrected.  The Exchange Act Officer Defendants also had access to the internal Fannie Mae

documents identified herein.

637.    The Officer Defendants culpably participated in the fraudulent conduct described

herein.

638.    As set forth herein, because of their positions at Fannie Mae and their access to

material non-public information, the Exchange Act Officer Defendants knew or recklessly

disregarded that the statements and representations being made were materially false and

misleading and that the adverse facts specified herein had not been disclosed to, and were being

concealed from, the public.  Thus, each of the Exchange Act Officer Defendants is legally

responsible for the falsification of Fannie's public reports, financial statements, press releases

and other statements as alleged herein.

639.    By virtue of their positions as controlling persons, these Exchange Act Officer

Defendants are liable pursuant to Section 20(a) of the Exchange Act for controlling a primary

violator of the federal securities laws.  As a direct and proximate result of the Exchange Act

Officer Defendants' wrongful conduct, Lead Plaintiffs and other members of the Classes suffered damages in connection with their purchases of the Company's securities during the Class Period.

### XIV.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

640.   The following allegations are in effect a separate complaint. For the following claims there is no allegation of fraud, scienter or recklessness, and the claims alleged do not incorporate any of the allegations contained in ¶¶ 3-639.  These claims, brought under Sections 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") are based solely on claims of negligence.

641.   The Securities Act claims are brought on behalf of all purchasers of 7.625% Non-Cumulative Preferred Stock, Series R ("Series R Preferred Stock"), Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S ("Series S Preferred Stock"), 8.25% Non-Cumulative Preferred Stock, Series T ("Series T Preferred Stock"), 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 ("Series 2008-1 Preferred Stock"), and common stock of Federal National Mortgage Association ("Fannie", "Fannie Mae" or the "Company"), by means of prospectuses, as set forth hereafter.  Each of the prospectuses contained untrue statements or omissions of material fact, or incorporated by reference documents that contained untrue statements or omissions of material fact.

642.   The particular prospectuses issued in connection with the offerings that are alleged to be materially false and misleading are: (a) the Series R Preferred Stock Offering Circular for the November 16, 2007 offering ("Series R Offering Circular"); (b) the Series S Preferred Stock Offering Circular for the December 6, 2007 offering ("Series S Offering Circular"); (c) the Series T Preferred Stock Offering Circular for the May 13, 2008 offering ("Series T Offering Circular"); (d) the Series 2008-1 Preferred Stock Offering Circular for the

May 8, 2008 offering ("Series 2008-1 Offering Circular"); and (e) the common stock Offering

Circular for the May 8, 2008 offering ("May 8, 2008 Common Stock Offering Circular").

643.    With respect to each of these offerings, Fannie represented that it was not acting

as an instrumentality of the government.  In the Series S Offering Circular, for example, Fannie

stated the following:

> The obligations related to this Preferred Stock, including any dividend payments,
> are solely the obligation of Fannie Mae. The Preferred Stock is not guaranteed by,
> and is not a debt or obligation of, the United States or of any of its agencies or
> instrumentalities . . .
>
> **The obligations of Fannie Mae under the terms of the Preferred Stock are**
> **obligations of Fannie Mae only and are not those of the United States or of**
> **any agency or instrumentality thereof.**

(Emphasis in original.)

644.    The Series R Offering Circular, Series T Offering Circular, Series 2008-1

Offering Circular and the May 8, 2008 Common Stock Offering Circular each contain

substantially similar language.

645.    In contrast, Fannie acts as an instrumentality of the government when it issues its

guaranteed mortgaged backed securities ("MBS") and other guaranteed debt.  For example,

Fannie stated the following in a June 1, 2007 Fannie Single-Family MBS Prospectus for

Guaranteed Mortgage Pass-Through Certificates (Single-Family Residential Mortgage Loans):

> **Fannie Mae Guaranty**
> We guarantee to the MBS trust that we will supplement amounts received by the
> MBS trust as required to permit timely payments of interest and principal on the
> certificates. We alone are responsible for making payments under our guaranty.
> **The certificates and payments of principal and interest on the certificates are**
> **not guaranteed by the United States, and do not constitute a debt or**
> **obligation of the United States or any of its agencies or instrumentalities**
> **other than Fannie Mae.**
>
> (Emphasis in original.)

**A.      Overview of the Securities Act Claims**

646.   Fannie was chartered by the U.S. Congress in 1968 with a statutory mission to provide stability, liquidity and affordability to the U.S. housing market.  Throughout the 1990s, the mortgages purchased by Fannie remained overwhelmingly 30-year, fixed-rate, prime mortgages.

647.   By the mid-2000s, the mortgage market was rapidly expanding in the direction of high-risk, non-prime mortgage loans and away from Fannie's traditional province of conventional, safer loans.  By 2005, Fannie began accumulating high-risk, non prime mortgage products and, by 2006, Fannie's book of business was exposed to much more risk as a result of the shift from safer, prime loans to high-risk non-prime and nontraditional loans, including Alt-A loans. However, Fannie was unable to identify and manage the credit risk associated with such loans.  Moreover, by the time of the offerings at issue in this action, the housing market was in a severe decline.

648.   Given these facts, Fannie's reported financial results and condition were false and violated generally accepted accounting principles ("GAAP") because Fannie negligently failed to consider the effects of the housing market decline and the Company's lack of risk controls.  This led to a material understatement of combined *loss reserves and other than temporary impairment*s, and an overstatement of *deferred tax assets*.  As a result, Fannie's core capital was also materially overstated.

649.   In violation of the Securities Act, none of the material facts set forth above were disclosed in the Offering Circulars in connection with the Offerings at issue in this action.

**B.      Jurisdiction and Venue**

650.    This Court has jurisdiction over the subject matter of this action pursuant to

Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and 28 U.S.C. §§ 1331, 1337, and 1367.

651.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15

U.S.C. § 77v(a) 28 U.S.C. §§ 1391 (b) and (c); and the order of the Judicial Panel of Multidistrict

Litigation, dated February 11, 2009, transferring all related actions pending in other districts to

the United States District Court for the Southern District of New York. Substantial acts in

furtherance of the wrongs alleged and/or their effects have occurred within this District, and

Fannie's common stock and certain preferred stock trade on the New York Stock Exchange.

652.    In connection with the acts and omissions alleged in this Joint Consolidated

Amended Class Action Complaint ("Complaint"), all of the Securities Act Defendants (as

defined below), directly or indirectly, used the means and instrumentalities of interstate

commerce, including, but not limited to, the mails, interstate telephone communications, and the

facilities of the national securities markets.

**C.      Securities Act Parties**

**1.      Plaintiff**

653.    Lead Plaintiff TCRS is a defined benefit pension plan that serves Tennessee state

employees, higher education employees, K-12 public school teachers, and employees of political

subdivisions who have elected to participate in the plan.  TCRS purchased or acquired Fannie

securities as set forth in the supplemental certification attached hereto.

**2.      Federal National Mortgage Association**

654.    Defendant Fannie is a government-sponsored enterprise ("GSE") chartered by

Congress, with its principal place of business located at 3900 Wisconsin Avenue NW,

Washington, DC 20016-2892.  Fannie is owned by the Company's shareholders, and the

Company's equity securities at issue in this action were listed and traded on the New York Stock

Exchange.  Fannie operates in the U.S. secondary mortgage market by providing funds to

mortgage lenders through the purchase of mortgages and mortgage-related securities.  Fannie

also issues and guarantees mortgage-related securities.

### 3.     Securities Act Officer Defendants

655.     Defendant Daniel H. Mudd ("Mudd") was President, Chief Executive Officer

("CEO") and a director of Fannie.  Mudd signed each of the Company's Forms 10-K and 10-Q

filed during the Class Period.

656.     Defendant Robert T. Blakely ("Blakely") was Chief Financial Officer ("CFO")

and Executive Vice President of Fannie until August 17, 2007, when he stepped down from his

position as CFO.  Blakely stayed on as Executive Vice President until his retirement in January

2008.  Blakely signed the Company's 2004, 2005 and 2006 Forms 10-K.

657.     Defendant Stephen M. Swad ("Swad") was Chief Financial Officer ("CFO") and

Executive Vice President of Fannie since August 2007 until his resignation on August 28, 2008.

Swad signed Fannie's 2007 Form 10-K and its Forms 10-Q for each quarter of 2007 and for the

first two quarters of 2008.

658.     Defendant David Hisey ("Hisey") has been Executive Vice President and CFO

since August 28, 2008.  Hisey previously served as Fannie's Senior Vice President and

Controller since February 1, 2005 and also as Senior Vice President of Financial Controls and

Operations since January 3, 2005.  Hisey signed Fannie's 2004, 2005, 2006 and 2007 Forms 10-

K.

659.    Defendants Mudd, Blakely, Swad, and Hisey are referred to herein collectively as the "Securities Act Officer Defendants."

**4.     Underwriter Defendants**

660.    Defendant Banc of America Securities LLC ("BofA") is headquartered at 9 West 57th Street, New York, New York 10019 and is a subsidiary of Bank of America, N.A., a Delaware corporation with headquarters at 100 North Tryon Street, Charlotte, North Carolina 28255.  BofA is registered with the New York State Department of State as an active foreign limited liability company whose registered agent in this State is CT Corporation System, 111 Eighth Avenue, New York, New York 10011.  BofA was an underwriter of the Series S Preferred Stock offering, Series T Preferred Stock offering and the Series 2008-1 Preferred Stock offering.

661.    Defendant Barclays Capital Inc. ("Barclays"), a subsidiary of Barclays PLC, headquartered at 1 Churchill Place, London E14 5HP, England, is a Connecticut corporation headquartered at 200 Park Avenue, New York, New York 10166.  Barclays was an underwriter of the Series T Preferred Stock offering.

662.    Defendant Bear, Stearns & Co., Inc. ("Bear Stearns") is a division of J.P. Morgan Chase & Co. and is headquartered at 383 Madison Avenue, New York, New York 10017.  Bear Stearns was an underwriter of the Series R Preferred Stock offering and the Series S Preferred Stock offering.

663.    Defendant Citigroup Global Markets Inc. ("Citigroup") is headquartered at 388 Greenwich Avenue, New York, New York 10013 and is a subsidiary of Citigroup Inc., a Delaware corporation that is headquartered at 399 Park Avenue, New York, New York 10043.

Citigroup was an underwriter of the Series S Preferred Stock offering, the Series T Preferred Stock offering and the May 8, 2008 offering of common stock.

664.    Defendant Deutsche Bank Securities, Inc. ("Deutsche"), a subsidiary of Deutsche Bank AG, is a Delaware corporation headquartered at 60 Wall Street, New York, New York 10005.  Deutsche was an underwriter of the Series S Preferred Stock offering and the Series T Preferred Stock offering.

665.    Defendant E*Trade Securities LLC ("E*Trade") is a subsidiary of E*Trade Financial Corp., a Delaware corporation headquartered at 135 East 57th Street, New York, New York 10022.  E*Trade was an underwriter of the Series T Preferred Stock offering.

666.    Defendant Goldman Sachs & Co. ("Goldman") is a subsidiary of The Goldman Sachs Group Inc., a Delaware corporation headquartered at 85 Broad Street, New York, New York 10004.  Goldman was an underwriter of the Series S Preferred Stock offering, the Series T Preferred Stock offering, the Series 2008-1 Preferred Stock offering and the May 9, 2008 offering of common stock.

667.    Defendant J.P. Morgan Securities, Inc. ("J.P. Morgan") is a subsidiary of J.P. Morgan Chase & Co., a Delaware corporation headquartered at 270 Park Avenue, New York, New York 10017.  J.P. Morgan was an underwriter of the Series S Preferred Stock offering, the Series 2008-1 Preferred Stock offering and the May 8, 2008 offering of common stock.

668.    Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), an operating subsidiary of Merrill Lynch & Co., Inc. (which was acquired by Bank of America Corp. as of January 1, 2009), is a Delaware corporation that is headquartered at 4 World Financial Center, New York, New York 10080.  Merrill Lynch was an underwriter of the Series

S Preferred Stock offering, the Series T Preferred Stock offering and the Series 2008-1 Preferred Stock offering.

669.     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") is a subsidiary of Morgan Stanley, a Delaware corporation that is headquartered at 1585 Broadway, New York, New York 10036.  Morgan Stanley was an underwriter of Series R Preferred Stock offering, the Series S Preferred Stock offering, the Series T Preferred Stock offering and the May 9, 2008 offering of common stock.

670.     Defendant UBS Securities LLC ("UBS") is a subsidiary of UBS AG, a Swiss corporation headquartered at Bahnhofstrasse 45, CH-8001 Zurich, Switzerland, and Aeschenvorstadt 1, CH-4051 Basel, Switzerland.  UBS is a Delaware corporation headquartered at 1285 Avenue of the Americas, New York, New York 10019.  UBS was an underwriter of Series S Preferred Stock offering and the Series T Preferred Stock offering.

671.     Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") is a subsidiary of Wachovia Corp., a North Carolina corporation headquartered at One Wachovia Center, Charlotte, North Carolina 28288, which has been acquired by Wells Fargo & Co.  Wachovia Capital is registered with the New York State Department of State as an active foreign limited liability company whose registered agent in this State is Corporation Service Company, at 80 State Street, Albany, New York 12207-2543.  Wachovia Capital was an underwriter of the Series T Preferred Stock offering.

672.     Defendant Wachovia Securities, LLC ("Wachovia Securities"), known as Wells Fargo Advisors as of May 1, 2009, is a subsidiary of Wachovia Corp., a North Carolina corporation headquartered at One Wachovia Center, Charlotte, North Carolina 28288, which has been acquired by Wells Fargo & Co.  Wachovia Securities is registered with the New York State

Department of State as an active foreign limited liability company whose registered agent in this State is Corporation Service Company, at 80 State Street, Albany, New York 12207-2543. Wachovia Securities was an underwriter of the Series T Preferred Stock offering.

673.     Defendant Wells Fargo Securities LLC ("Wells Fargo") is a subsidiary of Wells Fargo & Co., a Delaware corporation headquartered at 420 Montgomery Street, San Francisco, California 94163.  Wells Fargo is registered with the New York State Department of State as an active foreign limited liability company.  Wells Fargo was an underwriter of the Series T Preferred Stock offering.

674.     Defendants BofA, Barclays, Bear Stearns, Citigroup, Deutsche, E*Trade, Goldman, J.P. Morgan, Merrill Lynch, Morgan Stanley, UBS, Wachovia Capital, Wachovia Securities and Wells Fargo are referred to herein collectively as the "Underwriter Defendants."

675.     Fannie and the Securities Act Officer Defendants are referred to herein as the "Securities Act Defendants."

## D.     Fannie's Core Capital Was Materially Overstated

676.     The Securities Act Defendants materially misstated Fannie's financial results. This caused the Company's core capital to be inflated.

