# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE FANNIE MAE 2008 SECURITIES LITIGATION

Master File No. 08 Civ. 7831 (PAC)

**SECOND AMENDED JOINT CONSOLIDATED CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Donald R. Hall
Hae Sung Nam
Jeffrey P. Campisi
Melinda D. Rodon
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Lead Counsel for the Preferred Stock Lead Plaintiff Tennessee Consolidated Retirement System and the Proposed Preferred Stock Class*

**LABATON SUCHAROW LLP**
Jonathan M. Plasse
Joseph A. Fonti
Joshua L. Crowell
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Lead Counsel for the Common Stock Co-Lead Plaintiff State-Boston Retirement Board and the Proposed Common Stock Class*

**BERMAN DEVALERIO**
Glen DeValerio
One Liberty Square
Boston, Massachusetts 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194

**BERMAN DEVALERIO**
Daniel E. Barenbaum
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Lead Counsel for the Common Stock Co-Lead Plaintiff Massachusetts PRIM and the Proposed Common Stock Class*

*CONFIDENTIAL*

*UNREDACTED DOCUMENT THAT CONTAINS DESIGNATED DISCOVERY MATERIAL; FILED CONDITIONALLY UNDER SEAL PURSUANT TO PARAGRAPH 15 OF THE STIPULATED PRETRIAL PROTECTIVE ORDER FILED JULY 18, 2011*

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 3

II. JURISDICTION AND VENUE ....................................................................... 10

III. PARTIES ........................................................................................................ 10

IV. FANNIE'S BUSINESS AND OPERATIONS ............................................... 14

V. THE DEFENDANTS' FRAUDULENT SCHEME REGARDING FANNIE'S RISK MANAGEMENT AND CONTROLS .......................................................... 17

VI. FALSE AND MISLEADING STATEMENTS REGARDING FANNIE'S RISK MANAGEMENT AND CONTROLS .......................................................... 40

VII. DEFENDANTS' FRAUD REGARDING FANNIE'S EXPOSURE TO SUBPRIME AND ALT-A MORTGAGES ............................................................. 76

VIII. THE GOVERNMENT PLACES FANNIE INTO CONSERVATORSHIP .............. 140

IX. LOSS CAUSATION ..................................................................................... 145

X. APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ............................................................................ 153

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .............................. 154

XII. CLASS ACTION ALLEGATIONS ............................................................. 155

XIII. COUNTS ...................................................................................................... 159

1.      Lead Plaintiffs Massachusetts Pension Reserves Investment Management Board ("PRIM") and State-Boston Retirement Board ("Boston") (collectively, the "Massachusetts Public Pension Funds") bring this federal securities class action on behalf of themselves and a class of others similarly situated consisting of all persons and entities that, between November 8, 2006 and September 5, 2008, inclusive (the "Class Period"), purchased or otherwise acquired Federal National Mortgage Association ("Fannie," "Fannie Mae," or the "Company") *common stock* and/or *options* and were thereby damaged (the "Common Stock Class"). Lead Plaintiff Tennessee Consolidated Retirement System ("TCRS") brings this federal securities class action on behalf of itself and a class of others similarly situated consisting of all persons and entities that during the Class Period purchased or otherwise acquired Fannie *preferred stock* and were thereby damaged.   The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

2.      Lead Plaintiffs' allegations are based upon their respective information and belief and the investigation of Lead Counsel which included, among other things, a review and analysis of (1) Fannie's public filings with the United States Securities and Exchange Commission (the "SEC"); (2) reports and/or press releases regarding Fannie prepared by its regulators, the Office of Federal Housing Enterprise Oversight ("OFHEO") and the Federal Housing Finance Agency ("FHFA"); (3) congressional testimony regarding Fannie and the housing and mortgage crisis from, among other individuals, current and former members of the Company's senior management, industry experts, and the director of OFHEO and FHFA; (4) congressional and federal commission reports regarding Fannie and the housing and mortgage crisis; (5) publicly

1

available trading information; (6) articles in the general and financial press; (7) interviews with confidential witnesses; and (8) the pleadings and related documents in certain other litigation.[1]

    3.    Lead Plaintiffs' allegations in ¶¶257-453 relating to Fannie's false representations about its exposure to subprime and Alt-A loans are based upon their respective information and belief and the investigation of Lead Counsel which included: (1) Fannie's public filings with the SEC; (2) reports and/or press releases regarding Fannie prepared by its regulators, OFHEO and FHFA; (3) congressional testimony regarding Fannie and the housing and mortgage crisis from, among other individuals, current and former members of the Company's senior management, industry experts and the director of OFHEO and FHFA; (4) congressional and federal commission reports regarding Fannie and the housing and mortgage crisis; (5) publicly available trading information; (6) articles in the general and financial press; (7) review of non-public, internal Company documents obtained by Lead Counsel through discovery; (8) the pleadings in *United States Securities and Exchange Commission v. Daniel H. Mudd, et al.*, 11 civ9202 (S.D.N.Y.) (the "SEC Action"); and (9) the Non-Prosecution Agreement ("NPA") between the SEC and Fannie dated December 15, 2011 and signed by Fannie's current President and CEO, Michael J. Williams ("Williams"), and the statement of agreed-upon facts appended as Exhibit A thereto.[2]

---

[1]    For the purpose of preserving any and all of Lead Plaintiffs' rights and privileges concerning certain claims alleged in the Joint Consolidated Amended Class Action Complaint filed June 22, 2009 ("June 2009 Complaint") (Dkt#102) including without limitation the right to appeal, Lead Plaintiffs hereby adopt by reference and incorporate Sections IX (¶¶423-520) XIV-XV (¶¶640-834), and ¶¶72-76; 586-592 of the June 2009 Complaint as if fully set forth herein, as permitted under Fed. R. Civ. P. 10(c). These adopted and incorporated sections and the paragraphs therein include those claims dismissed by the Court in its decisions dated November 24, 2009 (Dkt #190), at 4-6, and September 30, 2010 (Dkt#228), at 12-22, 27-39 (and specifically those allegations and claims dismissed by the Court's September 30, 2010 order at 45, numbers 1(a), 1(c), 2, 3(a), and 3(c)).

[2]    New information alleged in this second amended complaint regarding Fannie's exposure to subprime and Alt-A loans is based on Plaintiffs' independent investigation, review of internal Fannie Mae documents, and, in part, on the allegations of the SEC Action and statement of facts appended to the NPA ("Statement of Facts"). The SEC Action was filed after a 2½ year investigation that involved over 100 witness examinations and the collection of over 60 million pages; the facts appended to the NPA, which was signed by CEO Williams, form the factual basis

## I.    INTRODUCTION

4.      On September 7, 2008, James Lockhart, the director of FHFA, Fannie's regulator, stunned investors by announcing that Fannie—always purportedly a model of safety and financial stability—would be placed under conservatorship.  This move was understood to have been necessitated by Fannie's losing gamble with risky subprime and "Alt-A" loans (*i.e.*, loans that were approved for borrowers with slightly higher credit scores than subprime borrowers but that had little to no documentation).   In direct contradiction to its conservative and prudent reputation, Fannie embarked on a multi-year strategy to shift its focus away from investing in, guaranteeing, and securitizing safe, "plain vanilla" loans and toward risky subprime and Alt-A loans. The Defendants (as defined herein) hid this material shift from investors and continued to depict Fannie as a picture of safety in the mortgage industry.  The Defendants fostered this illusion by failing to disclose and/or misstating the Company's ability to adequately gauge the risk of subprime and Alt-A loans.  As United States Senator Richard Shelby stated in a September 8, 2008 interview with *Bloomberg* while explaining why Fannie was placed in conservatorship, "**They found out [Fannie Mae] had a house of cards**. . . [O]nce [the U.S. Treasury Department] got someone looking closely at [Fannie's] books, they realized there just wasn't adequate capital there." (Emphasis added.)

5.      Throughout the Class Period, Fannie crafted a pristine public image as one of the lowest-risk financial institutions in the world.   Fannie was chartered by the United States Congress in 1968 with a statutory mission to provide stability, liquidity, and affordability to the U.S. housing market.   Consistent with the requirements of its Congressional charter, the

---

for the SEC Action's allegations.  In signing the NPA, CEO Williams on behalf of Fannie accepted responsibility for Fannie's conduct and did not "dispute, contest, or contradict the factual statements set forth" in the Statement of Facts. NPA ¶1. To the extent that these sources are considered the basis for information and belief, Lead Plaintiffs allege facts with particularity and identify within the newly-added sections of this complaint the exact sources for the factual allegations.  The information alleged is otherwise within Defendants' possession and knowledge.

Company had long been a cautious investor in safe, conventional mortgages.  At the beginning of the Class Period, Fannie's senior executives specifically reported that the Company was staying away from riskier loans, such as no-document Alt-A loans, and would only consider getting involved with them on a limited basis if Fannie was paid for the extra risk it was taking. But its public image and statements were at odds with reality; there was a very different story behind the scenes.

6.      By the mid-2000s, the mortgage market was rapidly expanding in the direction of high-risk, non-prime mortgage loans, and Fannie's market share was dropping rapidly.  At the same time, Fannie was under increasing pressure to take on more risk by purchasing and securitizing these non-prime mortgage loans.   In particular, Fannie's largest customer, Countrywide—with whom Fannie had a longstanding and lucrative relationship—threatened to sell its loans directly to Wall Street rather than to Fannie unless the Company bought a bigger piece of its highest-risk loans.

7.      As the housing market changed, Fannie was presented with a fateful choice.  As set forth in a June 2005 internal presentation ("June 2005 Presentation") that was found by Congressional investigators in the files of Fannie's now-former CEO, Defendant Daniel H. Mudd ("Mudd"), Fannie could either "stay the course" by continuing to focus on low-risk, traditional, 30-year fixed-rate mortgages or "meet the market" by focusing on high-risk, non-prime mortgage loans thereby generating higher revenue and profits, but exposing the Company to unprecedented risk.

8.      Defendants chose to meet the market and caused Fannie to secretly deviate from its public persona as one of the lowest-risk financial institutions in the world.  Yet, Fannie faced a problem.  It was ill-prepared to "meet the market."  As noted in the June 2005 Presentation, the

Company lacked "capabilities and infrastructure" as well as "knowledge of the credit risks." Defendants knowingly caused Fannie to begin accumulating high-risk loans without the resources—both human and structural—to identify and manage the credit risk associated with such loans.  In fact, in October 2006, at the same time that the Company was continuing to dramatically ramp up its investment in high-risk, non-traditional loans, Fannie's Chief Risk Officer, Defendant Enrico Dallavecchia ("Dallavecchia"), warned Mudd that he had "a serious problem with the control process around subprime limits . . . . **There is a pattern emerging of inadequate regard for the control process**." (Emphasis added.)  Dallavecchia repeated his internal warning in July 2007, telling Mudd that Fannie was "not even close" to having proper risk controls.  As Mudd later admitted at a December 2008 Congressional hearing, he was warned in October 2006 that Fannie "[was] rushing into billions of dollars worth of subprime loan purchases without really knowing what [it was] doing."

9.     Because Fannie lacked the capabilities to assess the credit risks of high-risk, non-traditional loans, its move to "meet the market" was essentially an undisclosed high stakes gamble without adequate ability to judge the risk of the bet.  As Marc Gott, a former director in Fannie's loan servicing department told the New York Times in October 2008, "**We didn't really know what we were buying . . . . This system was designed for plain vanilla loans and we were trying to push chocolate sundaes through the gears**." (Emphasis added.)[3]

10.     Despite these known facts, the Defendants began a radical shift in Fannie's business focus from high-quality prime loans to extremely risky non-prime and nontraditional loans, including subprime and Alt-A loans.  Throughout much of the Class Period, the Defendants failed to disclose Fannie's existing, and mounting, exposure to such loans.

---

[3]     Charles Duhigg, *Pressure to Take More Risk, Fannie Reached Tipping Point*, New York Times (Oct. 4, 2008).

11.    Moreover, by the fall of 2006, Fannie, in analyzing the housing market, realized that its foray into the subprime and Alt-A markets would result in massive losses.  Numerous internal reports pointed to severe declines in housing prices and offered projections of serious delinquencies and default rates that would adversely affect Fannie.

12.    In particular, at the end of 2006, Fannie, deeply concerned about home value decline, assembled a team to build a home price model forecast.  The result was a PowerPoint document, completed in January 2007, called the "Home Price Forecasting Report."  According to this report, which was not made public during the Class Period, Fannie projected a 50% decline in home prices in the near term.

13.    Notwithstanding Fannie's inadequate risk control and its projections of impending massive declines in home prices and increases in delinquency and default rates, the Defendants continued to tell investors that, regardless of the condition of the subprime/Alt-A mortgage market, the Company's book of business was strong because it was only purchasing products "comparable to the conventional book of business" and "the credit quality of [its Alt-A] looks like the credit quality of the rest of [its] book."

14.    Unbeknownst to investors, Defendants misrepresented Fannie's exposure to subprime loans.  While in its public filings Fannie described subprime loans as those "made to borrowers with weaker credit histories," or "a higher likelihood of default," Defendants failed to disclose that Fannie did not include in its subprime disclosures certain subprime-quality loan products that were specifically targeted at borrowers with weaker credit histories and higher default risks, including "Expanded Approval" ("EA") and "My Community Mortgage" ("MCM") loans.  Defendants knew that EA loans, in particular, actually performed worse than Fannie's subprime loans and had similar credit characteristics.  Further, Defendants falsely

6

represented that Fannie classified loans as "subprime" when they were originated by a "specialty" subprime lender or a "subprime division of a large lender." In fact, Fannie classified as "subprime" only the loans originated by 15 of approximately 210 lenders on the subprime lender list issued by the Department of Housing and Urban Development ("HUD"), and Fannie was unable to even identify loans originated by subprime divisions of large lenders.

15.     Similarly, Defendants also misrepresented Fannie's exposure to Alt-A loans. While in its public filings Fannie described Alt-A loans as those with lower or alternative documentation requirements, Defendants failed to disclose that Fannie did not include in its Alt-A disclosures certain reduced-documentation loan products, such as those internally classified as "Lender-Selected." In addition, Defendants failed to disclose that while they stated that Fannie classified loans as "Alt-A if the lenders that deliver the mortgage loans to [Fannie Mae] have classified the loans as Alt-A based on documentation or other product features," Fannie actually mandated which loans lenders should classify as "Alt-A" versus the undisclosed "Lender-Selected."

16.     By failing to disclose Fannie's true exposure to subprime and Alt-A loans, Defendants vastly understated Fannie's risk by magnitudes.

17.     Thus, as the Defendants transformed Fannie from a low-risk, conservative institution into a highly-leveraged entity with massive risk exposure, they falsely represented to investors that Fannie's credit profile and underwriting standards were strong and unchanged. Accordingly, investors had no way of knowing that Fannie was no longer the same prudent mortgage investor and guarantor it had been for decades.

18.     Fannie's misrepresentations misled even sophisticated research analysts. For example, on February 28, 2007, Bear Stearns issued a research report that stated, in part: "[T]o

date the [C]ompany has limited its exposures to sub-prime and Alt A loans .... [Fannie] believes its credit performance will remain significantly better than most other market participants ....” Further, on May 9, 2007, JP Morgan issued an analyst report which stated: “Single-family credit quality remains good, and what little exposure Fannie has to higher risk subprime and Alt-A products is largely credit enhanced to minimize Fannie’s losses.”

19.     Even as it accumulated hundreds of billions of dollars of risky loans, Fannie falsely reassured investors that it had a healthy core capital cushion—a crucial financial safety net the Company was required to maintain to protect against both a downturn in the mortgage market and other financial losses—that would allow it to absorb any losses.  The Company regularly affirmed to investors that its core capital level was well above the minimum required by federal regulators—an amount woefully inadequate to protect against the losses that the Defendants knew Fannie was facing based on its inadequate risk controls and internal projections regarding the housing market.

20.     As the housing market continued to crater in late 2007 and 2008, Fannie’s financial position became increasingly more difficult to hide.  By this time, Fannie’s internal projections had become a reality.  With actual housing prices plunging and borrowers— particularly the high-risk borrowers who took out subprime and like loans—defaulting in huge numbers, the Defendants could no longer continue the charade and were forced to admit that Fannie was swamped by massive losses.  Once the government discovered the truth, it had no choice but to assume control of Fannie as conservator.

21.     By the start of the Class Period, the Defendants had set in motion the events that led to Fannie’s destruction.  The Defendants blatantly ignored the specific warnings from Fannie’s Chief Risk Officer that the Company did not have the risk controls in place to monitor

and assess the risks of subprime/Alt-A products.  They knew that they were gambling with Fannie's—as well as investors'—future by blindly rushing into subprime mortgage investments, but they decided simply to disregard the danger.  As Columbia Business School professor and mortgage expert Charles W. Calomiris concluded in a written statement to Congress in December 2008, Fannie made a "conscious decision to encourage the underestimation of risk in subprime and Alt-A lending."[4]

22.     In the hours and days following the government takeover, federal officials confirmed the utter falsity of the Defendants' Class Period representations to investors regarding Fannie's purportedly low-risk credit profile and adequate capital cushion.  As Dallas Fed President Richard Fisher stated in a September 8, 2008 speech, quoted by *Bloomberg*, federal examiners "**concluded that the capital of these institutions was too low relative to their exposure.**"  (Emphasis added.)  In a September 23, 2008 report to Congress, FHFA Director Lockhart confirmed that "the credit profile at [Fannie] followed the market down in 2006 and 2007—**without commensurate pricing for risk.**"  (Emphasis added.)  As one pair of mortgage experts concluded:

> [T]he [Fannie Mae] propaganda machine purposefully misled people into believing that it was keeping risk low and operating under an adequate prudential regulatory regime.
>
> — Wallison and Calomiris, *The Last Trillion Dollar Commitment—The Destruction of Fannie Mae and Freddie Mac*, September 2008.

23.     During the Class Period, the Defendants knew of Fannie's exposure to the risks and caused Fannie to sell more than $14 billion of common and preferred shares and more than $439 billion of bonds and other debt securities.  As a result of Fannie's false and misleading statements, investors have suffered billions in losses:  on September 8, 2008, the first day of

---

[4]     Written Statement of Charles W. Calomiris Before the Committee on Oversight and Government Reform, U.S. House of Representatives, Dec. 9, 2008, at 2 ("Calomiris Statement").

trading after the government announced the conservatorship, Fannie's common stock price plunged nearly 90%—from $7.04 to $0.73. The price of Fannie's preferred shares similarly declined. The Defendants are also responsible for earlier losses stemming from the partial corrective disclosures leading up to that final shock to the market. In light of the foregoing, Lead Plaintiffs bring this action seeking to recover the billions of dollars in damages caused by the Defendants' violations of the federal securities laws.

