```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____           │
│ DATE FILED: August 30, 2012          │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re FANNIE MAE 2008 SECURITIES          :        *08 Civ. 7831 (PAC)
LITIGATION                                :        *09 MDL. 2013 (PAC)
----------------------------------------------------------x

COMPREHENSIVE INVESTMENT                  :
SERVICES, INC.,                           :        *09 Civ. 6102 (PAC)
                                          :
            Plaintiff,                    :        OPINION & ORDER
                                          :
       v.                                 :
                                          :
DANIEL H. MUDD, ET AL.,                   :
                                          :
            Defendants.                   :
----------------------------------------------------------x
EDWARD SMITH,                             :        *10 Civ. 2781(PAC)
                                          :
            Plaintiff,                    :
                                          :
       v.                                 :
                                          :
FEDERAL NATIONAL MORTGAGE                 :
ASSOCIATION, ET AL.,                      :
                                          :
            Defendants.                   :
----------------------------------------------------------x
LIBERTY MUTUAL INSURANCE                  :
COMPANY, ET AL.,                          :        *10 Civ. 9184 (PAC)
                                          :
            Plaintiffs,                   :
                                          :
       v.                                 :
                                          :
GOLDMAN, SACHS & CO.,                     :
                                          :
            Defendant.                    :
----------------------------------------------------------x

1

HONORABLE PAUL A. CROTTY, United States District Judge:

The above captioned private securities actions allege, generally, that Federal National

Mortgage Association ("FNMA"), its executives, and certain underwriters made material

misstatements in FNMA's filings with the Securities and Exchange Commission ("SEC") and in

various securities offerings, concerning FNMA's (1) subprime and Alt-A exposure; (2) risk

management controls; and (3) core capital financials.  While many of the private action plaintiffs

have joined the securities class action ("Class Action"), Comprehensive Investment Services,

Inc. ("CIS"), Edward Smith ("Smith"), and Liberty Mutual Insurance Co., Liberty Mutual Fire

Insurance Co., Peerless Insurance Co., SafeCo Corp., and Liberty Life Assurance Co. of Boston

(collectively, "Liberty") are pursuing their own individual actions.[1]

The eight defendants bring fourteen motions to dismiss the second amended complaints.[2]

Defendants' motions are GRANTED IN PART and DENIED IN PART.

## THE SECOND AMENDED COMPLAINTS

### I.    Class Action's Second Amended Complaint in 08 Civ. 7831

The Court previously held that the Class Action's allegations regarding FNMA's alleged

deficient risk control measures were sufficient to state Section 10(b) and Rule 10b-5 claims

against FNMA, Daniel H. Mudd ("Mudd"), and Enrico Dallavecchia ("Dallavecchia"), and

Section 20(a) claims against Mudd and Dallavecchia.  See In re Fannie Mae 2008 Sec. Litig.,

742 F.Supp.2d 382, 399 (S.D.N.Y. 2010).  Familiarity with the Court's prior opinion is assumed.

---

[1]  These cases were transferred and consolidated in this District by the Judicial Panel on Multidistrict
Litigation ("JPML").

[2]  These fourteen motions include:  FNMA's motions to dismiss (1) the Class Action's, (2) Smith's, and
(3) CIS's second amended complaints ("SACs"); Mudd's motions to dismiss (4) the Class Action's, (5)
Smith's, and (6) CIS's SACs; Dallavecchia's motions to dismiss (7) the Class Action's, (8) Smith's and
(9) CIS's SACs; (10) Robert J. Levin's motion to dismiss CIS's SAC; (11) Stephen M. Swad's motion
to dismiss CIS's SAC; (12) the Smith Underwriters' motion to dismiss; (13) the CIS Underwriters'
motion to dismiss; and (14) Goldman's motion to dismiss Liberty's SAC.

The Class Action's Second Amended Complaint adds new factual allegations that defendants failed to disclose adequately FNMA's level of exposure to subprime and Alt-A loans.

## II.    CIS's Second Amended Complaint in 09 Civ. 6102

In May 2008, CIS purchased 600,000 shares of FNMA's Series T Preferred Stock from Wachovia Securities for $15 million.  (CIS SAC ¶¶ 2, 14-15.)  On May 13, 2009, CIS filed a single-plaintiff lawsuit in the United States District Court for the Southern District of Texas, against FNMA; Mudd, Dallavecchia, Robert J. Levin ("Levin") and Stephen M. Swad ("Swad") (collectively, the "Individual CIS defendants"); and the CIS Underwriters.[3]  CIS alleges that FNMA, the Individual CIS defendants, and the CIS Underwriters violated the Texas Fraud in Real Estate and Stock Transaction statute, Section 27.01 of the Texas Business & Commerce Code ("TBCC"), as both primary violators and as aiders and abettors; Wachovia Securities and FNMA committed primary violations of the Texas Securities Act ("TSA"), Texas Revised Civil Statute article 581-33A(2); the Individual CIS defendants violated 581-33F(1) of the TSA; Dallavecchia, Mudd, and the CIS Underwriters violated article 581-33F(2) of the TSA; FNMA, Dallavecchia, and Mudd committed common law fraud; FNMA, the Individual CIS defendants, and the CIS Underwriters made negligent misrepresentations; FNMA, Mudd and Dallavecchia violated Section 10(b) of the Exchange Act and Rule 10b-5; and Mudd and Dallavecchia violated Section 20(a) of the Exchange Act.  On July 9, 2009, this action was transferred to this Court.

## III.    Smith's Second Amended Complaint in 10 Civ. 2781

Smith purchased FNMA's Series S Preferred Stock on or about December 6, 2007, and thereafter suffered substantial losses.  (Smith SAC ¶ 13.)  On February 26, 2010, Smith filed this action in the United States District Court for the Southern District of California, against FNMA;

---

[3] "CIS Underwriters'" includes defendants Wachovia Capital Markets, LLC and Citigroup Global Markets, Inc.

Mudd and Dallavecchia (collectively, the "Individual Smith defendants"); and the Smith

Underwriters.[4]  Smith claims that: FNMA and the Individual Smith defendants violated Section

10(b) and Rule 10b-5, committed common law fraud, and violated Sections 1572, 1709 and 1710

of California's Civil Code; FNMA violated Sections 25400 and 25500 of California's Corporate

Code; the Individual Smith defendants violated Section 20(a) of the Exchange Act; and all

defendants made negligent misrepresentations.  On March 12, 2010, this action was transferred

to this Court.

## IV.    Liberty's Second Amended Complaint in 10 Civ. 9184

Liberty raises claims only against Goldman, Sachs & Co. ("Goldman"), which served as

lead underwriter for FNMA's Series S and P offerings, and had solicited Liberty's purchase of

FNMA's Series S and Series P preferred stock offerings.  (Liberty SAC ¶¶ 130, 142.)  Liberty

claims that Goldman: violated Section 10(b) and Rule 10b-5; violated Massachusetts' securities

fraud statute, M.G.L. c. 110A Section 410, and Washington's securities fraud statute, Wash.Rev.

Code Sections 21.20.010 and 21.20.430; committed deceptive trade practices in violation of

M.G.L. c. 93A, Section 11, and Wash. Rev. Code. Sections 19.86.020 and 19.86.090; committed

common law fraud; and made negligent misrepresentations.  On December 9, 2010, the case was

transferred to this Court.

## GENERAL LEGAL STANDARDS

## I.    General Motion to Dismiss Standard

When considering a Fed. R. Civ. P. 12(b)(6)  motion, the court "must accept as true all of

the factual allegations contained in the complaint," and construe the complaint in the light most

---

[4] "Smith Underwriters'" includes: Banc of America Securities LLC, Citigroup Global Markets Inc.,
   Deutsche Bank Securities Inc., Goldman, JPMorgan Securities LLC (f/k/a JPMorgan Securities, Inc.),
   JPMorgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. LLC (f/k/a
   Morgan Stanley & Co. Incorporated), and UBS Securities LLC.

favorable to the plaintiff.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007); see Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009).  The court only "assess[es] the legal feasibility of the complaint"; it does not "assay the weight of the evidence which might be offered in support thereof."  Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003).

To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (citation omitted).

## II.  Heightened Pleading Standards of Rule 9(b) and the PSLRA

Fed. R. Civ. P. 9(b) requires a heightened pleading standard for complaints alleging fraud: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  See In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 632–33 (S.D.N.Y. 2008).  This standard requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999).

## III.    Elements of Claims under Section 10(b) and Rule 10b-5

Securities fraud claims under Section 10(b) and Rule 10b-5 must also meet the heightened pleading standards set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u-4(b).  Among other requirements, the PSLRA requires "plaintiffs to state with particularity both the facts constituting the alleged [securities fraud] violation" and

the other elements of the Section 10(b) cause of action.  Tellabs, 551 U.S. at 313.  To effectuate Congress's intent to eliminate baseless lawsuits through the application of rigorous pleading standards, the PSLRA mandates that a plaintiff alleging a Section 10(b) action must: (1) specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(1)-(2); Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000).