677.     Pursuant to the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 ("1992 Act"), Fannie is required to maintain a certain minimum amount of core capital—a critical measure of the Company's financial strength and viability.  The more core capital Fannie held, the better equipped the Company was to cover any unexpected losses.

678.     The core capital minimum threshold, set by the 1992 Act, includes two key requirements.  The first is a *statutory minimum capital requirement*, which essentially requires the Company's assets to exceed its liabilities by a certain ratio.  As stated in Fannie's 2007 10-K, "[f]or purposes of the statutory minimum capital requirement, we are in compliance if our core

capital equals or exceeds our statutory minimum capital requirement." Statutory minimum capital is generally the sum of (a) 2.5% of on-balance sheet assets; and (b) 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances.

679.     The second key capital requirement to which Fannie is subject is a heightened *OFHEO-directed minimum capital requirement*. This requirement came about as part of an OFHEO consent order directed to Fannie that addressed prior accounting misstatements. The OFHEO-directed minimum capital requirement set benchmarks for Fannie to meet and initially mandated that the Company maintain a 30% capital surplus **above** its statutory minimum capital requirement.

680.     A review of Fannie's credit risk exposure highlights the critical role played by the Company's capital. As of September 30, 2007, Fannie had total credit exposure of $2.8 trillion, and approximately $405 billion of that amount consisted of exposure to subprime and Alt-A loans. Given Fannie's significant exposure to high-risk, non-prime loans, its capital was a crucial bulwark against potential losses.

681.     As set forth in the tables below, Fannie reported that it held a substantial surplus over its statutory minimum capital and OFHEO-directed minimum capital requirements.

**REPORTED
STATUTORY MINIMUM CAPITAL AND
OFHEO-DIRECTED MINIMUM CAPITAL**

| | FY '06 10-K | Q1 '07 10-Q | Q2 '07 10-Q | Q3 '07 10-Q | FY '07 10-K | Q1 '08 10-Q | Q2 '08 10-Q | Q3 '08 10-Q | FY '08 10-K |
|---|---|---|---|---|---|---|---|---|---|
| **As Reported** | | | | | | | | | |
| | | | | | | | | | |
| **Core Capital** | 41,950 | 41,710 | 42,690 | 41,713 | 45,373 | 42,676 | 46,964 | 16,645 | (8,641) |
| **Statutory Minimum Capital** | 29,359 | 29,528 | 30,328 | 30,303 | 31,927 | 31,335 | 32,631 | 33,024 | 33,552 |
| **Surplus** | 12,591 | 12,182 | 12,362 | 11,410 | 13,446 | 11,341 | 14,334 | (16,379) | (42,193) |
| **% Surplus** | 43% | 41% | 41% | 38% | 42% | 36% | 44% | -50% | -126% |
| | | | | | | | | | |
| **Core Capital** | 41,950 | 41,710 | 42,690 | 41,713 | 45,373 | 42,676 | 46,964 | | |
| **OFHEO-Directed Minimum** | 38,166 | 38,386 | 39,426 | 39,393 | 41,505 | 37,602 | 37,525 | | |
| **Surplus** | 3,784 | 3,324 | 3,264 | 2,319 | 3,868 | 5,074 | 9,439 | | |
| **% Surplus** | 9.9% | 8.7% | 8.3% | 5.9% | 9.3% | 13.5% | 25.2% | | |

682.    Fannie reported inadequate loss reserves and overstated the value of key assets, including Fannie's *deferred tax assets*, which resulted in an overstatement of reported core capital.  Similarly, the Company negligently did not recognize unrealized losses for *available-for-sale securities* to be other than temporarily impaired and therefore segregated them in accumulated other comprehensive income, which is excluded from Fannie's core capital. Thus, by failing to recognize sufficient amounts of *other than temporary impairment*, the Company excluded losses that would have negatively impacted core capital.

683.    The table below depicts, by way of example, conservative estimates of the accounting changes Fannie should have made to its combined loss reserves, *other than temporary impairment* and *deferred tax assets*.

## OFHEO-DIRECTED MINIMUM CAPITAL[25]

| | FY '06 10-K | Q1 '07 10-Q | Q2 '07 10-Q | Q3 '07 10-Q | FY '07 10-K | Q1 '08 10-Q | Q2 '08 10-Q | Q3 '08 10-Q | FY '08 10-K |
|---|---|---|---|---|---|---|---|---|---|
| Core Capital | 41,950 | 41,710 | 42,690 | 41,713 | 45,373 | 42,676 | 46,964 | | |
| Understatement of combined loss reserves | (592) | (874) | (1,132) | (1,021) | (570) | (994) | (1,317) | (1,136) | |
| Understatement of other than temporary impairment | | | | (32) | (691) | (1,416) | (2,334) | (2,739) | |
| Overstatement of deferred tax asset | | (6,956) | (5,290) | (8,367) | (8,367) | (13,206) | (16,004) | (21,400) | |
| | | | | | | | | | |
| Core capital adjusted for these misstatements | 41,358 | 33,880 | 36,268 | 32,293 | 35,745 | 27,060 | 27,309 | 8,630 | (8,641) |
| OFHEO-Directed Minimum | 38,166 | 38,386 | 39,426 | 39,393 | 41,505 | 37,602 | 37,525 | | |
| Surplus | 3,192 | (4,506) | (3,158) | (7,100) | (5,760) | (10,542) | (10,216) | | |
| % Surplus | 8% | -12% | -8% | -18% | -14% | -28% | -27% | | |

---

[25]    These estimates are offered by way of example only; larger accounting adjustments—which would have driven core capital even further below the required minimums-may well have been reported.

**STATUTORY MINIMUM CAPITAL**

| | FY '06 10-K | Q1 '07 10-Q | Q2 '07 10-Q | Q3 '07 10-Q | FY '07 10-K | Q1 '08 10-Q | Q2 '08 10-Q | Q3 '08 10-Q | FY '08 10-K |
|---|---|---|---|---|---|---|---|---|---|
| **Core Capital** | 41,950 | 41,710 | 42,690 | 41,713 | 45,373 | 42,676 | 46,964 | 16,645 | (8,641) |
| **Understatement of combined loss reserves** | (592) | (874) | (1,132) | (1,021) | (570) | (994) | (1,317) | (1,136) | |
| **Understatement of other than temporary impairment** | | | | (32) | (691) | (1,416) | (2,334) | (2,739) | |
| **Overstatement of deferred tax asset** | | (6,956) | (5,290) | (8,367) | (8,367) | (13,206) | (16,004) | (21,400) | |
| | | | | | | | | | |
| **Core capital adjusted for these misstatements** | 41,358 | 33,880 | 36,268 | 32,293 | 35,745 | 27,060 | 27,309 | 8,630 | (8,641) |
| **Statutory Minimum Capital** | 29,359 | 29,528 | 30,328 | 30,303 | 31,927 | 31,335 | 32,631 | 33,024 | 33,552 |
| **Surplus** | 11,999 | 4,352 | 5,940 | 1,990 | 3,818 | (4,275) | (5,332) | (16,379) | (42,193) |
| **% Surplus** | 41% | 15% | 20% | 7% | 12% | -14% | 16% | -50% | -126% |

**E.    Preferred Stock and Common Stock Offerings and Untrue Statements of Material Fact and Material Omissions**

684.    The Offering Circulars in connection with each of the offerings of preferred stock at issue in this action included untrue statements of material fact and/or omitted to state the material facts, including the following:

a.    Fannie negligently monitored the underwriting of the lenders from which it acquired mortgage loans, which had the effect of increasing the amount of poorly-underwritten, high-risk loans purchased or guaranteed by the Company.

b.    Fannie's risk controls were inadequate and the Company lacked the ability to measure the credit risk of such securities.

c.    Fannie's credit book of business had weak credit characteristics.

    d.      The credit risk profile of Fannie's Alt-A and subprime mortgages and related securities was materially more risky than the credit profile of Fannie's portfolio of conventional 30 year fixed mortgages.

    e.      Fannie's subprime and Alt-A assets were not of equal credit quality to its conventional loan assets.

    f.      Fannie negligently failed to seek appropriate protection for its enhanced risk;

**1.    Series R Preferred Stock Offering**

685.    On November 16, 2007, Fannie disseminated the Series R Offering Circular, by means through which Fannie sold 20 million shares of Series R Preferred Stock. On December 14, 2007, the underwriters of the Series R Preferred Stock offering exercised their over-allotment option and Fannie issued an additional 1.2 million shares of Series R Preferred Stock.

686.    Fannie was the issuer of the Series R Preferred Stock, and Bear Stearns, and Morgan Stanley were the underwriters.

687.    The Series R Preferred Stock offering raised $530 million. After underwriting commissions, Fannie realized approximately $524.8 million.

688.    The Series R Offering Circular incorporated by reference Fannie's Form 10-K for the year ended December 31, 2006, and Forms 10-Q for the quarters ended March 31, 2007, June 30, 2007, and September 30, 2007, which, as set forth hereafter, contained material untrue statements and omissions of material fact.

**a.    Fannie's Form 10-K for the year Ended December 31, 2006**

689.    On August 16, 2007, the Securities Act Officer Defendants caused Fannie to file its annual report with the SEC on Form 10-K (the "2006 Annual Report"). The 2006 Annual Report was signed by Mudd, Blakely, and Hisey.

690.    The 2006 Annual Report stated, in part, that Fannie reported combined loss reserve of $859 million and core capital of $41.95 billion.

691.     These statements were false and misleading because as alleged in ¶¶ 676-83, in violation of GAAP, Fannie materially understated combined loss reserves and materially overstated core capital.

692.     The 2006 Annual Report included the following statements concerning the credit profile of Fannie's mortgage credit book of business:

**Market and Economic Factors Affecting Our Business**
*Market Environment: 2001 to Mid-2006 . . .*

As the composition of loan originations shifted from fixed-rate mortgages to a greater share of higher risk, less traditional mortgages, we concluded that the market's pricing of a significant portion of these loans did not appropriately reflect the underlying, and often layered, credit risks associated with these products. Based on this assessment, we made a strategic decision to forgo the guaranty of a significant proportion of mortgage loans because they did not meet our risk and pricing criteria. As a result of our decision to maintain a disciplined approach to managing our participation in the single family mortgage market, we ceded significant market share of issuances of single-family mortgage-related securities to our competitors. We believe, however, that this decision has helped us maintain a mortgage credit book of business with strong credit characteristics overall.

693.     These statements were untrue statements of material facts for the reasons set forth in ¶ 684(a)-(d).

694.     The 2006 Annual Report included the following statements concerning the impact of the subprime market on Fannie's business:

We believe that the limited scale and disciplined nature of our participation in the subprime market has helped to protect the company from a material adverse impact of the recent disruption in that market to date. We estimate that, as of June 30, 2007, subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans represented approximately 0.2% of our single-family mortgage credit book of business. As of June 30, 2007, we had invested in private-label securities backed by subprime mortgage loans totaling $47.2 billion, which represented approximately 2% of our single-family mortgage credit book of business.

695.   The 2006 Annual Report included the following statements concerning Fannie's exposure to Alt-A mortgages:

> 12% and 11% of our single-family mortgage credit book of business as of June 30, 2007 and December 31, 2006 respectively, consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans, and approximately 1% of our single-family mortgage credit book of business consisted of private-label mortgage-related securities backed by Alt-A mortgage loans . . . as of both June 30, 2007 and December 31, 2006.

696.   The 2006 Annual Report included the following statements concerning the Fannie's credit risk:

> We believe that our approach to the management of credit risk during the past several years has contributed to our maintenance of a credit book with strong credit characteristics overall, as measured by loan-to-value ratios, credit scores and other loan characteristics that reflect the effectiveness of our credit risk management strategy.
>
> *       *       *
>
> **Single-Family Business . . . .**
>
> Our conventional single-family mortgage credit book of business remained relatively strong from 2004 to 2006. We believe that our assessment and approach to the management of credit risk during these years allowed us to maintain a conventional single-family mortgage credit book of business with strong credit risk characteristics as evidenced by our credit losses, which remained low during the three-year period from 2004 to 2006.  We are focused on . . . providing more flexible mortgage options, including Alt-A and subprime products, which have represented an increased proportion of mortgage originations in recent years. We have increased our participation in these types of products where we have concluded that it would be economically advantageous and/or that it would contribute to our mission objectives. Our participation in these products reflects our assessment of anticipated guaranty fee income in light of our expectation for potentially higher credit losses. We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types. Our assessment of these dynamics will continue to determine the timing and level of our acquisitions of these types of mortgage products . . . .
>
> **Capital Markets Group . . .**
>
> The Capital Markets group continues to seek ways to maximize long-term total returns while fulfilling our chartered liquidity function . . . In an effort to gain

better returns, we have acquired new products for which we have been attractively compensated for the risk assumed. We will continue to seek out these beneficial opportunities in the future. . . .

**Credit Risk Management**

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk.  The degree of credit risk to which we are exposed will vary based on many factors, including the risk profile of the borrower or counterparty, the contractual terms of the agreement, the amount of the transaction, repayment sources, the availability and quality of collateral and other factors relevant to current market conditions, events and expectations. We evaluate these factors and actively manage, on an aggregate basis, the extent and nature of the credit risk we bear, with the objective of ensuring that we are adequately compensated for the credit risk we take, consistent with our mission goals . . . .

*Acquisition Policy and Standards*

We use proprietary models and analytical tools to price and measure credit risk at acquisition. Our loan underwriting and eligibility guidelines are intended to provide a comprehensive analysis of borrowers and mortgage loans based upon known risk characteristics. The underwriting of single-family mortgage loans primarily focuses on an evaluation of the borrower's creditworthiness and ability to repay the loan based on the value of the property and LTV ratio, the loan purpose and the loan product features . . . Our guidelines for both types of loans require a comprehensive analysis of the property value, the LTV ratio, the local market, and the borrower and their investment in the property . . . .

697.    These statements were untrue statements of material facts for the reasons set forth in ¶ 684(a)-(f).

698.    The 2006 Annual Report included the following statements concerning Fannie's chief risk office:

**RISK MANAGEMENT . . . .**

*Chief Risk Office*
The Chief Risk Office is an independent risk oversight organization with responsibility for oversight of credit risk, market risk, operational risk and liquidity risk. The Chief Risk Officer is responsible for establishing our overall risk governance structure and providing independent evaluation and oversight of our risk management activities. In 2006 and 2007, we centralized oversight of our business continuity efforts, information security programs, corporate insurance

program and SOX Finance Team under our Operational Risk Oversight function within the Chief Risk Office to further strengthen our existing operational risk programs. . . .

699.    These statements were untrue statements of material fact because Fannie

materially reduced the Chief Risk Officer's budget and staff.