## II.   JURISDICTION AND VENUE

24.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337, and 1367.

25.   Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. §§ 1391(b) and (c); and the order of the Judicial Panel of Multidistrict Litigation, dated February 11, 2009, transferring all related actions pending in other districts to the United States District Court for the Southern District of New York. Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District, and Fannie's securities traded on the New York Stock Exchange ("NYSE") during the Class Period.

26.   In connection with the acts and omissions alleged in this Second Amended Joint Consolidated Class Action Complaint ("Complaint"), all of the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A. Plaintiffs

27.   Lead Plaintiff TCRS is a defined benefit pension plan that serves Tennessee state employees, higher education employees, K-12 public school teachers, and employees of political subdivisions who have elected to participate in the plan. TCRS purchased or acquired Fannie

securities as set forth in the amended certification filed with the Court on June 22, 2009 (Dkt#102) (appended to the June 2009 Complaint) and July 18, 2011 (Dkt#300) (Exhibit C to the Declaration Of Frederic S. Fox In Support Of Preferred Stock Lead Plaintiff's Motion For Class Certification An Appointment Of Class Representatives And Class Counsel).

28.     Lead Plaintiff PRIM manages public pension funds established for the benefit of current and retired Massachusetts employees and public school teachers.  PRIM purchased or acquired Fannie securities as set forth in the certification filed with the Court on June 22, 2009 (Dkt#102) (appended to the June 2009 Complaint) and July 18, 2011 (Dkt#303) (Exhibit E to the Declaration Of Jonathan M. Plasse In Support Of Common Stock Lead Plaintiffs' Motion For Class Certification And Appointment Of Class Representatives And Class Counsel ("Plasse Class Certification Declaration")).

29.     Lead Plaintiff Boston oversees the management of retirement system funds on behalf of current and retired employees of The City of Boston.  Boston purchased or acquired Fannie securities as set forth in the amended certification filed with the Court on June 22, 2009 (Dkt#102) (appended to the June 2009 Complaint) and July 18, 2011 (Dkt#303) (Exhibit F to the Plasse Class Certification Declaration).   Federal National Mortgage Association

30.     Defendant Fannie is a government-sponsored enterprise ("GSE") chartered by Congress, with its principal place of business located at 3900 Wisconsin Avenue NW, Washington, DC 20016-2892.   Fannie is owned by the Company's shareholders, and the Company's equity securities were listed and traded on the NYSE during the Class Period. Fannie operates in the U.S. secondary mortgage market by providing funds to mortgage lenders through the purchase of mortgages and mortgage-related securities.   Fannie also issues and guarantees mortgage-related securities.

### B. Officer Defendants

31.     Defendant Daniel H. Mudd was President, Chief Executive Officer ("CEO") and a director of Fannie during the Class Period.  In his role as CEO, Mudd chaired the Management Executive Committee, which was responsible for reviewing and overseeing Fannie's overall risk management, which included addressing:  (1) issues referred to it by Fannie's risk committees; (2) matters that involved multiple types of risks; and (3) other significant business and reputational risks.  When the government took over Fannie, the Company announced that Mudd would be fired.  Mudd signed each of the Company's Forms 10-K and 10-Q filed during the Class Period.

32.     Defendant Enrico Dallavecchia was Executive Vice President and Chief Risk Officer ("CRO") during the Class Period until August 2008.  In his role as CRO, Dallavecchia chaired the Allowance for Loan Losses Oversight Committee, which reviewed and approved the methodology and the amount of Fannie's allowance for loan losses and reserve for guaranty losses (combined loss reserves) on a quarterly basis.  In addition, as CRO, Dallavecchia had an oversight role regarding credit, market, operational and liquidity risks.  Among other things, Dallavecchia warned Defendant Mudd that Fannie's risk management systems were inadequate.  Dallavecchia made a number of false and misleading statements in conference calls during the Class Period.

33.     Defendants Mudd and Dallavecchia are referred to herein collectively as the "Officer Defendants."  Each of the Officer Defendants made knowingly false and misleading statements concerning, *inter alia*, Fannie's (i) risk management and controls, and (ii) exposure to subprime and Alt-A mortgages in public filings and statements and in other public presentations, speeches, and/or testimony.

12

34.     Throughout the Class Period, Defendant Mudd was responsible for ensuring the accuracy of Fannie's public filings and other public statements, and he personally attested to and certified the accuracy of Fannie's financial statements.

35.     It is appropriate to treat the Officer Defendants as a group for pleading purposes and to presume that the false and misleading information contained in Fannie's public filings, press releases and other statements, as alleged herein, are the collective actions of this narrowly defined group of defendants.  By virtue of their high level positions at Fannie, each of the Officer Defendants directly participated in the day-to-day management of Fannie, and each was privy to confidential, proprietary information about Fannie's business, operations and practices.  The Officer Defendants were involved or participated in drafting, reviewing, approving, and/or disseminating the false and misleading statements alleged in the Complaint.  Both were on the disclosure committee–Mudd as CEO and Dallavecchia as the only representative from the Chief Risk Office.  They were thus aware that the statements were being made, and they nonetheless approved or ratified them in violation of the federal securities laws.

36.     As officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, and traded on the NYSE, and is also governed by the provisions of the federal securities laws, the Officer Defendants each had a duty to disseminate promptly accurate and truthful information with respect to Fannie's financial condition, performance, operations, and business practices and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Fannie's publicly traded securities would be based upon truthful and accurate information.  The Officer Defendants' misrepresentations and omissions during the Class Period violated the federal securities laws.

37.     Fannie and the Officer Defendants are referred to herein as the "Defendants."

**D.      Federal Housing Finance Agency**

38.     Defendant FHFA was created on July 30, 2008, when the President signed into law the Housing and Economic Recovery Act of 2008 ("HERA"). HERA gave FHFA the authority necessary to oversee Fannie Mae. In addition, HERA combined the staffs of OFHEO, the Federal Housing Finance Board (FHFB), and the GSE mission office at HUD. On September 7, 2008, James Lockhart, the director of FHFA, announced that Fannie would be placed under conservatorship and FHFA would assume the power of its board and management.

39.     On September 3, 2009, FHFA requested a pre-motion conference on its anticipated motion to intervene in this action. (Dkt#180). On October 2, 2009, the Court conducted a scheduling conference wherein FHFA's request was addressed. *Id.* On October 13, 2009, pursuant to Rule 24(a) of the Federal Rules of Civil Procedure, the Court granted FHFA's request to intervene and ordered that FHFA may "intervene as a defendant." *Id.*

**IV.    FANNIE'S BUSINESS AND OPERATIONS**

**A.      Fannie Is a Leading, Important Player in the Mortgage Market**

40.     Fannie is the nation's largest source of financing for home mortgages and one of the world's chief non-bank financial services firms. The Company's common stock was listed and publicly traded on the NYSE under the ticker "FNM" during the Class Period. Certain series of Fannie's preferred stock traded on the NYSE during the Class Period.

41.     At the end of 2006, Fannie had reported stockholder equity of $41.5 billion, making it one of the most prominent companies on the NYSE. By comparison, a company such as Microsoft had stockholder equity of approximately $40 billion for the same time period. Indeed, as Ladenburg Thalman analyst Richard X. Bove noted in a July 2008 research report, Fannie's assets approached the size of those held by the Federal Reserve.

42.    Fannie was chartered as a GSE in 1968 by the United States Congress for the purpose of providing liquidity in the secondary mortgage market to increase the availability and affordability of homeownership.  The other GSE is its sister organization, Freddie Mac (also referred to herein as "Freddie").  Although a GSE is government-chartered, it is a private shareholder-owned and controlled institution that, while lacking an express government guarantee, benefits from the perception that the government stands behind its securities and financial obligations.

**B.        Fannie Has Two Symbiotic Businesses**

43.    Fannie operates exclusively in the secondary mortgage market and does not loan money directly to consumers.  The foundation of its business is supported by two separate, but important pillars—its *credit guaranty* business and its *portfolio investment* business.  With both businesses' lifeblood consisting primarily of acquired mortgages, the two generally flourish or flounder in tandem.  Fannie refers to these two businesses together as its "mortgage credit book of business."[5]

44.    Fannie's role in the *credit guaranty* business is to be financially responsible for borrowers' defaults.  During the Class Period, Fannie purchased mortgages from lenders— mortgages it put into trusts for purposes of holding them separate from its other assets—and then packaged them into mortgage-backed securities ("MBS").[6]  Then, for a fee, Fannie *guaranteed* its MBS holders that the borrowers whose mortgages made up the MBS would, in fact, timely pay their interest and principal.

---

[5]      According to Fannie's 2007 Form 10-K, the *credit guaranty* side of Fannie's business represented 73% of Fannie's book of business, and the *portfolio investment* side represented 25%.

[6]      Purchasers of Fannie MBS were buying a beneficial interest in pools of mortgage loans and other mortgage-related securities issued by Fannie.

45.     On a regular basis, usually once or twice a year, Fannie bargained individually with each lender to determine (a) the types of loans that Fannie would accept from them and (b) the "guaranty fee" that the lender would pay Fannie.  Fannie was typically compensated for providing a guarantee by retaining a portion of the borrowers' interest payments going into the MBS trust.  While the guarantee obligation was Fannie's alone, it typically hedged that credit risk by either obtaining separate guarantees from third parties, such as lenders that originated the mortgages, or contracting with financial guarantors.

46.     On the *portfolio investment* side, Fannie held mortgage loans, mortgage-related securities, and other securities that it purchased from commercial banks for its own investment purposes.  The mortgage-related securities in which Fannie invested included both MBS created by third parties—referred to as "private label" MBS—and Fannie MBS.  Fannie funded these portfolio purchases by issuing short and long term debt and debt securities to domestic and international capital market investors.  Fannie profited to the extent that the income from mortgage assets and other investments in its portfolio exceeded the low amount of interest it was paying its debt-holders.

**C.    Fannie's Charter Places Restrictions on the Type of Loans in Which Fannie Can Transact, with a Clear Emphasis on Safety**

47.     As stated in an OFHEO "Report of the Special Examination of Fannie Mae," dated May 2006:  "Fannie Mae senior management promoted an image of the Enterprise as one of the lowest-risk financial institutions in the world and as 'best in class' in terms of risk management, financial reporting, internal control, and corporate governance."

48.     As explained in Fannie's 2006 10-K, under its charter, Fannie is not allowed to purchase or securitize mortgage loans with original principal balances larger than a certain limit, which, during 2006 and 2007, was $417,000 for a single-family residence.

16

49.     Similarly, Fannie's charter requires credit enhancement on any conventional single-family loan purchased or securitized by Fannie with a loan-to-value ratio of over 80%.

50.     As further explained in Fannie's 2006 10-K, Fannie is required under its charter "to obtain approval of the Secretary of HUD for any new conventional mortgage program that is significantly different from those approved or engaged in prior to the enactment of the [1992 Act]."

51.     Throughout the 1990s, the mortgages purchased and securitized by Fannie remained overwhelmingly 30-year (*i.e.*, long term) fixed rate, prime mortgages.

52.     Fannie's long-standing conservative reputation together with regulatory restrictions understandably gave investors false comfort — comfort that the Defendants exploited.

## V.     THE DEFENDANTS' FRAUDULENT SCHEME REGARDING FANNIE'S RISK MANAGEMENT AND CONTROLS

53.     The Defendants are liable for violations of the Exchange Act arising out of the sale of Fannie common shares and preferred shares during the Class Period.

### A.     Subprime and Non-Prime Loans Fueled the Growth and Crash of the United States Housing Market

#### 1.     The Growth

54.     In the early part of the last decade, low interest rates and easy credit conditions, followed by the availability of ample debt options, sparked a housing boom.  With eager potential purchasers, the seemingly always-escalating value of real estate, and a supply of properties that trailed demand, lenders loosened their lending standards and offered more and more loans to higher-risk borrowers.  During the early part of this decade, home prices rose exponentially faster than 25 years preceding it and at a dramatically faster rate than income. Somewhat illogically, between 2001 and 2006, while the premium charged by subprime lenders

over prime lenders shrunk by approximately 50%, the credit ratings of the subprime borrowers declined. In other words, while the risk of default went up, the cost of the loan went down.

55.    To keep pace with a market that seemed increasingly out of reach, buyers sought less traditional loan structures that allowed them to keep more expensive home purchases affordable. For example, one widely-used structure was the adjustable rate mortgage ("ARM"), which had a two-part interest payment system:  (a) several years at a very low rate, with (b) a jump to a higher adjustable rate for the remainder of the loan term.   Borrowers generally assumed that they would re-finance before the jump in rates.  But that assumption required stable rates to keep loans affordable, as well as level or rising home prices to ensure property values would cover the principal of the new loan, with room to spare.

56.    During this period, buyers of all stripes attempted to buy new homes.  Many did not have the credit or income history to justify lenders providing them with prime (*i.e.,* long-term, quality) loans.  But as interest rates dropped, mortgage *investors* became dissatisfied with the limited returns that they were getting from traditional loan investments.  They had an appetite for riskier debt, and loan originators obliged by expanding into the subprime and Alt-A market. In 2003, less than 11% of originations were non-prime (subprime or Alt-A); by 2006, more than one-third of all originations fit that category.  During this period, "Alt-A originations increased almost fivefold."

### 2.    The Crash

57.    Securitizing riskier loans was premised on the notion that one could obtain return while passing the risk to others.  Securitization of subprime and non-prime loans (*i.e.*, the creation of MBS) was fueled by the nexus of investor appetite and high ratings provided by the ratings agencies for these tranched instruments.

58.   A construction boom had followed on the heels of the housing rush, and by this period, with demand satiated, there was a surplus of inventory on the market. According to the National Association of Realtors, during the year that started with the third quarter of 2006, home prices actually declined by 1.5%. The S&P/Case-Shiller Index puts the decline at 3.2%.

59.   Home prices stopped rising in 2006. With property values maintaining or dropping (and with already scant equity evaporating), refinancing became a problem for those very borrowers who needed it the most—those in fear of rising interest rates. Borrowers who did not have verified income or sufficient documentation similarly began to have loan payment problems. Foreclosure rates began to noticeably increase in "early 2006," which can be attributed to the increase in the origination of subprime and other nontraditional mortgages, increases in short-term interest rates and declining home prices.

60.   In the months prior to this critical period, after previously shunning this high risk market, Fannie belatedly entered and aggressively began to increase its position in subprime/Alt-A products. The Defendants abandoned Fannie's reputation as a bastion of safety. As the subprime/Alt-A market grew, the Defendants felt that the Company was missing out on all of the action and, in an effort to stay relevant and find return, they directed Fannie down a fateful path of pursuing higher risk loans even though they knew and/or recklessly disregarded that Fannie's infrastructure was ill-equipped to handle such risk.

**B.   In Order to Maintain Market Share and Increase Returns, the Defendants Severely Altered Fannie's Strategy and Caused it to Pursue Higher-Risk Subprime and Alt-A Loans**

**1.   The Defendants Saw the Market Passing the Company By—It Risked Losing Market-Share, and Its Loans Yielded Unsatisfying Returns**

61.   By the mid-2000s, the credit market was quickly expanding beyond Fannie's comfort zone of safe, fixed rate loans, and into the abyss of riskier mortgage products, such as

19

subprime and Alt-A loans and related securities.   To the extent that there was business opportunity in these new credit areas, it was passing Fannie by; Fannie's market share was dropping dramatically.   As reported in Fannie's Form 10-K for 2004, which was filed in December 2006, "[d]uring 2005, our estimated market share of new single-family mortgage-related securities issuance was 23.5%, compared to 29.2% in 2004 and 45.0% in 2003."

62.     CEO Mudd recognized this diminishing return.   As he stated in an October 5, 2008 New York Times article entitled *Pressured to Take More Risks, Fannie Reached Tipping Point*, "Fannie Mae faced the danger that the market would pass us by. . . . We were afraid that lenders would be selling products we weren't buying . . . ."

63.     Indeed, Fannie faced direct pressure from its biggest lender.  The October 5, 2008 article reported on a meeting between Mudd and Countrywide Financial CEO Angelo Mozilo in or around late 2004/early 2005:

> Shortly after he became chief executive, Mr. Mudd traveled to the California offices of Angelo R. Mozilo, the head of Countrywide Financial, then the nation's largest mortgage lender. Fannie had a longstanding and lucrative relationship with Countrywide, which sold more loans to Fannie than anyone else. But at that meeting, Mr. Mozilo . . . threatened to upend their partnership unless Fannie started buying Countrywide's riskier loans. Mr. Mozilo . . . told Mr. Mudd that Countrywide had other options. For example, Wall Street had recently jumped into the market for risky mortgages. . . . "You're becoming irrelevant," Mr. Mozilo told Mr. Mudd, according to two people with knowledge of the meeting who requested anonymity because the talks were confidential. In the previous year, Fannie had already lost 56 percent of its loan-reselling business to Wall Street and other competitors. "You need us more than we need you," Mr. Mozilo said . . . .

### 2.     The Defendants Knew and/or Recklessly Disregarded the Immense Risk of the Subprime/Alt-A Market

64.     The Defendants materially altered Fannie's risk profile by accumulating subprime and Alt-A mortgage products and understood, but did not disclose, that they were exposing

Fannie to massive risk.  Certain executives at the Company warned against its new strategic direction as Fannie had studied this market before.  Edward J. Pinto, a former Fannie chief credit officer who testified before the U.S. House of Representatives Committee on Oversight and Government Reform on December 9, 2008 (the "December 9 Hearing"), noted in his written statement that "[i]n the early-1990s Fannie and Freddie publicly announced they were no longer buying [Alt-A] loans because they were too risky."[7]

65.    In his testimony at the December 9 Hearing, Charles W. Calomiris (Henry Kaufman Professor of Financial Institutions, Columbia Business School), explained that while subprime and non-prime loans serve a purpose, they require that: (a) a risk premium be paid for the extra risk the lender is taking on and (b) balance in the loan portfolio so that it is not too heavily weighted toward these riskier loans.  "The problem with these sorts of loans arises . . . when the risk is not priced properly . . . . [In such cases] the subprime portfolios may grow to be too large, may earn too little income and may be securitized with too high leverage, all of which results from the underestimation of their risk."[8]

66.    Shortly before accumulating material amounts of subprime and non-prime mortgage products, Fannie was specifically warned of the high risks of entering this market and Fannie's lack of resources to gauge such risk.  According to an internal Fannie presentation dated June 27, 2005 (the "June 27 Presentation"), the Defendants knew that Fannie faced obstacles in its ability to meet the market, including lack of: 1) capabilities and infrastructure and 2) knowledge of the credit risks.