Section 10(b) of the Exchange Act prohibits any person from using or employing "any manipulative or deceptive device or contrivance in contravention" of SEC rules. 15 U.S.C. § 78j(b).  Rule 10b-5 prohibits "any device, scheme, or artifice to defraud" and "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . ." 17 C.F.R. § 240.10b-5.  To state a claim under Rule 10b-5, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005).

### IV.   Materiality

A complaint alleging a Rule 10b-5 claim fails if it relies on statements or omissions "that a reasonable investor would [not] have considered significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).  "'[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426

U.S. 438, 449 (1976)). "An omitted fact may be immaterial if the information is trivial, or is so basic that any investor could be expected to know it." Ganino, 228 F.3d at 162 (internal citations omitted).

### V. Scienter Pleading Standards in Fraud Claims

A plaintiff claiming fraud can plead scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d Cir. 2006). To satisfy Rule 9(b), a plaintiff asserting common law fraud must allege "facts that give rise to a strong inference of fraudulent intent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). "Although speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'" Ganino, 228 F.3d at 169.

Recklessness sufficient to establish scienter involves conduct that is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996). The allegations must approximate an actual intent to defraud. Id. "[A] plaintiff pleading a § 10(b) violation based on defendant's recklessness faces two stiff challenges in this Circuit: the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud, *and* the inference of recklessness must be at least as compelling as any opposing inferences." In re Bayou Hedge Fund Litig., 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007).

## VI.    Loss Causation

In order to successfully allege loss causation, a plaintiff must adequately plead facts which, if proven, would show that its loss was caused by the fraud and not by other intervening events.  Lentell, 396 F.3d at 174; see also 15 U.S.C. § 78u-4(b)(4).Where a "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," making it more difficult for a plaintiff to establish loss causation.  Lentell, 396 F.3d at 173.  To survive a motion to dismiss, however, a plaintiff must only allege either: "(i) facts sufficient to support an inference that it was a defendant's fraud — rather than other salient factors — that proximately caused plaintiff's loss," id. at 177, or (ii) "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to . . . [the defendant's fraud]."  Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007).

## ANALYSIS

### I.  Subprime and Alt-A Disclosures

The Class Action, CIS, Smith, and Liberty have all amended their complaints to add allegations regarding FNMA's quantitative subprime and Alt-A exposure disclosures, which closely track (1) allegations made in an SEC action against Mudd, Dallavecchia, and Thomas Lund, and (2) statements made in a Non-Prosecution Agreement ("NPA") FNMA entered into with the SEC.[5]  Defendants move, pursuant to Fed. R. Civ. P. 12(f), to strike portions of the plaintiffs' amended pleadings that repeat allegations contained in the SEC complaint and the NPA.

---

[5] The ERISA plaintiffs, in 09 Civ. 1350, have also amended their complaint to incorporate allegations from the SEC action.  The Class Action, CIS, and Smith use such allegations to bring federal securities law claims against FNMA, Mudd, and Dallavecchia.  Liberty and the ERISA Class Action Plaintiffs do not raise any claims on this basis, but rather incorporate these factual allegations to bolster other claims.

A. *Defendants' Motions to Strike*

Under Fed. R. Civ. P. 12(f), a court is permitted to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "To prevail on a motion to strike, a party must demonstrate that '(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant.'" S.E.C. v. Lee,  720 F.Supp.2d 305, 340-341 (S.D.N.Y. 2010) (Daniels, J.) (quoting Roe v. City of N.Y., 151 F.Supp.2d 495, 510 (S.D.N.Y. 2001)).

In Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir. 1976), this Circuit struck a complaint's reference to a SEC consent decree because it was inadmissible under Fed. R. Evid. 410 and, thus, the private action plaintiff could not derive any evidentiary benefit from it.  Id. at 893.  The Circuit, however, reiterated the strong presumption against striking portions of the pleadings and cautioned that its holding was limited to "the facts of this case."  Id. 893-94. Lipsky does not, as defendants argue, stand for the proposition that any factual allegation derived from a government investigation or pleading must be stricken from a private plaintiff's complaint.  "There is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in order to meet the Rule 9(b) and PSLRA thresholds."  Lee, 720 F.Supp.2d at 341 (citing Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F.Supp.2d 385, 395 (S.D.N.Y. 2005) (holding that an SEC complaint is an adequate source for a factual allegation)).  Thus, "there is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA."  Id.  Indeed, "[i]t makes little sense to say that information from . . . a study [or investigation]— which the [complaint] could unquestionably rely on if it were mentioned  in a news clipping or public testimony — is

immaterial simply because it is conveyed in an unadjudicated complaint." In re Bear Stearns Mortgage Pass-Through Certificates Litig., No. 08 Civ. 8093 (LTS)(KNF), 2012 U.S. Dist. LEXIS 45679, at *53-55 (S.D.N.Y. Mar. 30, 2012).

The defendants have not satisfied the three elements to prevail on a motion to strike. First, while the SEC complaint and the NPA are not admissible, there is evidence in support of the factual allegations contained within these documents that would be admissible.  The Class Action plaintiffs have documentary support for some of their allegations from their limited discovery.  In addition, some of the publicly available information supports plaintiffs' allegations.[6]  Second, the new factual allegations relate to the issues previously raised in the private securities actions.[7]  Third and finally, it would not prejudice defendants to allow plaintiffs' new allegations to stand because many of these defendants must defend themselves against such claims in the SEC's enforcement action in any event.  Defendants' motions to strike the allegations derived from the SEC complaint and NPA are therefore DENIED.

B.  *The Class Action, CIS, and Smith Have Stated A Claim Against FNMA, Mudd, and Dallavecchia For Misstating FNMA's Subprime And Alt-A Exposure*

Defendants argue that plaintiffs' Section 10(b) and Rule 10b-5 claims premised on FNMA's quantitative subprime and Alt-A exposure disclosures fail to state a claim for a number of reasons.  Almost all of their arguments are identical to those raised in the

---

[6]  Contrary to defendants' arguments, however, the publicly available information did not correct, clarify or render immaterial FNMA's subprime and Alt-A exposure disclosures, because it was not clear to investors at that point that FNMA's subprime and Alt-A exposure excluded EA, MCM and lender-selected low-documentation loans, as discussed in this Court's prior opinion.  See SEC v. Mudd, 11 Civ. 9202, 2012 WL 3306961 (S.D.N.Y. Aug. 10, 2012).

[7]  The Class Action previously alleged that FNMA's disclosure of its subprime exposure was false and misleading.  The Court found the Class Action's prior factual allegations to be insufficient to state a claim at that time. In re Fannie Mae 2008 Sec. Litig., 742 F.Supp.2d at 402.  The SEC, however,  raises new factual allegations which are sufficient to state a claim.  See S.E.C. v. Mudd, 11 Civ. 9202, Dkt. No. 40.

SEC enforcement action and, therefore, are rejected for the reasons stated in the Court's

prior opinion, familiarity with which is assumed.  SEC v. Mudd, 11 Civ. 9202, --- F.

Supp. 2d ---, 2012 WL 3306961 (S.D.N.Y. Aug. 10, 2012).  Dallavecchia argues,

however, that he did not "make" the misstatements at issue within the meaning of Janus

Capital Grp., Inc., v. First Derivative Traders, 131 S.Ct. 2296, 2305 (June 13, 2011).

In Janus, the Supreme Court considered whether Janus Capital Management,

which served as an investment adviser and administrator for Janus Investment Fund,

made the misstatements contained in Janus Investment Fund's mutual fund prospectus.

The Supreme Court held that, in a private Section 10(b) or Rule 10b-5 action, "the maker

of a statement is the person or entity with the ultimate authority over the statement,

including its content and whether and how to communicate it."  Id. at 2305.  The Court

held that while Janus Capital Management "was significantly involved in preparing the

prospectus," it did not "make" the statements contained in the prospectus because it did

not have ultimate control over the statements, it did not file the prospectus with the SEC,

and the statements in the prospectus were not attributed to it.  Id.

Plaintiffs allege that Dallavecchia made misstatements on conference calls with

investors and in FNMA's SEC filings.  Dallavecchia can be found liable for his

statements on conference calls because "[o]ne 'makes' a statement by stating it . . . . Even

when a speechwriter drafts a speech, the content is entirely within the control of the

person who delivers it.  And it is the speaker who takes credit—or blame—for what is

ultimately said."  Janus, 131 S.Ct. at 2302; see also In re Pfizer Secs. Litig., No. 04 Civ.

9866(LTS), 2012 U.S. Dist. LEXIS 39454, at *20-21 (S.D.N.Y. Mar. 22, 2012) (holding

that Janus did not foreclose liability for statements the officer defendants made

themselves).  Plaintiffs adequately allege that Dallavecchia made material misstatements during conference calls with investors on February 27, 2007, May 2, 2007, and August 17, 2007.  On February 27, 2007, for example, Dallavecchia stated that only 0.2% of FNMA's Single Family book of business consisted of subprime loans, which he described as "immaterial" and a "prudent engagement."  (Class Action SAC ¶¶ 140, 317.)