700.    The 2006 Annual Report included the following statements concerning Fannie's

credit loss sensitivities:

We use internally developed models to assess our sensitivity to credit losses based on current data on home values, borrower payment patterns, non-mortgage consumer credit history and management's economic outlook. We examine a range of potential economic scenarios to monitor the sensitivity of credit losses. Our models indicate that home price movements are an important predictor of credit performance. We disclose on a quarterly basis the estimated impact on our expected credit losses from an immediate 5% decline in single-family home prices for the entire United States, which we believe is a stressful scenario based on housing data from OFHEO. Historical statistics from OFHEO's house price index reports indicate the national average rate of home price appreciation over the last 20 years has been about 5.3%, while the lowest national average annual appreciation rate in any single year has been 0.3%. However, we believe that the decline in home prices in 2007 is likely to continue.

701.    These statements were untrue statements of material facts for the reasons set forth

above in ¶ 684(a)-(b) and (f).

702.    The 2006 Annual Report included certifications pursuant to the Sarbanes-Oxley

Act of 2002 ("SOX Certifications") signed by Mudd and Blakely.  The SOX Certifications

stated, in part, the following:

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

209

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

703.    The SOX Certifications contained untrue statements of material facts for the reasons set forth in ¶ 684 (b) and (f) and because Fannie materially understated combined *loss reserves* and materially overstated core capital.

**b.      10-Q For The Periods Ended March 31, June 30 and September 30, 2007**

704.      On November 9, 2007, the Securities Act Officer Defendants caused Fannie to file the First Quarter 2007 10-Q with the SEC.  The First Quarter 2007 10-Q set forth Fannie's financial results and financial condition for the first quarter of 2007 and was signed by Mudd and Swad.

705.      The First Quarter 2007 10-Q stated that as of March 31, 2007, Fannie reported $930 million in combined *loss reserves*, *deferred tax assets* of $8.6 billion and core capital of $41.71 billion.

706.      These statements were false and misleading because as alleged in ¶¶ 676-83, in violation of GAAP, Fannie materially understated combined loss reserves, materially overstated *deferred tax assets* and materially overstated core capital.

707.      The First Quarter 2007 10-Q stated the following concerning Fannie's exposure to subprime mortgages:

> Subprime loans: … Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages.  In order to respond to the current subprime mortgage crisis and provide liquidity to the market, we intend to increase our purchase of subprime mortgages.  We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.

708.      These statements were untrue statements of material facts for the reasons set forth in ¶ 684(a)-(f).

709.      The First Quarter 2007 10-Q stated the following concerning Fannie's financial statements for the period ended March 31, 2007:

*Basis of Presentation*

The accompanying condensed consolidated financial statements have been prepared in accordance with GAAP for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by GAAP for complete consolidated financial statements. In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included.

710.    These statements were untrue statements of material fact because as alleged in ¶¶ 676-83, in violation of GAAP, Fannie materially understated combined *loss reserves*, overstated *deferred tax assets*, understated *other than temporary impairment*s to the fair value of its *available-for-sale* assets and overstated core capital.

711.    The First Quarter 2007 10-Q included SOX Certifications signed by Mudd and Swad that were substantially the same as the SOX Certifications alleged in ¶ 702.

712.    The SOX Certifications contained untrue statements of material facts for the reasons set forth in ¶ 703.

713.    Also on November 9, 2007, the Securities Act Officer Defendants caused Fannie to file the Second Quarter 2007 10-Q with the SEC. The Second Quarter 2007 10-Q was signed by Mudd and Swad.

714.    The Second Quarter 2007 10-Q stated that as of June 30, 2007, Fannie reported combined loss reserves of $1.158 billion, *deferred tax assets* of $11.6 billion and core capital of $42.69 billion.

715.    These statements were false and misleading because as alleged in ¶¶ 676-83, in violation of GAAP, Fannie materially understated combined loss reserves, materially overstated *deferred tax assets* and materially overstated core capital.

716.    The Second Quarter 2007 stated the following concerning Fannie's exposure to

subprime and Alt-A mortgages:

> *Subprime Loans:* . . .  Approximately 0.2% of our total single-family mortgage
> credit book of business as of June 30, 2007 consisted of subprime mortgage loans
> or Fannie Mae MBS backed by subprime mortgage loans.  This percentage
> increased to approximately 0.3% as of September 30, 2007.  Less than 1% of our
> single-family business volume for the nine months ended September 30, 2007
> consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime
> mortgage loans.  Our acquisitions of subprime mortgage loans have a combination
> of credit enhancement and pricing that we believe adequately reflects the higher
> credit risk posed by these mortgages.  In order to respond to the current subprime
> mortgage crisis and provide liquidity to the market, we intend to increase our
> purchase of subprime mortgages.  We will determine the timing and level of our
> acquisition of subprime mortgage loans in the future based on our assessment of
> the availability and cost of credit enhancement with adequate levels of pricing to
> compensate for the risks.
>
> *Alt-A and Subprime Securities:*
>
> We have not recorded any impairment of the securities classified as *available-for-
> sale*, as they continue to be rated investment grade and we have the intent and
> ability to hold these securities until the earlier of recovery of the unrealized loss
> amounts or maturity.  As of November 8, 2007, all of our private-label mortgage-
> related securities backed by Alt-A mortgage loans were rated AAA and none had
> been downgraded or placed under review for possible downgrade.

717.    These statements were untrue statements of material facts for the reasons set forth

in ¶ 684(a)-(f).

718.    The Second Quarter 2007 10-Q stated the following concerning Fannie's financial

statements:

> The accompanying condensed consolidated financial statements have been
> prepared in accordance with GAAP for interim financial information and with the
> SEC's instructions to Form 10-Q and Article 10 of Regulation S-X.  Accordingly,
> they do not include all of the information and footnotes required by GAAP for
> complete consolidated financial statements.  In the opinion of management, all
> adjustments of a normal recurring nature considered necessary for a fair
> presentation have been included.

719.    These statements were untrue statements of material facts for the reasons set forth

in ¶¶ 676-83.

720.     The Second Quarter 2007 10-Q included SOX Certifications signed by Mudd and Swad that were substantially the same as the SOX Certifications alleged in ¶ 702.

721.     The SOX Certifications contained untrue statements of material facts for the reasons set forth in ¶ 703.

722.     Also on November 9, 2007, the Securities Act Officer Defendants caused Fannie to file its Third Quarter 2007 Form 10-Q with the SEC.  The Third Quarter 2007 10-Q was signed by Mudd and Swad.

723.     The Third Quarter 2007 Form 10-Q stated that as of September 30, 2007, Fannie reported combined loss reserves of $1.407 billion, *deferred tax assets* of $9.9 billion, *other than temporary impairment*s of $84 million and core capital of $41.713 billion.

724.     These statements were false and misleading because as alleged in ¶¶ 676-83, in violation of GAAP, Fannie materially understated combined *loss reserves*, materially overstated *deferred tax assets*, understated other than temporary losses and materially overstated core capital.

725.     The Third Quarter 2007 10-Q stated the following concerning Fannie's core capital:

> We continue to maintain a strong capital position, and our access to sources of liquidity has been adequate to meet our funding needs.  If these market and economic conditions continue, we may take actions to ensure that we meet our regulatory capital requirements, including forgoing some business opportunities, selling assets or issuing additional preferred equity securities.

726.     These statements were untrue statements of material facts because as alleged in ¶¶ 676-83, by the end of the quarter ended September 30, 2007, Fannie core capital was materially overstated.

727.    The Third Quarter 2007 10-Q stated that "Our acquisitions of Alt-A mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages."

728.    This statement was an untrue statement of material fact because the Company had acquired Alt-A for which it negligently failed to charge loan originators an adequate guarantee fee to compensate Fannie for the increased credit risk.

729.    The Third Quarter 2007 10-Q stated the following concerning Fannie's exposure to subprime and Alt-A mortgages:

> *Subprime Loans:*  . . .  Approximately 0.3% of our total single-family mortgage credit book of business as of September 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans.  Less than 1% of our single-family business volume for the nine months ended September 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans.  Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages.  In order to respond to the current subprime mortgage crisis and provide liquidity to the market, we intend to increase our purchase of subprime mortgages.  We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.

> *Alt-A and Subprime Securities:*

> In 2007, we began to acquire a limited amount of subprime-backed private-label mortgage-related securities of investment grades below AAA.  As of September 30, 2007, approximately $441 million in unpaid principal balance, or 1%, of the subprime-backed private-label mortgage-related securities in our portfolio had a credit rating of less than AAA.  All of these subprime-backed mortgage-related securities with a credit rating of less than AAA were classified as trading securities in our condensed consolidated balance sheets as of September 30, 2007.

> We have not recorded any impairment of the securities classified as *available-for-sale*, as they continue to be rated investment grade and we have the intent and ability to hold these securities until the earlier of recovery of the unrealized loss amounts or maturity.

*      *      *

We invest in private-label mortgage-related securities that are backed by Alt-A and subprime mortgage loans. In October 2007, Standard & Poor's downgraded the credit ratings of a small number of private-label securities held in our portfolio that are backed by subprime mortgage loans, and Moody's placed under review for possible downgrade several additional subprime-backed private-label securities held in our portfolio. In recent months, mortgage loan delinquencies and credit losses generally have increased, particularly in the subprime and Alt-A sectors. In addition, home prices in many states have declined, after extended periods during which home prices appreciated. If delinquency and loss rates on subprime and Alt-A mortgages continue to increase, or there is a further decline in home prices, we could experience reduced yields or losses on our investments in private-label mortgage-related securities backed by subprime or Alt-A loans. In addition, the fair value of these investments may be adversely affected. A reduction in the fair value of these investments could negatively affect our earnings and financial condition.

(Emphasis added.)

730. These statements were untrue statements of material facts for the reasons set forth in ¶ 684(a)-(f).

731. The Third Quarter 2007 10-Q stated the following concerning Fannie's institutional counterparty credit risk management:

Institutional counterparty risk is the risk that institutional counterparties may be unable to fulfill their contractual obligations to us. Our primary exposure to institutional counterparty risk exists with our lending partners and servicers, mortgage insurers, dealers who distribute our debt securities or who commit to sell mortgage pools or loans, issuers of investments included in our liquid investment portfolio, and derivatives counterparties.

\*       \*       \*

***Our potential exposure to the risks associated with our dependence on the institutional counterparties to provide services that are critical to our business has increased in recent months, and our earnings and liquidity may be reduced if one or more of our institutional counterparties defaults on its obligations to us.***

Our primary exposure to institutional counterparty risk is with our mortgage insurers, mortgage servicers, lender customers, depository institutions, dealers that commit to sell mortgage pools or loans to us, issuers of investments held in our liquid investment portfolio, and derivatives counterparties. Our business with many of these institutional counterparties is heavily concentrated…. [A]s of

> September 30, 2007, our ten largest single-family mortgage servicers and their affiliates serviced 78% of our single-family mortgage credit book of business, and Countrywide Financial Corporation and its affiliates, which is our largest single-family mortgage servicer, serviced 23% of our single-family mortgage credit book of business.

(Emphasis added.)

732.    These statements were untrue statements of material facts because Fannie had material difficulties concerning its management of counterparty risk.

733.    The Third Quarter 2007 10-Q stated the following concerning Fannie's credit loss sensitivities:

> Pursuant to our September 1, 2005 agreement with OFHEO, we agreed to disclose on a quarterly basis the estimated impact on our expected credit losses from an immediate 5% decline in single-family home prices for the entire United States, which we believe is a stressful scenario based on housing data from OFHEO.

734.    These statements were untrue statements of material facts for the reasons set forth in ¶ 684(a)-(c).

735.    The Third Quarter 2007 10-Q stated the following concerning Fannie's financial statements:

> The accompanying condensed consolidated financial statements have been prepared in accordance with GAAP for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X.  Accordingly, they do not include all of the information and footnotes required by GAAP for complete consolidated financial statements.  In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included.

736.    These statements were untrue statements of material fact because as alleged in ¶¶ 676-83, in violation of GAAP, Fannie materially understated combined loss reserves, overstated *deferred tax assets*, understated *other than temporary impairment*s to the fair value of its *available-for-sale* assets and overstated core capital.

737.    The Third Quarter 2007 10-Q included SOX Certifications signed by Mudd and Swad that contained substantially the same statements as in ¶ 702.

738.    These statements were untrue statements of material fact for the reasons set forth above in ¶¶ 703.

**2.    Series S Preferred Stock Offering**

739.    On December 6, 2007, Fannie disseminated the Series S Offering Circular, by means of which Fannie sold 280 million shares of Series S Preferred Stock.

740.    Fannie was the issuer of the Series S Preferred Stock, and BofA, Bear Stearns, Citigroup, Deutsche, Goldman, J.P. Morgan, Merrill Lynch, Morgan Stanley and UBS were the underwriters.

741.    The Series S Preferred Stock offering raised $7 billion.  After underwriting commissions, Fannie realized $6.93 billion.

742.    The Series S Offering Circular  among other things incorporated by reference Fannie's Form 10-K for the year ended December 31, 2006, and Forms 10-Q for the quarters ended March 31, 2007, June 30, 2007, and September 30, 2007, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

743.    The statements in the Series S Offering Circular alleged to be materially untrue and the reasons they are alleged to be false are set forth in ¶¶ 689-738.

**3.    Series 2008-1 Preferred Stock Offering**

744.    On May 8, 2008, Fannie disseminated the Series 2008-1 Offering Circular, by means of which Fannie sold 45 million shares of Series 2008-1 Preferred Stock.  By May 14, 2008, the underwriters of the Series 2008-1 Preferred Stock offering exercised their over-

allotment option and Fannie issued an additional 6.75 million shares of Series 2008-1 Preferred Stock.

745.    Fannie was the issuer of the Series 2008-1 Preferred Stock, and BofA, Goldman, J.P. Morgan, and Merrill Lynch were the underwriters.

746.    The Series 2008-1 Preferred Stock offering raised $2.5875 billion.  After underwriting commissions, Fannie realized approximately $2.523 billion.

747.    The Series 2008-1 Offering Circular among other things incorporated by reference Fannie's Form 10-K for the year ended December 31, 2007, and Form 10-Q for the quarter ended March 31, 2008, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

### 4.    Common Stock Offering

748.    On May 8, 2008, Fannie disseminated the May 8, 2008 Common Stock Offering Circular, by means of which Fannie sold 82 million shares of common stock.  By May 14, 2008, the underwriters of the May 8, 2008 common stock offering exercised their over-allotment option and Fannie issued an additional 12.3 million shares of common stock.

749.    Fannie was the issuer of the common stock, and Citigroup, Goldman, J.P. Morgan, and Morgan Stanley were the underwriters.

750.    The May 8, 2008 common stock offering raised $ 2.593 billion.  After underwriting commissions, Fannie realized approximately $2.528 billion.