---

[7]    Written Statement of Edward J. Pinto Before the Committee on Oversight and Government Reform, U.S. House of Representatives, Dec. 9, 2008, at 9 ("Pinto Statement").

[8]    Written Statement of Charles W. Calomiris before the Committee on Oversight and Government Reform, U.S. House of Representatives, Dec. 9, 2008 ("Calomiris Statement").

67.     Moreover, as the June 27 Presentation noted, market participants were not appropriately pricing for risk.  The premium spreads between rates charged by subprime over prime lenders had narrowed significantly since 2001.  Further, a Fannie document from March 2005 noted that:  "Although we invest almost exclusively in AAA-rated securities, there is a concern that rating agencies may not be properly assessing the risk in these securities."

68.     According to the June 27 Presentation, due to Fannie's perception that the market was passing it by, the Company faced two choices:  (1) stay the course with safer loans or (2) meet the subprime and non-prime market.  If Fannie did nothing, it would face lower revenue and growth and would continue to lose market share.  On the other hand, as the Defendants knew, meeting the market involved more known risk, which Fannie was ill-suited to monitor and assess.

69.     Accordingly, at the time of the June 27 Presentation, Fannie's Single Family Guaranty Business group recommended that Fannie choose the safer option—"stay the course"—and advocate a public position that educated the public of housing risks, but also dedicate resources to develop a subprime infrastructure, modeling capabilities for alternative markets, and a conduit capability.  However, the immediate lure of revenues from subprime and Alt-A loans proved too tempting for the Defendants to forego, and they caused Fannie to quickly enter into the subprime/Alt-A market knowing that Fannie did not have the internal controls in place to monitor these riskier products.

70.     On June 26 and 27, 2006, Fannie's senior management met for a weekend retreat in Cambridge, Maryland to discuss future strategies.  The result was a report dated July 7, 2006, that, according to Congressional testimony, was circulated to Mudd and other top executives.  The report set forth Fannie's "New business model and growth initiatives."  One initiative

22

described Fannie's new focus on the subprime market: "Single Family's strategy is to say 'yes' to our customers by increasing purchases of sub-prime and Alt-A loans, reducing 'cut outs', and implementing new customer strategies."

     **C.**     **Though the Defendants Were Bullish on Fannie's Abilities Publicly, Fannie's Risk Controls Were Unequal to the Challenge of the Alt-A and Subprime Markets, and Disproportionately Negative Results Followed**

            **1.**     **Publicly, the Defendants Touted Fannie's Ability to Manage Risk for Subprime and Alt-A Investing**

71.    As alleged above, despite Fannie's strong reputation as a highly risk-averse investor, the Defendants recognized in mid-2006, when analyzing whether to materially increase Fannie's exposure to the subprime and non-prime markets, that the Company lacked critical risk-management resources and skills to weather them.  Nevertheless, the Defendants primed the market to believe that Fannie maintained a strong credit book of business and that its exposure to subprime and Alt-A loans was limited.  For example, Fannie stated:

- "We believe that our assessment and approach to the management of credit risk continued to contribute in the third quarter of 2006 to the maintenance of a credit book of business with strong credit characteristics." (Nov. 8, 2006 Form NT 10-Q); and

- "[I]t is a very strong credit book. That will bode us very well as we move into what is going to be a very different housing environment." (December 6, 2006 conference call, statement by Tom Lund ("Lund"), Executive Vice President in charge of Fannie's Single Family Mortgage Business).

72.    On February 27, 2007, Mudd repeated that "we have a book of business with very strong credit risk characteristics."  Further, on the same day, Lund made the following statements concerning Fannie's exposure to Alt-A and subprime mortgages:

Our participation has continued to remain in the higher credit quality segments of alternative documentation. . . .

[W]e have told you we're only going to participate when we think we get the right price/risk equation. . . . and we feel good about the pricing . . . we have put on the books.

73.     The market believed the Defendants' false statements.  On February 27, 2007, Prudential Equity Group LLC analysts Matthew Park and Tony Hill issued an analyst report which stated that: "[W]e expect Fannie Mae to perform better relative to the overall industry due to the statutory requirements for conforming mortgages and the relatively limited exposure to riskier non-traditional mortgage products."

74.     Further, on February 28, 2007, Bear Stearns issued a research report that stated, in part:  "To date the company has limited its exposures to sub-prime and Alt A loans . . . . [Fannie] believes its credit performance will remain significantly better than most other market participants . . . ."

75.     On May 2, 2007, during Fannie's conference call with analysts, Dallavecchia, Fannie's Chief Risk Officer, asserted that "[o]n average, the credit characteristics of our Alt-A portfolio is comparable to the conventional book of business that we have."  Later during the same conference call, Lund joined in with the same talking point, asserting that "[o]n the Alt-A side . . . the credit quality of that book looks like the credit quality of the rest of our book."

76.     On May 9, 2007, JP Morgan issued an analyst report which stated, in part, "Single-family credit quality remains good, and what little exposure Fannie has to higher risk subprime and Alt-A products is largely credit enhanced to minimize Fannie's losses."

77.     On July 27, 2007, Bear Stearns issued a report that stated "Credit quality remains very high.  The subprime mortgage crisis is not affecting Fannie Mae's loss experience. Delinquencies remain very low."  The analysts also stated that they "continue to see Fannie Mae

as much more of a beneficiary of the current subprime/mortgage market crises than a victim, and expect the [C]ompany's business volumes to grow as the market pays more attention to risk."

78.    On November 18-19, 2007, Bear Stearns issued reports that stated in part that "we believe the [C]ompany still faces far less credit risk than most other mortgage market participants" and that "[c]learly, severity is increasing with lower home prices, but we believe the [C]ompany's attention to underwriting and risk will result in significantly lower losses than most other mortgage market participants."

79.    The Defendants continued to bolster Fannie's false public persona.    As an example, the Company changed its policy on when to recognize a loss on a defaulted loan during a period where more loans were defaulting.    *The New York Times* reported in a September 7, 2008 article that, after scrutinizing Fannie's books, federal regulators became concerned that Fannie further **"mischaracterized [its] financial health by relaxing [its] policies on when to recognize a loss on a defaulted loan, according to people familiar with the review.   For years, [Fannie has] effectively done that when a loan is 90 days past due.   But, in recent months, [Fannie] said [it] would extend that to two years.**   As a result, tens of thousands of loans that previously would have been marked down have maintained their value." (Emphasis added.)

80.    In yet another example of the Defendants falsely minimizing Fannie's true risk exposure, according to Confidential Witness 1, a former Fannie Customer Account Risk Manager who reviewed loans being proposed for purchase by Fannie's lender-customers,[9]

---

[9]    Confidential Witness 1 is a former Fannie employee who worked for the Company from February 2006 through January 2009.  Confidential Witness 1 started with Fannie as an Account Associate, during which time she worked on the Company's account with the mortgage lender Countrywide Financial.  In January 2008, she was promoted to Customer Account Risk Manager. In her role working with Countrywide, Confidential Witness 1 gained specific knowledge as to Fannie's evaluation of loans from Countrywide.  Further, as a Customer Account Risk Manager, Confidential Witness 1 gained insight into Fannie's overall loan evaluation process.

Fannie had a category of loans called "Expanded Approval" which it did not classify as being

subprime but, which, if compared with Fannie's guidelines for what constituted a subprime loan,

was in fact subprime.

> **2.     Though They Realized the Company's Risk Was Extensive, the Defendants Failed to Support or Enforce Risk Control**

81.     As reported by the *Washington Post* on December 9, 2008, as long ago as March

2005, Fannie's *former* Chief Risk Officer, Adolfo Marzol, wrote to Defendant Mudd "to warn

that entering new areas of the mortgage market represented significant risk," including the area

of loans "that required little documentation . . . ."

82.     Fannie's Chief Risk Officer for the Class Period similarly had concerns that

Fannie's risk controls were defective at the same time as the Company was taking on more risk

in the form of subprime/non-prime mortgages.   On October 28, 2006, in a pointed email to

Mudd, Dallavecchia complained as follows:

> Dan, I have a seri[ous] problem with the control process around subprime limits.
>
> The business actions in terms of ramping up business much faster than what would be consistent with the $5 [billion] limit for [the] year end we agreed upon less than two months ago is de facto preventing me to exercise my reserved authority to determine limits without damaging relationships with customers.
>
> This is on top of the recent lack of process on the Chase deal (also a limit excess on concentration and debt to income ratios), and after we approved twice (in March and in June) to buy loans without having completed the new business initiative.
>
> There is a pattern emerging of inadequate regard for the control process.

83.     At the December 9 Hearing, Mudd confirmed that he understood Dallavecchia's

email meant that Fannie was "ramping up too quickly on the subprime purchases and this

acceleration prevented [Dallavecchia] from determining appropriate risk limits."   Congressman

Bruce Braley asked Mudd whether the e-mail meant that Dallavecchia "believed that you were

rushing into billions of dollars worth of subprime loan purchases without really knowing what you were doing. Isn't that what he is saying here?" Mudd responded, "Yes." Mudd also agreed with Congressman Braley's comment that "if the control processes [we]re not in proper working order, it prevent[ed] you from following a rational decision-making model …."

84.     Instead, according to Confidential Witness 2, a former risk modeler who worked for Fannie as Director of Risk Management in the Business Analytics division (which was overseen by Dallavecchia's Chief Risk Office) from May 1993 until August 2007,[10] Fannie did not evaluate the risk of the subprime mortgage pools it bought; it did not have a model to evaluate them. As late as August 2007, Fannie was still building those models.

85.     According to Confidential Witness 2, because Fannie did not have the ability to analyze pools in-house, it instead relied on ratings issued by ratings agencies, such as Moody's, to guide its mortgage pool purchases.

86.     As the Defendants subsequently admitted, in Fannie's 2006 Form 10-K, filed on August 16, 2007, "the prevalence of loans made based on limited or no credit or income documentation also increases the likelihood of future increase in delinquencies or defaults on mortgage loans.  An increase in delinquencies or defaults likely will result in a higher level of credit losses, which in turn will reduce our earnings."

87.     Fannie's own analytics predicted a surge in loan delinquencies by early 2007. Beginning in January 2007, Eric Rosenblatt, a Vice President ("VP") of Credit Risk for the Company's Single Family business, began producing a Comprehensive Credit Risk Assessment Report (the "Risk Report") that provided a detailed review of Fannie's overall credit risk. According to Confidential Witness 2, the Risk Report "had a way of showing whether a loss

---

[10]     Confidential Witness 2 has specific knowledge of Fannie's credit risk as well as its modeling procedures and capabilities.  Confidential Witness 2 was also privy to an internal home price forecasting report that warned top management at Fannie that home prices were about to suffer a massive decline.

attribute was worse than expected . . . . [For example y]ou could see what high [loan-to-value ratio ("LTV")] loans were doing."   The Risk Report was updated on a monthly basis, said Confidential Witness 2, and was "a key thing consumed by the business people" in the Single Family division — it was distributed to "anyone in [the] Single Family business or credit."   The Report was posted on the Company's internal website, for consumption by senior executives, which includes the Officer Defendants.   Confidential Witness 2 recalled that, by August 2007, the Credit Risk department was "getting very worried" about the risks of Alt-A loans based on loss projections set forth in the monthly Risk Reports.   In addition, Confidential Witness 2 stated, Rosenblatt ran an "internal quarterly portfolio review" of Alt-A loans at that time which specifically showed "the performance of Alt-A had started to deteriorate."   The quarterly portfolio review result would have been posted on the internal web site as part of the Risk Report, again for consumption by senior executives including the Officer Defendants.

88.    Fannie's analytics further predicted a massive decline in the housing market. According to Confidential Witness 2, in late 2006, Fannie was worried about a rapid decline in home prices that would wipe out Fannie's core capital.   According to Confidential Witness 2, in January 2007, Rosenblatt also assigned a team to build a home price model forecast.   The result was a Power Point document, completed in January 2007, called the "Home Price Forecasting Report."   This report, which was a component of the Risk Report, was built using home prices from forty different regions of the country.   The report showed that income was *far below* what it took to sustain the housing market and that home prices would therefore decline dramatically. According to Confidential Witness 2, Fannie saw a negative 50 percent drop in home prices in three to five years.   Based on this forecast of home price decline, for the first time in Fannie's

history the report predicted "over a billion dollars—up from $300 to $400 million dollars—in losses. We finally broke a billion."

89.   Confidential Witness 3 who, in her role as a Senior Business Manager in Fannie's Enterprise Risk Services department had direct knowledge of the Company's credit risk profile,[11] recalled that by late 2006 Fannie had produced internal reports warning of declining home prices and increased loan delinquency rates.  These reports went to "senior [Vice-Presidents] and senior leadership," which includes the Officer Defendants.  According to this source, there was no question that Fannie's senior leadership such as the Officer Defendants would have been aware of the dire warnings in the reports because the information from these reports came from the top down.  In other words, in order for someone in Confidential Witness 3's position to have knowledge of the information in the reports, senior leadership would have had to approve release of such information.

90.   Thus, by late 2006, the Defendants knew that their venture into risky subprime and Alt-A mortgages and mortgage related products was going to result in severe losses.  In an effort to prolong the inevitable, the Defendants continued to pursue risky mortgages in pursuit of higher revenue.  Fannie's Subprime Business Unit recommended to the Credit Risk Committee that the Company commit $11.25 billion more to subprime loans in 2007 than it did in 2006.

91.   Even while proceeding with their risky strategy of accumulating subprime/non-prime products, the Defendants never remedied the fact that Fannie lacked the risk control processes to assess and monitor the heightened risk.

---

[11]   Confidential Witness 3 is a former Fannie employee who worked for the Company from 2004 through early 2009.  In her position, she had direct knowledge of the decision-making that shaped the credit risk profile of Fannie's Single Family business.

92.     Dallavecchia warned Mudd and the Company's Chief Operating Officer, Michael
Williams, that cuts to his division's budget would materially impair Fannie's ability to manage
risk.  On July 16, 2007, Dallavecchia wrote an email to Williams and stated the following:

> **Doing the budget for n[e]xt year off my forecast and with a 16pct further
> reduction in budget is at best being ill informed or maybe . . . [is] due to
> malice.**  I find it offe[n]sive to my intelligence and that of my staff.
>
> **The company has one of the weakest control processes I [have] ever
> witness[ed] in my career . . . .  This company really doesn't get it, we are not
> even current and we are already back to the old days of scraping on controls
> and people . . . .**

(Emphasis added.)

93.     That same day, Dallavecchia forwarded to Mudd the email that he had sent to
Williams and further stated, in part, the following:

> In a nutshell, I am very upset as I had to stand at the Board meeting today and
> hear that we have the will and money to change our culture and support taking
> more credit risk.

                    *          *          *

> It was inappropriate what was said today to the Board as if I had all the necessary
> means and budget to act on the strategic plan.  **I do not even think that with
> what I was given for 2008 is adequate for the current risk, considering how
> far we already are from adequate market practices.**  I had no part in some
> Board members asking questions on having the means to execute, but I cannot let
> the impression stand, as my credibility and reputation with them will be at stake.

                    *          *          *

> …I can only infer malice from some of your directs…when they are fully aware
> that CRO is in full build up mode, that I took leadership not only in cutting
> expenses from CRO but for the whole risk discipline this year, and that **I have
> been saying that we are not even close to have proper control processes for
> credit, market and operational risk.  I get a 16pct budget cut. Do I look
> stupid?** And if they didn't act with malice, I would propose that maybe they don't
> get how you run budget custs [sic].

(Emphasis added.)

94.     None of these facts were disclosed to the investing public.   Instead, the Defendants maintained that Fannie's financial condition was sound and the risks it had taken were prudent.   On September 20, 2007, Mudd testified before Congress that Fannie could "provide more liquidity help to the home finance market today without taking risks we are not capable of managing" and that Fannie had "vastly reduced [its] material control weaknesses."

**D.      The Defendants Did Not Take Protective Steps to Reduce the Risk Associated With Fannie's Investments in and Guarantees of High-Risk Debt**

95.     At the same time that the Act Defendants shifted the business focus away from safe, "plain vanilla" loans and toward risky subprime and Alt-A loans, they failed to seek appropriate protection for the Company's enhanced risk through such things as higher pricing, stringent underwriting standards and financial guarantor hedging.

96.     As explained by Professor Calomiris in his written testimony for the December 9 Hearing, subprime and non-prime loans may serve a legitimate purpose but require (a) a premium to be paid for the extra risk the lender is taking on and (b) balance in the loan portfolio so that it is not too heavily weighted toward these riskier loans:

> The problem with these sorts of loans arises . . . when the risk is not priced properly as the result of either a distorting government subsidy or a market failure. In the presence of such distortions, subprime portfolios may grow to be too large, may earn too little income and may be securitized with too high leverage, all of which results from the underestimation of their risk. If this happens in the extreme, as during the current financial crisis, the excessive lending and leveraging can lead to a systemic threat to the financial system.[12]

**1.      The Defendants Failed to Properly Price Fannie's Guarantees Related to Alt-A Loans**

97.     The Defendants failed to price Fannie's guarantees for MBS backed by Alt-A loans to compensate for the loans' increased risk and the correspondingly increased likelihood

---

[12]     Calomiris Statement, at 2.

31

that the loans would default and leave Fannie liable for the remaining principal and loan payments.

98.     As reported by the New York Times in an October 5, 2008 article focusing on the period between 2005 and 2007, a "former senior Fannie executive" explained that the Defendants "understood that [Fannie was] now buying loans that [it] would have previously rejected, and that **the models were telling us that [Fannie was] charging way too little.**" (Emphasis added.)  As FHFA director Lockhart confirmed in his September 23, 2008 report to Congress, "the credit profile at [Fannie] followed the market down in 2006 and 2007—**without commensurate pricing for risk.**" (Emphasis added.)