While it is correct that Dallavecchia did not sign any of the SEC filings at issue, he still may be found to have made a misstatement.  In the post-Janus world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive.  See In re Merck & Co., Sec., Derivative & "ERISA" Litig., MDL No. 1658(SRC), 2011 U.S. Dist. LEXIS 87578, at *102-103 (D.N.J. Aug. 8, 2011) (finding Executive Vice President could be liable for misstatements in SEC filings, which he signed, and quotes attributed to him appearing in articles and reports); In re Pfizer Secs. Litig., 2012 U.S. Dist. LEXIS 39454, at *20-21 (holding that executive defendants could be liable for statements in press releases because they "approved" or "ratified" such statements).

Given Dallavecchia's position as Chief Risk Officer, his knowledge of FNMA's subprime and Alt-A exposure, his participation in drafting relevant disclosures, his position on the disclosure committee, his review of draft filings, the fact that he had individual discussions with Mudd about the SEC filings, and his sub-certification (and, thus, approval) of the SEC filings, a question of fact exists as to whether Dallavecchia had ultimate authority over the misstatements, or ratified and approved the

misstatements, contained in FNMA's SEC filings.   See In re Pfizer Secs. Litig., 2012

U.S. Dist. LEXIS 39454, at *20-21.  Dallavecchia's arguments thus fail at this juncture.

   C.   *The Class Action, CIS and Smith Have Stated A Claim For Control Person*
        *Liability, Under Section 20(a)*

        The Class Action, CIS, and Smith allege that Mudd and Dallavecchia are liable as control

persons, under Section 20(a) of the Exchange Act, for FNMA's false and misleading quantitative

subprime and Alt-A disclosures.  "While a party cannot be held liable for both a primary

violation and as a control person, alternative theories of liability are permissible at the pleading

stage."  In re Am. Intern. Grp., Inc. 2008 Sec. Litig., 741 F.Supp.2d 511, 534-535 (S.D.N.Y.

2010).

        "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show:

(1) a primary violation by a controlled person; (2) control of the primary violator by the

defendant; and (3) 'that the controlling person was in some meaningful sense a culpable

participant' in the primary violation."  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.1998)

(quoting SEC v. First Jersey Sec., Inc.,101 F.3d 1450, 1472 (2d Cir.1996).

        The first element is satisfied because plaintiffs plausibly allege that FNMA made material

misstatements regarding its level of exposure to subprime and Alt-A loans.  Second, the Court

already determined that Mudd and Dallavecchia "did indeed have control over FNMA."  In re

Fannie Mae, 742 F.Supp.2d at 416.  Finally, having already determined that Mudd and

Dallavecchia acted with scienter, as detailed in the Court's opinion SEC v. Mudd, 2012 WL

3306961, at *11-13, plaintiffs have adequately alleged culpable participation.  See In re Take–

Two Interactive Sec. Litig., 551 F.Supp.2d 247, 308 (S.D.N.Y. 2008) ("[B]ecause the Court has

determined that [Plaintiff] adequately pleads [Defendant's] scienter ... [plaintiffs] sufficiently

alleges [Defendant's] culpable participation in that fraud as well.").  Accordingly, Mudd and

Dallavecchia's motions to dismiss the Class Action, Smith and CIS's Section 20(a) claims are DENIED.

**II. Motions To Dismiss CIS and Smith's Federal Claims**

   *A. Section 10(b) and Rule 10b-5 Claims*

       1. <u>Accounting "Shenanigans"</u>

CIS alleges that FNMA, Mudd, and Dallavecchia misstated FNMA's core capital financials by engaging in "accounting fraud" and "accounting shenanigans." (<u>See</u> CIS SAC ¶ 246.) The Class Action previously raised similar claims, based on similar facts, which the Court dismissed as insufficient to state a claim. <u>See</u> <u>In re Fannie Mae</u>, 742 F.Supp.2d at 408-10.

CIS argues that two new sources cure the previous inadequacies. First, the Federal Crisis Inquiry Commission ("FCIC") Report references a March 8, 2008 email from a White House economist, Jason Thomas, to a Treasury official, Robert Steel, stating: "A realistic assessment of Fannie's capital position would show the company is currently insolvent. Accounting fraud has resulted in several asset categories . . . being overstated, while guarantee obligations liability is understated. These accounting shenanigans add up to tens of billions of exaggerated net worth." (CIS SAC ¶¶ 140, 267.) Second, Morgan Stanley conducted a review of FNMA's financials and concluded that FNMA overvalued its deferred tax assets ("DTAs"). (CIS SAC ¶ 142.)

Despite CIS's arguments, neither Thomas's email, nor the Morgan Stanley report, remedies the prior deficiencies. Thomas's conclusory statements regarding FNMA's insolent capital position, accounting fraud, and accounting shenanigans do not plausibly explain why FNMA's core capital financials were incorrect. CIS has not shown that FNMA committed any GAAP violation, that the governing accounting rules were not sufficiently flexible to cover

FNMA's interpretation of them during this period, or that any federal regulator has since asked for a restatement.  See In re Fannie Mae, 742 F.Supp.2d at 408.[8]

Likewise Morgan Stanley's statements concerning FNMA's DTAs do not warrant the inference that FNMA committed fraud, by believing that it could earn sufficient income over a 20-year period to realize the DTAs before they expired.  Rather, Morgan Stanley's statements merely further a fraud-by-hindsight theory that was previously rejected by the Court.  See In re Fannie Mae, 742 F.Supp.2d at 409-10.[9]

CIS has failed to remedy the previously delineated inadequacies; its claims that defendants misstated FNMA's core capital base are dismissed.

> 2.   Representations Regarding Risk Management

> > i.   *Material Misstatements*

CIS, which bought stock in May 2008, and Smith, who purchased stock in connection with a December 6, 2007 offering, allege that FNMA, Mudd, and Dallavecchia made numerous material misrepresentations concerning FNMA's risk management controls throughout 2006, 2007, and 2008; and specifically, in connection with the Series S and T offerings.  The Court previously found the same alleged misstatements are sufficient to state a claim.  See In re Fannie

---

[8]  The Court previously found that the "OFHEO, Fannie's federal regulator prior to conservatorship, reported repeatedly that Fannie was adequately capitalized"; "the FHFA has since scrutinized Fannie's financials and has not asked for a restatement of any of its financials" for the relevant period; and that "without a sufficiently pleaded misstatement, there can be no finding of scienter."  In re Fannie Mae 2008 742 F.Supp.2d at 408.

[9]  Indeed, CIS's own allegations suggest that FNMA intended to hold its securities until the market recovered, and was optimistic with respect to its long-term performance. (See CIS SAC ¶ 117 (alleging that during a February 28, 2008 conference call, Mudd stated:  "2007 was a tough year.  2008 will be tough as well.  And 2009 we do not anticipate will be particularly rosy, so throughout this period, capital remains king and we want to remain long capital . . ."); CIS SAC ¶ 126 (stating FNMA was seeking to "maintain a strong, conservative balance sheet through the housing correction, pursue growth opportunities to enhance long-term shareholder value, and provide liquidity to the secondary market"); id. ¶ 120 (Mudd stated: "As the market recovers, we will be a prime beneficiary . . . when the housing market finally stabilizes, the company will 'feast' on the mortgages it is currently buying.").

Mae 2008 Sec. Litig, 742 F.Supp.2d at 405-06.[10]  FNMA, Mudd, and Dallavecchia argue that the

allegations are insufficient to state a claim for a number of reasons.  All of their arguments,

however, are without merit.[11]

Defendants argue that since Dallavecchia's October 28, 2006 and July 16, 2007 emails

discussing FNMA's serious problems with risk controls, see supra n. 8, pre-date the Series S and

T offering circulars that:  they cannot be used to show defendants' viewpoints at the relevant

time; they were not made "in connection with" the offerings; and they were too far removed

given the intervening market events to create liability here.  Dallavecchia's July 16, 2007 email,

however, references FNMA's risk control measures for 2008, and thus plausibly reflects

defendants' viewpoint throughout the relevant time.  (See CIS SAC ¶¶ 165-66; Smith SAC  ¶

54.)  Courts routinely find that misstatements in SEC filings, press releases, and conference calls

are made "in connection with" the purchase or sale of a security.  See, e.g., S.E.C. v. Solucorp

---

[10] Specifically, CIS and Smith allege that FNMA, Mudd, and Dallavecchia falsely represented that
FNMA's risk management controls were adequate.  For example, on a February 27, 2007 conference
call, Dallavecchia said that "from a control and risk underwriting standpoint, we want to continue
maintaining prudent underwriting standards."  (CIS Compl. ¶ 274; Smith SAC ¶ 134.)  On November 9,
2007, FNMA issued a press release stating: "During the last year, we vastly reduced our material
weakness in internal controls, [and] expanded our risk-management functions . . . . The Company is in
solid shape to support the market, and is in better shape to benefit when the market correction ends."