751.    The May 8, 2008 Common Stock Offering Circular among other things incorporated by reference Fannie's Form 10-K for the year ended December 31, 2007, and Form 10-Q for the quarter ended March 31, 2008, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

a.      **2007 10-K**

752.     On February 27, 2008, the Securities Act Officer Defendants caused Fannie to file its 2007 10-K.  The Annual Report was signed by Mudd, Swad and Hisey.

753.     The 2007 10-K stated that as of December 31, 2007, Fannie reported combined loss reserves of $3.391 billion, *deferred tax assets* of $8.367 billion, *other than temporary impairment*s of $727 million and core capital of $45.373 billion.

754.     These statements were false and misleading because as alleged in ¶¶ 676-83, in violation of GAAP, Fannie materially understated combined *loss reserves*, materially overstated *deferred tax assets*, materially understated other than temporary losses and materially overstated core capital.

755.     The 2007 10-K included the following statements concerning Fannie's capital:

In order to continue to meet our statutory and OFHEO-directed minimum capital requirements, we may be required to take actions, or refrain from taking actions, to ensure that we maintain or increase our core capital.

*      *      *

Our principal strategy for responding to the current challenging market conditions is to prudently manage and preserve our capital, while building a solid mortgage credit book of business and continuing to fulfill our chartered mission of providing liquidity, stability and affordability to the secondary mortgage market. We identify below a number of the steps we have taken and are taking to achieve that strategy.

***Managing and Preserving Capital***

During the second half of 2007, our business activities were constrained by our need to maintain regulatory capital at required levels. We took steps to bolster our regulatory capital position during the second half of 2007 by:
• issuing preferred stock totaling $8.9 billion;
• announcing a 30% reduction in our common stock dividend effective for the first quarter of 2008;
• managing the size of our investment portfolio; and
• limiting or forgoing business opportunities that we otherwise would have pursued.

*        *        *

In addition, our total capital was $48.7 billion as of December 31, 2007, a surplus of $24.0 billion, or 97%, over our estimated statutory-risk based capital requirement of $24.7 billion for the period. Our total capital was $42.7 billion as of December 31, 2006, a surplus of $15.8 billion, or 58.9%, over our statutory risk-based capital requirement of $26.9 billion for the period.

*        *        *

We expect the downturn in the housing market and the disruption in the mortgage and credit markets to continue to negatively affect our earnings in 2008, and therefore to continue to negatively affect the amount of our core capital. We believe we will maintain a sufficient amount of core capital to continue to meet our statutory and OFHEO-directed minimum capital requirements through 2008.

756.    These statements were untrue statements of material facts because as alleged in ¶¶ 676-83, the Securities Act Defendants misstated and/or failed to disclose that Fannie's core capital was materially overstated and as a result did not meet Fannie's statutory and OFHEO-directed minimum capital requirements.

757.    The 2007 10-K included the following statements concerning Fannie's *deferred tax assets*:

***We must evaluate our ability to realize the tax benefits associated with our deferred tax assets quarterly. In the future, we may be required to record a material expense to establish a valuation allowance against our deferred tax assets, which likely would materially adversely affect our earnings, financial condition and capital position.***

As of December 31, 2007, we had approximately $13.0 billion in net deferred tax assets on our consolidated balance sheet that we must evaluate for realization on a quarterly basis under Statement of Financial Accounting Standards ("SFAS") No. 109, Accounting for Income Taxes ("SFAS 109"). Deferred tax assets refer to assets on our consolidated balance sheets that relate to amounts that may be used to reduce any subsequent period's income tax expense. Consequently, our ability to use these deferred tax assets in future periods depends on our ability to generate sufficient taxable income in the future.

If, in a future period, negative evidence regarding our ability to realize our deferred tax assets (such as a reduction in our projected future taxable income) outweighed positive evidence, we could be required to record a material expense to establish a valuation allowance against our deferred tax assets at that time.

221

Recording a material expense of this type would likely have a material adverse effect on our earnings, financial condition and capital position.

*        *        *

We recorded net deferred tax assets of $13.0 billion and $8.5 billion as of December 31, 2007 and 2006, respectively, arising to a large extent from differences in the timing of the recognition of derivatives fair value gains and losses for financial statement and income tax purposes. We currently have not recorded a valuation allowance against our net deferred tax assets as we anticipate it is more likely than not that the results of future operations will generate sufficient taxable income to allow us to realize the entire tax benefit. If we continue to experience losses or sustained significant decreases in our earnings, we may not be able to realize all of our deferred tax assets, which would require that we establish a valuation allowance that could materially adversely affect our earnings, financial condition and capital position.

758.    These statements were untrue statements of material facts because as alleged in ¶¶ 676-83, Fannie's *deferred tax assets* were materially overstated.

759.    The 2007 10-K included the following statements concerning Fannie's credit risk management:

> ***Building a Solid Mortgage Credit Book of Business by Managing and Mitigating Credit Exposure***
> We have implemented a variety of measures designed to help us manage and mitigate the credit exposure we face as a result of our investment and guarantee activities. These measures include:
> • establishing guidelines designed to limit our credit exposure, including tightening our eligibility standards for mortgage loans we acquire;
> • limiting losses associated with our guaranty contracts by increasing our guaranty fees and implementing an adverse market delivery charge to compensate us for the added risk we incur during this period of increased market uncertainty; and
> • working to mitigate realized credit losses, both by working closely with our servicers to enhance our ability to act promptly when borrowers fall behind on their loan payments and by offering an expanded array of loss mitigation alternatives.
>
> *        *        *
>
> We closely monitor housing and economic market conditions and loan performance to manage and evaluate our credit risks, adjusting our eligibility requirements and pricing as necessary to ensure that we are appropriately compensated for risk . . . .

*Underwriting Standards:* We use proprietary models and analytical tools to price and measure credit risk at acquisition. Our loan underwriting and eligibility guidelines are intended to provide a comprehensive analysis of borrowers and mortgage loans based upon known risk characteristics. Lenders generally represent and warrant that they have complied with both our underwriting and asset acquisition requirements when they sell us mortgage loans, when they request securitization of their loans into Fannie Mae MBS or when they request that we provide credit enhancement in connection with an affordable housing bond transaction. We have policies and various quality assurance procedures that we use to review a sample of loans to assess compliance with our underwriting and eligibility criteria. If we identify underwriting or eligibility deficiencies, we may take a variety of actions, including increasing the lender credit loss sharing or requiring the lender to repurchase the loan, depending on the severity of the issues identified.

760.    These statements were untrue statements of material facts for the reasons set forth in ¶ 684(a)-(d) and (f) and because Fannie negligently failed to follow risk management guidelines for Countrywide.

761.    The 2007 10-K also stated the following concerning Fannie's Alt-A loans and related securities:

Alt-A mortgage loans, whether held in our portfolio or backing Fannie Mae MBS, represented approximately 16% of our single-family business volume in 2007, compared with approximately 22% and 16% in 2006 and 2005, respectively. During 2007, private-label securitization of Alt-A loans significantly decreased and Fannie Mae assumed a larger role in acquiring Alt-A mortgage loans; however, the actual amount of our acquisitions of Alt-A loans decreased in 2007 from 2006. In order to manage our credit risk in the shifting market environment, we lowered maximum allowable LTV ratios and increased minimum allowable credit scores for most Alt-A loan categories. We also limited our acquisition of some documentation types and made other types ineligible for delivery to us. Finally, we implemented pricing increases to reflect the higher credit risk posed by these mortgages. As a result of these eligibility restrictions and price increases, we believe that our volume of Alt-A mortgage loan acquisitions will decline in future periods.

We estimate that Alt-A mortgage loans held in our portfolio or Alt-A mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by Alt-A mortgage loans, represented approximately 12% of our total single-family mortgage credit book of business as of December 31, 2007, compared with approximately 11% and 8% as of December 31, 2006 and 2005, respectively. The majority of our Alt-A mortgage loans are fixed-rate, and the weighted average credit score of borrowers under our Alt-A mortgage

loans is comparable to that of our overall single-family mortgage credit book of business.

762.    The 2007 10-K made the following statements about Fannie's exposure to

subprime mortgage:

> Subprime mortgage loans, whether held in our portfolio or backing Fannie Mae MBS, represented less than 1% of our single-family business volume in each of 2007, 2006 and 2005. Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages. We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.

> We estimate that subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by subprime mortgage loans, represented approximately 0.3% of our total single-family mortgage credit book of business as of December 31, 2007, compared with 0.2% and 0.1% as of December 31, 2006 and 2005, respectively.

763.    The statements in ¶¶ 761-62 were untrue statements of material facts for the

reasons set forth in ¶¶ 684(a)-(f).

764.    The 2007 Annual Report included the following statements concerning Fannie's

credit loss sensitivities:

> We use internally developed models to assess our sensitivity to credit losses based on current data on home values, borrower payment patterns, non-mortgage consumer credit history and management's economic outlook. We also review and compare publicly available credit loss analyses and predictions. We examine a range of potential economic scenarios to monitor the sensitivity of credit losses. Our models indicate that home price movements are an important predictor of credit performance. Due to the continued housing market downturn and our expectation that home prices will decline further in 2008, we expect a significant increase in our credit-related expenses and credit loss ratio.

> Pursuant to our September 2005 agreement with OFHEO, we disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. For purposes of this calculation, we assume that, after the initial 5% shock, home price growth rates return to the average of the possible growth rate paths used in our internal

credit pricing models. The present value change reflects the increase in future expected credit losses under this scenario, which we believe represents a reasonably high stress scenario because it assumes an instantaneous nationwide decline in home prices, over the future expected credit losses generated by our internal credit pricing models without this shock.

765.    These statements were untrue statements of material facts because the Securities Act Defendants misrepresented and/or failed to disclose the facts set forth in ¶ 684(a)-(c).

766.    The 2007 10-K included SOX Certifications signed by Mudd and Swad that were substantially the same as set forth above at ¶ 702.

767.    These statements were materially untrue statements of material facts for the reasons set forth in ¶ 703.

### b.    First Quarter 2008 10-Q

768.    On May 6, 2008, the Securities Act Officer Defendants caused Fannie to file its quarterly report for the period ended March 31, 2008 (the "First Quarter 2008 10-Q"). The First Quarter 2008 10-Q was signed by Mudd and Swad.

769.    The First Quarter 2008 10-Q stated that as of March 31, 2008 Fannie reported combined loss reserves of $5.195 billion, *deferred tax assets* of $17.806 billion, *other than temporary impairment*s of $55 million and core capital of $42.676 billion.

770.    These statements were false and misleading because as alleged in ¶¶ 676-83, in violation of GAAP, Fannie materially understated combined *loss reserves*, materially overstated *deferred tax assets*, materially understated other than temporary losses and materially overstated core capital.

771.    The First Quarter 2008 10-Q stated the following concerning Fannie's capital:

***Preserving and Building Capital***
We intend to continue to take aggressive management actions to preserve and further build our capital. OFHEO's reduction of the capital surplus requirement

will facilitate our capital management efforts and enhance our ability to provide additional liquidity and stability to the secondary mortgage market.

\*       \*       \*

We took several capital management actions to ensure compliance with our regulatory capital requirements during the first quarter of 2008, including: managing the size of our investment portfolio; selling assets to reduce the amount of capital that we were required to hold and to realize investment gains; and reducing our common stock dividend. We also elected not to take advantage of some opportunities to purchase mortgage assets at attractive prices and made other changes to our business practices to reduce our losses and expenses during the first quarter of 2008.

\*       \*       \*

We continue to carefully monitor the current volatile market conditions to determine the impact of these conditions on the amount of our available capital and our capital management goals. We may take a variety of actions in addition to those described above to further preserve and build our capital, including: issuing additional preferred, convertible preferred or common stock; further reducing or eliminating our common stock dividend; forgoing purchase and guaranty opportunities; reducing the size of our investment portfolio through liquidations or by selling assets; changing our current business practices to reduce our losses and expenses; and reclassifying a portion of our investment securities from held for trading to available-for-sale.

772.    These statements were untrue statements of material fact because as alleged in ¶¶ 676-83, Fannie materially overstated its core capital.

773.    The First Quarter 2008 10-Q stated the following concerning Fannie's subprime and Alt-A securities:

To date, the credit downgrades of our Alt-A and subprime securities classified as AFS have not resulted in our recognizing significant other-than-temporary writedowns on these securities. As of March 31, 2008, we had recognized cumulative other-than-temporary impairment totaling $222 million on our investments in Alt-A and subprime securities, of which $52 million was recognized in the first quarter of 2008. Although we consider recent external rating agency actions or changes in a security's external credit rating as one criterion in our assessment of other-than-temporary impairment, a rating action alone is not necessarily indicative of other-than-temporary impairment.

774.     These statements were untrue statements of material facts for the reasons set forth in ¶¶ 676-83, and Fannie's other than temporary impairments were materially understated.

775.     The First Quarter 2008 10-Q stated the following concerning Fannie's credit loss sensitivity:

> Pursuant to our September 2005 agreement with OFHEO, we disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. Table 17 shows for first lien single-family whole loans we own or that back Fannie Mae MBS as of March 31, 2008 and December 31, 2007, the credit loss sensitivity results before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancement. The increase of $625 million in the net credit loss sensitivity to $5.2 billion as of March 31, 2008, from $4.5 billion as of December 31, 2007 was primarily attributable to the continued decline in home prices during the first quarter of 2008.

776.     These statements were untrue statements of material facts because for the reasons set forth in ¶ 684(a)-(c).

777.     The First Quarter 2008 10-Q included SOX Certifications signed by Mudd and Swad that were substantially the same as these alleged in ¶ 702.

778.     These statements were untrue statements of material facts because for the reasons set forth in ¶ 703.

**5.     Series T Preferred Stock Offering**

779.     On May 13, 2008, Fannie disseminated the Series T Offering Circular, by mean of which Fannie sold 80 million shares of Series T Preferred Stock.  On May 22, 2008 and on June 4, 2008, the underwriters of the Series T Preferred Stock offering exercised their over-allotment option and Fannie issued an additional 8 million shares and 1 million shares, respectively, of Series T Preferred Stock.

780.    Fannie was the issuer of the Series T Preferred Stock, and BofA, Barclays, Citigroup, Deutsche, E*Trade, Goldman, Merrill Lynch, Morgan Stanley, UBS, Wachovia Capital, Wachovia Securities and Wells Fargo were the underwriters.

781.    The Series T Preferred Stock offering raised $2.225 billion.  After underwriting commissions, Fannie realized approximately $2.165 billion.

782.    The Series T Offering Circular incorporated by reference Fannie's Form 10-K for the year ended December 31, 2007, and Form 10-Q for the quarter ended March 31, 2008, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

783.    The statements in the Series T Offering Circular alleged to be materially untrue and the reasons they are alleged to be false are set forth in ¶¶ 752-777.