### 2.     The Defendants Did Not Maintain Fannie's Underwriting Standards

99.     Fannie also failed to adequately monitor the underwriting of the lenders from which it acquired mortgage loans.

100.    In the pursuit of ever-greater profits and market share, the Defendants essentially advocated abandoning Fannie's underwriting standards:  Congressional testimony given at the December 9 Hearing indicated that beyond the $11.25 billion in additional subprime loans that Fannie's Subprime Business Unit proposed on January 17, 2007 to the Credit Risk Committee, the Unit also proposed **eliminating** restrictions on the volume of mortgages Fannie could purchase with lower borrower scores and unverified income.

101.    According to Confidential Witness 1, who in her role as a Customer Account Risk Manager had a detailed knowledge of Fannie's loan evaluation process, the Defendants loosened Fannie's guidelines for the quality of the loans it would accept as early as 2006.  For example, the Company accepted FICO scores that were as low as 500.

102.   The Defendants also pulled back on the Company's use of Desktop Underwriter ("DU"), an automatic underwriting program that had previously been used to help screen out especially high risk loans.   As former Fannie CEO Franklin Raines ("Raines") testified to Congress at the December 9 Hearing, "it appears that in taking on [high-risk] loans, Fannie Mae had altered its underwriting standards by, for example, not running many of those loans through [DU], an automated tool that helps lenders evaluate and price credit risk."   Indeed, Lund admitted in the August 8, 2008 analyst conference call that "[a] significant portion of Alt-A doesn't go through DU."

### 3.   The Defendants Failed to Manage Credit Risk Exposure by Allowing, for Critical Customer Relationships, Internal Rule-Bending of Policies Designed to Insulate the Company from Risk

103.   Exhibiting a desire both to please lenders with whom Fannie had lucrative relationships and to obtain higher-risk/higher-yielding loans, the Defendants demonstrated an unwillingness—beyond already lax controls—to manage risk, as demonstrated by Fannie's relationship with its key customer/lending partners Countrywide Financial and IndyMac.

#### (a)   Countrywide

104.   Countrywide was Fannie's largest supplier; it delved heavily into subprime and non-prime loans.   As mentioned previously, Countrywide CEO Anthony Mozilo put direct pressure on Fannie CEO Mudd for Fannie to start buying Countrywide's riskier loans, noting, "You need us more than we need you."

105.   The relationship was one of continual pressure and disregard of internal rules and procedures.   Fannie made exceptions to its loan and servicing criteria for Countrywide. According to Confidential Witness 4—a former Operations Manager in the Credit Loss Management ("CLM") Operations group, who coordinated loan document review for loans that

had been selected for review during Fannie's quality control review process[13]—Countrywide's working relationship with the CLM group deteriorated during the Class Period. Specifically, starting in late 2007, Countrywide refused to cooperate with Fannie's loan review process. According to Fannie's normal review policies, once a loan was selected for review, Fannie's policies and procedures required that the loan documentation be turned over within 45 to 60 days. If that deadline was not met, Fannie would, as a matter of course, ask the lender to repurchase the loan. But starting in late 2007, Confidential Witness 4 observed that there were a very excessive 6,000 to 7,000 Countrywide files that had been requested, but had yet to be produced within the required timeframe.

106. According to Confidential Witness 1, a former Account Associate at Fannie who worked specifically with Countrywide, the mortgage lender was Fannie's biggest client and was given "more room" than other lenders. When Countrywide spoke, said Confidential Witness 1, "Fannie Mae jumped." Fannie feared that if it did not cater to Countrywide, the lender would take its business elsewhere.

107. Under the Company's risk management guidelines, when a certain significant number of outstanding files accumulate, a trigger acts to prevent the lender from selling to Fannie (at least until the risk issue is resolved), or else change the terms of their agreement. According to Confidential Witness 4, Fannie disregarded its policies and procedures and did not enforce the trigger for the Countrywide relationship.

---

[13]     Confidential Witness 4 is a former Fannie employee who worked for the Company from August 2006 through August 2008. From August 2006 until the end of 2007, Confidential Witness 4 was a member of the Central Business Analysis Team (CBAT)—a group which provided technology and business support to Credit Loss Management (CLM) and the National Underwriting Center (NUC), as well as the National Property Disposition Center (NPDC). In early 2008, Confidential Witness 4 assumed the role of Operations Manager in the CLM group, and remained in this role until he left Fannie in August 2008. The overall responsibility of CLM is to monitor credit loss management on Fannie's single family book of business. As a CLM operations manager, one of Confidential Witness 4's main responsibilities was to coordinate the loan review process, including loans that experienced early payment defaults or were foreclosed.

108.    Also, according to Confidential Witness 4, Fannie and Countrywide disagreed on the amount Countrywide should have to pay Fannie to repurchase certain loans that Fannie had the right to put back to lenders.  In the Spring of 2008, there was a directive from the VP for CLM setting the repurchase value that Fannie would seek from original lenders at 92% of the value of the loan.  But, in the Spring of 2008, when Fannie sought to have Countrywide repurchase approximately $680 to $690 million in loans, the VP of Sales in charge of the Countrywide relationship was told to accept just $120 million—materially less than 92% of the amount sought.

### (b)    IndyMac

109.    Prior to late 2007, IndyMac only had a limited relationship with Fannie.  In November 2007, after its primary sales pipeline—the secondary market—completely dried up, IndyMac announced massive losses for the third quarter of 2007, and its survival depended on it finding another repository for its loans.  In an attempt to find such a repository, IndyMac began to focus on loans that could be sold to the GSEs.  According to IndyMac's 2007 Annual Report, sales to GSEs such as Fannie increased to 48% of total loan distribution for the year ended December 31, 2007, which was $71.2 billion.

110.    Many of these loans were seriously flawed: According to Teri Buhl, an investigative reporter for the *New York Post*, after IndyMac was seized by regulators in July 2008, Fannie asked IndyMac to repurchase between $1 and $10 billion in loans because IndyMac violated representations and warranties on various loans sold to Fannie that continued to be serviced by IndyMac.  According to Buhl, IndyMac originated billions of dollars of loans that experienced early payment defaults or were made under fraudulent conditions.

111.    Fannie had advance warning of IndyMac's fraudulent loans in 2006, but nevertheless increased its exposure to that company anyway.  As alleged in *Folsom v. IndyMac*

*Bancorp, Inc. et al,* 2:08-cv-03812-GW-VBK (C.D. Cal.), Michelle Leigh ("Leigh"), First Vice President and Division Head of Post Production Quality Control in the Consumer Lending Group at IndyMac from August 4, 2004 to September 2006, specifically told Fannie of IndyMac's failure to comply with regulatory guidelines. Leigh was responsible for sampling and reviewing all IndyMac loans. In her position, she prepared a preliminary report that identified 63 findings of significant problems in the loans that she had reviewed. These findings showed that the loan documentation was fraudulent. For instance, she identified a loan with a "stated income" of $90,000, but the borrower's loan file disclosed that she earned $11.00 per hour as a cafeteria cashier at Disneyland. The report, despite the objection of Leigh, was revised. Accordingly, on September 8, 2006, Leigh wrote to Fannie complaining about this issue, a warning Fannie failed to heed. Despite this warning, Fannie continued to purchase, and actually increased its purchase of, loans from IndyMac.

### 4.    Fannie Did Not Diversify the Portion of its Book of Business That Was Concentrated in Geographically Risky States

112.    During a housing boom, geographic areas that have experienced exceptional appreciation in home prices are at risk for correspondingly disproportionate decreases when prices decrease. Fannie's book of business was concentrated in states that had been particularly affected by the real estate boom, leaving the Company with massive risk exposure: falling home prices lead to rising delinquencies, as the prices fall below unpaid mortgage principal.

113.    In past filings, Fannie had identified California—and California alone—as a geographic source of risk. In **each** of its Forms 10-K's for the years **2004**, **2005** and **2006**, which were filed, respectively, on December 6, 2006, May 2, 2007, and August 16, 2007, the Exchange Act Defendants only claimed concentrations in California—"Except for California . . . no other significant concentrations [of Fannie's book of business] existed in any state."

114.    However, unknown to the investing public, Fannie also had concentrations in other high risk geographic areas.  On November 9, 2007, when it filed its 2007 third quarter 10-Q, Fannie disclosed: "We have also experienced a significant increase in delinquency rates in loans originated in California, Florida, Nevada and Arizona.  These states had previously experienced very rapid home price appreciation and are now experiencing home price declines." Elsewhere in the filing, Fannie noted its exposure in California and Florida:  "California and Florida . . . represent the two largest states in our single family mortgage credit book of business . . . ."  And building on those disclosures, Fannie's 2008 first quarter 10-Q, filed before the start of trading on May 6, 2008, stated that "[o]ur credit losses for the quarter were concentrated primarily in our Alt-A and other higher risk loan categories, in loans originated in 2005 through 2007, and in areas of the country experiencing steep declines in home prices (such as **Florida, California, Nevada** and **Arizona**) . . . ."  (Emphasis added.)

115.    Indeed, California, Florida, Nevada, and Arizona had been and were states in which Fannie's book of business had significant concentrations, and in which Fannie was at risk for experiencing disproportionate amounts of credit losses.

### 5.    The Defendants Did Not Protect against, or Disclose, Fannie's Significant Exposure to Financially Unsound Mortgage Guarantors

116.    Fannie had significant exposure to unsound financial mortgage guarantors. Financial guaranty contracts, which assure the collectability of payments and principal on guaranteed MBS if the loans underlying the MBS go into default or delinquency, were crucial to the smooth operation of Fannie's business.  If the guarantors fail, so too do the good values of the securities they guarantee.  Where it was probable that any of the companies, or financial guarantors, that provide such contracts to Fannie would not fulfill their obligations, the value of the securities that Fannie insured would be impaired.

117.   Starting no later than November 2007, many financial guarantors were downgraded by credit ratings agencies and had seen their stock prices significantly decline, materially increasing the risk that they would fail to fulfill their obligations.   Both the Wall Street Journal (on November 8, 2007) and EuroWeek (on November 9, 2007) published articles warning that the financial guarantors were in fiscal danger as a result of their exposure to subprime mortgages.

118.   In December 2007 and early January 2008, there was a series of downgrades of the credit ratings of major financial guarantors.

119.   The events starting in November 2007 demonstrated it was probable that Fannie's financial guarantors would be unable to fulfill their contractual obligations to Fannie.   Fannie had exposure to financial guarantors of at least $12.3 billion as of December 31, 2006 and $11.8 billion as of December 31, 2007.   However, Fannie did not start to disclose such concentration of risk to investors until February 27, 2008, in the Company's annual report for the year ended December 31, 2007.

120.   The Defendants were further aware that the financial deterioration of financial guarantors and that the risk of non-payment had materially increased because, according to Fannie's SEC filings, Fannie managed its exposure to financial guarantors through in-depth analyses of their financial position and stress analyses of their financial guarantees and available capital.   Such in-depth analyses surely would have revealed that extreme circumstances that led to the guarantors' credit downgrades.

121.   Fannie's undisclosed exposure to its financial guarantors was highly material.   As the Company stated in its quarterly report for the quarter ended September 30, 2008—after the government takeover: **"we do not believe that we can rely on all of our counterparties to**

**repay us in full in the future** . . . . Further downgrades in the ratings of our financial guarantor counterparties could result in a reduction in the fair value of the securities they guarantee, which could adversely affect our earnings, liquidity, financial condition and net worth." (Emphasis added.)

### E.    Fannie's Lack of Control Mechanisms or Desire to Enforce Then-Existing Protocols Buckled Fannie's Finances

122.    In the end, as the Defendants knew, Alt-A and subprime loans proved for Fannie to be more risky and damaging than traditional loans.  Accepting reduced documentation led to greater default risk.  Alt-A loans generally had riskier characteristics, and Fannie's loans were no exception.

- As one example, as disclosed in Fannie's 2008 Credit Supplement, filed with the SEC on February 26, 2009, at the end of 2008, 26.7% of Fannie's Alt-A loans also involved adjustable rate rather than fixed rate mortgages.  Because borrowers stretch themselves financially to borrow and rely on stable housing prices and interest rates, the risk of default is greater.

- As another example, at the end of 2008, 22.2% of Fannie's Alt-A also involved mortgages on "other-than-principal residences."  Mortgages on other-than-principal residences are considered riskier to lenders and purchasers than mortgages on principal residences because a borrower is more likely to be fully committed to paying back the mortgage if he or she must do so in order to continue living in their home.  Indeed, many mortgages on other-than-principal residences are examples of speculation.

123.    As discussed above at ¶¶72, 75-76, while Dallavecchia and Lund were assuring analysts—in the presence of CEO Dan Mudd—that the Alt-A in Fannie's book of business had

the same credit quality as the rest of that book, Fannie had determined that the credit quality of the Alt-A in Fannie's book of business was so poor, and the default expectations so grim, that Fannie should significantly scale back their endeavor into Alt-A mortgages and mortgage related securities.

124.    In mid-2007, with the expectation of crushing losses, Fannie significantly reduced its investments in, and guarantees of, new Alt-A loans.  As Defendant Mudd stated in a May 2008 call with analysts—approximately a year later: "We stopped largely doing Alt-A a year ago, the concentration is a late '05, '06 or early '07 kind of a book . . . the Alt-A book [is] where we are seeing a disproportionate share of our losses . . . ."

125.    According to Confidential Witness 2, by the time he left in August 2007—just as Fannie was drastically pulling back on its new investments in Alt-A loans—the Company appointed a Vice President of subprime lending within its Single Family division and began "trying to build a model for sub prime" in a last ditch attempt to "evaluate loans bought directly from lenders like Countrywide."

126.    Indeed, the Defendants' expectations of increased losses came to fruition:  as disclosed in Fannie's 2009 First Quarter Credit Supplement, although Alt-A debt accounted for only 10% of Fannie's Single-Family Conventional Mortgage Credit Book of Business in that quarter, it was responsible for 39.2% of the quarterly credit losses.  Mr. Pinto testified at the December 9 Hearing that while expected defaults on non-prime loans originated in 2005 were 8%, they were nearly 40% for those originated in 2007.

## VI.    FALSE AND MISLEADING STATEMENTS REGARDING FANNIE'S RISK MANAGEMENT AND CONTROLS

127.    Lead Plaintiffs repeat and reallege each of the materially false and misleading statements set forth above in ¶¶40-126, as if fully set forth herein.  The false and misleading

statements further detailed below were made with scienter during the Class Period. The Defendants made these statements in, among other things, Fannie's SEC filings, public conference calls, press releases, statements to the media and Congressional testimony.

128.    As detailed below, during the Class Period, the Defendants, knowingly or with reckless disregard, misled Lead Plaintiffs and the other members of the Classes by making materially misleading statements or omissions, detailed herein:

a.    Fannie failed to adequately monitor the underwriting by the lenders from which it acquired mortgage loans, which had the effect of increasing the amount of poorly-underwritten, high-risk loans purchased or guaranteed by the Company (¶¶99-102).

b.    Even as Fannie dramatically ramped up its investment in subprime and Alt-A mortgages and related securities, Fannie's risk controls were inadequate and the Company lacked the ability to measure the credit risk of such securities and, specifically:

    i.    in stark contrast to Fannie's statements throughout the Class Period that it carefully monitored the credit risk of loans it purchased, as stated by Confidential Witness 2, as late as August 2007 the Company did not have its own credit analysis models but instead relied solely on the judgment of ratings agencies (¶¶84-85); and

    ii.    by the beginning of the Class Period, Defendant Dallavecchia had sounded the alarm that Fannie's risk controls were materially defective and incapable of assessing the risks of the Company's subprime investments: in October 2006, Dallavecchia complained to Mudd that Fannie was "ramping up" its subprime business such that the Company was exceeding its own limits on risk exposure and that "[t]here is a pattern emerging of inadequate respect for the control process."

c.    That Defendants falsely maintained that Fannie's credit book of business had strong credit characteristics when, in fact:

    i.    Fannie had a massive credit risk exposure to Alt-A and subprime mortgages and related securities; and

    ii.    In January 2007, as Defendants knew or recklessly disregarded, Fannie's business analytics division predicted a 50% decline in home prices and warned that such a decline would drastically increase the Company's losses and wipe out core capital (¶¶87-88).

d.    That the credit risk profile of Fannie's Alt-A and subprime mortgage and related securities was materially more risky than the credit profile of Fannie's portfolio of conventional 30 year fixed mortgages. (¶¶102-103).

e.    In July 2007, Fannie materially lowered its risk management capabilities by sharply cutting the Chief Risk Officer's budget and staff: as Dallavecchia complained to Mudd and the Company's Chief Operating Officer, Michael Williams, on or around July 16, 2007, Fannie had one of "the weakest control processes" he had ever witnessed, the Company's budget was inadequate for Fannie's risk exposure and that it was not even close "to having proper control processes for credit, market and operational risk."

f.    Rather than increase its guaranty fees to compensate for the increased risk of non-prime loans, including subprime and Alt-A, Fannie failed to seek appropriate protection for its enhanced risk (¶¶97-99).

**A.    November 8, 2006 Form NT 10-Q**

129.    On November 8, 2006, the Defendants caused Fannie to file a Form NT 10-Q for the period ending September 30, 2006 (the "Nov. 8 NT 10-Q") and stated the following concerning the Company's Alt-A and subprime exposure:

> We have increased our participation in [Alt-A and subprime] types of products where we have concluded that it would be economically advantageous or that it would contribute to our mission objectives. Our participation in these products reflects our assessment of anticipated guaranty fee income in light of our expectation for potentially higher credit losses. We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types. . . . **We believe that our assessment and approach to the management of credit risk continued to contribute in the third quarter of 2006 to the maintenance of a credit book of business with strong credit characteristics.**

(Emphasis added.)

130.    These statements were materially false and misleading because Fannie's credit book of business did not have strong credit characteristics, but rather, by the beginning of the Class Period Fannie had massive exposure to billions of dollars of risky subprime and Alt-A mortgage loans. Specifically, these statements were materially false and misleading for the reasons set forth in ¶128.

**B.     Fannie's 2004 Annual Report**

131.    On December 6, 2006, the Defendants caused Fannie to file its annual report with the SEC on Form 10-K (the "2004 Annual Report") that stated the following concerning the impact of trends in the mortgage market on the Company:

> In recent years, an increasing proportion of single-family mortgage loan originations has consisted of non-traditional mortgages such as interest-only mortgages, negative-amortizing mortgages and sub-prime mortgages, and demand for traditional 30-year fixed-rate mortgages has decreased. We did not participate in large amounts of these non-traditional mortgages in 2004 and 2005 because we determined that the pricing offered for these mortgages often was insufficient compensation for the additional credit risk associated with these mortgages.