(CIS SAC ¶ 202.)  FNMA's 2007 10K states that "controls are in place to better manage our risks."
(CIS SAC ¶ 196.) On a February 27, 2008 conference call, Mudd stated: "On credit, we're taking
additional steps to protect the book by controlling our risks and losses."  (CIS SAC ¶¶ 197.)

Meanwhile, on October 28, 2006 Dallavecchia emailed Mudd stating:  "I have a seri[ous] problem with
the control process around subprime limits. . . . There is a pattern emerging of inadequate regard for the
control process."  (See CIS SAC ¶ 164; Smith SAC ¶ 52.)  On July 16, 2007 Dallavecchia forwarded an
email to Mudd stating:  "The company has one of the weakest control processes I [have] ever
witness[ed] in my career. . . This company really doesn't get it, we are not even current and we are
already back to the old days of scraping controls and people."  "I do not even think that with what I was
given for 2008 is adequate for the current risk, considering how far we already are from adequate
market practices.  I have been saying that we are not even close to having proper control process for
credit market and operational risk.  I got a 60 percent budget cut.  Do I look stupid?"   (See CIS SAC ¶¶
165-66; Smith SAC ¶ 54.)

[11] Dallavecchia's argument that he cannot be held liable for any of the alleged risk management
statements because he did not "make" these statements under Janus, is rejected for the reasons
discussed above.  See supra, s. I.B. at 11-13.

Indust., Ltd., 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003).  Finally, the intervening market

conditions did not improve FNMA's risk management controls, but rather made FNMA's ability

to control risk more crucial.  Since all of the emails, viewed together, plausibly suggest that

FNMA, Mudd, and Dallavecchia maintained a constant view that FNMA's internal risk

management controls were inadequate—a view that was not communicated to the public during

this time frame—their risk control statements are actionable.

FNMA argues that plaintiffs' are improperly relying on a fraud-by-hindsight theory of

liability.  "The incantation of fraud-by-hindsight will not defeat an allegation of

misrepresentations and omissions that were misleading and false at the time they were made."  In

re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F.Supp.2d 423, 487 (S.D.N.Y.

2011).  Since the above emails plausibly suggest that FNMA, Mudd, and Dallavecchia knew that

FNMA's risk management representations were false at the time the statements were made,

FNMA's fraud-by-hindsight argument fails.

Dallavecchia argues that his statements were literally true.  In analyzing whether the

statements in the SEC filing were false or misleading "the court must 'read [them] as a whole'

. . . [because the] 'central issue . . . is not whether the particular statements, taken separately,

were literally true, but whether defendants' representations, taken together and in context, would

have misl[ed] a reasonable investor about the nature of the' securities."  In re Lehman Bros. Sec.

& ERISA Litig., 09 MD 2017(LAK), 2011 U.S. Dist. LEXIS 82119, at *152 (S.D.N.Y. July 27,

2011).  Accordingly, even if Dallavecchia's statements were literally true (a proposition that may

be doubted), he can still be found liable for the overall misleading impression his statements

created.

FNMA and Mudd argue that FNMA disclosed sufficient information and provided sufficient warnings regarding its risk control measures to correct, clarify, or render immaterial the purported misstatements.  "To be 'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.' " In re Bear Stearns, 763 F.Supp.2d at 495 (quoting In re Immune Response Sec. Litig., 375 F.Supp.2d 983, 1033 (S.D.Cal. 2005)).[12]  FNMA's and Mudd's warnings to investors about future risks and losses do not foreclose their liability for allegedly failing to disclose FNMA's currently inadequate risk control measures.  In addition, there is insufficient evidence at this juncture to find that any warnings reduced the risk of deception to nil.

The Court determines that CIS and Smith have adequately alleged that FNMA, Mudd, and Dallavecchia made material misstatements concerning FNMA's risk management controls.

     *ii.*    *Scienter*

The Court has already determined that the above emails are sufficient to show that Mudd and Dallavecchia were reckless in making misstatements concerning FNMA's risk control measures.[13]  Specifically, the Court held that these emails:

> suggest that FNMA was conscious of its internal inability to manage the risks
> associated with subprime loans.  Proceeding headlong into an unfamiliar market

---

[12] To the extent Defendants are raising a "truth on the market" argument, under which "a misrepresentation [can be found to be] immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market," their argument fails at this juncture.  A truth on the market defense will preclude liability only when the corrective information is "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000) (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir.1989)).  Making such a showing is "intensely fact-specific." Id.  Thus, the truth-on-the-market defense "is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." Id. at 167-68.  At best, defendants' arguments create a question of fact which cannot be resolved at this juncture.

[13] Mudd and Dallavecchia argue that their purchase of preferred stock in November 2007 negates a finding of scienter.  Purchases, however, only address a 'motive and opportunity' theory of scienter, not a recklessness theory.  See In re Regeneron Pharms., Inc. Sec. Litig., 03 Civ. 3111(RWS), 2005 U.S. Dist. LEXIS 1350, at *66-71 (S.D.N.Y. Feb. 1, 2005).

and telling investors that risk controls are in place while working, according to
Dallavecchia's emails, without the internal ability to analyze the risks associated
with that market is certainly enough of 'an extreme departure from the standards
of ordinary care' to show an inference of scienter and therefore survive a motion
to dismiss.

In re Fannie Mae, 742 F.Supp.2d at 406-07.  Accordingly, "the inference of recklessness here is

greater than that of 'garden-variety fraud,' and Plaintiffs' allegation of recklessness is at least as

compelling as any other inference."  Id.  The same emails warrant the same inferences here.

"When the defendant is a corporate entity, the law imputes the state of mind of the

employees or agents who made the statement(s) to the corporation."  In re Vivendi Universal,

S.A. Sec. Litig., 765 F.Supp.2d 512, 543 (S.D.N.Y. 2011) (citing Teamsters Local 445 Freight

Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008)).  Accordingly,

Mudd and Dallavecchia's scienter can be attributed to FNMA.

       *iii.*     *Reliance*

Smith alleges that he actually relied on the false statements, as read and interpreted by his

investment advisor, including "the Individual Defendants' contemporaneous communications."

(Smith SAC ¶ 14).  This "alone is a sufficient allegation of actual reliance for purposes of

surviving a motion to dismiss."  Maverick Fund v. Comverse Tech., 10-CV-4436 (JG) (JO),

2011 U.S. Dist. LEXIS 74601, at *30-31 (E.D.N.Y. July 12, 2011) (finding allegation that

plaintiff "read and/or listened to and relied upon the defendants' false and misleading statements

before investing" was sufficient to show reliance).

CIS alleges generally that it relied on the false statements and total mix of information.

(CIS SAC ¶¶ 353, 355, 368, 368.)  Under the fraud-on-the-market presumption, plaintiffs can

assume "that all publicly available information is reflected in the stock price of any security that

is traded on an efficient market."  Maverick Fund, 2011 U.S. Dist. LEXIS 74601, at *34-35.

"[I]f the market price was inflated because of defendants' material misstatements, the

presumption allows anyone who purchased shares on an efficient market to claim that he or she

relied on the misstatements by relying on the integrity of the market to reflect all publicly

available information."  Id.

FNMA, Mudd, and Dallavecchia argue that CIS and Smith could not have relied on any

of the purported misstatements because they were not included in the offering circulars, which

contained the following disclaimer:

> You should rely on only the most up-to-date information . . . [W]e are not
> incorporating in this Offering Circular all of the information available on
> [FNMA's or the SEC's websites].  You should rely only on the information
> included or incorporated by reference or deemed to be incorporated by reference
> in this Offering Circular in deciding whether or not to invest in the Preferred
> Stock.

(Kramer Decl. Ex. 1 at 3).  The Series T offering expressly incorporated FNMA's 2007 10-K and

first quarter 2008 10-Q.  (CIS SAC ¶ 243.)  The Series S offering expressly incorporated

FNMA's 2006 10-K and its 2007 10-Qs for the first, second, and third quarters.

Even if the Court were to limit its analysis to those SEC filings expressly incorporated by

reference, it would still find purported misstatements.  (See Smith SAC ¶ 152 (misstatements

alleged in the 2006 10-K and 2007 10-Qs); CIS SAC ¶ 196 (misstatements alleged in the 2007

10K).)  Accordingly, the disclaimers of reliance do not bar Smith and CIS's claims.

Dallavecchia raises a truth-on-the-market defense, arguing that by the time Smith and

CIS purchased stock, the market wide problems—and specifically the value and characteristic of

FNMA's subprime holdings—were already well known, negating reliance under a fraud-on-the-

market theory.  This defense, however "is intensely fact-specific and is rarely an appropriate

basis for dismissing a § 10(b) complaint."  Ganino, 228 F.3d at 167; see also supra n. 9.