## E.    Fannie's Violation of GAAP

784.    Fannie's financial statements were materially untrue due to their failure to comply with GAAP, which are those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

785.    As alleged herein, Securities Act Defendants negligently failed to properly account for the increased credit risk inherent in the portfolio and resultant estimated credit losses. Fannie overstated the value of its *deferred tax assets*, understated its loss reserves, failed to recognize adequate amounts of *available-for-sale* investments as other than temporarily impaired and materially overstated its core capital.

786.    Fannie's financial results and statements violated at least the following provisions of GAAP:

a.    The principle that loan impairments be recognized when it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the agreement (Statement of Financial Accounting Standards ("SFAS") No. 114);

b.    The principle that loan loss reserves recognize credit losses when it is probable that a loss has been incurred and the amount can be reasonably estimated (SFAS No. 5);

c.    The principle that as soon as it becomes "more likely than not" that future income would not be large enough to allow a company to realize all of the deferred tax assets, the company is required to record a valuation allowance to reduce the size of those assets on its balance sheet (SFAS No. 109);

d.    The principle that where it is judged that a decline in value of an asset is other than temporary, a write-down of the asset to fair market value is required and the amount of the write-down is required to be recorded in earnings as realized losses (SFAS 115);

e.    The principle that decreases in future cash flows expected to be collected on certain loans or debt securities transfers be recognized as impairments (American Institute of Certified Public Accountant's Statement of Position ("SOP") 03-3);

f.   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

g.   The concept that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions (Concepts Statement No. 1, ¶34);

h.   The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

i.   The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

j.   The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about past performance to help assess the prospects for an enterprise. Although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are

commonly based, at least partly, on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

k.   The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

l.   The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

m.   The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (Concepts Statement No. 2, ¶¶ 95, 97).

787.   As set forth above in ¶¶ 676-83, Fannie was required to maintain capital levels that were at least as high as certain regulatory minimums.  Specifically, Fannie had to meet a statutory *minimum capital requirement*, calculated as a percentage of shareholder's equity, and *OFHEO-directed minimum capital*, calculated as a percentage over the statutory minimum capital.  Because Fannie's loss reserves and loan assets were understated and deferred tax assets were overstated, its core capital was materially overstated.

## XV.   SECURITIES ACT COUNTS

### COUNT IV
**(For Violation of Section 12(a)(2) of the Securities Act, against Fannie, Bear Stearns, and Morgan Stanley, in connection with the Series R Preferred Stock Offering)**

788.   Lead Plaintiff TCRS repeats and realleges the allegations above at ¶¶ 1-2 as they pertain to the Securities Act and starting at ¶ 640, as if set forth herein.  For purposes of this claim, Lead Plaintiff TCRS expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

789.   This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of all purchasers of Fannie 7.625% Non-Cumulative Preferred Stock, Series R, against Fannie, Bear Stearns, and Morgan Stanley in connection with the November 16, 2007 offering.

790.   Fannie was a seller, offeror and/or solicitor of sales of the 7.625% Non-Cumulative Preferred Stock, Series R offered by means of the November 16, 2007 Offering Circular, a prospectus within the meaning of the statute, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

791.   Bear Stearns, and Morgan Stanley were underwriters of the November 16, 2007 offering.  As underwriters of the November 16, 2007 offering, Bear Stearns, and Morgan Stanley offered or sold stock to the investing public.

792.   Fannie, Bear Stearns, and Morgan Stanley offered or sold the 7.625% Non-Cumulative Preferred Stock, Series R to members of the Preferred Class, by the use of means and instrumentalities of interstate commerce and/or the mails, by means of a prospectus, specifically the November 16, 2007 Offering Circular, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

793.     Members of the Preferred Class who purchased the 7.625% Non-Cumulative Preferred Stock, Series R in the November 16, 2007 offering have sustained damages as a result of the untrue statements of material facts and omissions in the November 16, 2007 Offering Circular, for which they hereby elect to rescind and tender their shares of Fannie securities to the Securities Act Defendants and the applicable Underwriter Defendants sued in this count in return for the consideration paid for securities with interest.

794.     This claim is brought within the applicable statute of limitations.

795.     By virtue of the foregoing, the defendants named in this count violated Section 12(a)(2) of the Securities Act.

## COUNT V
**(For Violation of Section 12(a)(2) of the Securities Act, against Fannie, BofA, Bear Stearns, Citigroup, Deutsche, Goldman, J.P. Morgan, Merrill Lynch, Morgan Stanley and UBS, in connection with the Series S Preferred Stock Offering)**

796.     Lead Plaintiff TCRS repeats and realleges the allegations above at ¶¶ 1-2 as they pertain to the Securities Act and starting at ¶ 640, as if set forth herein.  For purposes of this claim, Lead Plaintiff TCRS expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

797.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of all purchasers of Fannie 8.25% Fixed-To-Floating Rate Non-Cumulative Preferred Stock, Series S, against Fannie, BofA, Bear Stearns, Citigroup, Deutsche, Goldman, J.P. Morgan, Merrill Lynch, Morgan Stanley and UBS in connection with the December 6, 2007 offering.

798.     Fannie was a seller, offeror and/or solicitor of sales of the 8.25% Fixed-To-Floating Rate Non-Cumulative Preferred Stock, Series S offered by means of the December 6, 2007 Offering Circular, a prospectus within the meaning of the statute, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the

statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

799.    BofA, Bear Stearns, Citigroup, Deutsche, Goldman, J.P. Morgan, Merrill Lynch, Morgan Stanley and UBS were underwriters of the December 6, 2007 offering.  As underwriters of the December 6, 2007 offering, BofA, Bear Stearns, Citigroup, Deutsche, Goldman, J.P. Morgan, Merrill Lynch, Morgan Stanley and UBS offered or sold stock to the investing public.

800.    Fannie, BofA, Bear Stearns, Citigroup, Deutsche, Goldman, J.P. Morgan, Merrill Lynch, Morgan Stanley and UBS offered or sold the 8.25% Fixed-To-Floating Rate Non-Cumulative Preferred Stock, Series S to Lead Plaintiff TCRS and members of the Preferred Class, by the use of means and instrumentalities of interstate commerce and/or the mails, by means of a prospectus, specifically the December 6, 2007 Offering Circular, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

801.    Members of the Preferred Class who purchased the 8.25% Fixed-To-Floating Rate Non-Cumulative Preferred Stock, Series S in the December 6, 2007 offering have sustained damages as a result of the untrue statements of material facts and omissions in the December 6, 2007 Offering Circular, for which they hereby elect to rescind and tender their shares of Fannie securities to the Securities Act Defendants and the applicable Underwriter Defendants sued in this count in return for the consideration paid for securities with interest.

802.    This claim is brought within the applicable statute of limitations.

803.    By virtue of the foregoing, the defendants named in this count violated Section 12(a)(2) of the Securities Act.

**COUNT VI**

**(For Violation of Section 12(a)(2) of the Securities Act, against Fannie, BofA, Barclays, Citigroup, Deutsche, E*Trade, Goldman, Merrill Lynch, Morgan Stanley, UBS, Wachovia Capital, Wachovia Securities and Wells Fargo, in connection with the Series T Preferred Stock Offering)**

804.     Lead Plaintiff TCRS repeats and realleges the allegations above at ¶¶ 1-2 as they pertain to the Securities Act and starting at ¶ 640, as if set forth herein.  For purposes of this claim, Lead Plaintiff TCRS expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

805.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of all purchasers of Fannie 8.25% Non-Cumulative Preferred Stock, Series T, against Fannie, BofA, Barclays, Citigroup, Deutsche, E*Trade, Goldman, Merrill Lynch, Morgan Stanley, UBS, Wachovia Capital, Wachovia Securities and Wells Fargo in connection with the May 13, 2008 offering.

806.     Fannie was a seller, offeror and/or solicitor of sales of the 8.25% Non-Cumulative Preferred Stock, Series T offered by means of the May 13, 2008 Offering Circular, a prospectus within the meaning of the statute, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

807.     BofA, Barclays, Citigroup, Deutsche, E*Trade, Goldman, Merrill Lynch, Morgan Stanley, UBS, Wachovia Capital, Wachovia Securities and Wells Fargo were underwriters of the May 13, 2008 offering.  As underwriters of the May 13, 2008 offering, BofA, Barclays, Citigroup, Deutsche, E*Trade, Goldman, Merrill Lynch, Morgan Stanley, UBS, Wachovia Capital, Wachovia Securities and Wells Fargo offered or sold stock to the investing public.

808.     Fannie, BofA, Barclays, Citigroup, Deutsche, E*Trade, Goldman, Merrill Lynch, Morgan Stanley, UBS, Wachovia Capital, Wachovia Securities and Wells Fargo offered or sold

the 8.25% Non-Cumulative Preferred Stock, Series T to Lead Plaintiff TCRS and members of

the Preferred Class, by the use of means and instrumentalities of interstate commerce and/or the

mails, by means of a prospectus, specifically the May 13, 2008 Offering Circular, which

contained untrue statements of material fact or omitted to state material facts necessary in order

to make the statements, in light of the circumstances under which they were made, not

misleading.

809.    Members of the Preferred Class who purchased the 8.25% Non-Cumulative

Preferred Stock, Series T in the May 13, 2008 offering have sustained damages as a result of the

untrue statements of material facts and omissions in the May 13, 2008 Offering Circular, for

which they hereby elect to rescind and tender their shares of Fannie securities to the Securities

Act Defendants and the applicable Underwriter Defendants sued in this count in return for the

consideration paid for securities with interest.

810.    This claim is brought within the applicable statute of limitations.

811.    By virtue of the foregoing, the defendants named in this count violated Section

12(a)(2) of the Securities Act.

**COUNT VII**
**(For Violation of Section 12(a)(2) of the Securities Act, against Fannie, BofA, Goldman,**
**J.P. Morgan, and Merrill Lynch, in connection with the Series 2008-1 Preferred Stock**
**Offering)**

812.    Lead Plaintiff TCRS repeats and realleges the allegations above at ¶¶ 1-2 as they

pertain to the Securities Act and starting at ¶ 640, as if set forth herein.  For purposes of this

claim, Lead Plaintiff TCRS expressly excludes and disclaims any allegation that could be

construed as alleging or sounding in fraud or intentional or reckless misconduct.

813.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf

of all purchasers of Fannie 8.75% Non-Cumulative Mandatory Convertible Preferred Stock,

Series 2008-1, against Fannie, BofA, Goldman, J.P. Morgan, and Merrill Lynch in connection with the May 8, 2008 offering.

814.     Fannie was a seller, offeror and/or solicitor of sales of the 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 offered by means of the May 8, 2008 Offering Circular, a prospectus within the meaning of the statute, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

815.     BofA, Goldman, J.P. Morgan, and Merrill Lynch were underwriters of the May 8, 2008 offering.  As underwriters of the May 8, 2008 offering, BofA, Goldman, J.P. Morgan, and Merrill Lynch offered or sold stock to the investing public.

816.     Fannie, BofA, Goldman, J.P. Morgan, and Merrill Lynch offered or sold the 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 to members of the Preferred Class, by the use of means and instrumentalities of interstate commerce and/or the mails, by means of a prospectus, specifically the May 8, 2008 Offering Circular, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

817.     Members of the Preferred Class who purchased the 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 in the May 8, 2008 offering have sustained damages as a result of the untrue statements of material facts and omissions in the May 8, 2008 Offering Circular, for which they hereby elect to rescind and tender their shares of Fannie securities to the Securities Act Defendants and the applicable Underwriter Defendants sued in this count in return for the consideration paid for securities with interest.

818.   This claim is brought within the applicable statute of limitations.

819.   By virtue of the foregoing, the defendants named in this count violated Section 12(a)(2) of the Securities Act.

## COUNT VIII
### (For Violation of Section 12(a)(2) of the Securities Act, against Fannie, Citigroup, Goldman, J.P. Morgan, and Morgan Stanley, in connection with the Common Stock Offering)

820.   Lead Plaintiff TCRS repeats and realleges the allegations above at ¶¶ 1-2 as they pertain to the Securities Act and starting at ¶ 640, as if set forth herein.  For purposes of this claim, Lead Plaintiff TCRS expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

821.   This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of all purchasers of Fannie common stock, against Fannie, Citigroup, Goldman, J.P. Morgan, and Morgan Stanley in connection with the May 8, 2008 offering.

822.   Fannie was a seller, offeror and/or solicitor of sales of Fannie common stock offered by means of the May 8, 2008 Offering Circular, a prospectus within the meaning of the statute, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

823.   Citigroup, Goldman, J.P. Morgan, and Morgan Stanley were underwriters of the May 8, 2008 offering.  As underwriters of the May 8, 2008 offering, Citigroup, Goldman, J.P. Morgan, and Morgan Stanley offered or sold stock to the investing public.

824.   Fannie, Citigroup, Goldman, J.P. Morgan, and Morgan Stanley offered or sold the Fannie common stock to members of the Common Stock Class, by the use of means and instrumentalities of interstate commerce and/or the mails, by means of a prospectus, specifically

the May 8, 2008 Offering Circular, which contained untrue statements of material fact or omitted

to state material facts necessary in order to make the statements, in light of the circumstances

under which they were made, not misleading.

825.     Members of the Common Stock Class who purchased Fannie common stock in

the May 8, 2008 offering have sustained damages as a result of the untrue statements of material

facts and omissions in the May 8, 2008 Offering Circular, for which they hereby elect to rescind

and tender their shares of Fannie securities to the Securities Act Defendants and the applicable

Underwriter Defendants sued in this count in return for the consideration paid for securities with

interest.

826.     This claim is brought within the applicable statute of limitations.

827.     By virtue of the foregoing, the defendants named in this count violated Section

12(a)(2) of the Securities Act.

### COUNT IX
### (For Violation of Section 15 of the Securities Act, against the Securities Act Officer Defendants)

828.     Lead Plaintiff TCRS repeats and realleges the allegations above at ¶¶ 1-2 as they

pertain to the Securities Act and starting at ¶ 640, as if set forth herein.  For purposes of this

claim, Lead Plaintiff TCRS expressly excludes and disclaims any allegation that could be

construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is

based solely on negligence.

829.     This Count is brought pursuant to Section 15 of the Securities Act on behalf of

Lead Plaintiff TCRS and the Classes.

830.     At the time of each offering circular alleged to be untrue statements of material

facts, the Securities Act Officer Defendants participated in the operation of Fannie, and

conducted and participated, directly and indirectly, in the conduct of Fannie's business affairs.

831.    Because of their positions of control and authority over Fannie, and as senior officers of Fannie, the Securities Act Officer Defendants were able to, and did, control the contents of the offering circulars that contained materially untrue statements of material facts information.  The Securities Act Officer Defendants were therefore controlling persons of Defendant Fannie within the meaning of Section 15 of the Securities Act.