132.    These statements were false and misleading for the reasons set forth in ¶128.

**C.     December 7, 2006 Conference Call**

133.    On December 7, 2006, Fannie conducted a conference call (the "Dec. 7 Conference Call"). Lund, who at the time ran Fannie's Single-Family Credit Guaranty business, stated: "if you look at the tables in the [2004] 10-K ... that shows the credit characteristics, it is a very strong credit book. That will bode us very well as we move into what is going to be a very different housing environment."

134.    These statements were false and misleading for the reasons set forth in ¶128.

135.    The market believed the Defendants' false statements. On February 7, 2007, Bear Stearns issued an analyst report stating that "[t]he [C]ompany made a strategic decision in 2005 NOT to participate in the market for exotic mortgage products, particularly those in the subprime segment because pricing did not adequately reflect the risk. Fannie Mae did not want to support a market that it believed was unsound."

**D.    February 23, 2007 Reuters News Interview**

136.    On February 23, 2007, in an interview with *Reuters News*, Mudd falsely assured

the public that: "We have a very small subprime effort . . . . We have entered the market

prudently with a lot of standards and high credit quality."

137.    These statements were materially false and misleading for the reasons set forth in

¶128.

**E.    February 27, 2007 Form NT 10-K, Conference Call and Related Statements**

138.    On February 27, 2007, the Defendants caused Fannie to file a Form NT 10-K with

the SEC (the "Feb. 27 NT 10-K").   The Company represented that Fannie's foray into the

subprime and Alt-A market was a careful and prudent one:

> Alt-A loans are generally defined as loans with lower or alternative
> documentation requirements, while sub-prime loans are made to
> borrowers with weaker credit histories... [W]e have increased our participation
> in these types of products by developing strategies to better support business,
> where we have concluded that it would be economically advantageous and/or that
> it would contribute to our mission objectives.  Our participation in these products
> reflects our assessment of anticipated guaranty fee income in light of our
> expectation for potentially higher credit losses.  We continue to closely monitor
> credit risk and pricing dynamics across the full spectrum of mortgage product
> types.

139.    These statements were materially false and misleading because the Defendants

misrepresented and/or failed to disclose the material facts set forth in ¶128.

140.    Also on February 27, 2007, Fannie conducted a conference call with investors

(the "Feb. 27 Conference Call").   On the call, Dallavecchia further represented that, to the extent

it invested in subprime and Alt-A loans, Fannie did so carefully and with the benefit of strong

risk controls:

> [W]e have increased our participation in subprime product in 2006.  **Our
> purchases have been prudent and have been made when we concluded that
> they would contribute to our mission objectives or they would generate a
> profitable return. . . .   [W]e participate in the subprime market in**

**accordance with parameters that were agreed between my team and the business leaders.  These parameters were developed to carefully calibrate exposure to layered risk, for example, the exposure to the combination of high loan-to-value duration and stated accommodation. . . .  [W]e have acquired subprime loans from selected lender partners whose underwriting practices and standards we reviewed. . . .  I believe that our activity in the subprime market represents an appropriate and prudent engagement in a segment that has been important to the housing market in this country. . . .**  I would advise that you consider our exposure in light of the strength of the risk characteristics I have described and the immaterial size of our participation in the subprime market.

*     *     *

I think from a control and risk underwriting standpoint, we want to continue maintaining prudent underwriting standards.  One thing that we always look very carefully to is the layering of the risk, not that all subprime loans are bad, but there's some conditions where all the risks are layered one on top of the other, which makes the risk higher.  And we want to make sure that we understand the risk and we are remunerated for it.

(Emphasis added.)

141.    Further, during the February 27, 2007 conference call Mudd repeated that "we have a book of business with very strong credit risk characteristics...."

142.    The statements in ¶¶140-41 were false and misleading because the Defendants misrepresented and/or failed to disclose the material facts set forth in ¶128.  In particular, these statements were at odds with the dire warnings Dallavecchia had previously sounded in his internal October 2006 email to Mudd regarding Fannie's inability to assess and manage the risks of subprime loans.

143.    In response to a question during the February 27 Conference Call by Citigroup analyst Brad Ball regarding Fannie's strategy with respect to no-doc and low-doc loans, Fannie executives Dallavecchia and Lund falsely represented that Fannie's risk controls for Alt-A loans were so strong that such loans did not carry a heightened risk of default:

45

[Dallavecchia]: On no-doc or limited documentation. . .  , **you have many instances where a lower level of documentation is not a clear indication that there is a heightened risk for default.** But if you start compounding low-level documentation, low FICO score, high loan-to-value ratio, maybe high debt-to-income ratio, then it becomes a critically more riskier loan. So that is how we tend to look at that.

*     *     *

[Lund]: [Y]ou can't look at a single factor. What we have tried to talk about historically is layering of risk—documentation, loan to values, credit scores—and we look very broadly at all of these things. And I don't think you can separate it from subprime, because I think low documentation began to bleed into subprime and it made it very difficult to even distinguish one from the other. We look at all these characteristics individually and then combined. And ... we also looked at economic factors—home prices, things of that nature. And then the final point is we look at the price available to cover the risk associated with that product. And when we think those characteristics are in line and the underwriting is prudent around that, we can participate.

*     *     *

[Dallavecchia]: [W]e are trying to work with our lender partners to review the standards that they utilize to generate, to originate these loans. We work with them in defining the type of standards that we are comfortable with with regard to the risk profile and the return that we can gain on the product. And therefore, we do not really exclude the specific segment a priori. We want to see what is the layering of the risk. We want to understand what is the return for the layer on the risk. And then we determine if we feel that there is a proper risk/reward for that type of risk.

(Emphasis added.)

144.    These statements above were false and misleading because the Defendants misrepresented and/or failed to disclose the facts set forth in ¶128.

145.    On the Feb. 27 Conference Call, Lund emphasized that Fannie's "participation has continued to remain in the higher credit quality segments of alternative documentation . . . . [W]e have told you we're only going to participate when we think we get the right price/risk equation . . . and we feel good about the pricing . . . we have put on the books." On that same call, Mudd further trumpeted Fannie's risk controls: "With the creation of the CRO position and

the CRO office also came an appropriate set of processes and controls that went around that . . . that involved a process of setting standards and setting limits." Mudd added: "We have enough engagement so far to be knowledgeable about the market, but we don't have so much that this is a major, significant exposure on our books."

146.   These statements were false and misleading because the Defendants misrepresented and/or failed to disclose the material facts set forth in ¶128.

**F.   March to April 2007 Congressional Testimony**

147.   On March 15, 2007 Mudd testified as follows before the United States House of Representatives Committee on Financial Services (the "Financial Services Committee") with regard to Fannie's exposure to subprime loans:

> We said a couple of years ago that this [subprime] market was evolving in a direction that we didn't like. The layering of some of the products presented excessive risk to consumers. We stepped away from it.
>
> *          *          *
>
> [Subprime is] 80 percent insured. It's highly unsubordinated. We've been in it very carefully, consistent with some very strong anti-predatory lending guidelines we have.

148.   Mudd's statements to Congress were materially false and misleading for the reasons set forth in ¶128.

**G.   Fannie's May 2, 2007 Earnings Release, 2005 Annual Report and Conference Call**

149.   On May 2, 2007, Fannie issued a news release that disclosed the Company's financial results for 2005 and the Company filed its annual report for the year ended December 31, 2005 with the SEC on Form 10-K (the "2005 Annual Report").

150.   The 2005 Annual Report stated that Fannie applied its risk controls to limit the financial hazards of such loans:

We consider the risk of default in determining our guaranty fee and purchase price. . . .   We have worked to enhance our credit analytics and data to better understand, assess and price for the risks associated with these products to allow us to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types.

151.    These statements were false and misleading for the reasons set forth in ¶128.

152.    In the 2005 Annual Report, Fannie added "To date, our purchases of subprime mortgage loans generally have been accompanied by the purchase of credit enhancements that materially reduce our exposure to credit losses on these mortgages."  Finally, in the same Report, Fannie represented that: "We believe our credit exposure to the subprime mortgage loans underlying the private-label mortgage-related securities in our portfolio is limited because we have focused our purchases to date on the highest-rated tranches of these securities."

153.    In actuality, Fannie's subprime holdings were highly risky and the Company had significant subprime exposure.  As such, these statements were false and misleading for the reasons set forth in ¶128.

154.    Also on May 2, 2007, Fannie conducted a conference call with investors (the "May 2 Conference Call").

155.    During the May 2 Conference Call, KBW analyst, Fred Cannon, asked: "One of the major criticisms in [Alt-A and subprime] has been the lack of income criteria and documentation of income. And I was wondering what kind of standards you're looking for as you invest in both areas moving forward?"   Mudd and Lund responded to this question as follows:

[Mudd]:   [T]he important characterization of all of our efforts with respect to subprime and Alt-A . . . is that we stood back from the market.  We adhered to our standards . . . . [N]ow the marketplace is moving back toward us."  . . . .

So if you go too far down the path that says that we're changing our standards or changing our risk criteria, I think you wind up in the wrong place. Rather, I think

we have stayed pretty steady....It's just that now, we are emerging as the best outlet for it . . . .

[Lund]: On the Alt-A side . . . the credit quality of that book looks like the credit quality of the rest of our book . . . our philosophy has always been price to the risk. **And we have maintained that."**

(Emphasis added.)

156.    These statements were false and misleading for the reasons set forth in ¶128.

157.    On the May 2 Conference Call, in response to a question posed by Merrill Lynch analyst, Ken Bruce, regarding Fannie's opportunities in the Alt-A sector in light of the dislocation in the subprime and Alt-A market, Lund and Dallavecchia reassured him as follows:

[Lund]: On the subprime and Alt-A front, I think we see significant opportunity for us as a Company. As Dan mentioned a little bit earlier, on a lot of these products and the layered risk that existed in the market, we backed away because we did not see the risk/return equation being appropriate.

That has obviously had significant dislocation in the last x number of months. We have seen much tighter underwriting guidelines. We have seen significant credit spread widening. As a result, we've seen the market really move back more towards where Fannie Mae was.

*          *          *

Second, in recent years, Alt-A has been predominantly associated with the ARM market, with the floating rate, the resetting markets, which accounts for approximately [70]% of the issuance of [non-agencies]. In contrast, the majority of our Alt-A portfolio is comprised of fixed-rate mortgages.

And finally, Fannie Mae uses credit enhancements to reduce our exposure to credit losses. And a significant proportion, about two times greater than our conventional portfolio, in our Alt-A book is covered by (multiple speakers) credit enhancement.

As such, although there has been a weakness in terms of the slow down of house prices' appreciation, I feel fairly comfortable that we continue to maintaining [sic] a solid credit portfolio.

(Emphasis added.)

158.    On the same May 2 Conference Call, Robert Blakely ("Blakely"), Chief Financial Officer and Executive Vice President of Fannie, said "We have already disclosed the strong characteristics for our credit book of business through year-end 2006, and our minimal exposure to subprime loans and securities backed by subprime loans."

159.    The Defendants' reassurances as to Fannie's Alt-A and subprime holdings in ¶¶157-58 were false and misleading for the reasons set forth in ¶128.

**H.    May 9, 2007 Form NT 10-Q**

160.    On May 9, 2007, the Defendants caused Fannie to file a Form NT 10-Q with the SEC (the "May 9 NT 10-Q").  In addition to reiterating the statements in its prior Forms NT 10-Q and NT 10-K, as detailed above, ¶¶129, 138, the Company stated the following concerning the Company's Alt-A and subprime mortgages:

> We have continued to work with our lender customers to support a broad range of mortgage products, including Alt-A and subprime products, which have represented an increased proportion of mortgage originations in recent years. . . . **We believe that our assessment and approach to the management of credit risk contributed to the maintenance of a conventional single-family mortgage credit book of business with strong credit characteristics in the first quarter of 2007.** . . . During 2006 and 2007, mortgage lenders have experienced higher levels of delinquencies relating to subprime loans.  **We believe our credit exposure to the subprime mortgage loans underlying the private-label mortgage-related securities in our portfolio is limited because we have focused our purchases on the highest-rated tranches of these securities to date.**

(Emphasis added.)

161.    These statements were false and misleading for the reasons set forth in ¶128.

162.    The Company's statements reaffirmed investors' that the Company's credit performance would be better than that of other market participants.  For example, on May 9, 2007, J.P. Morgan issued a research report that stated, in part, the following:

Single-family credit quality remains good, and what little exposure Fannie has to higher risk subprime and Alt-A products is largely credit enhanced to minimize Fannie's losses.

**I.  Fannie's August 16, 2007 News Release, 2006 Annual Report and Conference Call**

163.  On August 16, 2007, Fannie issued a news release concerning its financial results for 2006 (the "Aug. 16 News Release").  The Aug. 16 News Release quoted CEO Mudd as stating:

> "We made a decision several years ago to step back from the riskier margins of the mortgage market.  That decision cost us significant market share at that time, but as the market began to correct, particularly in the latter half of 2006, we began to get some of that market share back."

> \*       \*       \*

> "While we do expect our credit loss ratio to increase in 2007 from continuing strain in the housing market, we believe Fannie Mae is well positioned to weather the turmoil in the mortgage market. . . ."

> \*       \*       \*

> "Though the housing market continues to cool in 2007 and the credit environment remains challenging, I believe Fannie Mae is well situated for the future," Mudd said.  "Strategic decisions we made in the past several years—particularly with respect to our discipline in the non-traditional parts of the mortgage finance market—have positioned us to do well as the housing market stabilizes. . . ."

164.  The Aug. 16 News Release stated the following concerning credit risk:

**The Single-Family book of business grew at a rate of 7.2 percent**.  This growth rate—somewhat slower than the overall market—reflects the company's strategic decision to limit participation in certain non-traditional segments of the market when management concluded that pricing did not adequately reflect underlying risks in assets made available for securitization.

165.  The Aug. 16 News Release also included a "Discussion of Credit Book of Business" using data as of June 30, 2007 that stated, in part, the following concerning Fannie's credit book of business and exposure to Alt-A and subprime loans:

**How would you characterize the quality of your current single-family mortgage credit book of business?**

We believe our conventional single-family mortgage credit book has characteristics that reflect our historically disciplined approach to risk management. Our book is highly diversified based on date of origination, geography and product type.

*     *     *

**How would you characterize your exposure to Alt-A loans?**

We believe that our guaranteed Alt-A loans have more favorable credit characteristics than the overall market of Alt-A loans.

*     *     *

**How would you characterize your exposure to subprime loans?**

*     *     *

We have reduced our exposure to credit losses through the purchase of credit enhancement. We have also invested in highly rated private-label securities backed by subprime mortgage loans—primarily the highest rated tranches of these securities at the time of acquisition.

*     *     *

We believe that the subprime loans in our single-family mortgage credit book of business have more favorable credit characteristics than the overall market of subprime loans.

*     *     *

**Aside from your traditional core business, subprime and Alt A, are there other segments/product features in your book of business that could be viewed as particularly sensitive to further declines in home prices and/or further regional weakness in employment? What is Fannie Mae doing to mitigate risk in these segments?**

Certain product features and loan attributes are often associated with a greater degree of credit risk. For example, loans with low FICO scores, high LTV ratios, and negative amortization typically contribute to higher levels of delinquency, default and credit losses. We have taken a disciplined approach in our acquisition of mortgage loans with these features and generally limit our participation in these segments to where we are able to appropriately price for the risks.

52

166.    The statements in ¶¶163-65 were false and misleading for the reasons set forth in ¶128.

167.    On August 16, 2007, the Defendants caused Fannie to file its annual report with the SEC on Form 10-K (the "2006 Annual Report"), signed by Mudd.

168.    The 2006 Annual Report stated the following as to the credit profile of Fannie mortgage credit book of business:

**Market and Economic Factors Affecting Our Business**
*Market Environment: 2001 to Mid-2006 . . .*

As the composition of loan originations shifted from fixed-rate mortgages to a greater share of higher risk, less traditional mortgages, we concluded that the market's pricing of a significant portion of these loans did not appropriately reflect the underlying, and often layered, credit risks associated with these products. Based on this assessment, we made a strategic decision to forgo the guaranty of a significant proportion of mortgage loans because they did not meet our risk and pricing criteria. . . . We believe . . . that this decision has helped us maintain a mortgage credit book of business with strong credit characteristics overall.

169.    These statements were false and misleading for the reasons set forth in ¶128.

170.    The 2006 Annual Report represented:

We believe that the limited scale and disciplined nature of our participation in the subprime market has helped to protect the company from a material adverse impact of the recent disruption in that market to date.

171.    The 2006 Annual Report stated:

We believe that our approach to the management of credit risk during the past several years has contributed to our maintenance of a credit book with strong credit characteristics overall, as measured by loan-to-value ratios, credit scores and other loan characteristics that reflect the effectiveness of our credit risk management strategy.

\*          \*          \*

**Single-Family Business**

53

Our conventional single-family mortgage credit book of business remained relatively strong from 2004 to 2006. We believe that our assessment and approach to the management of credit risk during these years allowed us to maintain a conventional single-family mortgage credit book of business with strong credit risk characteristics as evidenced by our credit losses, which remained low during the three-year period from 2004 to 2006. We are focused on understanding and serving our customers' needs, strengthening our relationships with key partners, and helping lenders reach and serve new, emerging and nontraditional markets by providing more flexible mortgage options, including Alt-A and subprime products, which have represented an increased proportion of mortgage originations in recent years. We have increased our participation in these types of products where we have concluded that it would be economically advantageous and/or that it would contribute to our mission objectives. Our participation in these products reflects our assessment of anticipated guaranty fee income in light of our expectation for potentially higher credit losses. We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types. Our assessment of these dynamics will continue to determine the timing and level of our acquisitions of these types of mortgage products.

*     *     *

**Credit Risk Management**

...The degree of credit risk to which we are exposed will vary based on many factors, including the risk profile of the borrower or counterparty, the contractual terms of the agreement, the amount of the transaction, repayment sources, the availability and quality of collateral and other factors relevant to current market conditions, events and expectations. **We evaluate these factors and actively manage, on an aggregate basis, the extent and nature of the credit risk we bear, with the objective of ensuring that we are adequately compensated for the credit risk we take, consistent with our mission goals.**

*     *     *

**Acquisition Policy and Standards**

We use proprietary models and analytical tools to price and measure credit risk at acquisition. **Our loan underwriting and eligibility guidelines are intended to provide a comprehensive analysis of borrowers and mortgage loans based upon known risk characteristics.**

(Emphasis added.)