Moreover, even if the value and characteristics of FNMA's subprime holdings were well known,

this would not necessarily affect an investor's reliance on FNMA's risk management statements. Accordingly, Defendants' arguments are rejected.

iv.     *Loss Causation*

"[A]llegations that Defendants' misstatements regarding internal risk management and controls, which, in turn, resulted in government conservatorship, caused a stock price drop, which consequently caused their losses" is sufficient to allege loss causation at this stage, because "[t]he Court need not make a final determination as to what losses occurred and what actually caused them," it only needs to find that plaintiffs' allegations are plausible. In re Fannie Mae, 742 F.Supp.2d at 382 (quoting In re Bristol Myers, 586 F.Supp.2d at 166).

CIS and Smith have thus adequately alleged all elements to state Section 10(b) and Rule 10b-5 claims against FNMA, Mudd, and Dallavecchia for materially misstating the state of FNMA's risk management controls.

B.   *Section 20(a) Claims*[14]

The first element to a section 20(a) claim is satisfied here because CIS and Smith plausibly alleged that FNMA made material misstatements regarding its risk management controls.  The Court already found the second element is satisfied because "Mudd, as CEO, was not only FNMA's most senior officer, but he signed the 10-Ks and 10-Qs that contained many of FNMA's purported misstatements; Dallavecchia, as Executive Vice President and Chief Risk Officer, was responsible for FNMA's risk controls and for reviewing and approving the methodology and amount of FNMA's combined loss reserves, and also contributed to FNMA's misstatements."  In re Fannie Mae, 742 F.Supp.2d at 416.  Finally, the Court has already held that the scienter allegations, detailed above, are sufficient to show that Mudd and Dallavecchia

---

[14] For a recitation of the elements to a Section 20(a) claim, see supra, at 14.

are culpable participants in the primary violations.  See id.  Accordingly, Mudd and

Dallavecchia's motions to dismiss Smith and CIS's Section 20(a) claims are DENIED.

### III.   Defendants' Motions To Dismiss Plaintiffs' State Law Claims Under SLUSA

Defendants argue that CIS, Smith and Liberty's state law claims are preempted by the

Securities Litigation Uniform Standards Act of 1998 ("SLUSA").  "SLUSA provides that a state

law claim must be dismissed as completely preempted if: 1) the lawsuit is a 'covered class

action'; 2) the claim is based upon state law; 3) the claim concerns a 'covered security'; and 4)

the plaintiff alleges either a misrepresentation or omission of a material fact or a manipulative or

deceptive device or contrivance that is 'in connection with the purchase or sale of a covered

security.'"  In re Eaton Vance Mut. Funds Fee Litig., 380 F.Supp.2d 222, 240-241 (S.D.N.Y.

2005) (quoting 15 U.S.C. §§ 77p(b), 78bb(f)(1)).  "SLUSA does not actually pre-empt any state

cause of action. . . .[i]t simply denies plaintiffs the right to use the class-action device to

vindicate certain claims."  Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 87

(2006).

There is no dispute that the second, third, and fourth elements are satisfied here: CIS,

Smith, and Liberty raise state law claims; FNMA's securities were listed and traded on the New

York Stock Exchange during the relevant time; and the purported misrepresentations occurred in

connection with FNMA's securities offerings.  Only the first element—whether the lawsuits are

a "covered class action"—is disputed.

A "covered class action" includes a "group of lawsuits filed in or pending in the same

court and involving common questions of law or fact," in which (a) "damages are sought on

behalf of more than 50 persons" and (b) the lawsuits are "joined, consolidated, or otherwise

proceed as a single action for any purpose."  15 U.S.C. § 78bb(f)(5)(b).

With respect to the "joined, consolidated, or otherwise proceeding as a single action for any purpose" requirement, SLUSA is triggered where a group of actions are formally consolidated for *any* purpose (discovery, pre-trial, trial, etc.). See Gordon Partners v. Blumenthal, No. 02 Civ. 7377(LAK), 2007 WL 1438753, at *3 (S.D.N.Y. May 16, 2007). Alternatively, the actions "need not have been formally joined or consolidated with other actions" to trigger SLUSA, so long as they "proceed as a single action *for any purpose*." Amorosa v. Ernst & Young LLP, 672 F.Supp.2d 493, 517 (S.D.N.Y. 2009) aff'd 409 Fed. App'x 412, 417 (2d Cir. 2011); accord Krys v. Sugrue (In re Refco Inc. Sec. Litig.), 07 MDL 1902(JSR), 2012 U.S. Dist. LEXIS 65385, at *42 (S.D.N.Y. May 9, 2012) ("Although these actions have not been formally consolidated or joined, they are proceeding as a single action through coordinated pre-trial proceedings in this Multi-District Litigation.").

Under Second Circuit law, a court must conduct a claim-by-claim analysis of SLUSA preemption.  Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 47 (2d Cir.2005), rev'd as to other grounds, 547 U.S. 71 (2006).  "Any claim may trigger SLUSA preemption if the basis of that claim sounds in fraud or relies on alleged misstatements or omissions."  In re Merkin, 817 F. Supp. 2d 346, 359 (S.D.N.Y. 2011).

CIS and Smith's state law claims against FNMA, Mudd, and Dallavecchia are precluded under SLUSA.  CIS, Smith, and the Class Action constitute a group of lawsuits pending in the same court that raise almost identical questions of fact, in which damages are sought on more than 50 persons.  On April 16, 2009, the Honorable Gerald E. Lynch ordered that any "*action pertaining to FNMA . . . hereafter transferred* to this Court, including the actions transferred to this Court pursuant to the Judicial Panel of Multidistrict Litigation . . . brought under the federal securities laws or state laws relating to the issuance, purchase or sale of securities . . . *are*

23

*consolidated for pretrial purposes . . .*"  (See 08-cv-7831, Apr. 16, 2009 Order (emphasis

added)).  After this order, on June 19, 2009 and March 12, 2010, CIS's and Smith's actions,

respectively, were transferred to this Court through the JPML.  Judge Lynch's formal

consolidation of these cases for pre-trial purposes triggers SLUSA.  See Gordon Partners, 2007

WL 1438753, at *3; In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, and "ERISA" Litig., 503

F.Supp.2d 25, 32 (D.D.C. 2007) (finding "plaintiffs' state law claims are unquestionably part of

a 'covered class action' under SLUSA because the . . . plaintiffs' claims have been consolidated

with a larger MDL proceeding that includes class action securities claims under federal law.")

Alternatively, ever since plaintiffs amended their pleadings to incorporate allegations raised in

the SEC action, all of the securities actions have proceeded on the same motion schedule, which

is also sufficient to trigger SLUSA.[15]  Amorosa, 672 F.Supp.2d at 517; Krys, 2012 U.S. Dist.

LEXIS 65385, at *42.  CIS, Smith, and the Class Action thus collectively represent a "covered

class action" under SLUSA.  Each of CIS and Smith's state law claims against FNMA, Mudd

and Dallavecchia sound in fraud.  See e.g., Newman v. Family Mgmt. Corp., 748 F.Supp.2d 299,

311–13 (S.D.N.Y.2010) (dismissing common law fraud, negligent misrepresentation, breach of

fiduciary duty, gross negligence and mismanagement, unjust enrichment, malpractice and

professional negligence, and aiding and abetting breach of fiduciary duty claims as barred by

SLUSA).  Accordingly, CIS and Smith's state law claims against FNMA, Mudd, and

Dallavecchia are barred by SLUSA and thus DISMISSED.

　　　　CIS, Smith, and Liberty also raise claims against defendants who are not defendants in

the Class Action:  CIS raises claims against Levin and Swad; and CIS, Smith, and Liberty raise

claims against certain underwriters.  Viewed on a claim-by-claim basis, Dabit, 395 F.3d at 47,

---

[15] While Smith argues that the actions were merely "coordinated," actions that are "coordinated with the consolidated class action" can be treated as part of the "covered class action" for SLUSA purposes.  In re Merkin, 817 F.Supp.2d at 349 n.1, 360.

the Court finds that there are not more than 50 person seeking damages against Levin, Swad and the underwriters.  Accordingly, SLUSA does not bar plaintiffs' claims against these defendants.

### IV.  CIS's State Law Claims Against Levin and Swad

CIS's original complaint, filed in Texas state court, raised claims against FNMA, Mudd, Dallavecchia, Levin, and Swad under the Exchange Act.  CIS subsequently voluntarily dismissed all of its federal claims against Levin and Swad, prompting their challenge to this Court's personal jurisdiction.

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit."  Penguin Group (USA) Inc. v. American Buddha, 609 F.3d 30, 34 -35 (2d Cir. 2010).  "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists."  Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006).  Such a showing entails making "legally sufficient allegations of jurisdiction," including "an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant."  In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) (per curiam) (internal quotation marks and ellipsis omitted).