832.    The conduct of Fannie alleged herein constitutes violations of Section 12(a)(2) of the Securities Act.

833.    The Securities Act Officer Defendants are liable to the Lead Plaintiff and members of the Classes, jointly and severally with and to the same extent as Fannie for violations of Section 12(a)(2) of the Securities Act.

834.    Thus, the Securities Act Officer Defendants are liable under Section 15 as controlling persons for the underlying violations of Section 12(a)(2) by Fannie.

## XVI.    CLASS ACTION ALLEGATIONS FOR EXCHANGE ACT AND SECURITIES ACT COUNTS

835.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who, during the Class Period, purchased or acquired, either on the secondary market or through an original offering pursuant to a registration statement or prospectus: (a) Fannie common stock and options (the "Common Stock Class"); and (b) Fannie preferred stock during the Class Period (the "Preferred Class") (together, the "Classes").  The Massachusetts Public Pension Funds bring this action on behalf of the Common Stock Class, and TCRS brings the action on behalf of the Preferred Class. Excluded from the Classes are (i) Defendants; (ii) members of the immediate family of any defendant; (iii) any person who was an officer or director of Fannie or any of the Securities Act Underwriter Defendants (or any other underwriter of the offerings at issue in this class action)

during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any

defendant has or had a controlling interest; and (v) the legal representatives, agents, affiliates,

heirs, successors-in-interest or assigns of any such excluded party, including Deloitte.

836.    The members of the Common Stock Class are so numerous that joinder of all

members is impracticable.  The disposition of their claims in a class action will provide

substantial benefits to the parties and the Court.  As of October 30, 2006, there were 975,052,687

shares of Fannie common stock outstanding, and as of September 30, 2008, there were

1,076,207,174 shares of Fannie common stock outstanding.

837.    The members of the Preferred Class are so numerous that joinder of all members

is impracticable.  The disposition of their claims in a class action will provide substantial benefits

to the parties and the Court.  110,175,000 shares of preferred stock that were issued prior to the

Class Period were outstanding during that timeframe.[26]  496,950,000 shares of preferred stock

were issued during the Class Period and then had shares outstanding.[27]

---

[26]     Those shares are attributed to the specific series of offerings, as follows:

- 3,000,000 outstanding shares of 5.25% Non-Cumulative Preferred Stock, Series D ("Series D Preferred Stock");
- 3,000,000 outstanding shares of 5.10% Non-Cumulative Preferred Stock, Series E ("Series E Preferred Stock");
- 13,800,000 outstanding shares of Variable Rate Non-Cumulative Preferred Stock, Series F ("Series F Preferred Stock");
- 5,750,000 outstanding shares of Variable Rate Non-Cumulative Preferred Stock, Series G ("Series G Preferred Stock");
- 8,000,000 outstanding shares of 5.81% Non-Cumulative Preferred Stock, Series H ("Series H Preferred Stock");
- 6,000,000 outstanding shares of 5.375% Non-Cumulative Preferred Stock, Series I ("Series I Preferred Stock");
- 6,900,000 outstanding shares of 5.125% Non-Cumulative Preferred Stock, Series L ("Series L Preferred Stock");
- 9,200,000 outstanding shares of 4.75% Non-Cumulative Preferred Stock, Series M ("Series M Preferred Stock");
- 4,500,000 outstanding shares of 5.50% Non-Cumulative Preferred Stock, Series N ("Series N Preferred Stock");
- 50,000,000 outstanding shares of Non-Cumulative Preferred Stock, Series O ("Series O Preferred Stock"); and

838.     During the Class Period, the common stock, Series F Preferred Stock, Series G Preferred Stock, Series H Preferred Stock, Series I Preferred Stock, Series L Preferred Stock, Series M Preferred Stock, Series N Preferred Stock, Series P Preferred Stock, Series Q Preferred Stock, Series R Preferred Stock, Series S Preferred Stock, Series T Preferred Stock, and Series 2008-1 Preferred Stock actively traded on the New York Stock Exchange; Series D, Series E, Series 2004-1 and Series O traded over the counter.  These constitute efficient markets.  During the Class Period, Fannie was one of the largest companies in the world, with a market capitalization surpassing $40 billion.  Fannie was followed by securities analysts employed by major brokerage firms who wrote reports that were disseminated to the sales force and to certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

839.     Lead Plaintiffs' claims are typical of the claims of other members of the respective Classes.  Plaintiffs and the Classes purchased their securities through the offerings at issue, or on the open market, and they sustained damages from the Defendants' wrongful conduct.

---

- 25,000 outstanding shares of Non-Cumulative Convertible Series 2004-1 Preferred Stock ("Series 2004-1 Preferred Stock").

[27] Those shares are attributed to the specific series of offerings, as follows:

- 40,000,000 outstanding shares of Variable Rate Non-Cumulative Preferred Stock, Series P ("Series P Preferred Stock");
- 15,000,000 outstanding shares of 6.75% Rate Non-Cumulative Preferred Stock, Series Q ("Series Q Preferred Stock");
- 21,200,000 outstanding shares of 7.625% Non-Cumulative Preferred Stock, Series R ("Series R Preferred Stock");
- 280,000,000 outstanding shares of Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S ("Series S Preferred Stock");
- 89,000,000 outstanding shares of 8.25% Non-Cumulative Preferred Stock, Series T ("Series T Preferred Stock"); and
- 51,750,000 outstanding shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 ("Series 2008-1 Preferred Stock").

840.    Lead Plaintiffs will adequately protect the interests of the Classes, and they have retained counsel who are experienced in class action securities litigation.  Lead Plaintiffs have no interests that are contrary to or in conflict with those of the members of the Classes that Lead Plaintiffs seek to represent.

841.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it virtually impossible for the members of the classes individually to seek redress for the wrongful conduct alleged herein.

842.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes which predominate over questions which may affect individual members of either the Common Stock Class or the Preferred Class include:

> a.   whether the Securities Act or Exchange Acts were violated by defendants;
>
> b.   whether defendants omitted and/or misrepresented material facts;
>
> c.   whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
>
> d.   whether, with regard to the claims under the Exchange Act, the Exchange Act Defendants and Deloitte acted with the requisite state of mind;
>
> e.   whether the prices of Fannie securities were artificially inflated; and

      f.   whether members of the Classes have sustained damages, and if so, the appropriate measure thereof.

843.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

844.    The names and addresses of record owners of Fannie common and preferred shares who are members of the Classes are available from records maintained by Fannie or its transfer agent.  Notice may be provided to such record owners via first class mail, using techniques and a form of notice similar to that customarily used in securities class actions.

845.    As a direct and proximate result of the defendants' violations of the Exchange Act and/or Securites Act, Lead Plaintiffs and the other members of the Classes suffered damages in connection with their purchases of Fannie common and preferred shares.  Had Lead Plaintiffs and the other members of the Classes known of the material adverse information not disclosed by defendants, or been aware of the truth behind the material misstatements of the defendants, they would not have purchased Fannie shares at artificially inflated prices, if at all.

## PRAYER FOR RELIEF

**WHEREFORE,** Lead Plaintiffs pray for judgment as follows:

A.    Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding Lead Plaintiffs and the members of the Classes monetary and rescissionary damages, including interest;

C.    Awarding Lead Plaintiffs' counsel reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive relief or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  June 22, 2009

**KAPLAN FOX & KILSHEIMER LLP**

By: _____

Frederic S. Fox
Donald R. Hall
Hae Sung Nam
Jeffrey P. Campisi
Melinda D. Rodon
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714


**LABATON SUCHAROW LLP**

By: _____

Jonathan M. Plasse
Richard T. Joffe
Laura Killian Mummert
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477


**BERMAN DeVALERIO**

By: _____

Glen DeValerio
Jeffrey C. Block
Bryan A. Wood
Autumn W. Smith
One Liberty Square
Boston, Massachusetts 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194


*Lead Counsel for the Lead Plaintiffs and for
the Proposed Classes*

245

## AMENDED CERTIFICATION

I, Kathleen Kiely-Becchetti, as Executive Director of Boston Retirement Board, hereby certify as follows:

1. I am fully authorized to enter into and execute this Amended Certification on behalf of the State-Boston Retirement System ("Boston"). I have reviewed the Consolidated Amended Complaint prepared against Federal National Mortgage Association ("Fannie Mae") alleging violations of the federal securities laws;

2. Boston did not purchase securities of Fannie Mae at the direction of counsel or in order to participate in any private action under the federal securities laws;

3. Boston is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4. Boston's transactions in Fannie Mae during the class period are reflected in Exhibit A, attached hereto;

5. Boston sought to serve as a lead plaintiff in the following class actions under the federal securities laws during the last three years:

*Garber v. Juniper Networks, Inc.*
*In re SafeNet, Inc. Securities Litigation*
*Ellen Rosenthal Brodsky v. Yahoo! Inc. et al,*
*In re Luminent Mortgage Capital, Inc., Securities Litigation*
*Briarwood Investments, Inc. v. Care Investment Trust, Inc.*
*Steinberg v. Ericsson LM Telephone Co.*
*Hubbard v. BankAtlantic Bancorp, Inc. et al*
*Joel Stratte-McClure v. Gary G. Lynch*
*Rubin v. MF Global, Ltd. et al*
*Genovese v. Ashley, et al*
*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corporation, et al*
*Attias v. Anadigics, Inc. et al*
*Mas v. KV Pharmaceutical Company et al*
*In re Colonial Bancgroup, Inc. Securities Litigation*

6.    Boston is currently serving as a lead plaintiff in the following class actions

filed under the federal securities laws during the last three years:

*In re SafeNet, Inc. Securities Litigation*
*Hubbard v. BankAtlantic Bancorp, Inc. et al*
*Joel Stratte-McClure v. Gary G. Lynch*
*Rubin v. MF Global, Ltd. et al*
*Genovese v. Ashley, et al*
*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corporation, et al*
*Mas v. KV Pharmaceutical Company et al*
*In re Colonial Bancgroup, Inc. Securities Litigation*
*Attias v. Anadigics, Inc. et al (pending)*

7.    Beyond its pro rata share of any recovery, Boston will not accept payment

for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the

foregoing is true and correct this 18 day of June, 2009.

*Kathleen Kiely-Becchetti*
*Executive Director of Boston Retirement Board*

EXHIBIT A

**TRANSACTIONS IN**
**FEDERAL NATIONAL MORTGAGE ASSOCIATION**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 07/31/08 | 41,700.00 | $ 11.99 | ($500,662.71) |
| Purchase | 07/31/08 | 177,400.00 | $ 11.98 | ($2,132,188.34) |
| Purchase | 07/31/08 | 20,900.00 | $ 12.01 | ($251,123.95) |
| Purchase | 08/01/08 | 62,600.00 | $ 11.56 | ($726,317.00) |
| Purchase | 08/01/08 | 10,400.00 | $ 11.47 | ($119,444.00) |
| Purchase | 08/04/08 | 31,300.00 | $ 11.58 | ($363,584.00) |
| Purchase | 08/06/08 | 41,800.00 | $ 11.85 | ($496,985.00) |
| Purchase | 08/07/08 | 73,900.00 | $ 10.86 | ($805,237.00) |
| Purchase | 08/08/08 | 40,000.00 | $ 9.32 | ($374,376.00) |
| Sale | 09/08/08 | -500,000.00 | $ 0.78 | $389,697.80 |

## PLAINTIFF'S CERTIFICATION

I, Michael Travaglini, on behalf of the Massachusetts Pension Reserves Investment Management Board ("PRIM"), hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I am the Executive Director of PRIM.  I have reviewed a Complaint against the Federal National Mortgage Association ("Fannie Mae"), and authorize the filing of a comparable complaint on PRIM's behalf.

2.      PRIM is willing to serve as a lead plaintiff on behalf of a class as set forth in the Consolidated Complaint to which this certification is attached, including providing testimony at deposition and trial, if necessary.

3.      PRIM's transactions in Fannie Mae common stock and preferred securities between November 8, 2006 and September 5, 2008 are attached to this certification as Exhibits A and B.

4.      PRIM did not purchase its Fannie Mae securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934 and/or the Securities Act of 1933.

5.      During the three-year period preceding the date on which this certification is signed, PRIM has sought to serve as a representative party on behalf of a class in four other actions under the federal securities laws and was not appointed as Lead Plaintiff in any of these actions:  In re Mills Corp. Sec. Litig., 06-cv-77 (E.D. Va.); Pappas v. Countrywide Fin. Corp.,

07-5295 (C.D. Cal.); In re Washington Mutual, Inc. Sec., Derivative & "ERISA" Litig., C 08-387; 08-md-1919 (W.D. Wash.); and  In re Bear Stearns Cos. Sec., Derivative & "ERISA" Litig., 08-2793, 08-md-1963 (S.D.N.Y.).  PRIM was appointed to serve as lead plaintiff in In re Schering Plough Corp./ Enhance Sec. Litig., 2:08-397 (D.N.J.) and in In re Royal Bank of Scotland Group PLC  Sec. Litig., 09-300 (S.D.N.Y.).

6.     PRIM will not accept any payment for serving as a representative party on behalf of the class as set forth in the Consolidated Complaint, beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

7.     As Executive Director of PRIM, I am duly authorized to sign this certificate on behalf of PRIM.

Signed under the penalties of perjury this _18th_ day of June, 2009.