172.    The statements in ¶¶170-71 were false and misleading because Fannie's participation in the subprime market was neither limited in scale nor disciplined in nature. Indeed, the Defendants failed to disclose the material facts set forth in ¶128.

173.    The 2006 Annual Report included the following statements concerning Fannie's chief risk office:

**RISK MANAGEMENT . . . .**

*Chief Risk Office*
The Chief Risk Office is an independent risk oversight organization with responsibility for oversight of credit risk, market risk, operational risk and liquidity risk. The Chief Risk Officer is responsible for establishing our overall risk governance structure and providing independent evaluation and oversight of our risk management activities. In 2006 and 2007, we centralized oversight of our business continuity efforts, information security programs, corporate insurance program and SOX Finance Team under our Operational Risk Oversight function within the Chief Risk Office to further strengthen our existing operational risk programs.

174.    These statements were false and misleading because Fannie's Chief Risk Office was not independent and had not been strengthened.  In fact, in July 2007, Fannie materially lowered its risk management capabilities by materially reducing the Chief Risk Officer's budget and staff.  With respect to the budget and personnel cut, Dallavecchia complained to Mudd and Williams on or around July 16, 2007 that Fannie had one of "the weakest control processes" he had ever witnessed, that the Company's budget was inadequate for Fannie's risk exposure and that Fannie "was not even close" to having proper control processes for credit, market and operational risk.  As alleged in ¶¶92-93, instead of strengthening the Chief Risk Office, Fannie weakened the office by materially reducing its budget.

175.    The 2006 Annual Report also stated:

We use internally developed models to assess our sensitivity to credit losses based on current data on home values, borrower payment patterns, non-mortgage consumer credit history and management's economic outlook.  We examine a

range of potential economic scenarios to monitor the sensitivity of credit losses. Our models indicate that home price movements are an important predictor of credit performance. We disclose on a quarterly basis the estimated impact on our expected credit losses from an immediate 5% decline in single-family home prices for the entire United States, which we believe is a stressful scenario based on housing data from OFHEO. Historical statistics from OFHEO's house price index reports indicate the national average rate of home price appreciation over the last 20 years has been about 5.3%, while the lowest national average annual appreciation rate in any single year has been 0.3%. However, we believe that the decline in home prices in 2007 is likely to continue.

176.    These statements were false and misleading for the reasons set forth above in ¶128.

177.    The 2006 Annual Report included a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certification") signed by Mudd. Mudd's SOX Certification stated, in part, the following:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our

supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

178.   Mudd's SOX Certification was materially false and misleading for the reasons set forth in ¶128.

179.   Also on August 16, 2007, the Company conducted a conference call with investors (the "Aug. 16 Conference Call") in which the following statements were made:

[Mudd] "[O]ur risk position is excellent . . . We're more than adequately capitalized . . . the Alt-A loans we guarantee have more favorable credit characteristics than the overall market of Alt-A loans, including a weighted average FICO score of 720 and low exposure to high LTVs."

[Dallavecchia regarding the guarantee business] "[L]et me look ahead quickly to 2007 and 2008"... [t]he market is returning to more rational products and pricing."

[Mudd]: [04 through 06 the market changed] but] "our underwriting . . . our due diligence, our audit of these firms has remained the same . . . we fundamentally held our standards where they were."

180.    These statements were false and misleading for the reasons set forth in ¶128.

181.    Also during the Aug. 16 Conference Call, the following statements were made:

[Dallavecchia]: An important point for both our [subprime] and Alt-A backed securities is our use of stress tests to assess potential losses under multiple scenarios. We include the scenarios as severe as two consecutive years of 10% declines in home prices, coupled with the two consecutive years of 2% increase in interest rates. And the outcome of these scenarios project better (inaudible) loss and cash flow even under the direst scenario.

(alteration added).

182.    These statements were false and misleading for the reasons set forth in ¶128.

183.    On August 17, 2007, the *Washington Post* reported that "District-based Fannie Mae said it was less vulnerable to the turmoil than other players in the mortgage industry and could wind up with a larger share of the market. 'We'll come out of this in pretty good shape,' chief executive Daniel H. Mudd told analysts."

184.    This statement was materially false and misleading as Mudd knew and had reasons to know that Fannie was not in good shape for the reasons set forth in ¶128.

**J.    September 10-11, 2007 Lehman Brothers 5th Annual Financial Services Conference**

185.    At the September 10, 2007 Lehman Brothers Financial Services Conference, Lund said,

[W]e believe the nature of our participation in these [subprime and Alt-A] segments and our use of credit enhancements has mitigated our potential loss exposure to a significant degree. . . .

*            *            *

First, we generally acquire loans originated as Alt-A from our traditional lender partners. We review and approve lenders' underwriting guidelines, and are very familiar with their origination practices. Alt-A loans originated by these lenders

will typically follow an origination path similar to what will be used for prime mortgages.

**Second, and partly as a result of my first point, the credit characteristics of our Alt-A loans are more favorable than what you would see in the overall market, including a weighted average FICO of 720 and a low exposure to high LTVs.** Lastly, we own about $43.5 billion in securities backed by Alt-A loans. These securities have a weighted average subordination of 20%, and they are subjected to stress testing to assess potential losses under multiple scenarios. And the outcome of these scenarios project very little cash flow loss even under the most dire scenarios.

**In light of these factors, I believe we have engaged in non-traditional segments in the market in an appropriate and prudent way.** We largely limited our participation in more conservative traunches of these products, and we've taken additional steps to mitigate our loss exposure.

(Emphasis added.)

186.     These statements were materially false and misleading for the reasons set forth in

¶128.

187.     On September 20, 2007, Defendant Mudd testified before Congress that Fannie

could "provide more liquidity help to the home finance market today without taking risks we are

not capable of managing" and that Fannie had "vastly reduced [its] material control weaknesses."

188.     These statements were false and misleading for the reasons set forth in ¶128.

**K.     Fannie's November 9, 2007 News Release, Financial Results for Three and Nine Months Ended September 30, 2007 and Conference Call**

189.     On November 9, 2007, Fannie issued a news release that disclosed its financial

results for three and nine months ended September 30, 2007 (the "Nov. 9. News Release"). The

Nov. 9 2007 News Release quoted Mudd as stating the following:

During the last year, we vastly reduced our material weaknesses in internal controls, expanded our risk-management functions, reduced our headcount, and cut our operating expenses," Mudd said. "The company is in solid shape to support the market, and is in better shape to benefit when the market correction ends."

\*          \*          \*

59

"At the same time, our book of business is growing, our guaranty revenue is rising, and our market share is returning. **Further, in 2007 we're seeing the value of some of the tough choices we made in recent years to hold on to our credit discipline. Those choices have shielded us from the worst effects of the housing and mortgage market correction.**"

(Emphasis added.)

190. Mudd's statements were materially false and misleading because investors did not have a current picture of Fannie's performance and Fannie was not in solid shape. Mudd's statements were false and misleading for the further reasons set forth in ¶128.

191. Also on November 9, 2007, the Defendants caused Fannie to file the First Quarter 2007 10-Q with the SEC which was signed by Mudd.

192. The First Quarter 2007 10-Q stated the following concerning Fannie's subprime mortgages:

Subprime loans: . . . Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages. In order to respond to the current subprime mortgage crisis and provide liquidity to the market, we intend to increase our purchase of subprime mortgages. **We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.**

(Emphasis added.)

193. These statements were false and misleading for the reasons set forth in ¶128.

194. The First Quarter 2007 10-Q included a SOX Certification signed by Mudd that was substantially the same as the SOX Certification alleged in ¶177.

195. Mudd's SOX Certification was false and misleading for the reasons set forth in ¶128.

196.     Also on November 9, 2007, the Defendants caused Fannie to file the Second Quarter 2007 10-Q with the SEC.  The Second Quarter 2007 10-Q was signed by Mudd.

197.     The Second Quarter 10-Q 2007 stated the following concerning Fannie's subprime and Alt-A mortgages:

> *Subprime Loans:*  . . .  Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages.  In order to respond to the current subprime mortgage crisis and provide liquidity to the market, we intend to increase our purchase of subprime mortgages.  **We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.**

(Emphasis added.)

198.     These statements were false and misleading for the reasons set forth in ¶128.

199.     The Second Quarter 2007 10-Q included a SOX Certification signed by Mudd that was substantially the same as the SOX Certification alleged in ¶177.

200.     Mudd's SOX Certification was false and misleading for the reasons set forth in ¶128.

201.     Also on November 9, 2007, the Defendants caused Fannie to file its Third Quarter 2007 Form 10-Q with the SEC.  The Third Quarter 2007 10-Q was signed by Mudd.

202.     The Third Quarter 2007 10-Q stated that "Our acquisitions of Alt-A mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages."

203.     This statement was false and misleading because the Defendants misrepresented and/or failed to disclose that the Company had acquired Alt-A for which it failed to adequately increase the guarantee fee charged to loan originators to compensate Fannie for the increased credit risk.

61

204.   The Third Quarter 2007 Form 10-Q made the following misrepresentations, which minimized Fannie's credit risk exposure to subprime and Alt-A mortgages:

*Subprime Loans:* . . . Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages. In order to respond to the current subprime mortgage crisis and provide liquidity to the market, we intend to increase our purchase of subprime mortgages. We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.

*Alt-A and Subprime Securities:*

\*         \*         \*

We are subject to increased credit risk exposures related to subprime and Alt-A mortgage loans that back our private-label mortgage-related securities investments, and any increased delinquency rates and credit losses could adversely affect the yield on or value of our investments, which could negatively affect our earnings and financial condition.

We invest in private-label mortgage-related securities that are backed by Alt-A and subprime mortgage loans. In October 2007, Standard & Poor's downgraded the credit ratings of a small number of private-label securities held in our portfolio that are backed by subprime mortgage loans, and Moody's placed under review for possible downgrade several additional subprime-backed private-label securities held in our portfolio. In recent months, mortgage loan delinquencies and credit losses generally have increased, particularly in the subprime and Alt-A sectors. In addition, home prices in many states have declined, after extended periods during which home prices appreciated. If delinquency and loss rates on subprime and Alt-A mortgages continue to increase, or there is a further decline in home prices, we could experience reduced yields or losses on our investments in private-label mortgage-related securities backed by subprime or Alt-A loans. In addition, the fair value of these investments may be adversely affected. A reduction in the fair value of these investments could negatively affect our earnings and financial condition.

205.   These statements were false and misleading for the reasons set forth in ¶128.

206.   The Third Quarter 2007 10-Q explained Fannie's management of its institutional counterparty credit risk—but misrepresented the enormity of the increase to its counterparty risk:

Our potential exposure to the risks associated with our dependence on the institutional counterparties to provide services that are critical to our business has

increased in recent months, and our earnings and liquidity may be reduced if one or more of our institutional counterparties defaults on its obligations to us.

Our primary exposure to institutional counterparty risk is with our mortgage insurers, mortgage servicers, lender customers, depository institutions, dealers that commit to sell mortgage pools or loans to us, issuers of investments held in our liquid investment portfolio, and derivatives counterparties. Our business with many of these institutional counterparties is heavily concentrated... [A]s of September 30, 2007, our ten largest single-family mortgage servicers and their affiliates serviced 78% of our single-family mortgage credit book of business, and Countrywide Financial Corporation and its affiliates, which is our largest single-family mortgage servicer, serviced 23% of our single-family mortgage credit book of business.

207.   These statements were false and misleading because the Defendants misrepresented and/or failed to disclose that it made material exceptions to its risk management guidelines for Countrywide, Fannie's largest customer.   Starting in late 2007, Confidential Witness 4 observed that there were 6,000-7,000 outstanding loans that Fannie had selected to review.   Countrywide failed to provide the information, which under Fannie's guidelines should have triggered a limitation of Fannie's business with Countrywide.   However, Fannie failed to enforce the triggers on Countrywide, violating Fannie's risk management guidelines.

208.   The Third Quarter 2007 10-Q included a SOX Certification signed by Mudd that was substantially the same as the SOX Certification alleged in ¶177.

209.   Mudd's SOX Certification was false and misleading for the reasons set forth in ¶128.

210.   On the November 9 Conference Call, the following statements were made:

[Mudd]: **We've already tightened our underwriting and pricing, really going back to the early summer of '07 where we began requiring higher down payments, more documentation and higher credit scores.**   That came after the period where we made a specific decision not to get into some of the riskier segments of the market. Just this week we have announced a nationwide increase in our single-family guarantee fee to make sure that we are compensated for the risks that we manage. . . ."

*    *    *

Now, looking ahead, we expect the current market trends to continue through next year.  We see home prices falling by an average of 2% nationwide this year and 4% next year . . . .

*    *    *

[Lund]:  [T]he '06 and '07 books are clearly not going to be the credit quality books that we saw previously.  But you've got to remember where we're coming from is from a historical low, too, in terms of credit losses.  So, when we look at our projections moving forward, that we take that into account.

[Mudd]:  [T]he underwriting standards on our side have always stayed fairly constant.

*    *    *

[An analyst asks given exposure to subprime and Alt-A, couldn't things get "a lot worse."]  [Mudd in response]: [A]re we prepared for scenarios that are somewhat historical?  Yes.

(Emphasis added.)

211.  These statements were false and misleading because the Defendants misrepresented and/or failed to disclose that, even to the extent Fannie tightened its underwriting and pricing, the damage was already done:  the Company was exposed to billions of dollars of Alt-A and subprime mortgages and MBS that were acquired pursuant to materially looser underwriting guidelines and Fannie failed to adequately price for the risk it assumed.  Further, the Defendants failed to disclose the facts set forth in ¶128.

**L.    Preferred Series R Offering**

212.  On November 16, 2007 Fannie issued 20,000,000 shares of 7.625 Non-Cumulative Preferred Stock Series R at $25 per share pursuant to an Offering Circular (the "Preferred Series R Offering Circular").  The Preferred Series R Offering Circular incorporated by reference the following documents: (i) the 2006 Annual Report; and (ii) the First, Second and Third Quarter 2007 10-Qs.

64

213.    The documents incorporated by reference in the Preferred Series R Offering Circular were materially false and misleading for the reasons set forth in ¶¶168-176 (identifying false and misleading statements in the 2006 Annual Report); ¶¶191-209 (identifying false and misleading statements in the First, Second and Third Quarter 2007 10-Qs).

**M.    Preferred Series S Offering**

214.    On December 6, 2007, Fannie issued 280,000,000 shares of Fixed-to-Floating Rate Non-Cumulative Preferred Stock Series S pursuant to an Offering Circular (the "Series S Offering Circular").  The Series S Offering Circular incorporated by reference the following documents: (i) the 2006 Annual Report; and (ii) the First, Second and Third Quarter 2007 10-Qs.

215.    The documents incorporated by reference in the Preferred Series S Offering Circular were materially false and misleading for the reasons set forth in ¶¶168-176 (identifying false and misleading statements in the 2006 Annual Report); ¶¶191-209 (identifying false and misleading statements in the First, Second and Third Quarter 2007 10-Qs).

**N.    Mudd's Testimony Before the Senate Committee on Banking on February 7, 2008**

216.    Also on February 7, 2008, during testimony before the Senate Banking Committee, Mudd represented that the Company carefully managed its subprime exposure:

SENATOR RICHARD SHELBY:  Are [the subprime loans] performing?

MUDD:  They are [performing].  And we look at those very closely in terms of their performance.  We look very closely at where they're rated, but we do have our own separate rating system.

There is credit enhancement, mortgage insurance, other forms there, but we also stress test that and discount that, if need be.

We're watching it very closely.

217.    These statements were false and misleading for the reasons set forth in ¶128.

218.   During that same February 7, 2008 testimony before the Banking Committee, in response a question as to whether, "[g]iven Countrywide's recent financial problems and loan performances, do you have any concerns as to the quality of those purchases?", Mudd answered "We review [the Countrywide loans] very carefully. . . . [W]e **have good confidence in that portfolio**." (Emphasis added.)

219.   These statements were false and misleading because, in stark contrast to Mudd's false representations that Fannie carefully reviewed the loans it purchased from Countrywide, Fannie actually made material exceptions to its risk management guidelines for Countrywide. Specifically in late 2007, Confidential Witness 4 observed that there were 6,000-7,000 outstanding loans that had Fannie had selected to review. According to Confidential Witness 4, Countrywide failed to provide the information necessary to conduct such reviews, which under Fannie's guidelines should have triggered a limitation of Fannie's business with Countrywide. However, unbeknownst to investors, Fannie failed to enforce the triggers on Countrywide, violating Fannie's risk management guidelines.

**O.     February 27, 2008 News Release, 2007 10-K and Conference Call**

220.   On February 27, 2008, Fannie issued a news release that disclosed the Company's fourth quarter and full-year 2007 results (the "Feb. 27 News Release").  The Feb. 27 News Release quoted Mudd as follows:

> [Mudd]:  Our strategy for moving through another tough year is to protect and conserve our capital base, and control credit losses. We have also increased our credit loss reserves.  Finally, we will also provide liquidity to the market by growing our guaranty business as we build a very strong credit book. These steps will help us do our part to maintain a liquid, stable and affordable mortgage market—and also position us well when the market recovers.

221.   These statements were false and misleading because for the reasons set forth in ¶128.

222.   Also on February 27, 2008, the Defendants caused Fannie to file the 2007 10-K (the "2007 Annual Report"), which was signed by Mudd.

223.   The 2007 Annual Report included Fannie's fiscal year 2007 financial results as previously set forth in the Feb. 27 News Release above at ¶220.

224.   The 2007 Annual Report included the following statements concerning Fannie's credit risk management:

> ***Building a Solid Mortgage Credit Book of Business by Managing and Mitigating Credit Exposure***
>
> We have implemented a variety of measures designed to help us manage and mitigate the credit exposure we face as a result of our investment and guarantee activities. These measures include:
> • establishing guidelines designed to limit our credit exposure, including tightening our eligibility standards for mortgage loans we acquire;
> • limiting losses associated with our guaranty contracts by increasing our guaranty fees and implementing an adverse market delivery charge to compensate us for the added risk we incur during this period of increased market uncertainty; and
> • working to mitigate realized credit losses, both by working closely with our servicers to enhance our ability to act promptly when borrowers fall behind on their loan payments and by offering an expanded array of loss mitigation alternatives.