CIS argues that the Court has personal jurisdiction over Levin and Swad because:  (1) the federal claims provide "pendent personal jurisdiction" over their state law claims; and (2) Levin and Swad's misstatements and omissions on nationwide conference calls are sufficient, under Texas law, to confer personal jurisdiction over them.

#### A.  Pendent Personal Jurisdiction

"[P]endent personal jurisdiction is not explicitly authorized by statute and remains, at least in the view of most commentators, 'a federal common law doctrine.'"  U.S. v. Botefuhr, 309 F.3d 1263, 1272-1273 (10th Cir. 2002) (quoting 4A Charles Alan Wright & Arthur A. Miller,

<u>Federal Practice & Procedure</u> § 1069.7, at 227 (3d ed.2002).)  "[U]nder the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative fact', <u>see United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available."  <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1056 (2d Cir. 1993).  In other words, "once a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction. A defendant who already is before the court to defend a federal claim is unlikely to be severely inconvenienced by being forced to defend a state claim whose issues are nearly identical or substantially overlap the federal claim."  <u>Rolls-Royce Corp. v. Heros, Inc.</u>, 576 F.Supp.2d 765, 783 (N.D.Tex. 2008).

Having voluntarily dismissed all federal claims against Levin and Swad, there are no potentially related federal claims pending against them upon which CIS can 'piggyback' its state law claims.  Accordingly, the Court rejects this basis for personal jurisdiction.

  B.  *Texas's Long Arm Jurisdiction*

Since this is a multi-district litigation proceeding, "the forum state . . . is the district court where the action was originally filed, and therefore that state's law must be applied."  <u>In re Ski Train Fire In Kaprun, Austria on Nov. 11, 2000</u>, 257 F.Supp.2d 717, 723 (S.D.N.Y. 2003).  Texas law thus governs the Court's personal jurisdiction analysis.

Texas long arm jurisdiction extends as far as the constitutional requirements of due process permit.  <u>BMC Software Belgium, N.V. v. Marchand</u>, 83 S.W.3d 789, 795 (Tex. 2002).

Accordingly, "[p]ersonal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice." Id.  Minimum contacts require "purposeful availament"—"some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Michiana Easy Livin' Country, Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005).  Under a minimum contacts analysis, a defendant's contacts with a forum state can give rise to either general or specific jurisdiction. CSR Ltd. v. Link, 925 S.W.2d 591, 595 (Tex. 1996).

CIS alleges that Levin made misstatements on a February 27, 2008 conference call with investors (CIS SAC ¶ 334); and Swad made misstatements on two conference calls with investors, occurring on November 9, 2007 and February 27, 2008 (CIS SAC ¶ 343).  Their occasional participation on nationwide conference calls, however, is insufficient to confer specific jurisdiction under Texas law.  See Guillory v. JK Harris & Co., 2007 WL 7239890, at *3 (S.D.Tex. Aug. 24, 2007).  Specific jurisdiction does not exist where "[t]he sole connection to Texas was that it was the state in which [plaintiff] received the communications," Buffet Partners, L.P. v. Sheffield Square, L.L.C., 256 S.W.3d 920, 924 (Tex.App. Dallas 2008), because "personal jurisdiction cannot be based on the mere fortuity that a plaintiff resides in the forum state." Guillory, 2007 WL 7239890, at *3.

 "To make a prima facie showing of general jurisdiction, a plaintiff must produce evidence affirmatively demonstrating that the defendant's contacts with the forum state are substantial, continuous, and systematic." Guillory, 2007 WL 7239890, at *4.  Levin and Swad's participation on two "national . . . telephone conferences alone do not constitute a showing of

extensive contacts." <u>Id.</u>  Since CIS has not established any other connection between the State of Texas and Levin and Swad that would warrant the exercise of personal jurisdiction, the Court must dismiss all claims against these defendants.

**V.      Underwriters' Motions To Dismiss**

Goldman, the CIS Underwriters, and the Smith Underwriters moved to dismiss all claims raised against them.

*A.  Goldman's Motion to Dismiss*

1.  <u>Federal Claims</u>

Liberty brings Section 10(b) and Rule 10b-5 claims against Goldman for failing to disclose, in the Series S and P preferred stock offerings, that FNMA had not met its core capital requirements, in part due to its exposure to risky subprime and Alt-A mortgage loans.  Liberty claims that Goldman violated subparts (a), (b), and (c) of Rule 10b-5 by (1) making an untrue statement of material fact, (2) omitting to state material facts, and (3) employing a scheme to defraud.

*i.  Making a Misstatement*

As discussed above, in <u>Janus</u>, the Supreme Court held that for purpose of a private action under Section 10(b):

> the maker of a statement is the person or entity with the ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.

<u>Janus</u>, 131 S.Ct. at 2305.  The Supreme Court rejected the argument that the person who "suggests what to say" or drafts the language can be liable as the "maker" of the statement.  <u>Id.</u>

While the Supreme Court's analysis did not pertain explicitly to underwriters, its holding is instructive here.

In SEC v. Tambone, 597 F.3d 436 (1st Cir. 2010) (en banc), the First Circuit applied similar logic and held that two executives of a mutual fund underwriter, Columbia Funds Distributor, Inc., were not subject to primary liability under Rule 10b-5 for "making" misstatements contained in a prospectus issued by the mutual funds' sponsor, Columbia Management Advisors, Inc., the underwriter's sister company.  Id. 438-40.  The First Circuit held that "using" a statement is not the same as "making" a statement for purposes of a Rule 10b-5 claim, and thus the underwriters were not liable for "us[ing] and disseminati[ng] prospectuses created by others" in selling the mutual funds.  Id. 442-47.  The Circuit further held that the underwriters were not liable, under Rule 10b-5, for "directing the offering and sale of securities on behalf of an underwriter, thus making an implied statement that he has a reasonable basis to believe that the key representations in the relevant prospectus are truthful and complete."  Id. at 442.  To find an underwriter makes an implied representation would "impose primary liability under Rule 10b-5 on [ ] securities professionals whenever they fail to disclose material information not included in a prospectus. . . . [which] would be tantamount to imposing a free-standing and unconditional duty to disclose.  The imposition of such a duty flies in the teeth of Supreme Court precedent."  Id. at 447-48.

The Second Circuit's opinion in Pac. Invest. Mgmt. Co. v. Mayer Brown LLP, 603 F.3d 144, 148 (2d Cir. 2010) is likewise consistent with Janus, and instructive here.  In this case the Second Circuit held that an outside law firm and lawyer "can be held liable in a private damages action . . . only for false statements attributed to the secondary-actor defendant at the time of the dissemination.  Absent attribution, plaintiffs cannot show that they relied on defendants' own

false statements, and participation in the creation of those statements amounts, at most, to aiding and abetting securities fraud."  Id.  The Circuit held that the "mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient."  Id. at 155.

Liberty argues that since Goldman was the lead underwriter for the offerings, it made the purported misstatements that FNMA exceeded its core capital requirements.  Liberty's arguments, however, fail for a number of reasons.

First, Liberty has not alleged an actionable misstatement (made by anyone) in the offering materials.  Liberty claims that Goldman falsely stated that FNMA exceeded its core capital requirements, because FNMA should have taken a larger write down against its subprime and Alt-A exposure, which were overvalued assets at the time of the offerings.  (Liberty SAC ¶¶ 52, 56-58.)  Liberty claims that "Goldman knew that a relatively small impairment of these mortgages and mortgage-backed securities could wipe out the capital of Fannie Mae."  (Liberty SAC ¶ 54.)  The Court, however, already considered and rejected allegations that: FNMA committed fraud by failing to take write-downs at an earlier point, In re Fannie Mae, 742 F.Supp.2d at 409;[16] "Fannie should have, based upon 'expectations about the future,' increased its loan loss reserves in early 2007, which would have, in turn, reduced Fannie's Core Capital," id. at 411; and that FNMA committed fraud by falsely representing that it was adequately capitalized during the relevant period, id. at 408.[17]  Given the Court's holding that these

---

[16] The Court held: "the Court will not intervene in a business and accounting judgment simply because Plaintiffs allege that the write-down in the third quarter of 2008 should have occurred earlier. The fact that a financial item is accounted for differently, or in a later period, does not support an inference that a previously filed financial statement was fraudulent. This is an allegation of fraud by hindsight, which is insufficient to withstand a motion to dismiss. See Slayton v. Am. Express Co., 604 F.3d 758, 776 (2d Cir.2010)." In re Fannie Mae, 742 F.Supp.2d at 409 (internal citations omitted)

[17] The Court held that: "OFHEO, FNMA's federal regulator prior to conservatorship, reported repeatedly that FNMA was adequately capitalized. Further, the FHFA has since scrutinized FNMA's financials and

allegations are insufficient to show that FNMA made a misstatement, they are insufficient to

show that Goldman made a misstatement by conveying these statements to Liberty.  While

Liberty attempts to bolster its argument by alleging that FNMA had far greater exposure to risky

subprime and Alt-A loans then publicly disclosed, Liberty does not allege that the Series S and P

offering materials contained any statements regarding FNMA's subprime and Alt-A exposure.