Michael Travaglini

# Exhibit A

## Federal National Mortgage Association
## Common Stock (Cusip 313586109)

**Class Period:** 11/8/06 - 9/5/08
**Shareholder:** Massachusetts Pension Reserves Investment Management ("PRIM") Board

| Trade Date | Trans. Code | Shares Bought | Shares Sold | Price |
|---|---|---|---|---|
| 11/27/06 | S | | (14,500) | $55.93 |
| 12/04/06 | B | 4,100 | | $57.62 |
| 12/26/06 | S | | (12,000) | $59.95 |
| 01/03/07 | B | 6,900 | | $59.55 |
| 02/06/07 | S | | (6,200) | $56.94 |
| 03/01/07 | B | 17,000 | | $56.37 |
| 06/01/07 | B | 3,300 | | $64.37 |
| 06/01/07 | B | 200 | | $64.37 |
| 06/01/07 | B | 300 | | $64.37 |
| 06/01/07 | B | 1,300 | | $64.37 |
| 06/13/07 | B | 24,400 | | $68.01 |
| 06/27/07 | B | 2,000 | | $66.05 |
| 07/31/07 | S | | (4,400) | $60.39 |
| 08/07/07 | B | 67,900 | | $65.21 |
| 09/04/07 | B | 20,700 | | $65.71 |
| 09/12/07 | S | | (94,300) | $62.90 |
| 09/12/07 | S | | (2,600) | $62.94 |
| 10/01/07 | B | 19,000 | | $62.49 |
| 11/01/07 | B | 8,900 | | $54.63 |
| 11/19/07 | B | 8,400 | | $37.80 |
| 11/29/07 | B | 8,200 | | $32.75 |
| 12/17/07 | B | 7,900 | | $35.20 |
| 01/04/08 | B | 1,000 | | $34.05 |
| 01/04/08 | B | 1,500 | | $34.05 |
| 01/04/08 | B | 2,700 | | $34.05 |
| 01/07/08 | B | 12,500 | | $33.86 |
| 01/24/08 | B | 10,600 | | $33.28 |
| 02/07/08 | B | 87,768 | | $32.07 |
| 02/07/08 | B | 8,532 | | $31.38 |
| 02/11/08 | B | 11,400 | | $30.31 |
| 02/20/08 | B | 8,800 | | $29.25 |
| 03/03/08 | S | | (3,400) | $26.44 |
| 03/03/08 | S | | (1,200) | $26.44 |
| 03/03/08 | S | | (300) | $26.44 |
| 03/07/08 | B | 15,700 | | $22.78 |
| 03/26/08 | S | | (21,700) | $29.69 |
| 04/11/08 | B | 10,900 | | $26.56 |
| 04/29/08 | S | | (9,700) | $28.76 |
| 05/05/08 | S | | (13,581) | $29.06 |
| 05/15/08 | S | | (8,600) | $29.51 |
| 05/23/08 | B | 100 | | $27.59 |
| 06/02/08 | S | | (300) | $26.97 |
| 06/02/08 | S | | (800) | $26.97 |
| 06/02/08 | S | | (1,000) | $26.97 |
| 06/02/08 | S | | (2,200) | $26.97 |

| Trade Date | Trans. Code | Shares Bought | Shares Sold | Price |
|---|---|---|---|---|
| 06/02/08 | S | | (700) | $26.97 |
| 06/03/08 | S | | (13,000) | $27.15 |
| 06/27/08 | B | 39,600 | | $20.80 |
| 07/17/08 | S | | (23,800) | $10.88 |
| 08/18/08 | S | | (107,510) | $6.80 |
| 08/18/08 | S | | (11,290) | $7.04 |

# Exhibit B

**Class Period:** 11/8/06-9/5/08
**Shareholder:** Massachusetts Pension Reserves Investment Management ("PRIM") Board

## Federal National Mortgage Association
### Series S Preferred (Cusip 313586752)

| Trade Date | Shares Bought | Shares Sold | Price |
|---|---|---|---|
| 12/06/07 | 140,000 | | $25.00 |
| 12/06/07 | 354,712 | | $25.00 |
| 03/18/08 | | (104,475) | $24.15 |
| 03/18/08 | | (35,525) | $24.30 |
| 07/10/08 | 1,150 | | $19.00 |
| 07/10/08 | 2,350 | | $18.88 |
| 07/10/08 | 11,650 | | $20.82 |
| 07/11/08 | 1,150 | | $16.50 |
| 07/11/08 | 1,750 | | $15.25 |
| 07/11/08 | 2,900 | | $15.25 |
| 07/15/08 | 550 | | $15.05 |
| 07/15/08 | 1,050 | | $12.50 |
| 07/22/08 | 1,000 | | $16.55 |
| 07/25/08 | 350 | | $16.25 |
| 07/25/08 | 650 | | $16.50 |
| 07/25/08 | 650 | | $16.50 |
| 07/28/08 | 1,300 | | $17.00 |
| 07/29/08 | 2,600 | | $17.16 |
| 07/30/08 | 2,950 | | $17.13 |
| 07/31/08 | 1,300 | | $17.13 |
| 08/01/08 | 1,800 | | $17.00 |
| 08/04/08 | 2,150 | | $17.25 |
| 08/05/08 | 5,350 | | $17.38 |
| 08/06/08 | 650 | | $17.13 |
| 08/07/08 | 3,950 | | $17.06 |
| 08/08/08 | 1,000 | | $16.13 |
| 08/11/08 | 3,300 | | $15.75 |
| 08/15/08 | 2,650 | | $15.13 |
| 08/19/08 | 1,300 | | $12.00 |

## Federal National Mortgage Association
### Series Q Preferred (Cusip 313586778)

| Trade Date | Shares Bought | Shares Sold | Price |
|---|---|---|---|
| 07/17/08 | 3,600 | | $13.10 |

## Federal National Mortgage Association
### Series M Preferred (Cusip 313586836)

| Trade Date | Shares Bought | Shares Sold | Price |
|---|---|---|---|
| 07/15/08 | 7,900 | | $16.00 |

## Federal National Mortgage Association
### Series L Preferred (Cusip 313586844)

| Trade Date | Shares Bought | Shares Sold | Price |
|---|---|---|---|
| 07/30/08 | 1,300 | | $21.25 |

Federal National Mortgage Association
Series I Preferred (Cusip 313586877)

| Trade Date | Shares Bought | Shares Sold | Price |
|---|---|---|---|
| 07/30/08 | 2,600 | | $22.20 |

Federal National Mortgage Association
Series H Preferred (Cusip 313586885)

| Trade Date | Shares Bought | Shares Sold | Price |
|---|---|---|---|
| 07/11/08 | 2,300 | | $20.50 |

## AMENDED CERTIFICATION OF EDDIE W. HENNESSEE

I, Eddie W. Hennessee, Assistant Treasurer for Investments and Benefits, of Lead Plaintiff the Tennessee Consolidated Retirement System ("TCRS"), hereby declare that:

1.  I am authorized to make a certification on behalf of TCRS.

2.  I have reviewed a draft of the Joint Consolidated Amended Class Action Complaint alleging violations of the securities laws and authorize its filing.

3.  TCRS did not purchase the securities that are the subject of this action at the direction of the plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  TCRS is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial if necessary.  TCRS fully understands the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act of 1995, specifically concerning its selection and retention of counsel and overseeing and directing the prosecution of the action on behalf of the class.

5.  TCRS' transactions in Federal National Mortgage Association ("Fannie Mae") securities during the proposed class period that are at issue in this action are set forth in Schedule A hereto.

6.  TCRS has not served or sought to serve as a class representative in any action brought under the federal securities laws filed during the 3-year period preceding the date on which this certification is signed, except for the following action: *In re Citigroup Inc. Sec. Litig.*, 1:07-cv-09901-SHS (moved for appointment as lead plaintiff, but not appointed).

7.  TCRS will not accept any payment for serving as a representative party on behalf of a class beyond its pro-rata share of any recovery, except as ordered or approved by the court,

including any reward to a representative plaintiff of reasonable costs and expense directly related to the representation of the class.

8.    I declare under penalty of perjury that the foregoing is true and correct, executed on this 8th day of June 2009.

_Eddie W. Hennessee_
Eddie W. Hennessee

| Schedule A | | | | |
|---|---|---|---|---|
| Security Name | Transaction Type | Trade Date | Shares | Price Per Share |
| FNMA COM STK | Purchases | 11/13/06 | 5,000 | $60.1760 |
| FNMA COM STK | Purchases | 11/28/06 | 7,200 | $56.2160 |
| FNMA COM STK | Purchases | 12/07/06 | 10,000 | $60.9700 |
| FNMA COM STK | Purchases | 05/11/07 | 5,000 | $62.6440 |
| FNMA COM STK | Purchases | 05/17/07 | 5,000 | $63.0600 |
| FNMA COM STK | Purchases | 05/24/07 | 5,000 | $65.6400 |
| FNMA COM STK | Purchases | 06/12/07 | 5,000 | $67.6670 |
| FNMA COM STK | Purchases | 08/08/07 | 5,000 | $66.3410 |
| FNMA COM STK | Purchases | 08/17/07 | 10,000 | $67.6800 |
| FNMA COM STK | Purchases | 10/24/07 | 5,000 | $55.0276 |
| FNMA COM STK | Purchases | 10/29/07 | 25,000 | $57.2518 |
| FNMA COM STK | Purchases | 10/29/07 | 8,400 | $58.3801 |
| FNMA COM STK | Purchases | 10/31/07 | 10,000 | $57.4708 |
| FNMA COM STK | Purchases | 11/14/07 | 5,000 | $49.7544 |
| FNMA COM STK | Purchases | 11/30/07 | 10,000 | $35.8900 |
| FNMA COM STK | Purchases | 11/30/07 | 10,000 | $35.8900 |
| FNMA COM STK | Purchases | 03/07/08 | 3,300 | $22.0909 |
| FNMA COM STK | Purchases | 03/07/08 | 13,100 | $22.0500 |
| FNMA COM STK | Purchases | 03/17/08 | 19,000 | $20.7490 |
| FNMA COM STK | Purchases | 03/25/08 | 10,000 | $31.4017 |
| FNMA COM STK | Purchases | 04/02/08 | 25,000 | $31.7966 |
| FNMA COM STK | Purchases | 04/07/08 | 10,000 | $30.8714 |
| FNMA COM STK | Purchases | 04/08/08 | 10,000 | $30.6655 |
| FNMA COM STK | Purchases | 05/19/08 | 5,000 | $29.7838 |
| FNMA COM STK | Purchases | 06/03/08 | 10,000 | $27.2242 |
| FNMA COM STK | Purchases | 06/16/08 | 50,000 | $25.5894 |
| FNMA COM STK | Purchases | 06/18/08 | 50,000 | $24.8539 |
| FNMA COM STK | Purchases | 06/25/08 | 15,000 | $23.8579 |
| FNMA COM STK | Purchases | 07/15/08 | 400,000 | $7.7071 |
| | | | | |
| FNMA COM STK | Sales | 02/09/07 | 10,000 | $56.8950 |
| FNMA COM STK | Sales | 03/14/07 | 10,000 | $53.1680 |
| FNMA COM STK | Sales | 09/14/07 | 10,000 | $61.2480 |
| FNMA COM STK | Sales | 09/25/07 | 10,000 | $61.4774 |
| FNMA COM STK | Sales | 02/25/08 | 5,000 | $28.2056 |
| FNMA COM STK | Sales | 02/25/08 | 70,000 | $27.8770 |
| FNMA COM STK | Sales | 06/16/08 | 46,900 | $25.0044 |
| FNMA COM STK | Sales | 07/16/08 | 55,000 | $7.8514 |
| FNMA COM STK | Sales | 07/16/08 | 525,100 | $7.9520 |
| FNMA COM STK | Sales | 07/17/08 | 40,000 | $11.4799 |
| FNMA COM STK | Sales | 07/18/08 | 20,000 | $13.0882 |
| FNMA COM STK | Sales | 08/11/08 | 30,000 | $8.4386 |
| FNMA COM STK | Sales | 08/28/08 | 100,000 | $7.2279 |
| FNMA COM STK | Sales | 08/29/08 | 200,000 | $7.1540 |
| | | | | |
| | | | | |
| FNMA PFD SER T 8 25% | Purchases | 05/13/08 | 750,000 | $25.0000 |
| FNMA PFD SER T 8 25% | Purchases | 05/13/08 | 100,000 | $25.0000 |
| | | | | |
| | | | | |
| FNMA PFD SER S | Purchases | 12/06/07 | 1,000,000 | $25.0000 |
| FNMA PFD SER S | Purchases | 06/02/08 | 250,000 | $24.3500 |
| FNMA PFD SER S | Purchases | 06/02/08 | 250,000 | $24.3500 |
| FNMA PFD SER S | Purchases | 06/02/08 | 250,000 | $24.3500 |
| FNMA PFD SER S | Purchases | 06/02/08 | 250,000 | $24.3800 |
| | | | | |
| | | | | |
| FNMA 5 625 BDS 24/01/2017 USD1000 5 625 01-24-2017 | Purchases | 01/09/08 | 50,000,000 | $100.0350 |
| FNMA 5 625 BDS 24/01/2017 USD1000 5 625 01-24-2017 | Purchases | 01/09/08 | 50,000,000 | $100.0350 |
| FNMA 5 625 BDS 24/01/2017 USD1000 5 625 01-24-2017 | Purchases | 01/09/08 | 25,000,000 | $100.0350 |
| | | | | |
| | | | | |
| FNMA 6 23% DEB 14/02/2022 USD 6 23 02-14-2022/05-14-2008 | Purchases | 01/30/08 | 48,530,000 | $100.0828 |
| | | | | |
| | | | | |
| FNMA FEDL NATL MTG ASSN 5 65 03-06-2017 | Purchases | 02/27/08 | 25,000,000 | $100.0686 |

| Schedule A | | | | |
|---|---|---|---|---|
| Security Name | Transaction Type | Trade Date | Shares | Price Per Share |
| FNMA 5 3% DUE 02-22-2011 | Purchases | 02/12/08 | 19,939,000 | $100.0490 |
| | | | | |
| FNMA NT 5 5 01-15-2008 | Purchases | 11/29/07 | 25,000,000 | $100.1230 |
| | | | | |
| FNMA NT 5 5 01-15-2008 | Sales | 12/07/07 | 8,787,000 | $100.0864 |
| FNMA NT 5 5 01-15-2008 | Sales | 01/15/08 | 16,213,000 | $100.0000 |
| | | | | |
| FNMA PREASSIGN 00637 6 09-26-2013/06-26-2008 | Purchases | 12/04/07 | 25,000,000 | $100.0800 |
| | | | | |
| FNMA PREASSIGN 00716 5 5 07-30-2018/04-30-2008 | Purchases | 01/09/08 | 24,000,000 | $99.9800 |
| | | | | |
| FNMA NT 6 11-21-2016/05-21-2008 | Purchases | 01/30/08 | 10,000,000 | $100.1110 |
| | | | | |
| FNMA MTN 5 53 12-21-2011/06-21-2008 | Purchases | 12/04/07 | 23,300,000 | $100.0370 |
| | | | | |
| FNMA 6% NTS 20/03/2010 USD1000 6 03-20-2017/06-20-2008 | Purchases | 03/10/08 | 11,500,000 | $100.0844 |
| FNMA 6% NTS 20/03/2010 USD1000 6 03-20-2017/06-20-2008 | Purchases | 03/10/08 | 17,500,000 | $100.0844 |
| | | | | |
| FNMA DTD 12/18/2007 4 55 12-18-2009/06-18-2008 | Purchases | 03/04/08 | 25,000,000 | $100.0590 |
| | | | | |
| FNMA FNMA 3 25 04-09-2013 | Purchases | 02/12/08 | 10,000,000 | $98.6710 |
| FNMA FNMA 3 25 04-09-2013 | Purchases | 02/13/08 | 10,000,000 | $98.8240 |
| FNMA FNMA 3 25 04-09-2013 | Purchases | 02/19/08 | 10,000,000 | $98.0000 |
| FNMA FNMA 3 25 04-09-2013 | Purchases | 02/27/08 | 10,000,000 | $98.0940 |
| FNMA FNMA 3 25 04-09-2013 | Purchases | 02/27/08 | 50,000,000 | $97.8597 |
| | | | | |
| FNMA FNMA 3 25 04-09-2013 | Sales | 03/28/08 | 10,000,000 | $99.4180 |
| FNMA FNMA 3 25 04-09-2013 | Sales | 04/04/08 | 40,000,000 | $99.5610 |
| FNMA FNMA 3 25 04-09-2013 | Sales | 04/18/08 | 10,000,000 | $98.2560 |
| FNMA FNMA 3 25 04-09-2013 | Sales | 04/18/08 | 10,000,000 | $98.1672 |
| FNMA FNMA 3 25 04-09-2013 | Sales | 04/28/08 | 20,000,000 | $97.8360 |
| | | | | |
| FNMA NT 3 875 07-12-2013 | Purchases | 06/10/08 | 10,000,000 | $97.6690 |
| FNMA NT 3.875 07-12-2013 | Purchases | 07/02/08 | 10,000,000 | $98.5643 |
| | | | | |
| FNMA NT 3.875 07-12-2013 | Sales | 07/23/08 | 10,000,000 | $98.0280 |
| FNMA NT 3.875 07-12-2013 | Sales | 07/23/08 | 10,000,000 | $98.0190 |
| | | | | |
| FNMA DISC NT 09-05-2008 | Purchases | 08/27/08 | 20,000,000 | $99.9536 |
| FNMA DISC NT 09-05-2008 | Purchases | 08/28/08 | 41,500,000 | $99.9594 |
| | | | | |
| FNMA DISC NT 09-05-2008 | Sales | 09/05/08 | 61,500,000 | $99.9574 |
| | | | | |
| FNMA DISC NT DUE 12-19-2007 | Purchases | 12/11/07 | 20,000,000 | $99.9187 |
| | | | | |
| FNMA DISC NT DUE 12-19-2007 | Sales | 12/19/07 | 20,000,000 | $99.9187 |
| | | | | |
| FNMA DISC NT 01-22-2008 | Purchases | 12/21/07 | 41,000,000 | $99.6902 |
| | | | | |
| FNMA DISC NT 01-22-2008 | Sales | 01/22/08 | 41,000,000 | $99.6902 |
| | | | | |
| FNMA DISC NT 01-23-2008 | Purchases | 01/09/08 | 25,000,000 | $99.8975 |
| | | | | |
| FNMA DISC NT 01-23-2008 | Sales | 01/23/08 | 25,000,000 | $99.8975 |