225.   In its 2007 Annual Report Fannie represented that it "closely monitor[ed] housing and economic market conditions and loan performance to manage and evaluate our credit risks, adjusting our eligibility requirements and pricing as necessary to ensure that we are appropriately compensated for risk." The Company further stated in the 2007 Annual Report that

> Our loan underwriting and eligibility guidelines are intended to provide a comprehensive analysis of borrowers and mortgage loans based upon known risk characteristics ... **We have policies and various quality assurance procedures that we use to review a sample of loans to assess compliance with our underwriting and eligibility criteria.** If we identify underwriting or eligibility deficiencies, we may take a variety of actions, including increasing the lender credit loss sharing or requiring the lender to repurchase the loan, depending on the severity of the issues identified.

(Emphasis added.)

226.    The statements in ¶¶224-25 were false and misleading because, as described in ¶207 above, the Defendants misrepresented and/or failed to disclose that Fannie made material exceptions to its risk management guidelines for Countrywide, Fannie's largest customer.

227.    The 2007 Annual Report contained the following statements minimizing Fannie's credit risk exposure to Alt-A and subprime mortgages:

> **In order to manage our credit risk in the shifting market environment, we lowered maximum allowable LTV ratios and increased minimum allowable credit scores for most Alt-A loan categories. We also limited our acquisition of some documentation types and made other types ineligible for delivery to us. Finally, we implemented pricing increases to reflect the higher credit risk posed by these mortgages.** As a result of these eligibility restrictions and price increases, we believe that our volume of Alt-A mortgage loan acquisitions will decline in future periods.

**The majority of our Alt-A mortgage loans are fixed-rate, and the weighted average credit score of borrowers under our Alt-A mortgage loans is comparable to that of our overall single-family mortgage credit book of business.*   *        ***

> **Our acquisitions of subprime mortgage loans have a combination of credit enhancement and pricing that we believe adequately reflects the higher credit risk posed by these mortgages.** We will determine the timing and level of our acquisition of subprime mortgage loans in the future based on our assessment of the availability and cost of credit enhancement with adequate levels of pricing to compensate for the risks.

(Emphasis added.)

228.    These statements were false and misleading for the reasons set forth in ¶128.

229.    The 2007 Annual Report included the following statements concerning Fannie's credit loss sensitivities:

> We use internally developed models to assess our sensitivity to credit losses based on current data on home values, borrower payment patterns, non-mortgage consumer credit history and management's economic outlook. We also review and compare publicly available credit loss analyses and predictions. We examine a range of potential economic scenarios to monitor the sensitivity of credit losses. Our models indicate that home price movements are an important predictor of credit performance. Due to the continued housing market downturn and our expectation that home prices will decline further in 2008, we expect a significant increase in our credit-related expenses and credit loss ratio.

Pursuant to our September 2005 agreement with OFHEO, we disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. For purposes of this calculation, we assume that, after the initial 5% shock, home price growth rates return to the average of the possible growth rate paths used in our internal credit pricing models. The present value change reflects the increase in future expected credit losses under this scenario, which we believe represents a reasonably high stress scenario because it assumes an instantaneous nationwide decline in home prices, over the future expected credit losses generated by our internal credit pricing models without this shock.

230.    The 2007 Annual Report included a SOX Certification signed by Mudd that was substantially the same as set forth above at ¶177.

231.    Mudd's SOX Certification was materially false and misleading for the reasons set forth in ¶128.

232.    On a February 2008 Conference Call, Mudd reported that Fannie projected a larger decline in home prices, but still did not disclose that Fannie predicted a 50% decline in home prices over three to five years. Mudd said:

We now expect home prices to decline nationwide by 5 to 7% this year on average, instead of the 4 to 5% decline we last projected. So we have moved that projection for home price declines up one notch. Second, we do not expect national home prices to bottom out until late '09, and that drives a peak-to-trough decline on average nationally in the range of 13 to 17%, which is, again, a notch up from the last projection of 8 to 12%.

233.    This statement was materially false and misleading for the reasons set forth in ¶128.

**P.    Fannie's Financial Results for the Period Ended March 31, 2008 and Conference Call**

234.    In anticipation of certain offerings of common and preferred stock, on or around May 2, 2008 Fannie published "Fannie Mae Capital Raise Roadshow" that represented that

Fannie was actively monitoring counterparties and enhancing counterparty collateral requirements.

235.    This statement was materially false and misleading because, as set forth above at ¶¶104-108, the Defendants misrepresented and/or failed to disclose that Fannie made material exceptions to its risk management guidelines for Countrywide.  Further, these statements were materially false and misleading because the Defendants misrepresented and/or failed to disclose that Fannie settled a loan repurchase dispute with Countrywide in May 2008 for approximately $0.23-0.26 on the dollar for a claim of $680-690 million, which was a violation of the Fannie's stated policy concerning repurchase requests, as alleged in ¶225.

236.    Also on May 6, 2008, the Defendants caused Fannie to file its First Quarter 2008 Form 10-Q with the SEC (the "First Quarter 2008 10-Q").  The First Quarter 2008 10-Q was signed by Mudd.

237.    The First Quarter 2008 10-Q stated the following concerning Fannie's credit loss sensitivity:

> Pursuant to our September 2005 agreement with OFHEO, we disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States.  Table 17 shows for first lien single-family whole loans we own or that back Fannie Mae MBS as of March 31, 2008 and December 31, 2007, the credit loss sensitivity results before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancement.  The increase of $625 million in the net credit loss sensitivity to $5.2 billion as of March 31, 2008, from $4.5 billion as of December 31, 2007 was primarily attributable to the continued decline in home prices during the first quarter of 2008.

238.    This statement was materially false and misleading for the reason set forth in ¶128.

239.   The First Quarter 2008 10-Q included a SOX Certification signed by Mudd that was substantially the same as the SOX Certification alleged in ¶177.

240.   Mudd's SOX Certification was false and misleading for the reasons set forth in ¶228.

241.   On the May 6, 2008 analyst conference call, Mudd made the following statements concerning risk management:

> [Mudd]: Well, let me start and then either Rob or Mike Quinn, who is our Single-Family Chief Credit Officer, can jump in.... [M]ost of our business model is built off of a set of reps and warranties that the originators provide to us. So, we have always had a history of enforcing those reps and warranties. Because the documentation is lower in the Alt-A book which is after all the point of Alt-A, that's an area that we make sure that we focus on. With that, I would let Mike Quinn pick up.
>
> [Quinn]: Thanks Dan. [or ellipsis] Yes, every loan that defaults, we do an underwriting review to make sure it didn't tie out to our guidelines and what our contract with the lender was. So we're doing those review reviews of old loans that default. And we're issuing more make-whole and repurchase request that the volume has increased of that.

242.   This statement was materially false and misleading because Fannie was not doing an underwriting review of every loan that defaulted. As alleged in ¶¶104-108, Fannie made material exceptions to its risk management guidelines for Countrywide, and, further, misrepresented and/or failed to disclose that Fannie violated its stated policy regarding repurchase requests when it settled a loan repurchase dispute with Countrywide in May 2008.

**Q.   May 8, 2008 — Common Stock Offering Circular**

243.   On May 8, 2008, Fannie offered 82,000,000 shares of common stock pursuant to an Offering Circular dated May 8, 2008 (the "May 8 Common Stock Offering Circular"). The May 8 Offering Circular incorporated by reference the following documents: Fannie's 2007 10-K and 2008 First Quarter 10-Q.

244.    The documents incorporated by reference in the May 8 Common Stock Circular were materially false and misleading set forth in ¶¶236-240 (identifying materially false and misleading statements in the 10-Q for the quarter ended March 31, 2008); and ¶¶222-231 (identifying materially false and misleading statements in the 10-K for 2007).

R.    **May 8, 2008 — Preferred Series 2008-1 Offering Circular**

245.    Also on May 8, 2008, Fannie offered 45 million shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 shares of preferred shares Series 2008-1 pursuant to an Offering Circular dated May 8, 2008 (the "2008-1 Offering Circular").  The 2008-1 Offering Circular incorporated by reference Fannie's 2007 10-K and 2008 First Quarter 10-Q that were materially false and misleading for the reasons set forth above.

S.    **May 13, 2008 — Preferred Series T Offering Circular**

246.    On May 13, 2008, Fannie offered 80,000,000 shares of 8.25% Non-Cumulative Preferred Stock, Series T shares of preferred stock pursuant to an Offering Circular dated May 13, 2008 (the "Series T Offering Circular."

247.    The Series T Offering Circular incorporated by reference the following documents: Fannie's 2007 10-K and 2008 First Quarter 10-Q that were materially false and misleading for the reasons set forth above.

T.    **Fannie's August 8, 2008 News Release, Financial Results for the Quarter ended June 30, 2008 and Conference Call**

248.    On August 8, 2008, Fannie issued a news release that disclosed the Company's financial results for the period ended June 30, 2008 (the "Aug. 8 News Release"). As quoted in the Aug. 8 News Release, Defendant offered the following reassurances as to Fannie's safety and soundness, and its ability to generate revenue:

> [Mudd]: We are taking the necessary steps to meet the needs of our lending partners, provide liquidity to the market, and channel global capital into housing. The housing market will inevitably stabilize and recover, and we are working to make sure Fannie Mae will be at the center of that recovery, for our shareholders and the market we serve.

249.   As Defendant Mudd knew or recklessly disregarded, Fannie was sinking under the weight of its losses by that time, rendering their statements above materially false and misleading.

250.   Also on August 8, 2008, the Defendants caused Fannie to file its Second Quarter 2008 Form 10-Q with the SEC (the "Second Quarter 2008 10-Q"). The Second Quarter 2008 10-Q was signed by Mudd.

251.   The Second Quarter 2008 10-Q stated the following concerning credit loss sensitivities:

> Pursuant to our September 2005 agreement with OFHEO, we disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. Table 17 shows the credit loss sensitivity before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancement, as of June 30, 2008 and December 31, 2007 for first lien single-family whole loans we own or that back Fannie Mae MBS. The sensitivity results represent the difference between our base case scenario of the present value of expected credit losses and credit risk sharing proceeds, derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices. The increase in the credit loss sensitivities since December 31, 2007 reflects the decline in home prices during the first half of 2008 and the current negative near-term outlook for the housing and credit markets. These higher sensitivities also reflect the impact of updates to our underlying credit loss estimation models to capture the credit risk associated with the rapidly changing and worsening of conditions in the housing market. An environment of continuing lower home prices affects the frequency and timing of defaults and increases the level of credit losses, resulting in greater loss sensitivities. Although the anticipated credit risk sharing proceeds have increased as home prices have declined, the expected amount of proceeds resulting from a 5% home price shock are lower. As home prices decline, the number of loans without mortgage insurance that are projected to default increases. . . . .

252.    These statements were materially false and misleading because the Exchange Act Defendants misrepresented and/or failed to disclose that in January 2007, Fannie's business analytics division was predicting a 50% decline in home prices over three to five years that would materially increase Fannie's losses and wipe out Fannie's core capital.

253.    The Second Quarter 2008 10-Q included a SOX Certification signed by Mudd that was substantially the same as the SOX Certification alleged in ¶177.

254.    Mudd's SOX Certification was false and misleading for the reasons set forth in ¶128.

255.    On the August 8, 2008 analyst conference call (the "August 8 Conference Call"), Mudd stated the following about Fannie's exposure counterparty risk:

> [M. DeVries] [Lehman Brothers Analyst]: [C]ould you discuss the extent to which and you know, if at all, you have factored in counterparty risk with the financial guarantors and the MIs [mortgage insurance] in your reserving and impairments that you've taken?
>
> [D. Mudd]:    We've as a broad matter, we've moved with the installation of the Chief Risk Officer function, we have created the systems and the ability to look at our counterparty exposure to all of our counterparties on a divisible basis or on an aggregate basis.
>
> We look at that. We measure that. We understand where the risk is and as you've seen some of the larger counterparty changes along the way, with respect to some of the originators or some of the servicers that have changed form or as, for example, in the case of IndyMac, we've been able to manage through those by using that system; getting ahead of the curve, and having a very high degree of recovery.
>
> *        *        *
>
> [G. Gordon]: OK, thanks. The other is, I guess, sort of a counterparty risk in your loss mitigation efforts. Obviously, the people you're going back to collect in most cases are your clients; your customers delivering loans. How does that limit your ability to collect and obviously, there've been a number of bankruptcies of lenders. How does that limit your ability to collect?

[D. Mudd]:   So that said, in the situations that have been more publicized recently, I think it would go back, Gary, to my prior comment, which is we monitor these in advance.  We see where there are signs of stress.  The big concern there for us is that we're able to get in front and ensure that there's uninterrupted servicing because by-and-large you know the underlying quality of the loans is what it is, but it's the servicing that you don't want to have interrupted.  And we have been able to very efficiently, very quickly, and somewhat painlessly move those servicing books into hands where the servicing will continue uninterrupted.  With that Tom can give you a little flavor of the discussions.

[T. Lund]:   Sure.  Let me just reiterate what Dan said.  I mean this is a practice that we have had in place forever.  This is the way we operate with our customers.  Our customers understand this and as a team we've done a very good job, in a very tough environment managing counterparties.  And I think part of the reason is we've got people on the ground; we're inside these people's shops.  We have a great understanding of what they do.

In terms of the rep and warrant, our customers make rep and warrants to us and when the products that they sell meet the contracts.  They're very clear about what they're due.  They know how we do this.  We have ongoing discussions.  This is not a surprise to them.  I wouldn't even put this in an adversary way.  This is an understanding about how this business gets done.  It partly creates the efficiency in the secondary market and it's well accepted.  So I would say these continued discussions are ongoing and we're successful in that as we go forward.

256.    These statements were materially false and misleading because the Defendants misrepresented and/or failed to disclose that Fannie did not have a high degree of recovery concerning repurchase requests against Countrywide and that it was not true that Fannie was able to manage its exposure to IndyMac and have "a very high degree of recovery."  Specifically, the Defendants misrepresented and/or failed to disclose, as alleged in ¶¶104-108, that Fannie settled a loan repurchase dispute with Countrywide in May 2008 for approximately $0.23-0.26 on the dollar for a claim of $680-690 million and that, as alleged in ¶¶109-111, Fannie was aware that loans it had purchased from IndyMac were defective, and in fact, Fannie had asked IndyMac to repurchase between $1 and $10 billion in loans after IndyMac had been seized by regulators in

July 2008. These statements were materially false and misleading for the further reason that in July 2007, Fannie materially lowered its risk management capabilities by materially reducing the Chief Risk Officer's budget and staff, as alleged in ¶¶92-93.

## VII. DEFENDANTS' FRAUD REGARDING FANNIE'S EXPOSURE TO SUBPRIME AND ALT-A MORTGAGES

257.   The Defendants are liable for violations of the Exchange Act arising out of the sale of Fannie common shares and preferred shares during the Class Period.

### A.   Fannie's Underwriting System

258.   Fannie Mae's Single Family business principally acquired loans through one of two channels:  (i) the Lender (or flow) channel, which obtained loans from lenders on a going-forward or contractual basis through agreements to purchase loans from lenders before those loans were originated based on certain terms and conditions; and, (ii) the Investor (or bulk) channel, which acquired loans from lenders that had already been originated based on data files for those loans that were provided by lenders to Fannie Mae for review prior to purchase.  SEC Cmpl ¶31.

259.   Fannie Mae's Single Family business had a proprietary automated underwriting system called Desktop Underwriter ("DU").  DU was used by the Single Family business to assess the primary risk factors of a loan in order to measure that loan's default risk.  Customers of Fannie Mae also used DU to originate and underwrite loans so those customers would know— in advance—whether any given loan was eligible for sale to Fannie Mae.  When DU provided a Fannie Mae customer with an "approve" for a loan application, that customer knew that Fannie Mae would agree to acquire that loan and waive certain warrants and representations so long as the loan was originated in accordance with information originally submitted via DU.  SEC Cmpl ¶32.

260.    At various times during the Class Period, Fannie Mae adjusted and recalibrated the risk assessment models within its DU system.  For instance, in 2006, in connection with its *Say Yes* strategy to regain market share, Fannie Mae employed a "DU Bump" wherein eligibility parameters were expanded to provide more "approve" messages in DU for larger volumes of loans with lower FICO scores and higher LTVs than previously permitted.  By adjusting and recalibrating the risk assessment models within its DU system, Fannie Mae took on increasingly risky loans during the Class Period.  SEC Cmpl ¶33.

261.    While many mortgage originators used Fannie Mae's DU system as part of the underwriting process, many large mortgage lenders also had their own automated origination and underwriting platforms.   For instance, during the Class Period, Countrywide Financial Corporation's ("Countrywide") proprietary underwriting system was called Clues, and Freddie Mac had a system similar to DU that was called Loan Prospector.  SEC Cmpl ¶34.

262.    Not all loans acquired by Fannie Mae were underwritten using DU.  During the Class Period, Fannie Mae acquired and securitized mortgage loans that were underwritten through other automated underwriting systems or simply by agreed-upon standards in a manual process.  For instance, Fannie Mae acquired loans under Countrywide's Fast and Easy loan program that were underwritten using Countrywide's Clues system.  *E.g.*, FMCIV-NY-02_00529408 (document listing Fannie's internal Special Feature Codes for third party automated underwriting that was outside of Fannie's internal definition of Alt-A, including "Countrywide CLUES EASY PROGRAM," "Freddie Mac's LP," and others).  Similarly, most of the My Community Mortgage ("MCM") loans that Fannie Mae acquired during the Class Period were manually underwritten by loan officers and mortgage brokers at various companies nationwide and not evaluated using DU.  SEC Cmpl ¶35.

**B.** **The Officer Defendants' Roles at Fannie and Their Disclosure Responsibilities**

**1.** **Mudd's Role at Fannie Mae and His Disclosure Responsibilities**

263.   As Chief Operating Officer ("COO") and then CEO of Fannie Mae from 2000 until September 2008, Mudd oversaw all three Fannie Mae business units, including the Single Family business.  Additionally, during the Class Period, Mudd was a member of the Board of Directors and the Audit Committee, was a regular attendee at the Board's Risk Policy and Capital Committee meetings, held regular weekly meetings with his direct reports from the business units, and attended quarterly business unit briefings. Mudd regularly read, reviewed and marked-up draft periodic filings and met with individuals who provided sub-certifications prior to certifying Forms 10-K and Forms 10-Q.  SEC Cmpl ¶36.

264.   As CEO, and based on his prior role as COO, Mudd possessed detailed operational knowledge concerning Fannie Mae's subprime and reduced documentation loan exposure.  Further, during the Class Period, Mudd routinely received acquisition, delinquency and credit loss data concerning subprime and Alt-A loans.  Mudd certified filings and made public statements describing Fannie Mae's subprime and reduced documentation loan exposure knowing that those public statements were false and misleading.  SEC Cmpl ¶37.