While the offering materials referenced certain SEC filings, statements regarding FNMA's

subprime and Alt-A exposure in such SEC filings were clearly made by FNMA, not Goldman.

Second, even if there were a misstatement in the offering materials, Liberty has not

plausibly alleged facts to show that Goldman is the "entity with the ultimate authority over the

statement[s], including its content and whether and how to communicate it." Janus, 131 S.Ct. at

2305.  Any role Goldman served in the drafting process, or in preparing and publishing the

offering materials is insufficient to impose primary liability under Janus.  Id.  Moreover, it is

absolutely clear that FNMA, not Goldman, had ultimate authority over statements made in its

SEC filings incorporated by reference in the offering materials.

Third, the alleged misstatements in the Series S Offering Circular and Series P Private

Placement Memorandum concerning FNMA's core capital financials (Liberty SAC ¶¶ 51-55, 56,

59, 61); and the alleged misstatements in FNMA's quarterly and annual SEC filings, which were

incorporated by reference, were not attributed to Goldman.  (See, e.g., Liberty SAC  ¶¶ 57, 60,

63.)  "[A]ttribution within a statement or implicit from surrounding circumstances is strong

evidence that a statement was made by—and only by—the party to whom it is attributed."

Janus, 131 S.Ct. at 2305.  All of the purported misrepresentations in the offering documents are

couched in terms of "we" and "our," which clearly refer to FNMA, not Goldman.  "Absent

---

has not asked for a restatement of any of its financials for the Class Period."  In re Fannie Mae, 742
F.Supp.2d at 408 (internal citations omitted).

attribution, plaintiffs cannot show that they relied on defendants' *own* false statements, and participation in the creation of those statements amounts, at most, to aiding and abetting securities fraud." Pac. Invest. Mgmt, 603 F.3d at 148.

Finally, while Liberty cites cases where courts have allowed claims against underwriters to proceed—often based on the underwriters' participating in the drafting and/or decision making process—all of these cases pre-date, and likely do not survive Janus, Tambone, and Pacific Investment Management.[18] Moreover, in almost all of the cases Liberty cites, the purported misstatements were made in the offering materials, not in SEC filings incorporated by reference.

Accordingly, Liberty has not sufficiently alleged that Goldman made a material misstatement, under Rule 10b-5(b), in connection with the Series S and P Offerings.

### ii.   *Omitting Material Information*

Liberty also alleges that Goldman is liable for omitting material information about FNMA's subprime exposure and core capital financials in the Series S and P offering materials. In support of its argument, Liberty cites cases holding that "[a]n underwriter must investigate and disclose material facts that are known or 'reasonably ascertainable.'" Dolphin and Bradbury, Inc. v. S.E.C., 512 F.3d 634, 641 (D.C. Cir. 2008).

Since Liberty's allegations are insufficient to show that FNMA's core capital financials were misstated, Goldman cannot be held liable for omitting information needed to make such statements accurate and complete.

---

[18] See, e.g., Washington Nat'l Ins. Co. v. Morgan Stanley & Co., 90 Civ. 3342 (TPG), 1999 U.S. Dist. LEXIS 10042 (S.D.N.Y. July 2, 1999) (denying underwriter defendants motion to dismiss claims premised upon misstatements contained in the offering materials); Flecker v. Hollywood Entm't Corp., 1997 U.S. Dist. LEXIS 5329 (D. Or. Feb. 12, 1997) (denying underwriters motion for summary judgment because their "superior access to non-public information and participation in both drafting and decision-making is sufficient to establish a triable primary liability claim under § 10(b)"). The '33 Act cases cited by Liberty are inapposite, as the '33 Act contains a distinct regulatory scheme whereby underwriters can be found strictly liable under §§ 11 and 12(a)(2).

Additionally, courts have rejected similar attempts to avoid <u>Janus</u>, by arguing that a defendant had a duty to correct another company's misrepresentations.  <u>See</u> <u>Fulton County Emples. Ret. Sys. v. MGIC Inv. Corp.</u>, 675 F.3d 1047, 1052 (7th Cir. 2012) (rejecting plaintiffs' attempt to avoid <u>Janus</u> by arguing that defendant failed to correct another's misstatement, because "no statute or rule creates such a duty—if there were one, <u>Janus Capital</u> itself would have come out the other way," and finding that defendant "is no more liable than was Janus Capital Management for keeping silent when someone else spoke.")  As the First Circuit in <u>Tambone</u> held, imposing "primary liability under Rule 10b-5 on [underwriters] whenever they fail to disclose material information not included in a prospectus . . . would be tantamount to imposing a free-standing and unconditional duty to disclose . . ."  and "the imposition of such a duty flies in the teeth of Supreme Court precedent."  597 F.3d at 441.  Since Goldman had no freestanding duty to disclose, it cannot be held liable for materially omitting FNMA's quantitative subprime and Alt-A exposure.  Accordingly, Liberty's material omission claim, under Rule 10b-5(b), fails.

<em>iii.   Scheme to Defraud</em>

"In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure."  <u>Wilson v. Merrill Lynch & Co.</u>, 671 F.3d 120, 130 (2d Cir. Nov. 14, 2011).  As stated previously, Liberty has not sufficiently alleged that Goldman made any misrepresentation or omission concerning FNMA's core capital financials; and has not alleged that the offering materials contained any statement regarding FNMA's subprime and Alt-A exposure.

In addition, Liberty fails to set forth a plausible theory of market manipulation.  In support of their claim, Liberty cites <u>Dodona I, LLC v. Goldman, Sachs & Co.</u>, 10 Civ. 7497

33

(VM), 2012 U.S. Dist. Lexis 40968, at *50 (S.D.N.Y. Mar. 21, 2012), in which Judge Marrero found plaintiffs' adequately alleged that Goldman "inaccurately represented the risk, of which they were actually aware, associated with investing in the [synthetic] CDOs."  The Court further found that Goldman performed manipulative acts, but dismissed plaintiffs' claim for market manipulation for failure to prove reliance, noting that "Defendants' alleged misconduct is more appropriately suited for a claim of misrepresentations and omissions than market manipulation." Id. at 63-66.  Dodona I is similar to this Court's opinion in Richman v. Goldman Sachs Group, Inc., No. 10 Civ. 3461, --- F. Supp. 2d. ---, 2012 WL 2362539 (S.D.N.Y. June 21, 2012), holding that Goldman materially mislead its shareholders by stating that it had measures in place to address conflicts of interest and valued its reputation and integrity, while committing outright fraud.  The facts alleged in those cases are vastly different from the facts alleged here.  Here: there are no allegations that Goldman selected the assets in the offering; there are no allegations that Goldman shorted FNMA stock; and there are no allegations that the purported misstatements concerned Goldman's own conduct.  Rather, Liberty's argument here is that by failing to disclose that FNMA's subprime and Alt-A loans were over-valued, Goldman perpetuated its own scheme to sell off its own securities.  This theory of market manipulation is too attenuated to be plausible, particularly given that there were no misstatement concerning FNMA's subprime or Alt-A exposure in the offering materials, and Goldman had no independent duty to make such disclosures.  Accordingly, Liberty's Rule 10b-5(a) and (c) claims fail.

2.  Goldman's Motion to Dismiss Liberty's State Law Claims

Liberty also claims against Goldman under Massachusetts' and Washington's securities fraud statutes and deceptive trade practice statutes, and for common law fraud and negligent misrepresentation.

34

To state a claim under Massachusetts' securities fraud statute, Massachusetts common law fraud, or Washington's securities fraud statute, Liberty has to show Goldman "made" a materially false representation.  See Wash.Rev. Code § 21.20.010; Stolzoff v. Waste Sys. Intern., Inc., 58 Mass.App.Ct. 747, 759 (Mass.App.Ct. 2003); Goel v. Jain, 259 F.Supp.2d 1128, 1139 (W.D.Wash. 2003).[19]  To state a claim for common law negligent misrepresentation under Massachusetts and Washington law, and common law fraud under Washington law, Liberty must show that Goldman "supplied false information" for the guidance of others, and that Liberty justifiably relied upon the false information to their detriment.  See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 60 (Mass. 2004); Harkey v. Kingen, 2008 WL 5377847, at *7 (Wash.App. Div. 1 2008); Haberman v. Washington Public Power Supply Sys., 109 Wash.2d 107, 167 (Wash.1987).  To state a claim for violations of Massachusetts' and Washington's deceptive trade practices, Liberty must show that Goldman supplied or presented the misrepresentations.  See Marram, 442 Mass. at 60; Edmonds v. John L. Scott Real Estate, Inc., 87 Wash. App. 834, 844-49 (Wash. App. Div. 1 1997).