| Schedule A | | | | |
|---|---|---|---|---|
| Security Name | Transaction Type | Trade Date | Shares | Price Per Share |
| | | | | |
| | | | | |
| FNMA DISC NT 02-20-2008 | Purchases | 02/15/08 | 50,000,000 | $99.9922 |
| FNMA DISC NT 02-20-2008 | Purchases | 02/15/08 | 24,266,000 | $99.9922 |
| | | | | |
| FNMA DISC NT 02-20-2008 | Sales | 02/20/08 | 74,266,000 | $99.9922 |
| | | | | |
| | | | | |
| FNMA DISC NT 03-17-2008 | Purchases | 02/27/08 | 25,000,000 | $99.8600 |
| | | | | |
| FNMA DISC NT 03-17-2008 | Sales | 03/17/08 | 25,000,000 | $99.8600 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 01/16/07 | 50,000,000 | $99.7854 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 01/16/07 | 31,000,000 | $99.7854 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Sales | 01/29/07 | 5,000,000 | $99.9710 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Sales | 01/29/07 | 50,000,000 | $99.9710 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 02/01/07 | 26,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 01/12/07 | 22,000,000 | $99.6440 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 02/12/07 | 22,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 02/13/07 | 40,000,000 | $99.9000 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 02/13/07 | 38,000,000 | $99.9000 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 02/13/07 | 50,000,000 | $99.9000 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 02/21/07 | 128,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 02/21/07 | 50,000,000 | $99.7970 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 02/21/07 | 15,000,000 | $99.7970 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 03/08/07 | 65,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 02/26/07 | 50,000,000 | $99.5670 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 03/28/07 | 50,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 04/04/07 | 50,000,000 | $99.9010 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 04/04/07 | 50,000,000 | $99.9010 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 04/12/07 | 100,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 04/09/07 | 40,000,000 | $99.5450 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 05/14/07 | 40,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 05/14/07 | 25,000,000 | $99.9580 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 05/18/07 | 25,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 04/10/07 | 40,000,000 | $99.4464 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 05/21/07 | 40,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 03/28/07 | 50,000,000 | $99.0830 |
| | | | | |

| | | | | |
|---|---|---|---|---|
| **Schedule A** | | | | |

| Security Name | Transaction Type | Trade Date | Shares | Price Per Share |
|---|---|---|---|---|
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Sales | 05/09/07 | 50,000,000 | $99.6870 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 05/07/07 | 40,000,000 | $99.5880 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 05/08/07 | 18,000,000 | $99.5890 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 05/22/07 | 50,000,000 | $99.7200 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 05/22/07 | 40,000,000 | $99.7200 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Sales | 06/01/07 | 25,000,000 | $99.8840 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 06/12/07 | 123,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 05/07/07 | 50,000,000 | $99.5450 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 06/18/07 | 50,000,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 02/22/07 | 50,000,000 | $98.1900 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Sales | 12/21/06 | 27,000,000 | $97.3130 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Sales | 12/21/06 | 50,000,000 | $97.3130 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Sales | 05/30/07 | 50,000,000 | $99.5680 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Sales | 05/30/07 | 5,700,000 | $99.5680 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 06/29/07 | 17,300,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 12/21/06 | 20,138,000 | $99.9850 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Redemption | 12/22/06 | 20,138,000 | $100.0000 |
| | | | | |
| | | | | |
| FEDERAL NAT'L MTG ASSN~FNMA 4 7/8 12/15/16~PREASSIGN 00660~ISSUES | Purchases | 11/15/06 | 50,000,000 | $99.4930 |
| | | | | |
| FEDERAL NAT'L MTG ASSN~FNMA 4 7/8 12/15/16~PREASSIGN 00660~ISSUES | Sales | 11/15/06 | 50,000,000 | $99.4690 |
| | | | | |
| | | | | |
| FEDERAL NATL MTG ASSN NT | Purchases | 03/14/07 | 50,000,000 | $100.6440 |
| FEDERAL NATL MTG ASSN NT | Purchases | 03/15/07 | 50,000,000 | $100.4790 |
| FEDERAL NATL MTG ASSN NT | Purchases | 03/20/07 | 22,000,000 | $100.6500 |
| FEDERAL NATL MTG ASSN NT | Purchases | 03/28/07 | 25,000,000 | $100.2240 |
| | | | | |
| FEDERAL NATL MTG ASSN NT | Sales | 03/27/07 | 25,000,000 | $100.2960 |
| FEDERAL NATL MTG ASSN NT | Sales | 05/15/07 | 50,000,000 | $99.7030 |
| FEDERAL NATL MTG ASSN NT | Sales | 06/25/07 | 50,000,000 | $96.2930 |
| FEDERAL NATL MTG ASSN NT | Sales | 06/25/07 | 22,000,000 | $96.2930 |
| | | | | |
| | | | | |
| FEDERAL NATL MTG ASSN DEB | Purchases | 02/13/07 | 50,000,000 | $99.7810 |
| FEDERAL NATL MTG ASSN DEB | Purchases | 02/13/07 | 50,000,000 | $99.7810 |
| FEDERAL NATL MTG ASSN DEB | Purchases | 05/24/07 | 25,000,000 | $99.5671 |
| | | | | |
| FEDERAL NATL MTG ASSN DEB | Sales | 02/27/07 | 50,000,000 | $100.6200 |
| FEDERAL NATL MTG ASSN DEB | Sales | 02/27/07 | 50,000,000 | $100.6200 |
| FEDERAL NATL MTG ASSN DEB | Sales | 07/27/07 | 25,000,000 | $99.3880 |
| | | | | |
| | | | | |
| FNMA 6 625 11-15-2030 | Purchases | 07/30/07 | 25,000,000 | $112.9520 |
| FNMA 6 625 11-15-2030^ | Purchases | 07/31/07 | 25,000,000 | $113.3874 |
| FNMA 6 625 11-15-2030 | Purchases | 08/01/07 | 10,000,000 | $113.7733 |
| | | | | |
| FNMA 6 625 11-15-2030 | Sales | 08/01/07 | 50,000,000 | $113.6880 |
| FNMA 6 625 11-15-2030 | Sales | 08/01/07 | 10,000,000 | $113.6105 |
| | | | | |
| | | | | |
| FEDERAL NATL MTG ASSN~FEDERAL NATL MTG ASSN~PREASSIGN 00522~I | Purchases | 11/17/06 | 6,925,000 | $100.0000 |
| FEDERAL NATL MTG ASSN~FEDERAL NATL MTG ASSN~PREASSIGN 00522~I | Purchases | 11/17/06 | 50,000,000 | $100.0000 |

| Schedule A | | | | |
|---|---|---|---|---|
| Security Name | Transaction Type | Trade Date | Shares | Price Per Share |
| FEDERAL NATL MTG ASSN~FEDERAL NATL MTG ASSN~PREASSIGN 00522~I | Redemption | 02/22/07 | 56,925,000 | $100.0000 |
| | | | | |
| FNMA NT 5 25 10-30-2007 | Purchases | 05/30/07 | 5,140,000 | $99.9940 |
| FNMA NT 5 25 10-30-2007 | Purchases | 05/30/07 | 50,000,000 | $99.9940 |
| | | | | |
| FNMA NT 5 25 10-30-2007 | Sales | 08/31/07 | 150,000 | $99.9660 |
| FNMA NT 5 25 10-30-2007 | Sales | 10/30/07 | 54,990,000 | $100.0000 |
| | | | | |
| FEDERAL NATL MTG ASSN~FEDERAL NATL MTG ASSN~PREASSIGN 00650~I | Purchases | 02/09/07 | 50,000,000 | $99.8200 |
| | | | | |
| FEDERAL NATL MTG ASSN~FEDERAL NATL MTG ASSN~PREASSIGN 00650~I | Sales | 02/27/07 | 50,000,000 | $100.6010 |
| | | | | |
| FNMA 0 09-15-2007 | Purchases | 07/31/07 | 36,122,411 | $99.3260 |
| | | | | |
| FNMA 0 09-15-2007 | Sales | 08/15/07 | 235,213 | $100.0000 |
| FNMA 0 09-15-2007 | Sales | 09/17/07 | 35,887,197 | $100.0000 |
| | | | | |
| FNMA STEP UP 07-16-2013/04-16-2008 DTD 07/16/2003 | Purchases | 08/10/07 | 9,900,000 | $99.3000 |
| FNMA STEP UP 07-16-2013/04-16-2008 DTD 07/16/2003 | Purchases | 08/10/07 | 50,000,000 | $99.3000 |
| | | | | |
| FNMA STEP UP 07-16-2013/04-16-2008 DTD 07/16/2003 | Sales | 12/06/07 | 50,000,000 | $100.0750 |
| FNMA STEP UP 07-16-2013/04-16-2008 DTD 07/16/2003 | Sales | 12/06/07 | 9,900,000 | $100.0750 |
| | | | | |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Purchases | 08/09/07 | 25,000,000 | $99.7745 |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Purchases | 08/13/07 | 10,000,000 | $99.6246 |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Purchases | 08/13/07 | 10,000,000 | $99.5567 |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Purchases | 08/13/07 | 15,000,000 | $99.5266 |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Purchases | 08/13/07 | 15,000,000 | $99.5682 |
| | | | | |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Sales | 08/07/07 | 25,000,000 | $100.2533 |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Sales | 08/09/07 | 25,000,000 | $100.0362 |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Sales | 08/09/07 | 25,000,000 | $99.9455 |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Sales | 09/27/07 | 25,000,000 | $102.6300 |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Sales | 10/18/07 | 15,000,000 | $103.0340 |
| FNMA SEMI ANNUAL 5 375 06-12-2017 | Sales | 12/13/07 | 20,000,000 | $105.4565 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 11/14/06 | 50,000,000 | $96.2600 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 06/26/07 | 50,000,000 | $98.2090 |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 06/26/07 | 25,000,000 | $98.2090 |
| | | | | |
| FEDERAL NATL MTGE ASSN DISCOUNT NT | Purchases | 05/21/07 | 50,000,000 | $97.2873 |
| | | | | |
| FNMA DISC NT 02-29-2008 | Purchases | 05/09/07 | 50,000,000 | $95.9170 |
| FNMA DISC NT 02-29-2008 | Purchases | 05/22/07 | 50,000,000 | $96.0694 |
| | | | | |
| FNMA DISC NT 02-29-2008 | Sales | 01/31/08 | 24,708,000 | $99.7777 |
| FNMA DISC NT 02-29-2008 | Sales | 02/29/08 | 75,292,000 | $100.0000 |
| | | | | |
| FNMA 03-28-2008 | Purchases | 05/04/07 | 25,000,000 | $95.4850 |
| | | | | |
| FNMA 03-28-2008 | Sales | 03/28/08 | 25,000,000 | $100.0000 |
| | | | | |
| FNMA NT 5 5 01-15-2008 | Purchases | 11/29/07 | 25,000,000 | $100.1230 |
| | | | | |
| FNMA NT 5 5 01-15-2008 | Sales | 12/07/07 | 8,787,000 | $100.0864 |

| Schedule A | | | | |
|---|---|---|---|---|
| Security Name | Transaction Type | Trade Date | Shares | Price Per Share |
| FNMA NT 5.5 01-15-2008 | Sales | 01/15/08 | 16,213,000 | $100.0000 |
| | | | | |
| FNMA PREASSIGN 00637 6 09-26-2013/03-26-2008 | Purchases | 12/04/07 | 25,000,000 | $100.0800 |
| | | | | |
| FEDERAL NATL MTG ASSN M/T/N~STRIPS~GENERIC INT PMT | Purchases | 05/31/07 | 1,962,000 | $98.4752 |
| | | | | |
| FNMA INT STRIP GENERIC INT PMT 03-15-2007 | Purchases | 05/31/07 | 2,098,000 | $95.9426 |
| FNMA INT STRIP GENERIC INT PMT 03-15-2008 | Sales | 03/17/08 | 2,098,000 | $100.0000 |
| | | | | |
| FNMA MTN 5 53 12-21-2011/03-21-2008 | Purchases | 12/04/07 | 23,300,000 | $100.0370 |
| | | | | |
| FNMA FED NATL MTG ASSN 5 375 05-04-2022 | Purchases | 08/07/07 | 25,000,000 | $95.3120 |
| | | | | |
| FNMA DTD 05/15/2007 6 05-15-2017 | Purchases | 07/30/07 | 50,000,000 | $98.9780 |
| | | | | |
| FNMA PREASSIGN 00133 6 08-15-2012/02-15-2008 | Purchases | 08/03/07 | 20,000,000 | $100.0313 |