265.   With regard to subprime-quality and reduced documentation loans, he received at least quarterly risk briefings on the Single Family business in which data showing Fannie Mae's total subprime and reduced documentation loan exposure was presented.  Additionally, Mudd met weekly with his direct reports, who, among other things, informed him about Single Family loan acquisitions, trends and status with respect to market share targets.  SEC Cmpl ¶38.

266.   Mudd was well aware of the Company's increased acquisition of reduced documentation loans—indeed, Mudd himself directed the company to pursue that market.  For

78

instance, in an April 26, 2006, Credit Risk meeting following a presentation on reduced documentation loans and their risks by the Single Family credit officer (who noted low documentation loans were riskier), Mudd stated that "the market is moving to low documentation and we need to actively pursue the keys to this market." SEC Cmpl ¶39.

267.    Mudd oversaw Fannie Mae's 2006 market share increase during which the Single Family business grew its market share from 20% of total mortgage loan originations to 25% by acquiring more subprime and reduced documentation loans.  In part as a result of Fannie Mae's successful market share growth and timely filing of the company's periodic reports, Mudd's taxable compensation grew from $6.16 million in 2006 to $10.64 million in 2007.  SEC Cmpl ¶40.

268.    Throughout the Class Period, in addition to wages earned, Mudd—like all Fannie Mae executives—received an Annual Incentive Plan ("AIP") bonus that was tied to two things: (i) Company performance, measured by attaining corporate year-end goals; and, (ii) personal performance, measured by attaining individual year-end goals.  The AIP program was designed to "put part of the participants' total compensation package at risk, based on the achievement of one-year goals for both the participant and the corporation" with individual performance driving the AIP payout each year, adjusted for corporate goal performance.  The AIP bonus for a given year's performance was paid out in the following fiscal year such that an AIP bonus for performance in 2006 was received in 2007.  SEC Cmpl ¶41.

269.    In his 2006 year-end report to the Board, Mudd noted that the Single Family business increased its market share, in part "by entering new markets—especially Alt-A and subprime," that in response to filing the Company's 2004 Form 10-K, "[t]he market and ratings agency reactions generally were positive—there were no big surprises," and that the Company's

stock price improved by more than 20%.   FMCIV-NY-02_00269370, at 9372, 9375, 9380 (memorandum dated Jan. 3, 2007 from Mudd to Fannie's Board of Directors). Mudd's 2006 taxable compensation was more than $6 million with approximately $2.5 million from his AIP bonus.   In 2007, Fannie Mae's corporate goals included growing revenue, which the Single Family business set about doing by increasing its book by 5.6% with a plan to acquire more Alt-A and subprime loans.   In 2007, Mudd's taxable compensation was more than $10 million–with $3.5 million from his AIP bonus alone. Mudd served as CEO for only eight full months in 2008, but his taxable compensation in 2008 was $7.4 million–with more than $2.2 million from his AIP bonus based on his personal performance for 2007.  SEC Cmpl ¶42.

270.   Mudd was also well aware that investors were increasingly focused on subprime loans. In a February 6, 2007 memo to the Board of Directors of Fannie Mae, Mudd wrote that investors and analysts were "focused on our market share, subprime risk and our portfolio strategy."  As CEO of Fannie Mae, Mudd routinely interacted with investors and the media. During the Class Period, as investors and the media increasingly focused their attention on the credit risks associated with subprime and Alt-A mortgage loans, Mudd made numerous false and misleading statements that downplayed the Company's exposure to such loans and provided false assurance to the market that Fannie Mae was participating in a safer segment of the mortgage market.  Indeed, Mudd created the false perception that Fannie Mae's participation in high-credit-risk loans such as Alt-A and subprime was small and contained, and reinforced this false and misleading impression, telling investors that Fannie Mae was in the prime—not the subprime—market with a different, higher set of standards and underwriting.  SEC Cmpl ¶43.

271.   Mudd was knowledgeable about the mortgage markets.   While CEO of Fannie Mae, Mudd made numerous appearances before Congress to testify about the mortgage markets,

the role of the GSEs and the subprime market.  In that setting, Mudd repeatedly minimized Fannie Mae's reported exposure, falsely claiming it was less than 2% of the Company's book or that Fannie Mae held about zero percent subprime.  SEC Cmpl ¶44.

272.    During the Class Period, Mudd received, reviewed and commented on (often in handwritten notes) multiple draft versions of each of Fannie Mae's periodic and other filings with the Commission. Prior to certification, Mudd met–seriatim–with officers of the Company who had provided sub-certifications to discuss issues presented by upcoming public filings. Also, as a member of the Audit Committee at Fannie Mae and the Board of Directors, Mudd participated in final committee and board reviews of Fannie Mae's Forms 10-K and Forms 10-Q during the Class Period prior to certifying.  SEC Cmpl ¶45.

### 2.    Dallavecchia's Role at Fannie Mae and his Disclosure Responsibilities

273.    Enrico Dallavecchia served as Fannie Mae's EVP and Chief Risk Officer from June 2006 through August 2008.  In that position, Dallavecchia reported directly to Mudd and was responsible for credit, market, counterparty, and operational risk oversight for all business units within Fannie Mae, which included measuring, reporting, and monitoring Fannie Mae's risk profile and formulating the Company's risk policies.  As the senior-most executive in charge of credit risk, Dallavecchia received and provided regular reports on the actual volumes of subprime and reduced documentation loan acquisitions, the associated delinquency rates, and credit losses for those loans at Fannie Mae.  SEC Cmpl ¶53; e.g., FMCIV-NY-02_00005445, at 5463 (presentation dated Sept. 17, 2007 titled "Risk Policy and Capital Committee Chief Risk Officer Report" with chart listing Fannie's Subprime and Non-Full Doc loans as a percentage of acquisitions and of single family book of business); FMCIV-NY-02_00006413, at 6445 (presentation dated Oct. 15, 2007 titled "Risk Policy and Capital Committee Chief Risk Officer

Report" with graph showing Fannie's Alt-A, Subprime, and other types of loans as a percentage of single family book of business, and serious delinquency rates); FMCIV-NY-02_00021643, at 1651 (email dated Apr. 20, 2006 attaching presentation titled "CEO Credit Risk Briefing" with chart showing "Select Book and Acquisition Trends").

274.   Dallavecchia was also a member of Fannie Mae's Disclosure Committee, which oversaw the preparation of the Company's periodic (and other) filings with the Commission. During the Class Period, Dallavecchia was the only executive from the Chief Risk Office who sat on Fannie Mae's Disclosure Committee.  As CRO, Dallavecchia was uniquely positioned to recognize and inform others about the overall credit risks presented by Fannie Mae's loan portfolio. SEC Cmpl ¶54.

275.   Fannie Mae attendance records from the Class Period reflect that Dallavecchia routinely attended Disclosure Committee meetings where contemplated draft filings with the Commission were reviewed and issues discussed.  Dallavecchia personally received and reviewed draft versions of Fannie Mae's periodic and other filings with the Commission. Dallavecchia sub-certified as to the accuracy of the Company's materially false and misleading disclosures concerning its exposure to subprime and Alt-A loans, thereby substantially assisting the Company's fraud.  SEC Cmpl ¶55.

276.   Dallavecchia and the Single Family CRO team assisted in drafting the definition of subprime contained in the February 27, 2007, Form 12b-25 in which Fannie Mae first quantified its subprime exposure.  SEC Cmpl ¶56; FMCIV-NY-02_00341436 - FMCIV-NY-02_00341437 (emails dated Feb. 23, 2007 between Dallavecchia and Michael A. Shaw (SVP Credit Risk Oversight); Brenda Nettles (CRO VP Credit Risk Oversight); Pam Johnson (SVP Single Family Risk Management); and Eileen M. O'Malley (Director, Aggregate Reporting,

Policy & Administrative) regarding "Subprime Definition" in which Dallavecchia stated on Feb. 22 that "[t]he way I read it we have no definition at FNM" and stated on Feb. 23 that "[w]e have a whole morning to create a definition.").

277.    Dallavecchia occasionally led the Board's Risk, Policy and Capital Committee meetings and attended Executive Committee meetings.  In those roles, Dallavecchia received information and data concerning Fannie Mae's total exposure to reduced documentation and subprime loans.  SEC Cmpl ¶57.

278.    As Fannie Mae's CRO, Dallavecchia had credit risk oversight for Fannie Mae's 2006 market share growth, and, in part as a result of its success and timely filing of the company's periodic reports, Dallavecchia's taxable compensation more than doubled from $617,886 for 7 months of service in 2006 to $2.68 million in 2007.  SEC Cmpl ¶58.

279.    Throughout the Class Period, in addition to wages earned, Dallavecchia received an AIP bonus tied to attaining corporate and personal goals.  When Dallavecchia began as Fannie Mae's CRO, the then-Chairman of the Board of Directors noted in an address to Senior Management: "We have to think differently and creatively about risk... Enrico Dallavecchia was not brought on-board to be a business dampener."  In 2006, Fannie Mae's corporate goals included filing its 2004 Form 10-K, increasing its earnings per share, profitability, and subprime penetration while building a CRO function and implementing business unit risk officers.  In his year-end 2006 self-assessment, Dallavecchia noted that the most significant achievement was his office playing a role "from both a risk perspective and also from a business perspective." Dallavecchia further noted that his office "authored the Risk Section of the [late filed] 2004 10-K."  SEC Cmpl ¶59.

280.   In 2007, Fannie Mae's corporate goals included growing revenue and timely periodic filings with the Commission.   In addition to Fannie Mae meeting most of its 2007 corporate goals with respect to growing revenue, Mudd's year-end 2007 review of Dallavecchia noted that he completed the build out of the CRO structure, developed risk limits, and did good work on the Board Risk Policy and Capital Committee.   Dallavecchia's 2007 taxable compensation was more than $2.6 million with $1.04 million from his AIP bonus.  SEC Cmpl ¶60.

281.   One month prior to conservatorship, in August 2008, Dallavecchia was terminated as CRO.  Accordingly, Dallavecchia served as CRO for only seven full months in 2008; his 2008 taxable compensation was $2.3 million with $923,780 from his AIP bonus.  SEC Cmpl ¶61.

### C.   Overview of Fannie's Loan Programs

#### 1.   Fannie Mae's Reduced Documentation Loan Programs

282.   During the 1990s, Fannie Mae had limited market presence in Alt-A mortgage loans, which were not a large part of mortgage originations nationwide.  SEC Cmpl ¶62.

283.   In July 1999, Fannie Mae and Countrywide Home Loans entered into an alliance agreement, which included a reduced documentation loan program called the "internet loan," which was soon thereafter re-branded by Countrywide as the *Fast and Easy* loan.   This loan program featured a streamlined documentation process, which allowed mortgage-loan applicants with a qualifying FICO credit score to be preapproved for a mortgage loan without providing documentation to verify income or assets.  SEC Cmpl ¶63.

284.   The *Fast and Easy* loan program was popular.  Fannie Mae executives referred to it as Countrywide's "signature" or "flagship" mortgage product.  By the mid-2000s, other

mortgage lenders developed similar reduced documentation loan programs such as Mortgage Express and PaperSaver-many of which Fannie Mae acquired in ever-increasing volumes throughout the Class Period. *E.g.*, FMCIV-NY-02_00529408 (document listing reduced documentation loan programs from numerous lenders, including Countrywide, that are outside of Fannie's "Internal … Definition of Alt-A"); SEC Cmpl ¶64.

285.    Alt-A loans proliferated in the marketplace, and during the Class Period Fannie Mae's Single Family business pushed to increase its acquisitions of those Alt-A loans. By year-end 2006, 35% of Fannie Mae's Single Family loan acquisitions were Alt-A loans. By year-end 2007, that number increased to 37%, and by June 30, 2008, 26% of its Single Family loan acquisitions were Alt-A loans. SEC Cmpl ¶65.

### 2.    Fannie Mae's Subprime Loan Programs

286.    Since the late 1990s, Fannie Mae acquired and guaranteed subprime mortgage loans described in Fannie Mae periodic filings during the Class Period as loans made to "borrowers with weaker credit histories" or "weaker credit profile[s]" that "have a higher likelihood of default than prime loans" as part of the Company's two primary programs for borrowers with weaker credit histories: Expanded Approval/Timely Payment Rewards ("EA") and My Community Mortgage ("MCM"). SEC Cmpl ¶66.

287.    The credit risks posed by these programs were well understood by senior management at Fannie Mae. Mudd was familiar with the EA and MCM loan programs and the credit risks those loan programs entailed. Throughout the Class Period all the Defendants received reports, briefings and presentations containing acquisition volume, Serious Delinquency Rates ("SDQ Rates") and credit loss data with respect to Fannie Mae's EA and MCM loans. Throughout the Class Period, Mudd, and Dallavecchia knew that EA loans were—on—average-the highest credit risk loans on Fannie Mae's book of business, and knew that EA loans

contributed disproportionately to Fannie Mae's credit losses.  SEC Cmpl ¶67; *e.g.*, FMCIV-NY-02_00009036, at 9037-38 (presentation dated Feb. 29, 2008 titled "Single Family Book of Business and Update on Loss Mitigation");  FMCIV-NY-02_00023054, at 3054, 3060 (email dated Aug. 5, 2007 from Michael Shaw to Mudd and Dallavecchia attaching Aug. 3, 2007 draft of Fannie's Credit Supplement and stating:  "Pages 3 through 8 are the reports my team created in response to your request for basic data on our credit book.");  FMCIV-NY-02_00299696 at 9701 (presentation dated Jan. 2008 titled "Expanded Approval/Subprime Analysis, Key Observations and Recommendations" stating as "Bottom Line:"  "The EA products look like and largely perform like Subprime collateral").

288.    Indeed, in May 2001, Mudd wrote a memo to the then-CEO noting that EA loans "are the highest default risk loans we have ever done."  SEC Cmpl ¶68.

289.    Traditionally, Fannie Mae treated EA loans as part of its subprime exposure.  For example, a March 2002 Report prepared for HUD with the participation of Fannie Mae, entitled "Subprime Markets, the Role of GSE and Risk-Based  Pricing," stated under a section entitled "Agency Subprime Lending Products" that:

> The agencies are increasing their presence in the subprime market by rolling-out new subprime mortgage products through updated versions of their automated underwriting systems.  Fannie Mae seller/servicers now offer loan products to three groups of credit-impaired borrowers under two new programs. Fannie Mae's Expanded Approval program allows lenders to approve borrowers who would have been formerly classified as 'Refer with Caution' ... by Fannie Mae's Desktop Underwriter (DU). ... The Expanded Approval products are recent innovations, and, according to Fannie Mae representatives, account for a relatively small portion of that GSE's book of business ... At most, according to a Fannie Mae stock analyst, these subprime loan purchases will account for no more than five percent of that GSE's purchase volumes. (Emphasis added).

SEC Cmpl ¶69.

290.    Similarly, in its annual exam process in 2004 and 2005, Fannie Mae's then-primary regulator, OFHEO asked for information on Fannie Mae's total Single Family subprime loan exposure, specifically requesting: "[t]he volume of loans purchased in 2004 [and 2005] defined as CE structured subprime ... or sub-prime as otherwise defined." In March of 2005 and April of 2006, respectively, Fannie Mae responded by providing OFHEO with information on mortgage loan purchases and mortgage-backed securities under the EA program, describing the EA program as, "our most significant initiative to serve credit-impaired borrowers." SEC Cmpl ¶70; Fannie NPA ¶12.

291.    In anticipation of communications with investors in March, 2004, Fannie Mae's then—CEO received a document listing questions and answers ("Q&A") relating to Fannie Mae's business. That document stated in part: "Delinquencies in the subprime market have been rising. What is Fannie Mae's exposure to subprime loans?  Does subprime include Alt-A loans? ANSWER [:] Our strong risk management tools and practices have enabled expansion of Fannie Mae's product offerings to include products targeted to borrowers with minor credit blemishes.  The most notable product line for reaching these borrowers, Expanded Approval with Timely Payment Rewards, has grown in volume but represents less than two percent of Single Family credit portfolio." Further, in March of 2005, Fannie Mae's CEO was provided with a Q&A that stated in part: ".... Delinquencies in the subprime market have been rising. What is Fannie Mae's exposure to subprime loans?  Does subprime include Alt-A loans? ANSWER[:] Fannie Mae's  subprime exposure primarily consists of our own product line for serving credit-impaired borrowers-the Expanded Approval with Timely Payment Rewards product, and mortgage related securities backed by subprime loans that we hold in our mortgage portfolio ..." Fannie NPA ¶11.

292.    Moreover, before December 2006, various internal Fannie Mae reports, including reports to the Board, identified subprime loans as including: (i) investor channel subprime loans acquired as part of its Subprime NBI; (ii) A-Deal loans that pre-date December 2005; and, (iii) EA loans.  SEC Cmpl ¶71.

**D.    Fannie's Subprime Disclosure Fraud**

**1.    Fannie Excluded EA and MCM Loans from its Subprime Disclosures**

293.    When Fannie Mae first reported its quantitative exposure to subprime loans in a filing with the Commission on February 27, 2007, the Company broadly defined subprime as loans to "borrowers with weaker credit histories."  EA and MCM loans fell squarely within this definition, but were not included in the accompanying quantification of Fannie Mae's subprime exposure.  SEC Cmpl ¶72; Fannie NPA ¶¶7-8, 13.

294.    Instead, the quantification consisted primarily of private label securities it held that were marketed as being backed by subprime loans, certain "A-" loans that the company acquired prior to 2005, and certain loans that had been acquired through a limited new business initiative beginning in 2006.  Fannie Mae's subprime quantification did not include significant numbers of other loans that fell within its published subprime definition of loans to "borrowers with weaker credit histories."  SEC Cmpl ¶73.

295.    Throughout the Class Period, EA loans had, on average, higher SDQ rates than the loans Fannie Mae used in calculating its disclosed subprime exposure.  Senior management at Fannie Mae, including the Defendants, were aware of this fact, as SDQ rates were tracked and regularly included in reports and other internal presentations.  SEC Cmpl ¶74; *e.g.*, FMCIV-NY-02_00006413, at 6445 (presentation dated Oct. 15, 2007 titled "Risk Policy and Capital Committee Chief Risk Officer Report" with graph showing EA SDQ rate as higher than Subprime); FMCIV-NY-02_00009036 at 9037-38 (presentation dated Feb. 29, 2008 titled