Liberty failed to adequately allege that the Series S Offering Circular and Series P Private Placement Memorandum contained any false information, as discussed above.  While Liberty notes that certain SEC filings were referred to in the offering materials, Liberty does not allege that Goldman supplied such filings or otherwise represented such facts to Liberty; nor does Liberty explicitly allege that it relied on statements contained in FNMA's SEC filings in purchasing the securities.  Since Liberty failed to allege an actionable misstatement contained in the offering circular, it cannot show that Goldman made or supplied false statements to Liberty.  Accordingly all of Liberty's state law claims fail.

---

[19] There is no case law discussing Janus's impact on securities claims raised under Massachusetts or Washington State laws.  Accordingly, the Court does not rely on Janus.

B.  Smith Underwriters' Motion to Dismiss

The Smith Underwriters move to dismiss Smith's California common law negligent misrepresentation claim—the sole claim against them.  "To state a claim for negligent misrepresentation, plaintiff must allege that the defendant: (1) made a misrepresentation of a material fact; (2) without reasonable grounds for believing it to be true; (3) with intent to induce another's reliance and that plaintiff (4) was ignorant of the truth, (5) justifiably relied on the misrepresentation and (6) suffered damages."  Helm v. Alderwoods Grp., Inc., 696 F.Supp.2d 1057, 1079 (N.D.Cal. 2009)(emphasis added).  A negligent misrepresentation claim must satisfy Rule 9(b)'s particularity requirements.  See Neilson v. Union Bank of California, N.A., 290 F.Supp.2d 1101, 1141 (C.D.Cal. 2003).

While Smith claims that the offering circular incorporated by reference misstatements made in SEC filings and in "other false and misleading statements" (Smith SAC ¶ 174), Smith does not specify even one misstatement contained in the offering circular.[20]  Since Smith has not alleged that the offering circular contained any misstatements, he has not shown that the Smith Underwriters "made a misrepresentation."  Accordingly, his negligent misrepresentation claims against the Smith Underwriters are dismissed.

C.  CIS Underwriters' Motion to Dismiss

The CIS Underwriters move to dismiss CIS's primary statutory fraud claim, under Section 27.01, CIS's negligent misrepresentation claims, and CIS's primary Texas Security Act violation claim against Defendant Wachovia.

---

[20]  There is no case law addressing whether Janus should apply to California state law claims.  The Court declines to apply Janus here.

### 1. Section 27.01 violations

To bring a statutory fraud claim under Section 27.01, CIS must allege that the defendant "made" a material representation.  See Brush v. Reata Oil and Gas Corp., 984 S.W.2d 720, 726, 984 S.W.2d 720 (Tex.App. 1998).  While CIS alleges that the offering circular materially misstated FNMA's core capital financials, this allegation fails for the reasons discussed above. See supra s. II.A.2 at 15.  Other than FNMA's core capital financials, CIS does not identify any misstatement contained in the offering materials.  Since CIS has not plausibly alleged an actionable misstatement in the offering materials, its Section 27.01 primary liability claim fails.

In the alternative, CIS alleges that the CIS Underwriters are liable under Section 27.01(d).  "Section 27.01(d) addresses secondary liability."  See Haralson v. E.F. Hutton Grp., Inc., 919 F.2d 1014, 1033 (5th Cir. 1990), abrogated on other grounds, Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir.2001).  Since CIS has not stated a claim for primary liability, its Section 27.01(d) claim for aider and abettor liability also fails.  See In re Enron Corp. Sec., Derivative & Erisa Litig., 762 F.Supp.2d 942, 968-969, 1021 (S.D.Tex. 2010).

### 2. TSA violations

CIS seeks to hold Wachovia liable as a primary violator of the TSA and, in addition or in the alternative, to hold both CIS Underwriters liable for aiding and abetting a violation of the TSA.  The TSA imposes primary liability "when a person 'offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.'"  Sterling Trust Co. v. Adderley, 168 S.W.3d 835, 839 (Tex. 2005) (quoting Tex. Rev. Civ. Stat. Ann. art. 581–33A(2).)  Courts will not read 581–33 broadly to "hold[] all sellers 'in the chain' liable and not require that Defendants make the false or misleading statements."

Billitteri v. Sec. Am., Inc., No. 09–CV–1568–F, 2010 WL 6785484, at *7 (N.D.Tex. July 26,
2010); R2 Inv. v. Phillips, No. Civ.A. 302CV0323N, 2003 WL 22862738, at *7 (N.D.Tex. Mar.
26, 2003) (holding that Plaintiffs "Texas Security Act claim fails because the pleadings do not
allege that [defendant] made any untrue statements or omitted any material facts").

      As discussed above, CIS has not sufficiently alleged that the offering materials contained
any misstatement.  Accordingly, CIS's primary TSA claim against Wachovia fails.  See
Billitteri, 2010 WL 6785484, at *7-8; R2 Inv., No2003 WL 22862738, at *7.  Since CIS has not
stated a primary violation against Wachovia or FNMA, its aiding and abetting claims against the
CIS Underwriters also fails.  See In re WorldCom, 2006 WL 1047130, at *5.

      *3.  Negligent Misrepresentation*

      Texas courts limit negligent misrepresentation claims "to the person or one of a limited
group of persons for whose benefit and guidance the defendant intends to supply the information
or knows that the recipient intends to supply it." In re Enron Corp., 762 F.Supp.2d at 980.
Where a plaintiff does not "allege facts showing that Plaintiffs were members of a limited group
known to, and for whose benefit and guidance these Defendants supplied information and which
they intended or knew Plaintiffs would rely upon, distinct from the much larger group or class of
persons who might reasonably be expected sooner or later to have access to it and foreseeably
take action in reliance upon it," then the plaintiff has not stated a negligent misrepresentation
claim. Id. at 1022.

      CIS premises its negligent misrepresentation claims on its allegation that the CIS
Underwriters "made" false and misleading statements.  (CIS SAC. ¶¶ 416, 418.)  As discussed
above, CIS has not sufficiently alleged that the offering materials contained misstatements, or
that any such misstatement was made by the CIS Underwriters.  Moreover, CIS has not alleged

facts to show that the CIS Underwriters intended to supply the purported misstatements to CIS

alone or to a limited group that included CIS, rather than a large group or class of person who

would be expected, sooner or later, to have access to FNMA's offering materials.  Accordingly,

CIS's negligent misrepresentation claims fail.

## **CONCLUSION**

To summarize the Court's holdings:

- Defendants' motions to strike are DENIED;

- FNMA, Mudd, and Dallavecchia's motions to dismiss the Class Action's, Smith's, and CIS's Section 10(b), Rule 10b-5 and Section 20(a) claims premised on FNMA's subprime and Alt-A exposure disclosures are DENIED;

- FNMA, Mudd, and Dallavecchia's motions to dismiss CIS's Section 10(b), Rule 10b-5 and Section 20(a) claims premised on FNMA's core capital financials are GRANTED;

- FNMA, Mudd, and Dallavecchia's motions to dismiss Smith's and CIS's Section 10(b), Rule 10b-5 and Section 20(a) claims premised on FNMA's risk management disclosures are DENIED;

- FNMA, Mudd, and Dallavecchia's motions to dismiss all state law claims as against them under SLUSA are GRANTED;

- Levin and Swad's motions to dismiss  for lack of personal jurisdiction are GRANTED;

- Goldman's motion to dismiss Liberty's complaint in its entirety is GRANTED;

- The Smith Underwriters' motion to dismiss Smith's negligent misrepresentation claims is GRANTED; and

- The CIS Underwriters' motion to dismiss CIS's state law claims against them is GRANTED.

The Class Action, Smith and CIS's federal securities law claims against FNMA, Mudd,

and Dallavecchia regarding FNMA's subprime and Alt-A exposure disclosures and risk

management controls can proceed.

The Clerk of Court is directed to terminate the following motions:  08 Civ. 7831 Dkt. Nos. 353, 355, 357, 359, 362, 365, 368, 370, 372, 377, 378, 380, 382; 09 Civ. 6102 Dkt. Nos 83, 85, 88, 90, 93, 97, 98; 10 Civ. 2781 Dkt. Nos. 57, 60, 61, 67, 68; and 10 Civ. 9184 Dkt. No. 17. As all of Liberty's claims have been dismissed, the Clerk of Court is directed to close the 10 Civ. 9184 case.  The Clerk of Court is further directed to dismiss the following defendants from the 09 Civ. 6102 action:  Levin, Swad, Wachovia Capital Markets, LLC and Citigroup Global Markets, Inc.  The Clerk of Court is directed to dismiss the following defendants from the 10 Civ. 2781 action: Banc of America Securities LLC, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman, JPMorgan Securities LLC (f/k/a JPMorgan Securities, Inc.), JPMorgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. LLC (f/k/a Morgan Stanley & Co. Incorporated), and UBS Securities LLC.

Dated: New York, New York
       August 30, 2012

SO ORDERED

PAUL A. CROTTY
United States District Judge